# Exhibit 1

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

CIVIL ACTION NO.: 3:16-CV-05808-BRM-LHG

-----------------------------*
JEFFREY BOWIE,                          DEPOSITION OF:

   Plaintiff,                           JEFFERY BOWIE

   vs.

COSTCO WHOLESALE CORPORATION,
BRUCE DZENEORF; and JOHN AND
JANE DOES 1-10 (fictitious
names)

   Defendants.
-----------------------------*

   T R A N S C R I P T of the stenographic notes
of the proceedings in the above-entitled matter, as
taken by and before RENÉE A. LEWIS, a Certified
Court Reporter of the State of New Jersey, License
Number 30XI00108800, held at the offices of DeNOIA,
TAMBASCO & GERMANN, LLC, 501 Main Street, Toms
River, New Jersey, on Monday, June 18, 2018,
commencing at 10:22 a.m.

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

2

1   A P P E A R A N C E S :

2

3   DeNOIA, TAMBASCO & GERMANN, LLC
    BY:   JAMES N. CITTA, ESQ.
    Judge, Superior Court (Retired)
4   501 Main Street
    Toms River, New Jersey 08753
5   (732) 341-1030
    citta@denoiatambasco.com
6   Attorneys for the Plaintiff

7

    SEYFARTH SHAW, LLP
8   BY:   PAUL GALLIGAN, ESQ.
    620 Eighth Avenue
9   New York, New York 10018
    (212) 218-5500
10  pgalligan@seyfarth.com
    Attorneys for the Defendant
11  COSTCO WHOLESALE CORPORATION
    and BRUCE DEZENDORF

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

12

1    education?

2         A.    High school graduate.  Some college.

3         Q.    When you say "some college," can you

4    be more specific?

5         A.    Um, approximately ten credits short of

6    my associates.

7         Q.    Which college?

8         A.    Middlesex Community College.

9         Q.    What was your first job out of high

10   school or college?

11        A.    While I will was in college, I don't

12   remember.

13        Q.    Okay.  Let me skip that and go to when

14   you were hired by Costco.  Approximately when were

15   you hired by Costco?

16        A.    1994.

17        Q.    How did you get that job?

18        A.    I walked in and applied.

19        Q.    Which warehouse did you work in first?

20        A.    The Edison depot.

21        Q.    So when you say "depot," that wasn't a

22   store?

23        A.    No, sir.

24        Q.    What was the business at the depot?

25        A.    We loaded trucks.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

13

1       Q.      And what was your first job for

2   Costco?

3       A.      Loader.

4       Q.      How long did you work at the Edison

5   depot?

6       A.      Approximately two years.

7       Q.      Were you a loader for the whole two

8   years you were there?

9       A.      I did transfer to another department

10  within the depot called PCI where I did shipping

11  and receiving.

12      Q.      What does PCI stand for, if you

13  remember?

14      A.      Price Costco Industries.

15              COURT REPORTER:  Price?

16              THE WITNESS:  Price Costco.

17      Q.      And the "i" is Industries?

18      A.      Yes.

19      Q.      So after two years where did you go

20  then?

21      A.      To PCI.

22      Q.      Oh, I see.

23      A.      It's a building within.

24      Q.      There's another building at Edison?

25      A.      Inside the depot.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

14

1  Q.    All right.  And how long did you work

2  in the PCI building?

3  A.    Approximately two years.

4  Q.    So that's four years in total in that

5  area?

6  A.    Approximately.

7  Q.    And where did you go from there?

8  A.    I transferred into a store in Livonia,

9  Michigan.

10  Q.    Why did you do that?

11  A.    To get promoted.

12  Q.    What was the promotion to?

13  A.    Foods manager.

14  Q.    And how long did you work in the

15  Livonia store?

16  A.    Approximately two years.

17  Q.    So that brings us up to about -- 2000?

18  A.    Yes.

19  Q.    Right, okay.  So where did you go

20  then?

21  A.    Waterbury, Connecticut.

22  Q.    That's another store?

23  A.    Yes.

24  Q.    And how long did you work in

25  Waterbury?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

15

1        A.      Approximately four years.

2        Q.      Why did you move from Livonia to

3   Waterbury?

4        A.      At the time my current wife wanted to

5   come back to the East Coast.

6        Q.      What was her name?

7        A.      Pamela.

8        Q.      What positions did you hold at

9   Waterbury?

10        A.      Waterbury I was the merchandise

11   manager and assistant general manager.

12        Q.      The assistant general manager, that

13   would have been another promotion?  Is that

14   correct?

15        A.      Yes.

16        Q.      Approximately when were you promoted

17   from merch manager to AGM?

18        A.      Approximately 2002.

19        Q.      And who was the general manager at

20   Waterbury?

21        A.      Terry Jobb.

22        Q.      J-o-b?

23        A.      J-o-b-b.

24        Q.      B-b, two b's.  J-o-b-b.

25        A.      I believe so.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

16

1      Q.   And where did you go from Waterbury?

2      A.   Waterbury, I went to Clifton.

3      Q.   Clifton, New Jersey?

4      A.   Yes.

5      Q.   Approximately when was that?

6      A.   2004, 2005.  2004.  In that area.

7      Q.   So why did you transfer from Waterbury

8  to Clifton?

9      A.   To an attempt to bring my children

10  back to New Jersey so my ex-wife would drop her

11  custody suit.

12      Q.   And this is Pamela being now your

13  ex-wife?

14      A.   Yes.

15      Q.   What was your position at Clifton?

16      A.   Assistant general manager.

17      Q.   So it was a lateral transfer?

18      A.   Yes.

19      Q.   How long were you in Clifton?

20      A.   Approximately year and a half, two

21  years.

22      Q.   What happened then?

23      A.   I had the opportunity to move closer

24  to home.  So they transferred me over to Brick.

25      Q.   What was your position at Brick?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

17

1      A.    Assistant general manager.

2      Q.    And that's Brick, New Jersey?

3      A.    Yes.

4      Q.    So that was another lateral transfer.

5  Is that right?

6      A.    Yes.

7      Q.    And how long did you work as the AGM

8  in Brick?  First time around.

9      A.    Until 2008.

10     Q.    Who was the GM in Brick?

11     A.    Chris Binns, B-i-n-n-s.

12     Q.    Was he the general manager for the

13  entire time you were at Brick the first time?

14     A.    No.

15     Q.    Who was the other general manager?

16     A.    Leonard Wohlgemuth.

17     Q.    Wohlgemuth replaced Binns.  Is that

18  right?

19     A.    Yes.

20     Q.    All right.  So where did you go from

21  Brick?

22     A.    Manahawkin.

23     Q.    Again, was that a lateral transfer?

24     A.    Yes.

25     Q.    And why did you transfer to

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

18

1  Manahawkin?

2       A.    New store.  Closer to home.

3       Q.    You've got two or three at least

4  lateral transfers at the AGM level.  Can you just

5  generally describe Costco procedure for an AGM

6  transferring?  Who has to recommend it?  Who has to

7  approve it, generally?

8       A.    My understanding of it is that the GM

9  makes the recommendation.

10      Q.    The GM of the outgoing store or the

11  incoming store?

12      A.    Both.

13      Q.    Both, okay.

14           And who would approve the

15  recommendations from the general managers?

16      A.    I would assume their boss.  I don't

17  know that for sure.

18      Q.    That's fine.

19           Okay.  So at Manahawkin, you were at

20  Manahawkin from 2008 to when?

21      A.    Approximately 2012.

22      Q.    And who was the general manager there?

23      A.    Where?

24      Q.    Sorry.  At Manahawkin.

25      A.    That was, um -- George Acosta.

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

19

1  Q.   And was George Acosta the GM for the

2  whole time you were at Manahawkin?

3  A.   No.

4  Q.   Who was the GM there?

5  A.   Zoya Vlady.

6  Q.   V-l-a-d-y?

7  A.   V-l-a-d-y.

8  Q.   And so did Zoya replace George at some

9  point?

10  A.   Yes.

11  Q.   Do you remember when that was

12  approximately?

13  A.   2010 maybe.  Approximately.

14  Q.   Okay.  Let's stop there for that.  I'm

15  going to show you another document, which has been

16  previously marked as Defendants Exhibit 2.  So

17  Defendants Exhibit 2 is a two-page resume with a

18  Bates stamp number Costco 538 and 539.  And it

19  appears to be your resume at some point in time.

20  Is that right?

21  A.   Yes.

22  Q.   And looking at this document, it looks

23  like you wrote this while you were the AGM in Brick

24  the first time around?  Is that right?

25  A.   Yes.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

20

1     Q.    Okay.  So it would have been sometime

2  in 2005 and 2008.  Is that right?

3     A.    Yes.

4     Q.    Do you remember why you were writing

5  -- why you were putting together a resume at that

6  time?

7     A.    Yes.  To apply for AGM in Manahawkin.

8     Q.    I just want to do some questions about

9  your marital history.  Your first wife was Pamela.

10  Is that right?

11     A.    Yes.

12     Q.    Did you have a second wife?

13     A.    Yes.

14     Q.    When did you and Pamela get divorced?

15  Approximately.

16     A.    2002.

17     Q.    Did you have any kids?

18     A.    Yes.

19     Q.    What are the names?  Sorry.  Boys or

20  girls?  I'm sorry.  Boys or girls?

21     A.    From.

22     Q.    Pamela.

23     A.    The first -- okay.  Two girls.

24     Q.    What are their names?

25     A.    Aubrey and Calista.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

21

1      Q.    And approximately -- sorry.  What age
2  are they?
3      A.    20 and 18 currently.
4      Q.    Do they currently live with you?
5      A.    Yes.
6      Q.    How long have they lived with you?
7      A.    Always.
8      Q.    Always, okay.  So you got custody of
9  your two daughters from that marriage?
10     A.    Yes.
11     Q.    Okay.  So did you get remarried?
12     A.    Yes.
13     Q.    To who?
14     A.    Kimberly.
15     Q.    When did you get remarried?
16     A.    2003 maybe.  Approximately.
17     Q.    Did you have any kids from that
18  marriage?
19     A.    Yes.
20     Q.    How many?
21     A.    Three.
22     Q.    Three boys or girls?
23     A.    Boys.
24     Q.    Three boys.  And their names?
25     A.    Gage, Cooper, Keifer.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

22

| | | |
|---|---|---|
| 1 | Q. | And Gage is how old now? |
| 2 | A. | 12. |
| 3 | Q. | Cooper? |
| 4 | A. | 11. |
| 5 | Q. | Keifer? |
| 6 | A. | 10. |
| 7 | Q. | I have four children, so this is like. |
| 8 | | Are they all your children? |
| 9 | A. | Yes. |
| 10 | Q. | Are you still married to Kimberly? |
| 11 | A. | No. |
| 12 | Q. | Divorced? |
| 13 | A. | Yes. |
| 14 | Q. | When did you get divorced? |
| 15 | A. | 2012. |
| 16 | Q. | And do you have custody of the three |
| 17 | | boys? |
| 18 | A. | Yes. |
| 19 | Q. | All three of them? |
| 20 | A. | Yes. |
| 21 | Q. | They all live with you? |
| 22 | A. | Yes. |
| 23 | Q. | They've lived with you their whole |
| 24 | | lives? |
| 25 | A. | Yes. |

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

25

1    Q.    And you were employed by Costco for a

2 long time.  How often did Costco reissue or change

3 its handbook?  Do you know?

4    A.    I'm not sure.  I believe -- I think it

5 was every four years.  I don't know.

6    Q.    Okay.  When you started at Costco in

7 1994, did you get a copy of the handbook that was

8 in effect at that time?

9    A.    I don't recall.

10    Q.    Do you recall ever having -- getting a

11 copy of the handbook?

12    A.    I do.

13    Q.    When did you first get a copy of the

14 handbook, that you recall?

15    A.    I couldn't give you a date.

16    Q.    Okay.  Do you recall getting a copy of

17 the handbook that's in front of you, Defendants-3,

18 which has the date of March 2013?

19    A.    I recall seeing the handbook.

20    Q.    So we'll go with this handbook.  Are

21 you familiar generally with the procedures in this

22 handbook?

23    A.    I used to be.

24    Q.    Well, right, you used to be when you

25 worked at Costco.  Is that right?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

26

1    A.    Yes.

2    Q.    Okay.  So I want to direct your

3    attention to Section 2.1, which is on page 11.  So

4    in Section 2.1 is Costco's open door policy.  Is

5    that correct?

6    A.    That's what it reads.

7    Q.    Okay.  When you worked at Costco, what

8    was your understanding as to what the open door

9    policy meant?

10   A.    My understanding of the policy is that

11   any employee can go to anybody they felt

12   comfortable.

13   Q.    How far could the employee go up the

14   chain of command?

15   A.    As high as they felt comfortable.

16   Q.    That would include the CEO of the

17   company?

18   A.    Correct.

19   Q.    Did you ever take advantage of the

20   open door policy yourself?

21   A.    Take advantage of it as far as going

22   to a supervisor I'm comfortable to talk to them?

23   Q.    Yes.

24   A.    Yes.

25   Q.    Do you recall when that happened?  Or

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

27

1    how often it happened?   I guess we should start

2    with that.

3            A.    It wasn't a regular thing.   It was

4    when necessary.

5            Q.    Do you recall any specific examples?

6            A.    I do.

7            Q.    Okay.   Can you tell me?

8            A.    When I spoke to Leonard about my son.

9            Q.    That's Leonard Wohlgemuth?

10           A.    Yes.

11           Q.    Leonard was the general manager at

12   Brick at the time.   Is that right?

13           A.    Yes.

14           Q.    Was this the first time you were at

15   Brick or the second time?

16           A.    Second time.

17           Q.    We're a little behind in terms of your

18   progression through Costco.   You were at Manahawkin

19   until 2012.   Is that correct?

20           A.    Approximately.

21           Q.    Approximately, right.   What happened

22   in 2012 in terms of your employment at Manahawkin?

23           A.    I was relocated to Brick.

24           Q.    Was that the same store that Brick was

25   the first time?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

28

1      A.     No.

2      Q.     Can you explain that?

3      A.     They moved the store and opened a new

4   one in Brick.

5      Q.     And who was the -- sorry.

6             Was Leonard Wohlgemuth still the

7   general manager when you went back to Brick?

8      A.     Yes.

9      Q.     And what position did you go back to

10  Brick as?

11     A.     Assistant general manager.

12     Q.     So how soon after you went back to

13  Brick did you have -- did you talk to Leonard about

14  your son?

15     A.     Don't have a specific date, but it was

16  within the first few months.

17     Q.     Which son?

18     A.     Gage.

19     Q.     Could you just describe the nature of

20  your discussion with Leonard under the open door

21  policy?

22     A.     I explained my situation with my

23  marital situation and that I was a single father

24  with custody of my kids and that I was concerned

25  because my son has autism and was having a

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

29

1   difficult time at that period of his life because I

2   just went through a divorce with his mother and he

3   was having behavioral issues and difficulty with

4   his medication.   And I may need accommodations.   Do

5   I -- and I asked if I need to fill out FMLA

6   paperwork.

7            Q.      And generally what was Leonard's

8   response?

9            A.      He was very personable, very

10   understanding.   He explained to me that as long as

11   the building had coverage, it wasn't necessary.

12           Q.      It wasn't necessary for what?

13           A.      For me to fill out FMLA paperwork.

14   Family Medical Leave of Absence.

15           Q.      So in sum and substance, Leonard told

16   you it wasn't necessary to complete FMLA paperwork.

17   As long as the building had coverage, you could

18   take time off.   Is that correct?

19           A.      Correct.

20           Q.      Was this one conversation you had with

21   Leonard about this issue or was it more than one?

22           A.      One.

23           Q.      So were you satisfied with that

24   resolution?

25           A.      Yes.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

30

1          Q.     And can you explain just generally

2    when you're talking about the building having

3    coverage, what does that mean?

4          A.     Prior to opening there needed to be a

5    key-carrying manager.  During open hours there

6    needed to be at least an assistant general manager

7    in the building.

8          Q.     When you say "open hours," you mean

9    customer business hours?

10         A.     Correct.

11         Q.     Okay.  Anything else?

12         A.     That was the criteria.

13         Q.     What about after closing?

14         A.     Same.  As long as there's no customers

15   in the building, there needed to be a key-carrying

16   manager in the building at all times.  While there

17   was people in the building.

18         Q.     What levels of managers were key

19   managers?

20         A.     Staff level managers.

21         Q.     Maybe this is a good time to explain

22   for the record, and let's take Brick since we're

23   going to talk about that the most, second time

24   around, new building, Leonard Wohlgemuth was the

25   general manager.  Was he the top manager in the

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

31

1    building?

2         A.    Yes.

3         Q.    How many AGMs?

4         A.    Two -- three, excuse me.  Myself and

5    two others.

6         Q.    And you worked -- second time around

7    you worked in Brick from 2012 to 2014.  Is that

8    right?

9         A.    Yes.

10        Q.    At which point you were terminated.

11   Is that right?

12        A.    Yes.

13        Q.    Yeah.  We'll get to that.  Don't

14   worry, we'll get back to that.

15             So during that two-year period -- I'm

16   just trying to get a time frame established here.

17   During that two-year period who were the AGMs other

18   than you?

19        A.    Jim Mack.  I believe Jeff Kenny was

20   there for a short period of time.  Peter.

21        Q.    Peter.  Okay.

22        A.    Demealias.

23        Q.    Demoleas?

24        A.    Demoleas.  Something to that.  I don't

25   know how to pronounce it properly.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

36

1   6 a.m.  It could be five; it could be four,

2   depending on the needs of the business, needs of

3   the employees, the rest of the staff.

4         Q.    Right.

5         A.    Into the afternoon, early afternoon.

6         Q.    Again, how many days off?

7         A.    Two.

8         Q.    And did it vary?

9         A.    Yes.

10        Q.    What would be the variables in terms

11   of days off?

12        A.    I don't understand the question.

13        Q.    Okay.  It was a bad question.

14              So in terms of as long as the building

15   had coverage, when you had this conversation with

16   Leonard and you reached this arrangement with him,

17   what time off were you taking to take care of your

18   son typically?

19        A.    I didn't take off on a regular basis.

20        Q.    Okay.  Just explain to me when you

21   would take off, why and how that worked with the

22   building.

23        A.    I'm not sure I understand.

24        Q.    Well, okay.  You reached an

25   arrangement with Leonard that you've got an

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

37

1    autistic son who's got difficulty with the

2    medication and his behavior, and he said you could

3    take time off as long as the building had coverage.

4    Am I right there?

5            A.    Yes.

6            Q.    Okay.  So how did that actually work

7    out?  How much time were you taking off typically

8    and for what reason?

9            A.    I don't recall any issues when I was

10   working with Leonard.  And if I did utilize time, I

11   don't recall an issue.

12           Q.    So is it possible that you didn't have

13   to take any time off for your son during the period

14   that Leonard was the GM?

15           A.    Yes.  It's possible.

16           Q.    And if you did, you don't remember as

17   you sit here today.

18           A.    I don't recall specifics.

19           Q.    That's fine, okay.

20                 Any other times that you recall using

21   the open door policy?

22           A.    No.  Nothing specific where I would

23   say yes, I'm going to use the open door policy.

24   No.

25           Q.    Okay.  So I just wanted to go back --

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

38

1    we're going to come back to this issue, obviously,

2    but in terms of the employee agreement, which is in

3    front of you, you have an open door policy.  You've

4    explained your understanding of that.  You've

5    explained your use of it.

6              Do you recall if in, let's say -- in

7    either Manahawkin or Brick.  So that would have

8    been the last six years of your employment.  You

9    were an AGM.  Do you recall any other employees or

10   managers using the open door policy?

11        A.   I would have employees on a regular

12   basis come to me.  Because they felt comfortable

13   speaking with me.  I don't know specifics, but I

14   dealt with hundreds of employees every day.

15        Q.   Do you recall examples of where

16   employees or managers went above the warehouse to

17   corporate with complaints or issues under the open

18   door policy?

19        A.   I don't have direct knowledge of it.

20        Q.   Okay.  Other than the employee

21   agreement, which is in front of you, how did

22   employees know that the company had an open door

23   policy?  Was there any other way of knowing?

24        A.   Just by communication from me.  I know

25   I would communicate it.

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

39

1   Q. What about, was the open door policy

2 posted anywhere in the building?  Any of the

3 buildings you worked at.

4   A. The break room.

5   Q. It was posted in the break room?

6   A. Yes.  I believe it was.

7   Q. Do you know if employees got training

8 on the open door policy?

9   A. Specifically?  No, I don't know that.

10   Q. So going back to the exhibit in front

11 of you, which is Defendants Exhibit 3, the employee

12 agreement, Section 2.2, which is on the next page.

13 Equal opportunity.  Costco had an equal opportunity

14 policy.  Is that right?

15   A. That's what I'm reading.

16   Q. Were you aware of that when you worked

17 at Costco?

18   A. No.  When I worked or when I was

19 hired?

20   Q. When you worked there.

21   A. Oh, after I was employed, yes.  When I

22 applied I did not know.

23   Q. What was your understanding as to

24 Costco's EEO policy?

25   A. That we don't discriminate.  Race,

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

40

1    religion, etc.

2        Q.    Did you get any training -- as a

3    manager did you get any training on Costco's EEO

4    policy?

5        A.    Specifically, I don't recall.

6        Q.    Were you involved in hiring as an AGM?

7        A.    Yes.

8        Q.    What was your involvement in hiring?

9        A.    As an AGM I would do the third

10   interviews.  Sometimes help out with other

11   interviews.

12       Q.    Do you know if employees got a copy of

13   the employee agreement when they were hired?

14       A.    Yes.

15       Q.    Looking again at 2.3, which is the

16   next policy, on page 13.  Americans with

17   Disabilities Act, ADA.  Are you aware that Costco

18   had a policy on the ADA?

19       A.    Yes.

20       Q.    What's your understanding as to

21   Costco's ADA policy?

22       A.    We don't -- that at the time when I

23   was employed we didn't discriminate for

24   disabilities.

25       Q.    And then 2.4 is the anti-harassment

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

41

 1    policy.  Are you aware that Costco had an

 2    anti-harassment policy?

 3         A.    Yes.

 4         Q.    And again, what was your understanding

 5    as to Costco's anti-harassment policy?

 6         A.    That we didn't tolerate a hostile work

 7    -- anybody creating a hostile work environment.

 8         Q.    Could people use, as far as you know

 9    and understand, could people use the open door

10    policy to make complaints or raise issues about

11    harassment, discrimination, equal opportunity?

12         A.    Yes.

13         Q.    And if you look at 2.5, which is on

14    page 15, section 2.5 of the employee handbook is

15    entitled, "Reporting harassment discrimination or

16    retaliation."  What is your understanding as to

17    Costco's policy with respect to reporting

18    harassment, discrimination or retaliation?

19         A.    That retaliation, harassment or

20    discrimination wasn't tolerated.

21         Q.    Okay.  But what's your understanding

22    as to the different ways that an employee or a

23    manager, any employee, from stocker to general

24    manager could report either that they were the

25    victim or that they witnessed discrimination or

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

42

1    harassment or retaliation?  What are their options?

2         A.    Their options with the open door

3    policy, they can report to anybody they felt

4    comfortable.

5         Q.    Skip ahead to 7.0, which is page 43.

6               Before we do that, I just noticed

7    something.  6.7 right on the other side of the

8    page.  The CARE network.  Are you familiar with

9    that?

10        A.    Yes.

11        Q.    What was your understanding as to

12   Costco's CARE network?

13        A.    CARE network was a network of

14   therapists, and even more than that, assisting

15   employees, whatever needs or crisis they're dealing

16   with.

17        Q.    Can you give me an example of how it

18   works?

19        A.    If someone was going through a divorce

20   and needed some therapy, or alcoholism, any kind of

21   issues, financial issues, lawyer issues, whatever

22   they had.

23        Q.    And how would you get in touch with

24   the CARE network?

25        A.    I wouldn't.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

43

1       Q.      Do you know how it was done, if an

2   employees has an issue?

3       A.      I handed them a phone number.

4       Q.      So there's a phone number they can

5   call.

6       A.      Yes.

7       Q.      Did you ever use the CARE network

8   yourself?

9       A.      Personally, I have.

10      Q.      You have, okay.  How many times?

11      A.      Once that I recall.

12      Q.      Can you tell me when that was?

13      A.      Approximately around 2012.

14      Q.      Can you describe the nature of your

15  issue and how CARE network helped you?

16      A.      I was dealing with stress of being a

17  single father with five kids, one with autism and

18  going through a divorce, as well as having my

19  position at work.

20      Q.      At the time that you contacted the

21  CARE network, do you recall which warehouse you

22  were working in?

23      A.      Manahawkin.

24      Q.      So before you went back to Brick.  Is

25  that right?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

44

1        A.      I believe it was.  I think it was
2    right around the time I may have been transferred.
3    So I'm not a hundred percent sure.
4        Q.      Fair enough.  So what kind of help did
5    you get from the CARE network?
6        A.      Therapy.
7        Q.      Was that in-person therapy, over the
8    phone?
9        A.      In person.
10       Q.      In person.  Was that paid for by
11   Costco?
12       A.      No.  I believe I used my insurance.  I
13   paid.
14       Q.      Okay.  And your insurance will be your
15   health insurance from Costco, correct?
16       A.      Correct.
17       Q.      All right.  So we were going to talk
18   about the family medical leave, Section 7.0, is
19   entitled, "What if I need time off?"  7.0 Family
20   and medical leaves of absence.  Generally, it seems
21   to be a long policy.  I'm just going to ask you
22   generally what was your understanding as to
23   Costco's FMLA policy?
24       A.      My understanding is the policy was
25   there to help assist you if you needed it

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

45

1  personally or if you were taking care of someone

2  who is chronically ill.  Or in need under the

3  qualifications of FMLA.

4          Q.    What was your understanding as to how

5  -- when an employee, Costco employee, qualified for

6  FMLA?

7          A.    I don't understand the question.

8          Q.    When would you be eligible to have

9  FMLA as a Costco employee?

10         A.    Under the criteria of Costco or under

11 the criteria of FMLA?

12         Q.    Under FMLA.

13         A.    I don't know.  That's for them to

14 determine.

15         Q.    Okay.  What about for Costco?

16         A.    I would assist -- I would direct them

17 to the payroll department, who would deal with

18 making sure they meet the minimum requirements.

19         Q.    So the payroll department in Brick

20 second time around, who was the payroll -- who was

21 the person in the payroll department, if you

22 recall?

23         A.    I don't remember her name.

24         Q.    So it was one person that you would

25 direct employees to?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

46

1      A.      Not just one.  It could be -- it would

2    be the administration manager or the payroll clerk.

3      Q.      Okay.  Did you get any training from

4    Costco about how to help employees get FMLA?

5      A.      Yes.

6      Q.      Can you just please describe that

7    training?

8      A.      To direct them to, um -- the

9    administration department, which can help get them

10   -- I'd give them the number for FMLA; they would

11   call; and they would deal with it that way.

12              As far as whether or not they

13   qualified, that's up to them to fill out the

14   paperwork; it gets sent in, and then a

15   predetermination was made that had nothing to do

16   with me.

17     Q.      Okay.  When you say you got training,

18   what kind of training was that, in terms of was it

19   computer training, in person, if you recall?

20     A.      I don't recall computer training.  I

21   recall having discussions.

22     Q.      With who?

23     A.      Specifically, I don't remember.  I

24   just remember general meetings.

25     Q.      Did you ever apply for FMLA?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

47

1      A.    I did not.

2      Q.    At any time during your 20 years at

3   Costco you didn't apply for FMLA ever?

4      A.    No, I did -- I did have FMLA when my

5   children were born.  I think that was FMLA.

6      Q.    Okay.

7      A.    I'm not certain, but I believe that

8   falls under FMLA.

9      Q.    Was FMLA paid or unpaid?

10      A.    Paid.

11      Q.    So when your children were born, you

12   were able to get paid FMLA leave?  Is that right?

13      A.    I believe it was FMLA I got paid.

14      Q.    We'll get back to that.  So if you

15   could go to 11.1.  Page 69.  Generally, the title

16   of 11.0 is what are the rules, standards of conduct

17   and discipline.  11.1 is standards of conduct and

18   discipline.  11.2 is unpaid suspension.  11.3 are

19   causes for termination.  Were you familiar with

20   these sections of the employee handbook?

21      A.    Yes.

22      Q.    If you look at 11.3, I think you're on

23   that page.  So 11.3, it lists, it looks like 30 --

24   wait, is it 30?  Yeah, 30 different causes for

25   termination.  Am I right?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

50

1   mean?

2          A.    Going to his -- the GM going to his

3   boss.  Or her boss.

4          Q.    And you've kindly explained --

5   actually, you didn't get to the bottom of it, but

6   the GM has typically two or three AGMs reporting

7   and then down from there -- what about going up the

8   hierarchy from the general manager?  Who is the

9   general manager's boss at Costco?

10         A.    The assistant VP.

11         Q.    All right.  And what typically --

12  typically -- how many stores is an assistant VP

13  responsible for?

14         A.    I don't remember how many he was

15  responsible for.

16         Q.    How many assistant VPs did you

17  interact with in the time you worked at Costco?

18         A.    My entire career?

19              JUDGE CITTA:  Excuse me.  Objection.

20  Can you rephrase the question?

21              MR. GALLIGAN:  Actually, I'm going to

22  withdraw it.

23         Q.    Who does the AVP report to?

24         A.    Senior VP.

25         Q.    And who does the senior VP report to?

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

51

1     A.    I would assume it's the -- it was Joe

2  Portera at that point.  So I think it was the -- I

3  don't know what his title is, actually, at this

4  point anymore.  I don't remember.  It's vice

5  president.

6     Q.    Was Joe -- as far as you know, was Joe

7  Portera the SVP, the senior VP?

8     A.    No.

9     Q.    He was above the senior VP?

10    A.    Yes.

11    Q.    You just don't remember his title?

12    A.    I think it was vice president.  I

13  believe.

14    Q.    Okay, and I think there's something I

15  forgot to do earlier, which is to go down from the

16  AGM, below the AGM, we got halfway and then I got

17  sidetracked.

18         So below the AGM -- and, again, we can

19  probably use Brick as an example.  It's the last

20  warehouse you worked in.  What positions were

21  directly below the AGM?

22    A.    You have the merchandise manager, the

23  receiving manager, administration manager.

24         I'm forgetting one.  I believe that

25  was it.

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

52

1      Q.    I think you mentioned the term "staff

2  manager" earlier.

3      A.    Yes.  Those are staff managers.

4      Q.    And below the staff managers.

5      A.    Department managers.

6      Q.    Who are they?

7      A.    You have --

8      Q.    Positions.

9      A.    You have a membership manager, tire

10  shop manager, photo manager, optical manager, hard

11  lines manager, center manager, foods manager, deli

12  manager, meat manager, bakery manager.

13      Q.    Okay.

14      A.    There may be a couple of others.  I

15  don't remember.

16      Q.    That's fine.  And below the department

17  managers who do you have?

18      A.    There would be supervisors.

19      Q.    And in Brick, again, the last

20  warehouse you worked in, so 2012 to 2014,

21  approximately how many employees worked in that

22  store?

23      A.    I don't recall.

24      Q.    More or less than 200?

25      A.    More.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

53

1       Q.      And were the rank and file employees

2   at Brick represented by union?

3       A.      Yes.  Brick was union.

4       Q.      Was Manahawkin union?

5       A.      No.

6       Q.      In Brick were the supervisors in the

7   union or not?

8       A.      Yes.

9       Q.      Department managers, were they in

10  union or not?

11      A.      No.

12      Q.      Okay.  So back to the employee

13  agreement.  One more section to cover is 11.7.

14  Standard of ethics.  Were you familiar with the

15  standard of ethics for managers and supervisors?

16      A.      I remember seeing it.

17      Q.      And who did the standard of ethics

18  apply to?

19      A.      Managers and supervisors.

20      Q.      Sorry for the obvious, but.  So at

21  least since you became a supervisor/manager, you --

22  were you familiar with the standard of ethics?

23  What it meant?

24      A.      I don't understand the question.

25      Q.      Like, as the AGM, what did the

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

54

1   standard of ethics, what did you understand the

2   standard of ethics to mean to you?

3        A.    Treat people properly.

4        Q.    Did it mean to you that managers and

5   supervisors were held to a higher standard than

6   rank and file employees?

7        A.    I just understood it to treat people

8   properly.  Conduct yourself professionally.

9        Q.    Direct your attention to six lines

10  down.  The first word on the line is "committed."

11       A.    Mm-hmm.  I see it.

12       Q.    Go to the end of that line.  There's a

13  sentence starts "any time"?  Can you read that

14  sentence starting "any time"?

15       A.    "Any time there is a slight doubt

16  about an activity that could be questioned

17  regarding honesty, integrity or intent, you must

18  discuss it with your manager or regional vice

19  president to remove any doubt."

20       Q.    Okay.  You were aware of that rule and

21  procedure?  As an AGM?

22       A.    I don't recall specifically reading

23  that.

24       Q.    Were you aware of the general

25  principle that you as an AGM, if you ever had the

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

55

1    slightest doubt about an activity that could be

2    questioned regarding your honesty, integrity or

3    intent, you must discuss it with your manager?  Did

4    you understand that concept?

5          A.    I understand that concept.

6          Q.    Did you understand it at the time you

7    worked for Costco?

8          A.    Yes.

9          Q.    I have one more section to direct your

10   attention to.  You still have it open.  11.7.  Last

11   sentence of the entire 11.7 starts with "managers"?

12   You see that right at the bottom of the page?

13         A.    Yes.

14         Q.    Page 77.  Can you read that last

15   sentence?

16         A.    "Managers must never engage in any

17   activity which could raise question concerning

18   their integrity."

19         Q.    Did you understand that to be a rule

20   or procedure at Costco?

21         A.    Yes.

22         Q.    I show you what's been marked as

23   Defendants Exhibit 4.  This is a job description

24   for assistant warehouse manager administration.

25   And it's marked with the Bates numbers Costo 465

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

58

1           Did you understand that as part of the

2      job?

3           A.    Yes.

4           Q.    Do you understand what's meant here by

5      "disability considerations"?

6           A.    I do.

7           Q.    What does that mean to you?

8           A.    To me, if someone has a disability,

9      maybe some type of accommodation.

10          Q.    Okay.

11          A.    That's what it would kind of refer to.

12          Q.    Thank you.

13                I show you what's marked as

14     Defendants-5.  This is a Bates number Costco 648.

15     It's an acknowledgment of management training HR

16     month.  Acknowledgment appears to be from Jeffery

17     Bowie.  Is that your signature three-quarters of

18     the way down on the right?

19          A.    It appears to be.

20          Q.    What does "HR month" mean at Costco?

21          A.    In that month they would pick a

22     different subject and review it.

23          Q.    What does "HR" stand for?

24          A.    HR?

25          Q.    Yes.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

59

1       A.      Human resources.

2       Q.      So when Costco refers to "HR month,"

3    what's the "month" stand for?  As far as you know.

4       A.      What does "month" stand for?

5       Q.      Is it one month of the year it's HR

6    month or is every month an HR month?

7       A.      This is one particular month they

8    focus on HR.

9       Q.      Okay.  Is it one month per year, as

10   far as you know?

11      A.      I believe.

12      Q.      Is it a particular month of year?

13      A.      I don't recall.

14      Q.      Do you recall attending discrimination

15   and harassment prevention policies and procedures

16   in May 2006?

17      A.      I don't specifically recall attending

18   -- attending this.

19      Q.      Do you have any reason to dispute the

20   fact that you did attend it?

21      A.      I don't.  It appears to be my

22   signature.

23      Q.      This is another acknowledgement of

24   management training.  HR month.  Costco 640 Bates

25   stamp.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

60

1           JUDGE CITTA:  Is this D-6?

2           MR. GALLIGAN:  D-6.

3           JUDGE CITTA:  Thank you.

4      Q.    So here's an acknowledgment from 2007.

5  Is that your signature?

6      A.    It appears to be.

7      Q.    Do you recall attending training in

8  May 2007?

9      A.    No.  I don't recall this specifically.

10     Q.    Do you generally recall attending HR

11 month training every year?

12     A.    Not every year, no.

13     Q.    What do you recall about HR month?

14     A.    Exactly as I explained before.  They

15 would pick different subjects through that month

16 and review them.  Whether it be informally through

17 managers' meetings, personal discussion.

18     Q.    And give me an example what topics

19 would be covered.

20           JUDGE CITTA:  Can we have

21 clarification?  Are we talking specifically about

22 D-6, that month, Counsel?

23           MR. GALLIGAN:  No.

24     Q.    Just generally speaking, what subjects

25 are covered by HR month?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

61

1        A.     I don't specifically remember the
2    subjects they would cover.
3        Q.     Would they cover discrimination,
4    retaliation, disability, that kind of thing?
5        A.     You're asking me if it's possible or
6    if I remember it?
7        Q.     If you remember it.
8        A.     Specifically in this one, no.  In the
9    ten years that I was an AGM, I'm sure.
10       Q.     You're sure what?
11       A.     I've heard it once.  At least once.
12       Q.     Heard what once?
13       A.     That they may have discussed
14   discrimination.  I don't have any specific
15   recollection of going over any specific topics.
16       Q.     Okay.
17       A.     It's just general HR topics they would
18   go over.
19       Q.     Okay.  You can move that one over.
20              Defendants-7.  This is the standard of
21   ethics.  It appears to have your signature on it.
22   Is that correct?
23       A.     It appears to be.
24       Q.     Okay.  Is it?
25       A.     It appears to be my signature.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

62

1          Q.     This is Costco Bates number -- Costco

2    643.  You recall signing, specifically signing an

3    acknowledgment for the standard of ethics?

4          A.     I do not specifically recall signing

5    this.

6          Q.     Do you recall ever seeing this?

7          A.     I don't recall seeing it.

8                 MR. GALLIGAN:  This would be eight,

9    Judge.

10                JUDGE CITTA:  Thank you.

11         Q.     I'm showing you what's been marked

12   Defendants Exhibit 8.  It's a participation and

13   policy acknowledgment form.  Bates number Costco

14   628.  Do you recall participating in managing to

15   Costco standards of ethics program in 2011?

16         A.     I don't specifically recall.

17         Q.     Is this your signature?

18         A.     Yes, it appears to be.

19         Q.     This is nine.  This is leave of

20   absence FMLA quiz.  Costco 670.  From May 2003.  Do

21   you recall filling out a quiz about the FMLA?

22         A.     No.

23         Q.     Defendants-10.  This is a multi-page

24   document.  I'm just going to describe it for the

25   record.  It's a request for leave of absence and

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

63

1   notification of family and medical leave

2   entitlements and other similar state leave acts

3   form.

4                   This is for birth of a child.  This is

5   your signature on page one?

6           A.      Yes, it appears to be.

7           Q.      September 30th of '05.  Which child is

8   this for?  If you can recall.

9           A.      The date -- the date reflects my son

10  Gage.

11          Q.      This is for Gage?  So is it fair to

12  say that you applied for and received FMLA for time

13  off connected to the birth of your son Gage?

14          A.      Yes.

15          Q.      And this was paid?

16          A.      Yes.

17          Q.      This will be Defendants-11.  This is

18  another FMLA form.  Costco 818 to 823.  It's a

19  package.  It's another FMLA for childbirth.  Is

20  that correct?

21          A.      Correct.  For paternity leave.

22          Q.      Do you remember which child this is

23  for?

24          A.      The date reflects my son Cooper.

25          Q.      Cooper.  This was paid as well?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

64

1      A.      Yes.

2      Q.      Defendants-12.  Same set of type of

3  documents.  FMLA form for childbirth again.  Is

4  that correct?

5      A.      Correct.

6      Q.      2008?

7      A.      Yes.

8      Q.      Can you identify which child?

9      A.      The date reflects my son Keifer.

10     Q.      Keifer.  I know this probably goes

11  back.  Your daughters are older.  Do you recall if

12  you got FMLA for their births as well?

13     A.      No.  I don't think it was FMLA back

14  then.

15     Q.      We'll go to 13.  It's a one-page

16  letter from Leonard Wohlgemuth.  Do you recall this

17  letter from Leonard recommending you for transfer

18  to Manahawkin?

19     A.      I recall him writing a letter

20  recommending me for transfer.  I don't specifically

21  recall this letter.

22     Q.      Okay.  I'm showing you what's being

23  marked as Defendants-14.  It's a one-page document

24  entitled "Area of concern."  It's undated, but it

25  refers -- it appears to refer to something that

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

68

1    We'll go back to 15.

2         Q.     This is a performance appraisal.  It

3    appears to be for you as the AGM from April 2009 to

4    April 2010.  It's marked and Bates number Costco

5    757 through 763.  Do you recall getting -- did you

6    get a performance appraisal every year?

7         A.     No.

8         Q.     Do you remember getting a performance

9    appraisal in this year, 2009 to 2010?

10        A.     I don't specifically remember that

11   year.

12        Q.     Okay.  If you look at the Bates

13   number, it's at the bottom, 760, that's the

14   signature page.  Is that your signature?

15        A.     It appears to be.

16        Q.     And the manager who reviewed you is

17   Zoya Vlady.  Is that correct?

18        A.     That's what I read.

19        Q.     I direct your attention to the

20   integrity section, which is 759.  So this section,

21   like all of the sections, has some ratings, but at

22   the bottom there are manager comments.  In the

23   integrity section before you get to business savvy.

24   Do you see that?

25        A.     I see it.

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

69

1      Q.      And there's a manager has commented

2   here that you have been addressed recently about

3   not acting in a manner which reflects the company's

4   ethical standards, i.e., unnecessary return of

5   four-year-old merchandise?  Do you recall that?

6      A.      I recall that.

7      Q.      Tell me what you recall about that.

8      A.      I recall about the review?

9      Q.      About the four-year-old merchandise.

10      A.      They were bookshelves that I purchased

11   that were left in boxes for quite some time because

12   we weren't -- that room wasn't set up.  Once we did

13   set the bookshelves up, they had glass shelves in

14   there.  I had no way of securing the doors, and my

15   children kept knocking them down.

16      Q.      So what happened next?

17      A.      I returned them.  Under the double

18   guarantee.  And it was explained to me that I could

19   not return them, I needed to purchase them back.

20      Q.      When you say "double guarantee," what

21   do you mean?

22      A.      100 percent satisfaction, no questions

23   asked.

24      Q.      So this was -- these were bookshelves

25   that you bought at Costco.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

72

1   return them.  That we were not allowed to do

2   returns like regular members.

3          Q.    And then you repurchased them.  Is

4   that right?

5          A.    I did.

6          Q.    And then it was referenced to your

7   performance appraisal.  Is that correct?

8          A.    That's what it appears to be, yes.

9          Q.    And you signed off on that performance

10  appraisal.  Is that right?

11         A.    It does appear that I signed it.

12         Q.    And who was the manager or person who

13  told you you had to repurchase them, that you

14  couldn't refund them?

15         A.    I don't recall.

16         Q.    Was it Zoya?

17         A.    I don't recall.

18         Q.    Who was the vice president in charge

19  of Manahawkin at that time?

20         A.    Rob Leuck.

21         Q.    And that's -- do you remember how to

22  spell his name?

23         A.    It's not spelled L-u-k-e.  It's

24  L-u-e-k or something like that.

25         Q.    I'm going to go with L-e-u-c-k.  There

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

73

1    may be a document later that reflects that.  I

2    don't know.

3              So did you have a discussion with Rob

4    Leuck about the return of these bookcases?

5         A.    I do vaguely recall having a

6    conversation with him about the bookcases after the

7    fact.

8         Q.    When you say "after the fact," what do

9    you mean?

10        A.    I don't recall when he spoke to me

11   about it.

12        Q.    Do you recall the sum and substance of

13   the discussion you had with Rob about the

14   bookcases?

15        A.    As an employee I'm not entitled to the

16   same return policy.

17        Q.    Did you challenge Rob Leuck's position

18   on that?

19        A.    To his face, no.

20        Q.    Did you challenge it under the open

21   door policy to his superiors?

22        A.    No.

23              I'd like to clarify?

24        Q.    Sure.

25        A.    When you say "challenge," I didn't

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

74

1    challenge, but I discussed why I returned it with

2    him.

3            Q.    What did you tell him?   "Him" being

4    Rob Leuck, right?

5            A.    Exactly what I said before is the same

6    thing.  The glass shelves would fall.  I was

7    concerned with my son's safety.

8            Q.    How did -- if you recall, Mr. Leuck's

9    response to that?

10           A.    I don't recall.

11           Q.    Do you recall another issue coming up

12   at Manahawkin regarding an anonymous complaint that

13   was made by an employee that implicated you in some

14   Facebook posts?

15           A.    I recall.

16           Q.    What do you recall?

17           A.    Vaguely.

18           Q.    What do you recall about that?

19           A.    I vaguely recall them printing out

20   pictures from my daughter's Facebook of them

21   putting makeup on me and making fun of me.

22           Q.    Your daughters making fun of you?

23           A.    Yes.

24           Q.    What do you recall in terms of any

25   issue that came up at work about that?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

75

1        A.     I was questioned about it and I

2   explained it.

3        Q.     I show you what's been previously --

4   you can put that away.  Previously been marked for

5   identification as Defendants-19.  This is a

6   one-page typewritten letter with some handwritten

7   comments.  It's written by "Concerned at number

8   1025."  There's no name attributed to this.  Do you

9   recall ever seeing this before?

10       A.     I have seen this.

11       Q.     What is this?

12       A.     It appears to be an anonymous letter.

13       Q.     To Rob Leuck?

14       A.     That's what the top says.

15       Q.     Do you know -- I understand it's

16   anonymous.  I don't see a name here either.  But do

17   you know -- do you know who made the complaint?

18       A.     No.

19       Q.     As you said, the complaint -- part of

20   the issues referred to in here was some pictures on

21   Facebook.  But there's also other things that this

22   anonymous person is complaining about.  Is that

23   right?

24              JUDGE CITTA:  I object to the

25   phraseology.  Rephrase, please.  You say it

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

77

1          20.   Defendants-20.   It's a packet of

2    documents.   It starts with an email from Sarah

3    Rajski, R-a-j-s-k-i, to Rob Leuck regarding an

4    anonymous complaint letter.   And it's Bates 950.

5    And the documents after that are a series of

6    Facebook pictures.

7               My question for you, Mr. Bowie, is are

8    these the pictures that you referred to, the

9    Facebook pictures?

10        A.    The ones I was referring to are the

11   last -- it looks like the last few of my daughter's

12   Facebook.   That's what I spoke of.

13        Q.    Can you just read the numbers of the

14   pages that you're referring to?   The Bates number

15   at the bottom?

16        A.    000954.   000955.   000956.   000957.

17        Q.    Now, there are other pictures like

18   961, the last one?

19        A.    Mm-hmm.

20        Q.    It's a picture -- it looks like you?

21   Is that you?

22        A.    It's me.

23        Q.    Sorry, it's a bad copy, but.   And who

24   is the lady?   If you recognize her.

25        A.    That's Rena Sardella.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

78

1        Q.      She was an employee at Costco?

2        A.      She was.

3        Q.      Manahawkin?

4        A.      Yes.

5        Q.      And then the other pictures that you

6    didn't identify, specifically the ones at Costco

7    952 and 953.  It's a series of photographs with you

8    and -- other people.  Can you identify those?

9        A.      00952 is me, my ex-wife Kimberly and

10   -- I don't remember her name.

11       Q.      Okay.  Costco employee?

12       A.      Yes.

13       Q.      And then 953 is three pictures on it.

14   Can you identify any of those?

15       A.      Excuse me.  I do recall her name.

16   Jennifer Wilson.

17       Q.      Jennifer Wilson, okay.  Sorry, which

18   one is Kimberly and which one is Jennifer?  Sorry.

19       A.      Kimberly is to the left of the picture

20   and Jennifer is to the right.

21       Q.      Back to Costco 953.  Do you recognize

22   any of these pictures?

23       A.      I recognize two of them.

24       Q.      Okay.  Which ones?

25       A.      I recognize the one to the top right

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

79

1    and the one on the bottom.

2         Q.    What's the top right?

3         A.    That's myself and Jennifer Wilson.

4         Q.    And the bottom?

5         A.    That's myself.  It's Jennifer and I

6    can't see who's in the back.

7         Q.    Were these pictures that you have on

8    Facebook?

9         A.    Not my Facebook.

10        Q.    Not your Facebook?  Do you know whose

11   Facebook these pictures were taken from?

12        A.    I do not.

13        Q.    So somebody made an anonymous

14   complaint.  Was there an investigation of some

15   kind?

16        A.    My understanding is there was.

17        Q.    What do you recall about that

18   investigation?

19        A.    All I recall from that investigation

20   is I was asked to explain them.

21        Q.    Okay.  To who?  To whom?

22        A.    I believe I wrote a statement -- I

23   don't recall to who.  Zoya asked me to write the

24   statement, but I don't recall who I wrote it to.

25        Q.    I show you what's been marked as 21.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

85

1         A.    I don't recall.

2         Q.    Do you recall when the transfer took

3    place?

4         A.    No.

5         Q.    Was the conversation you had with Rob

6    Leuck in person or on the phone or some other --

7         A.    In person.

8         Q.    In person.  Can you describe that

9    conversation the best you remember it?

10              Well, where was it?

11        A.    In Brick.

12        Q.    In Brick.  Okay.  Please tell me about

13   the conversation, what you remember.

14        A.    It was brief.  He explained to me that

15   he was moving me from concerns that I may have been

16   too close to employees.  And he was making fun of

17   some of the pictures, that I remember, in -- that

18   were sent to them.

19        Q.    How was he making fun of the pictures?

20        A.    He made a face at me with his tongue

21   sticking out sideways.

22        Q.    Why did you perceive that to be making

23   fun of the pictures?

24        A.    Because there appears to be pictures

25   of me with my tongue out.

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

87

```
 1        Q.     GM in new Brick.  And he was GM in the
 2   old Brick as well.  Is that correct?
 3        A.     When I left old Brick he was.
 4        Q.     And how long -- when you went back to
 5   the new Brick, how long were you reporting to
 6   Leonard?
 7        A.     Approximately a year.  Maybe less.
 8        Q.     And I may have asked you this before,
 9   and I apologize, but to the best of your
10   recollection, when did that transfer, the
11   involuntary transfer occur between Manahawkin and
12   new Brick?
13        A.     I honestly don't recall.
14        Q.     I show you what's been marked as
15   Defendants-23.
16               I'm showing you what's been previously
17   marked for identification as Defendants Exhibit 23.
18   It's a five-page handwritten letter from -- signed
19   by Vickey Citro.  Costco 902 to 906.  Again, I
20   don't want to mix up between what you may have
21   reviewed in preparation and what you reviewed at
22   the time.  Did you see this letter at the time, the
23   time -- actually, this letter has a date.
24   September 17, 2012.  Did you see this letter at the
25   time it was written?
```

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

88

1       A.    I did not see it on 9/17.  I'm sure of

2  that.  I'm not sure I understand the question.

3       Q.    I think you testified that you were

4  made aware of a complaint that was made by Vickey

5  Citro.  Is that correct?

6       A.    Yes.

7       Q.    How were you made aware of that

8  complaint?

9       A.    Leonard told me.

10      Q.    Do you recall at the time that Leonard

11 told you about it in or around that time that you

12 -- were you shown Vickey Citro's complaint?

13      A.    I was.

14      Q.    Okay, good.  And is this the complaint

15 that you were shown?

16      A.    It looks like it.

17      Q.    That's D-23?

18      A.    Yes.

19      Q.    Can you describe what you recall about

20 the nature of Vickey Citro's complaint, what was

21 she complaining about?

22      A.    What the letter reads?

23      Q.    Yes.

24      A.    I read that she felt that I was

25 calling her and she felt that I was bothering her.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

89

1        Q.    So she's working at Manahawkin; you're

2   working at Brick?

3        A.    Yes.

4        Q.    And you're calling her.  Is that

5   right?

6        A.    Correct.

7        Q.    And the date of this letter, which is

8   the first date we've had in a while, as counsel

9   points out, 9/17/12.  September 17, '12.  Does this

10  refresh your memory in any way as to when the

11  transfer occurred?

12       A.    No.

13       Q.    Would it be before September of 2012

14  -- or before -- sorry.  Strike that.

15             Before September 17th of 2012.  Is

16  that right?

17       A.    Yes.

18       Q.    But you don't remember whether it was

19  a month before or two months before or more than

20  that.

21       A.    No, I'm sorry, I don't.

22       Q.    That's fine.  So in response -- did

23  you make a written response to Citro's complaint?

24       A.    I typed one.

25       Q.    You typed one.  I have it here.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

90

1    Defendants-24.   I'm showing you what's been marked

2    Defendants-24.   It's a one-page typed statement.

3    Costco 940 Bates stamp number.   Is this your

4    response?

5            A.     It appears to be.

6            Q.     Any reason it's not signed?

7            A.     I can't answer.

8            Q.     Okay.   Fine.

9                   JUDGE CITTA:   Is this my copy of that?

10                  MR. GALLIGAN:   Sorry, sorry.   Go

11   ahead.

12           Q.     What action, if any, did Costco take

13   with regard to Miss Citro's complaint?

14           A.     I recall Leonard having an informal

15   discussion with me, and then he said -- he

16   explained to me that I needed to document it and

17   there was some type of documentation.

18           Q.     This is going back in terms of

19   numbers.   This is Defendants-15.   You can put that

20   away.

21                  I'm showing you what's been marked

22   Defendants-15.   It's Costco Bates 469, October 8,

23   2012, memo from Leonard to you.   Re:

24   Unprofessional conduct.   Do you recall this?

25           A.     Yes.

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

91

1       Q.    Does this refresh your recollection as

2  to what action was taken?

3       A.    This was taken.

4       Q.    This is the action that was taken,

5  right?

6       A.    Yes.

7       Q.    Is that correct?

8           And that's your signature

9  three-quarters of the way down the page?

10      A.    Yes, it appears to be.

11          (Discussion is held off the record.)

12      Q.    I'm showing you what's been marked for

13  identification as Defendants-18.  Looking at some

14  documents we skipped over.  This does not have a

15  Bates number, but I believe it was produced

16  recently.  This is a memo on Costco Wholesale

17  stationery, February 8th, 2007, to Costco Warehouse

18  managers and then some individuals who I believe

19  are high-level VPs from Craig Jelinek, CEO,

20  regarding 90-day electronics return policy and

21  concierge program rollout.  Do you recall this?

22      A.    This specific memo I do not.

23      Q.    Do you recall at some point Costco

24  implemented a 90-day return policy?

25      A.    Yes.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

93

1      Q.    Okay.  And who replaced him?

2      A.    Bruce Dezendorf.

3      Q.    Had you known Bruce prior to him

4  taking over as GM?

5      A.    Yes.

6      Q.    How did you know him?

7      A.    We were both assistants in old Brick

8  at one point.

9      Q.    How would you describe your

10  relationship with him when you were both AGMs?

11      A.    We had minimal interaction.

12      Q.    No issues?

13      A.    Not on a regular basis.

14      Q.    Okay.  Well, what kind of issues do

15  you recall having with him?

16      A.    I don't recall specific issues.

17      Q.    So he took over as general manager.

18  Do you know where he came from?

19      A.    For certainty, no.

20      Q.    But he came from outside the

21  building --

22      A.    Yes.

23      Q.    -- he came from another building?

24            Did you make him aware of the issues

25  you had with Gage?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

94

1       A.      Yes.

2       Q.      How did you make him aware?

3       A.      Informal conversation in the office.

4       Q.      And do you recall in sum and substance
5   what you told him?

6       A.      Basically just explained my son,
7   briefly described my situation personally, and I
8   explained that, you know, the discussion I had with
9   Leonard.

10      Q.      The discussion you had with Leonard is
11  what you testified to this morning about, you know,
12  you could take time off but just make sure the
13  building's covered.  Is that right?

14      A.      Correct.

15      Q.      And what was Bruce's response when you
16  told him about the discussion you had with Leonard?

17      A.      Verbatim, I can't answer, but it was
18  along the lines of he was in agreement with it.

19      Q.      Okay.  Now, towards -- I direct your
20  attention to, I guess, September -- September and
21  October of 2014.  So the last two months that you
22  worked there.

23      A.      Okay.

24      Q.      I want to focus on that time frame.
25  At some point -- well, actually, strike that.

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

99

1          A.      I believe he was.

2          Q.      It's fair to say he's a long-term

3    employee at that location?

4          A.      I don't -- I don't know.

5          Q.      Well, he was there when you first came

6    there, right?

7          A.      I believe he was.  I don't know what

8    classifies as "long term."

9          Q.      But he was there when you first came

10   to Brick, right?

11         A.      Yes.

12         Q.      And he was there when you left in two

13   thousand -- he was there when you came back in

14   2012.

15         A.      Yes.

16         Q.      And he was there when you left in

17   2014.   Correct?

18         A.      I believe he was still there when I

19   left, yes.

20         Q.      Do you know any other disabled

21   employees at Brick?  At least in the 2012-2014 time

22   frame?

23         A.      Not that I can recollect at this time.

24         Q.      Do you recall Bruce Dezendorf taking a

25   vacation in the time frame of September,

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

100

1    October 2014?

2            A.      I do recall him taking a vacation.

3            Q.      Okay.  Do you recall where he went?

4            A.      No, I don't.

5            Q.      And do you recall having a

6    conversation with him before he left about taking

7    time off to take care of Gage?

8            A.      I don't recall that.

9            Q.      Do you recall him telling you when he

10   told you that you could take time off, to make sure

11   to let him know?  Do you recall that part of it?

12           A.      No.

13           Q.      Are you saying that didn't happen or?

14           A.      I don't recall that.

15           Q.      At the time that he took this

16   vacation, again, the September, October 2014 time

17   frame, what issues were you having with Gage that

18   would pull you out of work?

19           A.      Specifically on what days what

20   happened, I can't attest to, but the typical issues

21   I would have with him is in the morning if I woke

22   up -- he woke up before I left, he wouldn't -- he

23   wouldn't let me go.  I also had difficulties with

24   him getting on and off the bus.  Difficulties with

25   him getting on the bus at school.  Having

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

103

1      Q.    Okay.  And in that situation who did

2   you notify at work?  Presuming that day you're at

3   work, right?  And you're working away and you get

4   the call from the school.  How did you deal with

5   that in terms of notifying somebody at work that

6   you have to go?

7      A.    What I have done, whatever other

8   assistant would be there, I would make sure that

9   there was -- if there was customers in the

10  building, talk to the other assistant and notify

11  them what's going on, make sure that they're going

12  to be there, and I would leave from the building.

13  I fortunately never ran into a situation where

14  there wasn't an assistant to help me.

15     Q.    And prior to Bruce going on

16  vacation -- that's September, October.  I don't

17  have a fixed time right now, but.  Prior to him

18  going on vacation, you had, basically, as I

19  understand it, a couple of years of up and downs

20  with Gage where sometimes you'd have to leave the

21  building or come in late.  Is that right?

22     A.    I can't attest to when or how that

23  affected me then because I was in different

24  positions at different time slots.  Sometimes the

25  time slots worked well.  Like, when I was in

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

104

1   administration, I'd be coming in later, so I was

2   able to attend to him in the morning without any

3   issue.

4        Q.     Yeah.  Okay.  But the times that you

5   have to leave or come in late or leave early or

6   leave in the middle of the day and you notified the

7   other GM or whoever it was you had to notify, did

8   Bruce have any -- prior to going on vacation in

9   September, did he have any issue -- did he express

10  any issue to you that he was having with you taking

11  time off?

12       A.     No.  Not that I recall.

13       Q.     So you would just take the time off as

14  needed, notify whoever you had to notify, take care

15  of your son.  Is that right?

16       A.     That sounds pretty close.

17       Q.     Right, okay.  And you were salaried,

18  so you just got paid your salary no matter how many

19  hours you worked, correct?

20       A.     Yes.

21       Q.     And again, prior to Bruce going on

22  vacation in September, October 2014 time frame, you

23  don't recall him telling you, you know, words to

24  the effect of, I don't mind, take care of your son

25  as you need to, but just let me know, you know,

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

105

1   that you're not in the building?

2         A.    I don't specifically recall that

3   conversation.

4         Q.    Okay.  So you recall his vacation; you

5   don't recall the exact dates, and you don't recall

6   where he went to, but he was out of the building

7   for how long on vacation?

8         A.    I don't know.

9         Q.    Okay.  So the period of time that he

10  was out on vacation, was that a particularly

11  problematic time for Gage?

12        A.    My recollection, yes, I had a few

13  issues then, that particular week.

14        Q.    So did that cause you to come in late

15  or leave early or both?

16        A.    I'm not sure about that particular

17  week.  So I can't answer whether it was late or

18  early or both.

19        Q.    Okay.  Would there be any records of

20  you coming in late or leaving early that the

21  company should have or might have?

22        A.    Not that I'm aware of.

23        Q.    So you would just leave, tell

24  somebody, you'd go and take care of your son and

25  come back in later or the next day, whatever.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

106

1    Right?  There was no documentation on it.

2           A.    I didn't punch a time clock.

3           Q.    Right.

4           A.    If that answers your question.

5           Q.    Yeah, I mean, you didn't punch a time

6    clock, so there wouldn't be a record, electronic

7    record of when you came into the building and left.

8    There wouldn't -- as far as you know, there weren't

9    any notes that were exchanged, like you would write

10   a note and say I'm leaving --

11          A.    No.

12          Q.    -- or anything like that.

13          A.    No.

14          Q.    As you sit here today, you don't

15   recall -- you said you recall that you had a few

16   issues with Gage the week or so he was on vacation,

17   but you don't recall if that caused you to come in

18   late or leave early or both.  Is that fair to say?

19          A.    It's fair.

20          Q.    So do you recall in the week, that

21   week in question did you come in late or leave

22   early every day?

23          A.    I don't believe so.

24          Q.    Do you recall how many times in that

25   week you left early or came in late?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

109

1          Q.      When did he approach you?

2          A.      How long after he came back, I don't

3    know.  I don't recall when he came back.

4          Q.      Sometime after he came back.

5          A.      Sometime after he came back.

6          Q.      And where did this conversation take

7    place?

8          A.      In the office.

9          Q.      Anyone else present?

10         A.      No.

11         Q.      Did you record that conversation?

12         A.      No.

13         Q.      Did you write any memo afterwards or

14   email to document the conversation?

15         A.      The only thing I wrote was the

16   one-paragraph statement that he asked me to write.

17   That's the only documentation I have from that.

18         Q.      We'll get to the documents in a few

19   minutes.  Just describe that conversation between

20   the two of you in the office, the best you can.

21         A.      Um, the part I recollect is he asked

22   me to speak to me, so he came in the office.  I sat

23   down at my desk.  He came in and immediately

24   started talking to me about leaving early and

25   accused me of stealing company time.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

110

1    I immediately responded back about my
2    son.  We had a brief conversation about that and he
3    moved onto another subject.
4        Q.    What was the other subject?
5        A.    Um, about the office tea kettle, some
6    oatmeal, going out the tire center door.  And
7    obviously talked to me first about that, about the
8    time off.
9        Q.    Okay.  So the conversation opened
10   about the time off.  Is that right?
11       A.    Yes.  Absolutely.
12       Q.    And then it moved onto the subject of
13   the tea kettle and the other stuff.
14       A.    Yes.
15       Q.    So when you explained to him about
16   your son, did you also explain to him that, you
17   know, hey, you know, we have -- we have an
18   accommodation already, you know, I get to take time
19   off as needed to take care of my son as long as I
20   let anyone know.  Did you remind him of that?
21       A.    Yes.  Not in those words, but yes.
22       Q.    What did he say?
23       A.    Um, I just recall continuing to
24   explain more of what was going on and what the
25   situation with him was, with my son.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

111

1        Q.      Yeah.

2        A.      And I don't recall him ever either

3   saying anything else after that about it.  I just

4   recall him moving on.

5        Q.      Okay.  He moved onto that other

6   subject.

7        A.      Yes.

8        Q.      Right?

9        A.      The order of those subjects, I'm not

10  clear -- I'm not a hundred percent.

11       Q.      It's okay.  Well, we'll get to that.

12  Did he mention that somebody had complained about

13  you taking a lot of time off while he was on

14  vacation?

15       A.      He said it was brought to his

16  attention.

17       Q.      Brought to his attention.  Okay.

18       A.      Something along those lines.

19       Q.      Did he explain what was brought to his

20  attention?

21       A.      Just said "some issues."

22       Q.      Some issues?

23       A.      That's what he was referring to.  I

24  guess the list.

25       Q.      The issues -- strike that.

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

112

1          So did he say that it was brought to

2    his attention that you had left early or come in

3    late a lot while he was on vacation?  Do you recall

4    that?

5          A.     Not in those terms, but I do recall

6    him saying that.

7          Q.     Him saying what?

8          A.     That I did come in late.  He said I

9    came in late and left early while he was on

10   vacation.

11         Q.     Did he, Bruce, discipline you for

12   leaving early, coming in late?

13         A.     No.  Not that I recall.

14         Q.     Okay.  Let's talk about these other

15   issues, the tea kettle, the oatmeal, for a minute,

16   if I may.  Prior to Bruce going on vacation, did he

17   ask you any questions about the tea kettle?

18         A.     Yes.

19         Q.     So prior to vacation what did he say

20   to you and what did you say to him about the tea

21   kettle?

22         A.     I don't remember verbatim.

23         Q.     Right.

24         A.     I do recall him asking me about the

25   tea kettle.  I assume he asked me because the box

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

113

1    was under my desk still.  I said that should have

2    been put on the supply card; I'll verify with Ronn

3    and make sure it was put on.

4         Q.    What's the supply card?

5         A.    It's a card that's just for anything

6    that's needed within the building or the office

7    that's on the sales floor.

8         Q.    Who has the authority to put items on

9    the supply card?

10         A.    Actually ring them up on the supply

11    card?

12         Q.    Yes.

13         A.    Several people, but I always bring

14    that to the attention of the administration manager

15    so I know that he's aware.

16         Q.    So if you want to use something from

17    the floor in the office, such as a tea kettle, all

18    right, the procedure is to notify the

19    administration manager and have him put it on the

20    supply card?  Is that right?

21         A.    Well, generally the person who gets

22    the supply card goes up, rings it up at the

23    register, and that's how it's rung up.  And then

24    the card goes back to the mall clerk.

25         Q.    All right.

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

114

1      A.    There's numerous occasions where we'll

2  pull stuff off the floor when we need it, pull the

3  UPC, hold it for the administration manager and

4  tell him it needs to go on the supply card.

5      Q.    Do you know why items have to be put

6  on the supply card?

7      A.    Um.

8      Q.    I mean items for the office.  Use of

9  the office.

10     A.    I would assume to track expenses.

11     Q.    Right.  It's an inventory issue, isn't

12  it?

13     A.    That's a way of putting it, yes.

14     Q.    Typically, what type of items are put

15  on the supply card?

16     A.    It could be anything.

17     Q.    Give me an example.

18     A.    Tape.  It could be coffee pot.  Tea

19  kettle.

20     Q.    Right.

21     A.    TV.

22     Q.    Right.

23     A.    It could literally be anything that's

24  needed.

25     Q.    Needed in the office.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

115

1          A.      In the building.

2          Q.      In the building for --

3          A.      Any department.

4          Q.      -- for anybody to work, you know, any

5     department, basically to facilitate them doing

6     their jobs.  Whatever reason.

7          A.      Or with approval, yes.

8          Q.      With approval, right.

9                  So before Bruce left on vacation, he

10    asked you about the tea kettle, which was I guess

11    in -- near your desk?  Is that right?

12         A.      It's between the desks.  On the

13    counter.

14         Q.      And what did you say to him?

15         A.      I said, "I asked Ronn to put it on the

16    supply card and I will verify that it was."

17         Q.      And Ronn is who?

18         A.      He's the administration manager.

19         Q.      So you told Bruce words to the effect

20    of "I asked Ronn to put it on the supply card and

21    I'll verify that he did."  Words to that effect?

22         A.      Words to that effect.

23         Q.      And did you check with Ronn that day

24    to see if it had been put on the supply card?

25         A.      I don't recall if I checked that day.

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

116

1          Q.      When did you check?

2          A.      I don't know the date I checked with

3    him.

4          Q.      When you told -- what was -- when you

5    told Bruce you were going to check with Ronn to see

6    if it was on the supply card, what did he say, if

7    anything?  Of substance.

8          A.      I don't recall.

9          Q.      Okay.  Prior to going on vacation, did

10   you have any conversation with Bruce about any of

11   the other items that bubbled up afterwards?

12         A.      Yeah.  He also at the same time of the

13   tea kettle, he asked me about the oatmeal.

14         Q.      What did he ask you about the oatmeal?

15         A.      Just asked me if it was paid for.

16         Q.      And what did you say?

17         A.      Yes.

18         Q.      That's it?  Simple as that?

19         A.      Simple as that.

20         Q.      So you said you were asked to write a

21   statement?  Is that right, about these issues?

22         A.      No.  I was only asked to write a

23   statement about one item?

24         Q.      About one item?  Okay.  What item was

25   that?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

120

1   enough of the tea kettle for now.

2           The oatmeal.  Specifically what was

3   discussed about the oatmeal in that meeting in

4   Bruce's office after his vacation?

5       A.   He asked me if it was paid for.

6            I said yes.

7            He said they pulled up my -- how I

8   paid for it.  Because he can't find the transaction

9   on my membership card.

10           I said I didn't purchase it.  I said

11  my girlfriend did in Manahawkin.  She left

12  Manahawkin without it, so I took it off the floor

13  here.

14      Q.   What was Bruce's response, if any, to

15  that?

16      A.   His exact response, I don't recall.

17      Q.   Okay.  Do you recall the sum and

18  substance of his response?

19      A.   Basically repeating back to me kind of

20  all right, so you didn't pay for it here; she

21  bought it over there and left it and -- kind of --

22  something along those lines.

23      Q.   Now, you had had a conversation before

24  Bruce went on vacation about the oatmeal, correct?

25      A.   Yes.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

121

1        Q.     Brief conversation.   You told him --
2   he asked you if you paid for it.   You said yes.
3        A.     He asked me if it was paid for.
4        Q.     If it was paid for and you said yes.
5        A.     Yes.
6        Q.     You didn't explain to him this whole
7   thing about your girlfriend buying it, forgetting
8   it in Manahawkin, did you?
9        A.     Correct, no, I did not.
10        Q.     Okay.  So do you recall any other
11   issues that were raised in that meeting besides the
12   tea kettle and the oatmeal and of course the issue
13   with your son we discussed?
14        A.     Exiting through the tire center.
15        Q.     Describe what was discussed about
16   that.
17        A.     He asked me if I left through the tire
18   center door.
19               I said I did.
20               He asked me why.
21               I said the exact reason I was talking
22   to the tire shop manager at that point; I don't
23   recall, and I still don't, but on occasion I'd have
24   to relay information or whatever the case may be,
25   communication with the tire shop manager, and if

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

123

1       Q.      Do you understand the policy about

2   everyone leaving through the exit door of the

3   building, employees and members?

4       A.      Am I aware of it?

5       Q.      Yeah.

6       A.      Um -- can't say I was fully aware of

7   it.

8       Q.      So is it not true that members and

9   employees are required to leave and have their

10  receipts checked if they have product at the exit

11  door of the warehouse?

12      A.      That's correct.

13      Q.      Right.  Do you understand the reason

14  why that would be -- why Costco would want that to

15  happen?

16      A.      Yes.

17      Q.      Why?

18      A.      To make sure that there's controls in

19  place.

20      Q.      Right.  There are Costco employees,

21  member service employees at the door checking

22  receipts, correct?

23      A.      There's member service people at the

24  door verifying -- marking receipts.

25      Q.      Right.  That's their job, right?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

124

1          A.      To mark receipts, yes.

2          Q.      Do you recall the name of the tire

3     center manager?

4          A.      Bill Poser.

5          Q.      Bill Poser, thank you.

6                  Did you tell Bruce that you had your

7     receipt checked by Bill Poser, the tire center

8     manager?

9          A.      I did.

10         Q.      Flowers was the product you had,

11    correct?

12         A.      That's what I remember.

13         Q.      What was Bruce's response when you

14    told him that Bill Poser had checked your receipt?

15         A.      I don't recall what reaction he had or

16    if he had a reaction.

17         Q.      Okay.  Did Bill Poser report to you in

18    the building?

19         A.      He did.

20         Q.      Had you ever left trough the tire

21    center with product before this?

22         A.      Yes.

23         Q.      And who would check your receipt in

24    those situations?

25         A.      Either tire shop supervisor or Bill

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

127

1         A.      Yes.

2         Q.      Before we get into the documentation,

3    when you say the TV, tell me what Bruce raised and

4    how you responded.

5         A.      That I did a return on a TV for my

6    brother.

7         Q.      Okay.  That's what he said.  Bruce

8    said.

9         A.      I don't know verbatim what he said.

10        Q.      I know you don't know verbatim, but

11   sum and substance.

12        A.      He brought up the issue I did a return

13   on the old TV for my brother.

14        Q.      And how did you respond in sum and

15   substance?

16        A.      Um, that I didn't do the return, that

17   I was involved, but I did not do the return.

18        Q.      How were you involved?

19        A.      I was -- I went over there and I

20   helped them look in the computer to show that it

21   was a justified return, and once the return clerk

22   saw that, then I called for somebody else to

23   approve it.

24        Q.      Okay.

25        A.      Because I know I can't approve it.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

128

1        Q.      Why can't you approve it?

2        A.      Because it's my brother.

3        Q.      Right.   Okay.   So you told Bruce that

4    you didn't do the return.   Did you tell him

5    anything else?

6        A.      We definitely discussed it.   In what

7    order, I don't know precisely, but we definitely

8    discussed it with some more detail.   I did explain

9    I was over and I did pull it up on the screen,

10   showed the return.

11              I also pointed out that once they were

12   going to do the return, that they were going to

13   refund him the full price, and I stopped it to show

14   them that there was a price adjustment done a

15   couple -- a few years back after they purchased it,

16   that he doesn't get the full price back.   Because

17   there was a price adjustment done.

18              And then I had Daryl, who was the

19   front end supervisor, look at it, asked him --

20   showed him the screen where it showed it was okay

21   to return, asked him if he's okay with it.   He said

22   yes.   And then I asked him if he could assist in

23   getting him another TV.   That's the meat of it.

24       Q.      Right.   This is what you told Bruce.

25       A.      Yes.

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

134

1    Q.    Regional vice president.  What was his

2  role with regard to the Brick warehouse, the new

3  Brick warehouse?

4    A.    He would be Bruce's supervisor.

5    Q.    Okay.  So going to the meat of this is

6  the two-page memo, undated memo from Bruce

7  Dezendorf to Paul Pulver, Costco 868, 869.

8          So this is Bruce's memo.  I'm just

9  going to ask you if what's true and what's not true

10  in what he's written here, okay?

11    A.    Okay.

12    Q.    So going through the allegations.

13  Number one, the tea kettle.  The allegation is that

14  you removed the tea kettle off the floor for use in

15  the office.  Is that true?

16    A.    It is true that I put it in there for

17  use in the office.

18    Q.    Bruce writes here, the second

19  sentence:  "Jeff admits to taking the kettle from

20  the floor and setting it up on his desk to be used

21  by the office."  Is that true?

22    A.    No, it wasn't on my desk.  It was in

23  between the desks.  For public use.  For the rest

24  of the employees to use.

25    Q.    It wasn't on the desk, okay.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

135

1       He writes here that you stated to him

2   on 9/22/14, September 22nd, "When asked where the

3   tea kettle came from, that it was put on the supply

4   card."  Is that what you told him?

5       A.    Should have been put on the supply

6   card.

7       Q.    So you didn't -- on September 22nd you

8   did not tell Bruce that it had been put on the

9   supply card.  You said it should have been.

10      A.    Yes.

11      Q.    "When asked by me on October 9th."  So

12  let me just hold there for that date.  You don't

13  recall the date of the meeting you had with Bruce

14  that we just discussed for, like, a half an hour.

15  You don't recall that date, do you?

16      A.    The first meeting, I recall it on the

17  9th of October.

18      Q.    So you do, okay.  All right.  So when

19  he's talking about the 9th of October meeting,

20  that's --

21      A.    That is the first time --

22      Q.    -- accurate in terms of the date.  Is

23  that right?

24      A.    Yes.

25      Q.    So he's writing here that -- when he

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

136

1  asked you about the tea kettle -- why the tea

2  kettle was not on the supply card on October 9th,

3  you responded that you had just given the UPC --

4  that's, I guess, the bar card is it?

5      A.    Bar code.

6      Q.    Bar code.  You had just given the UPC

7  from the box to Ronn Neil, the min manager, and

8  told him to put it on the supply card.  Is that

9  what you said?

10      A.    It is.

11      Q.    All right.  So move on to the oatmeal.

12      A.    There was more.

13      Q.    Sorry, go ahead.

14      A.    As far as me giving it to him.  I had

15  cut it out and handed it to him, so it wasn't on

16  the box.

17      Q.    All right.  You handed him the UPC --

18      A.    Just the UPC without the box.

19      Q.    Right.  And that would be the -- I

20  guess you cut out the bar code, effectively, right?

21      A.    Yes.

22      Q.    So with the oatmeal, the second

23  sentence, he said -- he says, he reports here that

24  when you were asked by him on September 22nd, you

25  said you purchased the oatmeal.  Is that true?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

137

1          A.      No.

2          Q.      What's not true about it?

3          A.      He asked me if the oatmeal was

4    purchased.  I said yes.

5          Q.      And when he questioned you again on

6    October 9th, you stated that your girlfriend

7    purchased the item at Manahawkin on September 6th

8    and did not bring the item home, so you took one of

9    the units off the floor at Brick.  Is that

10   accurate, what you told him?

11         A.      Yes.

12         Q.      So the oatmeal, if you look at --

13   going through these documents, there is a receipt,

14   or I guess transaction detail report, not an actual

15   receipt, Costco 882.  And underlined in there is a

16   -- it says, Carol Murray's transaction detail

17   report from September 6th.  Is that right?

18         A.      Yes.

19         Q.      And it shows the purchase of the

20   oatmeal.  Is that right?

21         A.      Yes.

22         Q.      And that's underlined in the document

23   you have.

24         A.      Yes.

25         Q.      Okay.  All right.  And it says here,

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

142

1    didn't get full refund?

2          A.    I did not.

3          Q.    Like you said earlier, Daryl -- you

4    got Daryl to -- to do the override.  Is that right?

5          A.    I got Daryl to overlook what I showed

6    him and he did the override.

7          Q.    Right.  And that would be -- that

8    would be standard policy if somebody was in this

9    situation.  Is that right?  To get another

10   supervisor, a manager, to do the override, correct?

11         A.    Because it was my brother.

12         Q.    Right.

13         A.    Yes.

14         Q.    Yeah, because it was your brother,

15   you're not going to do the override yourself.

16         A.    Correct.

17         Q.    Thank you.

18               So, again, going back to the bold part

19   of this section here, the last sentence:  "Allowing

20   his family member to purchase a 75-inch Samsung TV

21   with extended warranty for $237."

22               Were you aware of that?

23         A.    After the fact.

24         Q.    Okay.  When you say "after the fact,"

25   what do you mean?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

153

1              Is that true?

2              JUDGE CITTA:  That statement, "Jeff

3  never spoke to me at any time to have the return

4  approved for a family member."

5              MR. GALLIGAN:  That's the sentence.

6              JUDGE CITTA:  You're asking him if

7  that statement by Bruce --

8              MR. GALLIGAN:  Is true.

9              JUDGE CITTA:  -- is a true statement.

10             MR. GALLIGAN:  Yes.

11      A.    I can't answer that.  I -- I'm not

12  sure how to answer that question.

13      Q.    Well, let me ask it a different way

14  then.

15      A.    Please.

16      Q.    At any point on the 20th did you say

17  to Bruce, Hey -- words to the effect of, "Hey, my

18  brother's going to come in to return an

19  eight-year-old TV; is that okay"?

20      A.    I did not.

21      Q.    Did it not even cross your mind to do

22  that?

23      A.    No.

24      Q.    You didn't think this was

25  questionable, a questionable return?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

160

1    Q.    All right.  So a two-page statement is

2    dated 10/10/14.  And then there's another statement

3    that's undated that's Costco 881.  Do you know

4    which came first?

5    A.    881.

6    Q.    881 came first, okay.

7          Do you remember when you wrote that,

8    the statement that's on the page 881?

9    A.    The day he initially spoke to me.

10   Q.    So that would be the 9th.

11   A.    That would be the 9th.

12   Q.    So when you said earlier that -- when

13   you testified about that meeting on the 9th and he

14   asked you to write a statement, this is the

15   statement that you wrote.  Correct?  The 881,

16   that's on 881?

17   A.    That's what Bruce asked me to write.

18   Q.    Right, and that's what you wrote.

19   A.    Yes.

20   Q.    And that addresses the tea kettle --

21   just the tea kettle, correct?

22   A.    Yes.

23   Q.    No, I'm sorry.  The oatmeal.  Tea

24   kettle and the oatmeal, correct?

25   A.    Correct.

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

161

1          Q.     And then the followup statement, which

2     is written the next day, if I got the dates right.

3     Why did you write the second statement, the longer

4     one?

5          A.     Bruce handed me what looks to be this

6     paper.

7          Q.     You're pointing to?

8          A.     878.

9          Q.     These are handwritten notes that are

10    on 878?

11         A.     I don't know if there was another

12    page.  He handed me notes and asked me to write a

13    new statement based on the questions he put in

14    front of me.

15         Q.     Okay.  So is it your understanding

16    that these notes are Bruce's notes?  Is this

17    Bruce's handwriting?

18         A.     I can only tell you that Bruce handed

19    them to me.

20         Q.     All right.  So you don't know who

21    wrote them.

22         A.     I don't.

23         Q.     That's perfectly fine.  And then you

24    wrote this statement which is 879, 880.

25         A.     Yes.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

175

1    Q.    "He" being Bruce?

2    A.    Correct.

3    Q.    Do you know who made the decision to

4  suspend you?

5    A.    No.

6    Q.    I'll show you what has been marked as

7  Defendants-26.  It's two pages, but they're really

8  not connected so much.  So the first page of

9  Defendants-26 appears to be an Employee Counseling

10  Notice where you were suspended for five days

11  without pay pending further review.  Right --

12    A.    Yes.

13    Q.    -- is that what you're referring to?

14  The suspension?

15    A.    Correct.

16    Q.    Is that what you're referring to?

17    A.    That's what I'm referring to.

18    Q.    Tell me how that happened, who was

19  there, what was said.

20    A.    I don't know who made the decision,

21  but Bruce brought me in.  I think Peter was in the

22  room.  He explained to me that I was being

23  suspended pending further review.

24          Then he kind of went along the lines

25  explaining to me that I probably -- possibly be

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

176

1   demoted -- probably be demoted, it wasn't sure, and

2   be relocated.  And that my new warehouse manager

3   would be back in touch with me to let me know where

4   I would be -- where I would need to report to.

5   Along those lines.

6         Q.    Did you understand that the decision

7   was made somewhere above Bruce's head?

8         A.    That's what he said.

9         Q.    Do you have any reason to dispute

10  that?

11        A.    That's just what he told me.  I don't

12  know anything about it.  All he said was that it's

13  not his -- it's out of his hands.

14        Q.    Right.  Okay.  And he told you that

15  you'd probably be demoted and/or transferred.  Is

16  that right?

17        A.    He told me I would be transferred,

18  probably demoted and that my new warehouse manager

19  would be in touch with me to let me know where to

20  report.

21        Q.    That didn't happen.  You were

22  terminated, correct?

23        A.    Correct.

24        Q.    And this is your signature on the

25  document?

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

177

1        A.      Yes, it is.  It appears to be my

2   signature.

3        Q.      And you got a copy of this at the

4   time?  Just the first page.

5        A.      I believe I did.

6        Q.      Did you have any response to Bruce

7   when he gave you the news and told you what may

8   happen?

9        A.      At that point, no, I didn't.  I just

10   -- I did not.  I don't remember having much of a

11   response.  I definitely wasn't, um -- I was -- how

12   do I explain?  I didn't have much of a response.  I

13   just accepted what he told me and had to wait for

14   pending for further review.

15        Q.      Okay.  So you were just waiting, then,

16   for that five-day period?  You were just going to

17   wait?

18        A.      Yeah.  See what comes of it.

19        Q.      All right.  So the next page is an

20   email from Jeff Long to Bruce Dezendorf, cc to Paul

21   Pulver.  Who's Jeff long?

22        A.      Jeff Long is Paul Pulver's supervisor.

23        Q.      So he's the senior VP in the chain

24   that you described earlier?

25        A.      Yes.

**Jeffrey Bowie v. Costco Wholesale Corporation, et al.**
**June 18, 2018**

180

1  12:30 today."

2          So your termination was on

3  October 21st.  Is that correct?

4          A.    That's what the papers indicate, yes.

5          Q.    Did you recall the date?

6          A.    I don't recall the date specifically.

7          Q.    Can you describe how that termination

8  took place?

9          A.    He brought me in with Peter in the

10  room.  Sat down, and he said came down from above

11  him that I was being terminated.  And I did

12  question, I said, I thought I was being possibly

13  demoted and relocated.  He says it's beyond his

14  control.

15          Q.    Okay.  And you still don't know who

16  actually made the decision to terminate your

17  employment.  Is that right?

18          A.    I questioned who to speak to, and he

19  gave me the typical "Paul, Jeff."  Paul Pulver,

20  Jeff Long.  He asked me to -- he told me I can -- I

21  asked who do I contact, and he said, he indicated

22  that I can call Jeff Long or Paul Pulver.  Which I

23  intended to do.  And did.

24          Q.    Okay.

25          A.    Or tried to do, I should say.

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

185

1    on page three.  So we'll go page number and then

2    paragraph number?

3              "Plaintiff," that's you, "had risen to

4    the position of general manager through a series of

5    meritorious promotions."

6              You see that?

7         A.   I do.

8         Q.   Right.  That's not strictly correct,

9    is it?

10        A.   Assistant general manager.

11        Q.   Assistant general manager.  But you

12   did get a series of promotions to assistant general

13   manager.  Is that right?

14        A.   Yes.

15        Q.   You'd been promoted up the chain from

16   -- what was your first position again?

17        A.   Forklift operator.

18        Q.   Forklift operator all the way up to

19   assistant general manager.  Is that right?

20        A.   Yes.

21        Q.   Paragraph seven on the next page, page

22   four.  "Defendants Costco Wholesale Corporation and

23   Bruce Dezendorf had earlier been made aware of

24   plaintiff's disabled son when plaintiff made a

25   formal request for intermittent family leave or an

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

186

1   accommodation."

2           Did you make a formal request for

3   intermittent family leave during this period of

4   time?

5       A.    Could you define "formal" for me,

6   please?

7       Q.    I was going to ask you.

8           Let me put it this way.  Did you make

9   any kind of request for intermittent family leave

10  from Bruce?

11      A.    I had a conversation with Bruce,

12  explaining the agreement I had with the previous

13  GM, asking if this was okay.  He confirmed it was

14  okay.

15      Q.    Right.  So that is -- that's the

16  closest we have to the formal request for

17  intermittent leave, what's written in here?

18      A.    Yes.

19      Q.    There's nothing else that I'm missing?

20      A.    Correct.

21      Q.    There's no paperwork that was

22  submitted, correct?

23      A.    Correct.

24      Q.    Okay.  Paragraph ten on the same page,

25  alleges that you were reprimanded and chastised by

Jeffrey Bowie v. Costco Wholesale Corporation, et al.
June 18, 2018

193

1      Q.    He was also as general manager?

2      A.    Yes.

3      Q.    He was -- I guess was he present in

4    the suspension meeting or the termination meeting

5    or both?

6      A.    I think both.

7      Q.    Both, okay.

8            Other than being present during the

9    termination and suspension meeting, does he have

10   any other knowledge that you know of pertaining to

11   your case?

12     A.    Yes.

13     Q.    What is his other knowledge?

14     A.    He's aware that I had to leave to help

15   my son.

16     Q.    Other than that.

17     A.    That my son has autism.

18     Q.    Anything else?

19     A.    As far as what else he knows, I don't

20   know.

21     Q.    Skip Bruce.  Unless there's something

22   else that Bruce said to you or did to you that was

23   not discussed today that pertains to your case?

24     A.    Not that I can recollect at this time.

25     Q.    James Mack is another assistant

# Exhibit 2

```
                                             1
1           UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
2           CIVIL ACTION NO. 3:16-CV-05808-BRM-LHG

3    ------------------------------x
     JEFFREY BOWIE,
4
              Plaintiff,
5
         vs.
6
     COSTCO WHOLESALE CORPORATION,
7    BRUCE DEZENDORF; and JOHN AND
     JANE DOES 1-10 (fictitious names),
8
              Defendants.
9    ------------------------------x

10          DEPOSITION OF:  BRUCE DEZENDORF
            DATE:  WEDNESDAY, JULY 11, 2018
11

12

13

14       T R A N S C R I P T of the deposition in the

15   above-entitled matter by and before

16   GERALDINE ADINOLFI, a Certified Court Reporter,

17   License Number 30XI00228000 of the State of

     New Jersey, held at the offices of
18
     DENOIA TAMBASCO & GERMANN, ESQS., 501 Main Street,
19
     Toms River, New Jersey, on July 11, 2018, commencing
20
     at 10:10 in the morning.
21

22

23

24

25
```

```
                                             2
1                A P P E A R A N C E S

2

3    DENOIA TAMBASCO & GERMANN, ESQS.
     BY:  THOMAS DENOIA, ESQ.
4    BY:  JUDGE JAMES N. CITTA
         501 Main Street
5        Toms River, New Jersey  08753
         Telephone: 732.341.1030
6        Email: Tom@denoiatambasco.com
     Attorneys for Plaintiff
7

8    SEYFARTH SHAW, LLP.
     BY:  PAUL GALLIGAN, ESQ.
9        620 Eight Avenue
         New York, New York  10018
10       Telephone: 212.218.5500
         Email:  Pgalligan@seyfarth.com
11   Attorneys for Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                             3
1                   I N D E X

2    WITNESS       DIRECT   CROSS   REDIRECT   RECROSS

3    BRUCE DEZENDORF
     BY: MR. DENOIA    4
4

5

6

7                E X H I B I T S

8    EXHIBIT          DESCRIPTION              PAGE

9    P-1      Defendants' objections and        31
              Responses to Plaintiff's
10            Interrogatories

11   P-2      Memo                              45

12   P-3      E-mails                           60

13   P-4      Evaluation**                      82

14            **retained by counsel

15

16

17

18

19

20

21

22

23

24

25
```

```
                                             4
1    BRUCE DEZENDORF, first having
2    been duly sworn, testified as follows:
3    DIRECT EXAMINATION BY MR. DENOIA:
4        Q.    Good morning.
5        A.    Good morning.
6        Q.    Why was Jeff Bowie fired?
7        A.    Violation of the manager's standard
8    of ethics.
9        Q.    Explain.
10       A.    He violated the manager's standard of
11   ethics by -- there was a hint, or there was some
12   things that were questionable, and he did not get a
13   partner and ask for some help.
14             There were a lot of things that
15   happened.
16       Q.    What do you mean, get a partner?
17   Explain that.
18       A.    Any time your motives could be
19   questioned for something, you should ask for help
20   from someone else, get a partner, talk it out with
21   another manager, usually your superior.
22       Q.    Are you referring to any specific
23   incident?
24       A.    The television that he returned for
25   his -- that he authorized the return for his
```

**STATE SHORTHAND REPORTING SERVICE, INC.**

13

1    Q.    What were your job duties there?
2    A.    I was a truck loader.  I was a
3  sorter, and I was also an on-call air driver for a
4  period of time.
5    Q.    Why did you leave UPS?
6    A.    I'm legally blind in my left eye.  I
7  have 20/50 vision.  They strung me along for years
8  telling me I could be a driver, and then they
9  changed the rules, and I could not become a
10  full-time driver.
11    Q.    Were you terminated, or did you
12  leave?
13    A.    I left.
14    Q.    What was your next position?
15    A.    I started to advance at Costco.  I
16  was working at Costco at the same time I was working
17  at UPS, so I dedicated my career to Costco.
18    Q.    What was your first position at
19  Costco?
20    A.    Part-time food stocker.
21    Q.    And which Costco were you working at?
22    A.    Costco Brick, 229.  It was on
23  Route 88 and Route 70.
24    Q.    And how many hours a week were you
25  working at the time?

14

1    A.    At Costco?
2    Q.    Yes.
3    A.    Twenty-five to forty.
4    Q.    And what was your next position at
5  Costco?
6    A.    Part-time forklift driver, cooler
7  stocker.
8    Q.    How many hours a week did you work in
9  that position?
10    A.    Twenty-five to forty.
11    Q.    How many years did you do that?
12  Strike that.
13         How long did you do that?
14    A.    Those two jobs were about three
15  years.
16    Q.    At some point, you obtained a
17  full-time position at Costco?
18    A.    Yes.
19    Q.    And what position was that?
20    A.    Full-time forklift driver.
21    Q.    When did you first meet Jeff Bowie?
22    A.    I don't know.
23    Q.    He was also a forklift driver; is
24  that correct?
25    A.    I don't know.  When I met him, he was

15

1  an assistant warehouse manager.
2    Q.    Okay.  How long were you a forklift
3  driver?
4    A.    Five to six years.
5    Q.    While you were a forklift driver, did
6  you have any interaction with Jeff Bowie?
7    A.    No.
8    Q.    What was your next position?
9    A.    Seasonal supervisor.
10    Q.    Now, I am making the assumption there
11  were no breaks in employment; is that correct?
12    A.    Correct.
13    Q.    What is a seasonal supervisor?
14    A.    I was promoted to supervisor, which
15  was a dollar more an hour, to run the seasonal area
16  of Costco.
17    Q.    When you say run the area, what were
18  your job duties?
19    A.    Stock it, make sure the signs were
20  up, make sure we were show time ready at 9:45.
21    Q.    And how long did you have that
22  position?
23    A.    Six months.
24    Q.    Okay.  Then what happened?
25    A.    I was promoted to foods manager.

16

1    Q.    Is this still at the Brick store?
2    A.    Yes.
3    Q.    What were your job responsibilities
4  as foods manager?
5    A.    To run the foods area, make
6  schedules, again make sure we got open at 9:45.
7    Q.    And how long did you have that
8  position?
9    A.    Eighteen months, two years.
10    Q.    And did you have any supervisory
11  responsibility of other employees -- of employees in
12  that position?
13    A.    Foods manager?
14    Q.    As the foods manager.
15    A.    Yes.
16    Q.    How many?
17    A.    Five.
18    Q.    During the time you were foods
19  manager, did you need to terminate any of your
20  employees?
21         MR. GALLIGAN:  Objection to form.
22         You can answer.
23         THE WITNESS:  No.
24  BY MR. DENOIA:
25    Q.    What was your next position?

**STATE SHORTHAND REPORTING SERVICE, INC.**

21

1  A.    Sixty to seventy.
2  Q.    And how long were you in that
3  position?
4  A.    Two-and-a-half, three years.
5  Q.    And in the two-and-a-half to three
6  years in that position, did you recommend any
7  employee for termination or discipline?
8  A.    No.
9  Q.    Would that be one of your job
10 responsibilities, to recommend employees for
11 termination or discipline?
12 A.    Yes.
13       And I don't believe I understood the
14 question before.  Your termination and discipline,
15 yes, I have recommended employees for discipline,
16 not for termination.
17 Q.    And let's see, this will be from the
18 time you started in management to the present; how
19 many employees have you recommended for discipline?
20 A.    I don't know.
21 Q.    More than one?
22 A.    Yes.
23 Q.    More than five?
24 A.    Yes.
25 Q.    More than ten?

22

1  A.    Yes.
2  Q.    More than twenty?
3  A.    Yes.
4  Q.    More than fifty?
5  A.    Yes.
6  Q.    And during that period, how many
7  employees have you recommended for termination?
8  A.    None.
9  Q.    Did you recommend that Jeff Bowie be
10 terminated?
11 A.    No.
12 Q.    So you were two-and-a-half to three
13 years as an assistant general manager over
14 merchandising; what was your next position?
15 A.    Assistant general manager over fresh.
16 Q.    I'm sorry?
17 A.    Fresh departments; meat, bakery,
18 deli, produce.
19 Q.    How long did you have that position?
20 A.    A year to eighteen months.
21 Q.    Did you get a raise every time you
22 changed positions?
23 A.    No.
24       I apologize, from foods manager to --
25 was a junior level manager, to merchandise manager,

23

1  was a step up to senior manager.  I got a raise.
2        From senior manager, which was
3  merchandising and admin, to assistant general
4  manager, I got a raise.  From there, it was yearly
5  raises.
6  Q.    And what were your responsibilities
7  in fresh?
8  A.    Oversee the bakery, meat and deli
9  departments, the quality of their product, their
10 schedules, their plans and their profit and loss.
11 Q.    And how long did you have that
12 position?
13 A.    That was about eighteen months, I
14 believe.
15 Q.    What was your next position?
16 A.    I went to Staten Island as an
17 assistant over administration.
18 Q.    Is that the same position you had
19 held previously in Brick?
20 A.    Yes.
21 Q.    Did you get a promotion, a raise when
22 you went to Staten Island?
23 A.    I did.  I got a $5,000 raise for the
24 commute and going to a high volume building.
25 Q.    And how long were you there, in the

24

1  Staten Island position?
2  A.    That position or the store?
3  Q.    We'll start with the position.
4  A.    Three years.
5  Q.    And how long were you in that store?
6  A.    Seven years.
7  Q.    What was your next position?
8  A.    I was the assistant general manager
9  over merchandising in Staten Island.
10 Q.    How long did you have that position?
11 A.    About a year.
12 Q.    And the next position after that?
13 A.    Assistant general over fresh.
14 Q.    That would be Staten Island?
15 A.    Staten Island, yes.
16 Q.    And how long did you have that
17 position?
18 A.    About a year there.
19 Q.    And what was your next position?
20 A.    I rotated back to merchandising.
21 Q.    For how long?
22 A.    Until 2013.
23 Q.    And what happened in 2013?
24 A.    I got promoted to general manager in
25 Brick.

25

1   Q.    And what were your duties as general
2  manager?
3      A.    Oversee the entire building,
4  everything that happens in the building comes
5  through me.
6      Q.    Did you have responsibility for
7  hiring and firing?
8      A.    Yes.
9      Q.    And that would cover all the
10  employees in that store?
11      A.    Yes.
12      Q.    Other than Jeff Bowie, who was
13  terminated, did you initiate an action that led to
14  termination of any other employees at the Brick
15  store since being made the general manager?
16      A.    Yes.
17      Q.    How many?
18      A.    I don't know the exact number.
19      Q.    I would like to talk about those
20  incidents. I don't want the people's names. I just
21  want to know what was the basis for the termination
22  of the employees, if you can recall.
23      A.    The first employee was a grazing
24  incident. He was stealing, eating the food off of
25  the floor.

26

1          MR. GALLIGAN: Can I clarify
2  something while the witness is thinking?
3          MR. DENOIA: Sure.
4          MR. GALLIGAN: Are we talking about
5  as general manager, or is it broader than that?
6          MR. DENOIA: As general manager of
7  the Brick store, while he was at the Brick store.
8          MR. GALLIGAN: While at the Brick
9  store?
10          MR. DENOIA: Well, yeah.
11  BY MR. DENOIA:
12      Q.    So let's clarify the question. Let
13  me ask you this --
14      A.    Mm-hmm.
15      Q.    Did you have any position after
16  general manager of the Brick store?
17      A.    No.
18      Q.    So that would be while you were
19  general manager at the Brick store.
20          MR. GALLIGAN: Thank you.
21          THE WITNESS: The only one I can
22  remember is, within the first six months of me being
23  there, a gentleman was caught grazing, and he was
24  terminated for grazing, for theft.
25  BY MR. DENOIA:

27

1      Q.    So then the next person that was
2  terminated would be Mr. Bowie?
3      A.    I don't know.
4      Q.    Have you ever terminated an employee
5  in all the time you worked there, or recommended
6  disciplinary termination, because they went out the
7  wrong door, other than Mr. Bowie?
8          MR. GALLIGAN: Objection to form.
9          You may answer.
10          THE WITNESS: I didn't recommend
11  termination. I just investigated --
12  BY MR. DENOIA:
13      Q.    Okay.
14      A.    -- the incident with Jeff Bowie.
15      Q.    All right. So let me modify the
16  question. Have you ever investigated another
17  employee, other than Mr. Bowie, for going out the
18  wrong door?
19      A.    I don't know.
20      Q.    Is there anything that would help you
21  refresh your recollection, a document or something?
22      A.    I don't think so.
23      Q.    Have you ever been disciplined by
24  Costco?
25      A.    Yes.

28

1      Q.    Okay. What were the circumstances
2  around that?
3      A.    I was an hourly employee, and I had a
4  late problem. So I was counseled for that because
5  of -- well, it doesn't matter why.
6          I had a forklift incident, where I
7  had an accident with the forklift, and I was
8  counseled for that.
9          I believe I had some register
10  shortages.
11          Since I became a manager, I have
12  never been counseled.
13      Q.    Have you ever been arrested?
14      A.    No.
15      Q.    Have you ever been -- well -- how
16  long have you known Jeff Bowie?
17      A.    I don't know exactly.
18      Q.    Did you know Jeff Bowie other than as
19  an employee?
20      A.    No.
21      Q.    Did he work with you in any other
22  stores?
23      A.    He worked with me in the original
24  Brick building when we were both assistants.
25      Q.    And how did you get along with him

29

1 when you were both assistants?
2     A.    Fine.
3     Q.    Have you worked with him since the
4 original Brick store?
5     A.    When I was promoted back to the --
6 when I was promoted to the Brick building and came
7 back, he was the assistant there.
8     Q.    So he was the assistant manager when
9 you came in as the general manager?
10    A.    Yes.
11    Q.    Do you know who the prior general
12 manager was at the Brick store?
13    A.    Leonard Wolgemuth.
14    Q.    Do you know him?
15    A.    We've met.
16    Q.    Did you have any discussions with him
17 when you came into the store for transition
18 purposes?
19    A.    Yes.
20    Q.    Did you discuss Mr. Bowie at all with
21 Leonard?
22    A.    I don't remember.
23    Q.    So is it fair to say that you
24 discussed nothing that was significant enough that
25 you recall?

30

1     A.    Yes.
2     Q.    When did you first become aware that
3 Mr. Bowie had an autistic son?
4     A.    I don't know the exact date.  It was
5 before I was promoted.
6     Q.    So you would have known that back in
7 the original Brick store?
8     A.    I believe so.
9     Q.    When you became general manager of
10 the Brick store, were you aware that Mr. Bowie had
11 an autistic son?
12    A.    Yes.
13    Q.    And had anyone discussed with you his
14 request to have to take time, from time to time,
15 because of his autistic son?
16        MR. GALLIGAN:  Objection to form.
17        You may answer.
18        THE WITNESS:  No.
19 BY MR. DENOIA:
20    Q.    Were you aware that Mr. Bowie had to
21 take time off or leave early or come in late from
22 time to time because of his autistic son?
23    A.    Yes.
24    Q.    And how did you become aware of that?
25    A.    He told me when I got back there that

31

1 he might have to take time off, and he took some
2 time off.
3        Whenever he did, he would tell me
4 that he was coming in late.  He had an issue with
5 his son, getting him on the bus.  He was the only
6 one that could get him on the bus, or off the bus
7 sometimes, and he was late from time to time.  He
8 even had to leave a couple times.
9     Q.    And when did this occur?
10    A.    I don't know dates.
11    Q.    Did that create a problem for you,
12 when he was late from time to time?
13    A.    No.
14    Q.    Or, when he had to leave early from
15 time to time?
16    A.    No.
17        MR. DENOIA:  Mark that P-1.
18        (Whereupon, P-1 was received and
19 marked for identification.)
20 BY MR. DENOIA:
21    Q.    I'm going to show you a document
22 that's been marked P-1 for identification, which I
23 can represent to you is Costco's objections and
24 responses to the plaintiff's interrogatories.
25        My question is, after you've had --

32

1 take your time to look at the document, and then the
2 question is, have you ever seen the document?  That
3 is the first question.
4        Apparently, there is also -- and I
5 apologize, attached the defendants objections and
6 responses to the first notice to produce.
7     A.    No, I do not ever remember seeing
8 this document.
9     Q.    Did you personally answer any of
10 these questions?
11        MR. GALLIGAN:  Object to form.
12        You may answer.
13        THE WITNESS:  I don't know.
14 BY MR. DENOIA:
15    Q.    Were you ever given a document called
16 interrogatories and asked to supply answers?
17    A.    I don't remember.
18    Q.    Did Jeff Bowie ever ask for
19 permission to leave at various times, and
20 specifically ask for family leave as a result of his
21 autistic son?
22        MR. GALLIGAN:  Objection to form.
23        You may answer.
24        THE WITNESS:  I'm not sure I
25 understand what you're asking.

---

**33**

1  BY MR. DENOIA:
2      Q.     Well, did he ever come to you and
3  say, I may need to leave from time to time due to my
4  autistic son?
5      A.     Yes.
6      Q.     And what was your response?
7      A.     Let me know when you have to go.  I
8  am 15 minutes down the road.  If there's nobody
9  here, I'll come and cover.
10     Q.     Now, you went on vacation in late
11  September, early October of 2014; is that correct?
12     A.     Yes.
13     Q.     And when you came back from vacation,
14  did you discover that Mr. Bowie had come into the
15  store late or left early while you were away?
16     A.     Yes.
17     Q.     Did you discuss that with him?
18     A.     Yes.
19     Q.     And what did you say?
20     A.     I told him that the appearance was
21  that he was hiding it from me by doing it when I was
22  off and not telling me about it, that he just needed
23  to let me know.
24     Q.     Did you accuse him of stealing time?
25     A.     No.

---

**34**

1      Q.     Did you tell him there was an
2  appearance that he was stealing time?
3      A.     I don't know.
4      Q.     Is this the first time that you
5  addressed to Mr. Bowie that you were -- did you
6  express you were not happy that he had left while
7  you were away?
8      A.     I'm not sure I'm understanding what
9  you want.
10     Q.     Okay.  Did you express to him that
11  you were not happy that he left early or came in
12  late when you were away?
13     A.     I expressed to him that I wasn't
14  happy that he didn't let me know.
15     Q.     Is this the first time that you told
16  Mr. Bowie that you weren't happy that he didn't let
17  you know that he left early or came in late because
18  of his son?
19     A.     I believe so.
20     Q.     That would have been your vacation in
21  late September ending on or about October 3rd of
22  2014?
23     A.     On my return of it, yes.
24     Q.     Okay, and tell me exactly what you
25  told him, to the best of your recollection, about

---

**35**

1  this incident.
2      A.     I don't remember the specific
3  conversation.
4      Q.     Well, give me your best paraphrase of
5  what happened.
6      A.     I believe I asked him if he had left
7  early while I was on vacation, how many days.
8          He told me that he left for his son a
9  few times.  He asked if it was a problem.
10         I said, no, the only problem was you
11  didn't e-mail me or let me know what was going on,
12  and it didn't leave a good appearance to the
13  building when you just walk out and don't tell
14  anyone.
15     Q.     What did he say to that?
16     A.     Somewhere in there, I think it was
17  before or in the middle, he asked if he needed FMLA.
18         I said I don't think he needs FMLA.
19  He just needs to let me know when he's leaving,
20  that I have no problem with him leaving to take care
21  of his son.  It's just an information thing, that
22  someone in the warehouse knows.
23     Q.     Did he tell you that he had made sure
24  there was coverage?
25     A.     I don't know.

---

**36**

1      Q.     How soon after your return from
2  vacation did you address with him the FMLA issue?
3          When did that come up; did that come
4  up in that conversation when you came back from
5  vacation?
6      A.     I don't know when it was.  It came up
7  in the conversation that we had about his leaving
8  early.
9      Q.     Okay.  So that would have been -- but
10  that would have been in the same conversation in
11  which you told him you weren't happy about the
12  appearance it left when he left early when you
13  weren't there?
14         MR. GALLIGAN:  Objection to form.
15         You may answer.
16         THE WITNESS:  I believe so.
17  BY MR. DENOIA:
18     Q.     Did you report this conversation
19  between you and Mr. Bowie to anyone else in Costco?
20     A.     I don't remember.
21     Q.     Did anyone from Costco comment to you
22  that Mr. Bowie had left early?
23     A.     Yes.  I believe someone told me that
24  he had left early while I was on vacation.
25     Q.     Do you know who that was?

---

**37**

1    A.    I do not remember.
2    Q.    Now, do you have an HR department at
3  Costco in Brick?
4    A.    An actual HR department, no.
5    Q.    Do you have an HR representative?
6    A.    Closest I would have would be my
7  payroll clerk.
8    Q.    Who is that?
9    A.    Jessica Vaughn.
10    Q.    Did she tell you that he left early?
11    A.    I don't know.
12    Q.    Were you upset that he had left early
13  without telling you?
14    A.    No.
15    Q.    Now, other than Jeff Bowie, had you
16  undertaken investigations concerning any other
17  employee discipline while you were a manager at
18  Brick, your last position?
19    A.    I don't know if there were any before
20  him.
21    Q.    Have there been any after him?
22    A.    Yes.
23    Q.    And what was the nature of the
24  employees that you investigated after him?
25    A.    A supervisor was complaining that a

**38**

1  manager harassed her.
2    Q.    And how did you investigate that?
3    A.    Interviewed the people, created a
4  finding of all the facts I could gather and got with
5  my vice president as to how to resolve it.
6    Q.    And who would that be?
7    A.    Paul Pulver.
8    Q.    And what was the result?
9    A.    I believe the employee was counseled,
10  and the manager was also counseled. There was no
11  harassment, but they acted inappropriately.
12    Q.    Is there a handbook or any writing
13  that tells you what procedures you should undertake
14  to investigate an employee incident?
15    A.    Not that I know of.
16    Q.    So in that case, you interviewed
17  people in person?
18    A.    Mm-hmm, yes.
19    Q.    You took notes, I would assume?
20    A.    Yes.
21    Q.    Wrote memos or e-mails?
22    A.    Yes.
23    Q.    Anything else?
24    A.    Nothing I remember.
25    Q.    And that came to your attention as a

**39**

1  result of a complaint of another employee; is that
2  correct?
3    A.    Mm-hmm, yes.
4    Q.    And any other investigations while
5  you were manager, to date?
6    A.    To date, yes.
7    Q.    What type?
8    A.    Pharmacy incident, two employees.
9    Q.    Generally, what was that about?
10    A.    Possible HIPAA violations.
11    Q.    Okay, and how did you investigate
12  that?
13    A.    Interviewed the people involved,
14  gathered the facts, presented the facts that I had
15  to Paul Pulver, and we came up with a resolution.
16    Q.    And what was the resolution in that
17  case?
18    A.    Both employees were counseled and
19  removed from the pharmacy.
20    Q.    Were they terminated from Costco?
21    A.    No. Again, there was no violation,
22  but it was inappropriate conduct.
23    Q.    Any other investigations?
24    A.    I don't believe so.
25    Q.    What was the reason you initiated the

**40**

1  investigation against Jeff?
2    A.    I was told he took the teapot and the
3  oatmeal off the floor without paying for it.
4    Q.    And who told you that?
5    A.    I do not remember.
6    Q.    Well, let's go back to that
7  harassment incident. I don't want the person's
8  name, but do you know the name of the person who
9  initiated that information for the alleged sexual
10  harassment?
11    A.    It wasn't sexual harassment.
12    Q.    Or, the alleged harassment.
13    A.    Yes.
14    Q.    And do you know who the person who
15  reported the pharmacy incident was?
16          Again, I don't want a name. I just
17  want to know if you know the person.
18    A.    Actually, yes, I do.
19    Q.    And yet you do not know the person
20  who told you that Jeff took a teapot and oatmeal off
21  the floor?
22    A.    In both the other investigations, the
23  person -- the people who -- the harassment claim was
24  made by the person in the investigation, and the
25  pharmacy was made by the people who ended up

**STATE SHORTHAND REPORTING SERVICE, INC.**

41

1 being -- the first complaint was made be them, which
2 started the investigation.
3      Q.     But you don't know who gave you the
4 information that initiated the investigation that
5 led to Jeff Bowie's termination; is that correct?
6      A.     Correct.
7      Q.     So somebody came to you and said, I
8 believe Jeff is stealing merchandise or -- is that
9 correct?
10      A.     Somebody came to me and told me that
11 he took a teapot and oatmeal off of the floor, and
12 they don't know if it was paid for.
13      Q.     And then what did you do upon
14 discovering this?
15      A.     I spoke to Jeff, asked him how the
16 teapot was paid for, if the teapot was paid for.
17          He told me it was put on the supply
18 card, and he was using it for his oatmeal.
19          I asked him if the oatmeal was paid
20 for.
21          He told me he paid for the oatmeal.
22      Q.     Let's talk about the oatmeal.  Did he
23 tell you that the oatmeal was bought at another
24 store, and he had the receipt but that he didn't
25 take it, that he left it there by mistake?

42

1      A.     Not until after I got back from
2 vacation.
3      Q.     Well, did this incident with the
4 teapot happen before or after you went on vacation?
5      A.     I believe it happened before I went
6 on vacation.
7      Q.     And when did you find out about it,
8 before or after you went on vacation?
9      A.     When did I -- I am sorry, when did I
10 find out?
11      Q.     When did someone tell you about this,
12 before or after you went on vacation?
13      A.     Before I went on vacation.
14      Q.     Do you know what dates you were on
15 vacation in September of 2014?
16      A.     It was the end of the month.  I don't
17 know the exact dates.
18      Q.     Bear with me a second.
19          MR. GALLIGAN:  Tom, are your looking
20 for the date?
21          MR. DENOIA:  Yeah.
22          MR. GALLIGAN:  I think I have them in
23 my notes.
24          Do you want this on or off the
25 record?

43

1          MR. DENOIA:  You can put this on the
2 record.
3          MR. GALLIGAN:  I just want to state
4 for the record that we advised counsel that
5 Mr. Dezendorf was on vacation from September 25 to
6 October 3, 2014.
7 BY MR. DENOIA:
8      Q.     Now, when did you initiate the
9 investigation against Jeff?
10      A.     When I returned from vacation.
11      Q.     Do you know the exact date?
12      A.     No.
13      Q.     Was that after the conversation you
14 had with him about him leaving the office while you
15 were on vacation, leaving early?
16      A.     I don't know.
17      Q.     Do you know when you had the
18 conversation with him about leaving the office
19 early?
20      A.     I don't remember.
21      Q.     But it was after you came back from
22 vacation, is that correct, because I believe you
23 said the issue was that he did that while you were
24 on vacation?
25      A.     Yes, I think so.

44

1      Q.     Okay.  Now, who handled the
2 investigation into Jeff?
3      A.     I am sorry?
4      Q.     Who was in charge of the
5 investigation into Jeff?
6      A.     Jeff Bowie?
7      Q.     Yes.
8      A.     Me.
9      Q.     And how did you initiate that
10 investigation?
11      A.     I don't remember exactly.
12      Q.     Okay, and it was initiated -- is it
13 fair to say it was initiated because of the oatmeal
14 and teapot, or were there other reasons it was
15 initiated?
16      A.     Oatmeal and teapot, I believe.  I
17 think that would be fair.
18      Q.     So how did you go about handling this
19 investigation; did you do it like the others?
20      A.     No.
21      Q.     Did you interview anyone?
22      A.     Only Jeff.
23      Q.     What else did you do to investigate
24 the issues?
25      A.     I had my loss prevention person help

45

1  me look through purchases. I had him look through
2  purchases to try and find the oatmeal purchase that
3  Jeff claimed to make. I also had him look for the
4  teapot on the supply card.
5      Q.    And who was that?
6      A.    Mike Statile.
7      Q.    How do you spell that, if you know?
8      A.    S-t-a-t-i-l-e.
9            We also reviewed video.
10     Q.    Who are we?
11     A.    Myself and Mike.
12     Q.    Now, when did you review these
13  videos?
14     A.    I don't know the exact date.
15     Q.    Was that before or after you had the
16  conversation with Jeff about coming in late or
17  leaving early?
18     A.    I don't know.
19     Q.    Is Mike still with the company?
20     A.    Yes.
21     Q.    Is there any way to know -- is there
22  any documentation that would tell us when you
23  actually reviewed the video?
24     A.    Not that I know of.
25     Q.    Just out of curiosity, how much was

46

1  the oatmeal?
2      A.    I don't know the exact price, $10.
3      MR. DENOIA: I'll have this marked as
4  D-2 -- I mean, P-2.
5            (Whereupon, P-2 was received and
6  marked for identification.)
7  BY MR. DENOIA:
8      Q.    I'm going to represent that P-2 is
9  Bates stamped 868 through 888 of the documents
10  produced by the defendants in this matter.
11           If you would just look at the first
12  two pages of P-2, read them to yourself, and when
13  you are done reading them, I would like to ask you
14  some questions, so let me know.
15     A.    Okay.
16     Q.    Start with, did you prepare that
17  document?
18     A.    Yes.
19     Q.    Now, going to No. 3 under the
20  allegations section --
21     A.    Mm-hmm.
22     Q.    It's -- would you just read that
23  slowly into the record so we know what we are
24  talking about, the bold part.
25     A.    The bold part, No. 3, on 9/17/2014 --

47

1  or, 9/17/14, Jeff Bowie left the building for the
2  day with flowers he purchased through the tire
3  center not through the main entrance.
4      Q.    Who reported that incident to you?
5      A.    I'm not sure; I don't remember.
6      Q.    How did that come to your attention;
7  do you know?
8      A.    I believe when we were reviewing
9  video it came up that he left through the tire
10  center on that day.
11     Q.    Was that one of the days he left
12  early?
13     A.    I don't know.
14     Q.    And I'm -- I would like to understand
15  why you would be looking for a video of him leaving
16  the building when you were investigating the tea
17  kettle and the oatmeal.
18     A.    I don't know.
19     Q.    So you don't know how this came
20  about?
21     A.    How this --
22     Q.    This memo came about.
23     A.    Mm-hmm.
24     Q.    It appears from the memo that you
25  were reviewing videos; is that correct?

48

1      A.    I had my -- I had Mike Statile, my LP
2  guy, review video, and then he went over his
3  findings with me.
4            So yes, I was reviewing video with
5  him.
6      Q.    And you were -- the LP was reviewing
7  the teapot issue and the oatmeal issue; is that
8  correct?
9      A.    Yes. I believe he was also reviewing
10  whether or not Jeff left early or not.
11     Q.    So who gave him instructions on what
12  to review?
13     A.    Me.
14     Q.    So it's fair to say you said, review
15  to see if Jeff paid for the tea kettle, review to
16  see if Jeff paid for the oatmeal, and I would also
17  like you to review the videos to determine whether
18  or not Jeff left early; is that correct?
19     A.    Yes, that would be a fair statement.
20     Q.    Did you ask him to review for
21  anything else that could be used to write Jeff up?
22     MR. GALLIGAN: Objection to form.
23           You may answer.
24     THE WITNESS: I am not sure -- could
25  you repeat the question, I'm sorry?

**STATE SHORTHAND REPORTING SERVICE, INC.**

**49**

1  MR. DENOIA: Would you be so kind.
2  (Whereupon, the previous question was
3  read back by the reporter.)
4  THE WITNESS: Not that I remember,
5  and it wasn't to review to write Jeff up. It was to
6  gather facts.
7  BY MR. DENOIA:
8  Q. How much video did he review; do you
9  know?
10  A. I don't know.
11  Q. Are those videos all still available?
12  A. I don't know.
13  Q. Did you give him a time period to
14  review?
15  A. Probably.
16  Q. And where did you -- do you know what
17  that time period was?
18  A. I don't remember.
19  Q. So then since you told him to see if
20  he was leaving early, that was also the subject of
21  your investigation, was it not, whether or not he
22  left early?
23  A. I don't think it was part of my
24  investigation.
25  Q. Well, then why did you ask him to

**50**

1  review the video to see if he left early?
2  A. I was told he left early. I wanted
3  to find out if he did.
4  Q. Who told you that?
5  A. I don't remember.
6  Q. Have you discussed this case with
7  Mike since it's been filed?
8  And I don't want you to tell me if at
9  times you may have talked with Mike in front of
10  counsel.
11  MR. GALLIGAN: Thank you.
12  THE WITNESS: Not that I remember.
13  BY MR. DENOIA:
14  Q. Did you tell Mike you had your
15  deposition today?
16  A. No.
17  Q. Does Mike still work at the store?
18  A. Yes.
19  Q. Do you see him on a day-to-day basis?
20  A. Yes, I see him at least once a day.
21  Q. So did you ever discuss Jeff's
22  lawsuit with Mike?
23  A. Not that I remember.
24  Q. Go on to the next page of the
25  exhibit.

**51**

1  And it talks about the return of the
2  TV by Jeff's brother. How did you become aware of
3  that?
4  A. In gathering the information with
5  Mike, either he or I found the return, which looked
6  strange on the account. So we looked at it and
7  looked at video to see what happened.
8  Q. And what was your understanding of
9  the TV return policy at that time?
10  A. At this time?
11  Q. Correct.
12  A. We had a 90-day return policy that we
13  would -- it was when you purchased it on an Amex you
14  got two years, had a concierge service for two
15  years. After 90 days, the member owned the TV.
16  Q. Explain that for me. If you bought
17  it on Amex, you could bring it back for two years?
18  A. I am sorry, no. You could only bring
19  it back after two years -- sorry, start over.
20  It was a 90-day return policy. You
21  could return the TV to Costco in the first 90 days
22  for any reason, no questions asked.
23  There was a two-year manufacturer's
24  warranty and a two-year concierge program through
25  Costco. So the manufacturer's warranty was for two

**52**

1  years, and Costco concierge helps you go through
2  that.
3  If you purchased it on your Amex
4  card, it was extended for another two years.
5  Q. So effectively four years?
6  A. If you used your Amex card, yes, with
7  the manufacturer's warranty.
8  Q. In this case, do you know whether an
9  Amex card was used?
10  A. I do not.
11  Q. Now, when did that 90-day policy go
12  into effect?
13  A. 2007.
14  Q. And prior to 2007, what was the
15  policy?
16  A. Satisfaction guaranteed.
17  Q. Which means you could bring it back
18  at any time; is that fair to say?
19  A. People did, yes.
20  Q. And it was accepted; is that correct?
21  A. Most of the time, yes.
22  Q. Isn't it true that you had a policy
23  that grandfathered anything within the original
24  policy up to 2007?
25  A. I guess. I'm not sure.

53

1     Q.    Okay. Now, when an employee or
2 manager goes to the computer and puts in a return,
3 and it was within a time that was acceptable, would
4 the computer say on it okay?
5     A.    Yes.
6     Q.    And if I were to tell you that Jeff
7 testified that when he put this into the computer it
8 said okay, would that surprise you?
9     A.    No.
10     Q.    And why is that?
11     A.    Because I believe it was purchased
12 before the return policy was in effect.
13     Q.    So let me ask you this; if I brought
14 in a TV -- let's not make it me. John Smith brought
15 in a TV.
16     A.    Mm-hmm.
17     Q.    You don't know him.
18     A.    Mm-hmm.
19     Q.    He bought it in 2006, said this is no
20 good; would you accept it?
21     A.    No.
22     Q.    And why not?
23     A.    Because our return policy changed in
24 2007, I would not accept a TV from someone purchased
25 in 2010. I wouldn't accept it back.

54

1     I'm not going to take your TV back.
2 It's not the right thing to do by our member, by the
3 members now or even by you, because it's wrong. The
4 TV is old, and it's out of warranty.
5     Q.    Now, has this in fact ever been done?
6     MR. DENOIA:  I have to take this one,
7 unfortunately, if I can find my phone.
8     (Whereupon, a brief recess was
9 taken.)
10 BY MR. DENOIA:
11     Q.    But in fact, Costco has accepted
12 older returns, older than 90 days recently; is that
13 true?
14     A.    What timeframe are you talking about?
15     Q.    More than 90 days, within the last
16 two years.
17     A.    Yes.
18     Q.    And why is that?
19     A.    The recent TVs have been -- they have
20 gone through the concierge program. The warranty
21 program hasn't worked. They were not able to
22 warranty the TV, and it was still in the -- under
23 warranty or under the Citi warranty now, and it
24 could not be repaired.
25     So we would -- they would come in,

55

1 bring us the TV back. We would get them a
2 comparable TV, which at this time is probably at
3 least half the price of when they bought it two
4 years ago because of the way technology is.
5     If they had a 50-inch TV, 1080P, we
6 would get them a 50-inch TV, 4K TV now, and it would
7 be half the price. We would refund them the new
8 purchase price.
9     So if it cost $1,000 two years ago,
10 they would come in. We would give them a 50-inch TV
11 that would cost $500, and they would walk out with a
12 new 50-inch TV.
13     Q.    Would it be reasonable to assume that
14 if your computer said it's okay, and you were aware
15 of a grandfather provision, that if it wasn't Jeff's
16 brother and this was returned that it would not be a
17 problem?
18     MR. GALLIGAN:  Objection to form.
19 You may answer.
20     THE WITNESS:  No.
21 BY MR. DENOIA:
22     Q.    It's not fair to say; why?
23     A.    I would not refund the TV in full.
24     Q.    But if one of your managers did,
25 would they be disciplined?

56

1     A.    I don't know.
2     Q.    Well, would you recommend discipline
3 if one of your managers did?
4     A.    Probably put something in their file
5 that they did it wrong, you know, document the
6 incident.
7     Q.    Is there any policy that you are
8 aware of at Costco that says you can't sell to
9 family members?
10     A.    Yes.
11     Q.    There is?
12     A.    I believe it's in the handbook, that
13 you cannot ring up a family member.
14     Q.    And how is family member defined?
15     A.    It's not.
16     Q.    So it's not restricted to husband and
17 wife. It could be your sixteenth cousin comes in,
18 you can't ring them up?
19     A.    You shouldn't.
20     Q.    And I assume it's the same policy for
21 returns?
22     A.    Yes.
23     Q.    Now in this case, another manager
24 approved this return; is that correct?
25     A.    Approved? No.

57

1  Q. What did the -- what was the name of
2  the other manager who was involved in this return?
3  A. I don't believe it was a manager. It
4  was a supervisor.
5  Q. Okay.
6  A. I believe his name was Daryl.
7  Q. All right.
8  A. And he just keyed an override.
9  Q. What does that mean?
10  A. In order to authorize a different
11  price or an older return, depending what it is, the
12  register system will ask for a key to be turned with
13  an authorization code.
14  Q. And he supplied that code?
15  A. Yes.
16  Q. Was he disciplined for that?
17  A. No.
18  Q. Was he investigated for that?
19  A. No.
20  Q. Why not?
21  A. He was told to override the return.
22  Q. And how do you know that?
23  A. That is what he told me.
24  Q. Well, you said you didn't interview
25  anybody concerning Mr. Bowie's investigation. Did

58

1  you -- do you want to amend that?
2  Did you interview this gentleman,
3  Daryl?
4  A. Yes.
5  Q. Did you take any written statements
6  from Daryl when you interviewed him?
7  A. Yes, I believe so.
8  Q. You did. And do you still have that
9  written statement?
10  A. I believe.
11  MR. GALLIGAN: For the record, it is
12  in the package that is currently in front of the
13  witness.
14  BY MR. DENOIA:
15  Q. Do you want to go through that packet
16  that is in front of you and see if you can find
17  Daryl's statement.
18  Did you find it?
19  A. Yes.
20  Q. So that's a statement dated
21  October 11, 2014?
22  A. Yes.
23  Q. And I assume that is Daryl's
24  signature on this statement?
25  A. I believe so.

59

1  Q. Just for the record, it's Bates
2  stamped 877 as part of P-2.
3  Where does it say he was told to key
4  it in?
5  A. It doesn't.
6  Q. In fact, it says he was called down
7  to verify an older TV; is that correct?
8  A. Correct.
9  Q. And in fact, Daryl volunteers in his
10  statement that he then helped the member shop for a
11  replacement TV; is that correct?
12  A. Correct.
13  Q. So why do you say that he was told to
14  key it in?
15  A. Because only an assistant general
16  manager or myself could authorize that return.
17  Q. So although this gentleman authorized
18  the return, he didn't have authority; is that what
19  you're saying?
20  A. Correct.
21  Q. But he was not disciplined or
22  investigated; is that correct?
23  A. Correct.
24  Q. Do you know if Daryl has an autistic
25  child?

60

1  A. I don't know.
2  Q. Does Daryl have any disability?
3  A. Not that I know of.
4  Q. Has Daryl ever asked for family
5  leave?
6  A. Not that I know of.
7  Q. Now, when you wrote the memo starting
8  at 868, the first page of P-2, did it originally
9  include both pages, or was it just the first page?
10  A. It would have included both pages.
11  Q. Do you know what date you typed this
12  memo?
13  A. I don't know the exact date.
14  Q. Do you usually date your memos?
15  A. I don't know. I thought I did.
16  Q. This one is not dated; is that
17  correct? Can we agree with that?
18  A. Correct.
19  Q. Is there any way you can determine
20  what date you prepared this memo?
21  A. I believe there's an e-mail when I
22  sent it to Paul Pulver. I would have finished it on
23  that date.
24  MR. DENOIA: Can we mark this. I
25  think we are to 3, right? P-3.

65

1  identify the customer?
2          MR. DENOIA: Can you identify the
3  customer?
4          I will play back the section, or I
5  will try. Here we go.
6          MR. GALLIGAN: It seems to be not
7  moving.
8          MR. DENOIA: Of course, it's
9  technology.
10         THE WITNESS: I would be guessing if
11 I could make out that face. I really don't know who
12 that is.
13 BY MR. DENOIA:
14     Q.    Okay. Now, did you initiate these
15 investigations on your own, or did someone above you
16 order the investigation?
17     A.    I don't remember.
18     Q.    Now, the investigation does not talk
19 about him leaving early. Yet, you were looking at
20 the videos to see whether or not he left early; why
21 is that?
22         MR. GALLIGAN: Objection to form.
23         You may answer.
24         THE WITNESS: Leaving early wasn't an
25 issue once he explained to me why.

66

1  BY MR. DENOIA:
2      Q.    But he explained that to you before
3  the investigation started; is that correct?
4      A.    I don't know.
5      Q.    Did you communicate with any
6  supervisors or HR personnel prior to initiating the
7  investigation?
8      A.    I don't know.
9      Q.    What concerned you more of the five
10 elements in your memo?
11         That would be that memo, right.
12     A.    They all concerned me.
13     Q.    So they all concerned you equally?
14         MR. GALLIGAN: Sorry, did you say
15 five or four?
16         MR. DENOIA: Five. Are there five?
17         MR. GALLIGAN: There are only four in
18 the document.
19         MR. DENOIA: I thought there were
20 five. All right.
21         MR. GALLIGAN: Sorry, I just want to
22 make sure the record is clear.
23         MR. DENOIA: Oh, one is not in the
24 document, would be leaving early.
25         MR. GALLIGAN: So can you -- I would

67

1  ask the question be rephrased.
2  BY MR. DENOIA:
3      Q.    So of the four in the document, which
4  concerns you more?
5      A.    I don't know.
6      Q.    Okay. As the general manager, do you
7  determine who gets investigated?
8      A.    Sometimes.
9      Q.    And who determined it in this case?
10     A.    I don't know.
11     Q.    So you don't know whether or not you
12 initiated this investigation or someone told you to?
13     A.    I don't remember if I spoke to
14 Paul Pulver first or after.
15         MR. DENOIA: Counsel, I made a
16 written request for the rest of that video. I never
17 received -- informally by e-mail, but I never
18 received a response.
19         Do I need to make a formal request?
20         MR. GALLIGAN: Did you get a response
21 by e-mail?
22         MR. DENOIA: I did not.
23         MR. GALLIGAN: No, you don't need a
24 formal request. I will follow up.
25         MR. DENOIA: Thank you.

68

1          MR. GALLIGAN: So you got no
2  response?
3          MR. DENOIA: No. Maybe it got lost
4  in e-mail heaven.
5          MR. GALLIGAN: Yeah, right. No
6  problem.
7          Are we on or off?
8          MR. DENOIA: We can go off.
9          (Whereupon, a discussion was held off
10 the record.)
11 BY MR. DENOIA:
12     Q.    I am going to have you look at
13 Costco 1248. This will be on the record next, and
14 if I can get it to start from the beginning again, I
15 can, and I think it's running.
16         What is the -- do you know what that
17 is?
18     A.    A video of Jeff Bowie taking a teapot
19 off the floor on 9/15/2014 at 7:04 a.m.
20     Q.    The next one we will look at is 1249.
21         What's the purpose of 1249, or do you
22 know what 1249 is?
23     A.    It's the actual door of the Brick
24 building.
25     Q.    What's the date of that video?

69

1     A.   9/20/2014. I believe that video is
2 Jeff Bowie's brother leaving with the new TV that he
3 purchased. That is Jeff Bowie leaving.
4     Kim Clemente, my -- she was an
5 assistant, front end at the time.
6     MR. GALLIGAN: Sorry, could you state
7 the time, if you can see it?
8     Paul, I did something. I just waved
9 at it, and it stopped.
10     MR. DENOIA: Go like this.
11 Apparently -- here you go.
12     THE WITNESS: It's 1802.
13 BY MR. DENOIA:
14     Q.   And did you consider this video as
15 part of your investigation?
16     A.   I don't remember this video.
17     Q.   Okay. Is it done?
18     You have seen this to the end,
19 correct?
20     A.   Hmm?
21     Q.   You have seen the video to the end?
22     A.   I don't remember. I don't know where
23 it ended. Oh, that was the end, yes, then I have
24 seen it to the end.
25     Q.   A little further.

70

1     MR. GALLIGAN: The time?
2     THE WITNESS: At 1803, I guess it's
3 the end.
4 BY MR. DENOIA:
5     Q.   I'm going to show you Bates stamp
6 1250. Tell us what that is.
7     Can you give us the date?
8     A.   9/15/2014, 6:17 a.m.
9     Q.   What does that video depict, if you
10 know?
11     A.   I believe that's Jeff Bowie coming in
12 the building with nothing in his hands.
13     Q.   What time is he supposed to come in
14 the building?
15     A.   I don't know. The schedule is
16 different all the time.
17     I believe he was over in merchandise
18 at the time. He could have been in at 6:00. He
19 could have been in at 8:00. I'm guessing that day
20 he was scheduled at 6:00.
21     Q.   So is this demonstrating that he was
22 17 minutes late?
23     A.   No. I believe that is demonstrating
24 on the day that he had told me he purchased the
25 oatmeal that -- that he didn't have oatmeal, I

71

1 believe, is why that's video is there, that he
2 didn't bring oatmeal into the building.
3     Q.   Now, you don't reference, and you can
4 check, but I don't see a reference to a -- oh, I
5 take that back. I see a reference, No. 2. It's
6 9/15 at 7:37 a.m.
7     So that is to demonstrate that on
8 9/15 he walked into the building without oatmeal; is
9 that correct?
10     A.   I believe so, yes.
11     Q.   Did you review that video as part of
12 your investigation?
13     A.   I don't remember.
14     Q.   We are going to look at 1251. Tell
15 us the date and time and what that depicts.
16     A.   9/15/2014, 7:37. It looked like
17 Jeff Bowie walking out of the office. Jeff walking
18 up to the office with oatmeal in his hand.
19     MR. GALLIGAN: Do you want him to
20 watch the rest of it? I don't know. It just
21 keeps --
22     THE WITNESS: I don't know how much
23 further it goes.
24 BY MR. DENOIA:
25     Q.   It seems to go pretty far. Do we

72

1 want to scrub it, and you can take a look and see if
2 there's anything in there that you think is
3 significant?
4     A.   I think the significant part has
5 already passed.
6     Q.   I will just run it by you. Can you
7 see it?
8     A.   Mm-hmm.
9     A.   Okay.
10     A.   Okay.
11     Q.   Let's look at 1252.
12     A.   Costco tire center, 9/17/2014, 1434.
13     Q.   So that is 2:30; is that correct?
14     A.   Correct.
15     Q.   What does that -- do you know what
16 the purpose of that video was?
17     A.   I will wait until it happens, but I
18 think -- so there is Jeff Bowie leaving for the day
19 through the tire shop with flowers that he
20 purchased.
21     Q.   And the problem with that is what?
22     A.   It's not an authorized entry, when we
23 are open, to leave through the tire shop.
24     Q.   Why is that?
25     A.   Because everyone goes through the

73

1  main entrance and exit, or all employees and members
2  go through the main entrance. Truck drivers and
3  receiving can go out through receiving once we are
4  open.
5      Q.     And what was the problem with him
6  going through the tire shop?
7      A.     It's not an authorized exit for
8  employees.
9      Q.     Did you ask him about that in part of
10  your investigation?
11      A.     I had asked him about it, yes.
12      Q.     What did he say?
13      A.     He said he had Bill Poser, the tire
14  shop manager, check the receipt.
15      Q.     Did he tell you why he was at the
16  tire shop?
17      A.     I don't remember.
18      Q.     Did he have any responsibility over
19  the tire shop?
20      A.     As an assistant manager, he had
21  responsibility over the whole building, so yes. He
22  wasn't directly overseeing them at that time, but he
23  would be responsible for anything that happened in
24  the building.
25      Q.     Now, are you alleging that he stole

74

1  the flowers?
2      A.     No.
3      Q.     Why not?
4      A.     They showed up on a purchase.
5      Q.     Okay. 1253.
6          What's the date of that video?
7      A.     9/17/2014, 1434. It looked like that
8  was Jeff walking out of the office with the flowers,
9  across the front end.
10      Q.     Did you review this video in your
11  investigation?
12      A.     I believe so, yes.
13      Q.     And again, what was the purpose of
14  reviewing him walking with the flowers within the
15  building?
16      A.     I don't know.
17      Q.     Well, what were you looking for?
18      A.     I was seeing Jeff walk across the
19  front to the tire shop and out the tire shop.
20      Q.     Was there any further reason to look
21  at this video that you are aware of?
22      A.     Not that I'm aware of.
23      Q.     Okay. I think I just had this.
24  Okay, and let me show you 1254.
25      A.     9/20/2014, 1506 p.m.

75

1          MR. GALLIGAN: No, it's 1706.
2          THE WITNESS: Oh, sorry, 1706.
3  BY MR. DENOIA:
4      Q.     And that is?
5      A.     That is me leaving the building at
6  1706 and 27 seconds.
7      Q.     What's the purpose of that video; do
8  you know?
9      A.     It was to show me leaving, and when
10  the other part happens, I will give you the time
11  and -- if it's the video I think it is.
12          MR. GALLIGAN: Off the record.
13          (Whereupon, a discussion was held off
14  the record.)
15  BY MR. DENOIA:
16      Q.     Here we go; is that it?
17      A.     Yes. That would have been 1713 and
18  50 seconds; Jeff Bowie's brother brings the TV into
19  the warehouse.
20      Q.     All right. We are through with the
21  videos.
22      A.     If I can amend something I said from
23  the videos --
24      Q.     Yes, go ahead.
25      A.     The video of him coming in the back

76

1  door at 6:17 on 9/15 a.m. -- coming in on 9/15 at
2  6:17 a.m. was to show that he had nothing in his
3  hands.
4          The other video at 7 -- I forget the
5  time, on the same date, when he walked through the
6  register with the oatmeal, was to show that he
7  didn't bring it into the building.
8      Q.     How many hours was spent reviewing
9  these videos; do you know?
10      A.     I don't know.
11      Q.     And that was done by who?
12      A.     Mike Statile.
13      Q.     And did you review them with him or
14  just he compiled them for you?
15      A.     He compiled them for me.
16      Q.     How many loss prevention people do
17  you have?
18      A.     One.
19      Q.     So he is your sole loss prevention
20  guy?
21      A.     Yes.
22      Q.     And he is the head of the loss
23  prevention department, I assume?
24      A.     He is my only loss prevention person.
25  There is not a head because there is only one

77

1 person.
2    Q.    So you don't have any loss prevention
3 people on the floor?
4    A.    He does everything.
5    Q.    He does everything with videos, I
6 assume?
7    A.    Video, he walks the floor.  He will
8 do research for me.  He will do research for the
9 regionals.
10    Q.    Did you report the tea kettle
11 incident to the police?
12    A.    No.
13    Q.    Did you report the oatmeal incident
14 to the police?
15    A.    No.
16    Q.    Did you report the TV return incident
17 to the police?
18    A.    No.
19    Q.    How long had you worked with Jeff
20 prior to his termination?
21    A.    I was back in Brick a little over a
22 year.
23    Q.    And how would you -- how was your
24 relationship with him?
25    A.    A fine working relationship.

78

1    Q.    Now in your investigation, you bring
2 up his history from 2012; is that correct?
3    A.    In my investigation, no.
4    Q.    Did you review his history in the
5 other store from 2012?
6    A.    Did I review -- I read the -- I read
7 it.
8    Q.    Where did you get it from?
9    A.    It was in his employee file.
10    Q.    So when you were reporting to Paul,
11 did you bring up the 2012 incident as part of your
12 report?
13    A.    I sent Paul the document.
14    Q.    And what do you know about the 2012
15 incident?
16    A.    I don't know much except he was moved
17 up to Brick.
18    Q.    Were you aware that he was -- that
19 back then he had marital issues?
20    A.    Yes.
21    Q.    Were you aware that his wife
22 ultimately left him because she was gay?
23    A.    Yes.
24    Q.    Did that have anything to do with
25 your decision to investigate Jeff?

79

1    A.    No.
2    Q.    Now, you said you had a fine working
3 relationship with him.  Did you have other
4 relationship problems with him, other than working?
5         MR. GALLIGAN:  Objection to form.
6         You may answer.
7         THE WITNESS:  No.
8 BY MR. DENOIA:
9    Q.    Did you ever see Jeff outside of
10 work?
11    A.    No.
12         Sorry, if I can amend that, it was --
13 I was working, but he came in off of work for CMN
14 with his daughters to -- for a CMN promotion.  They
15 kind of played in a band and did music for a
16 promotion.
17         So he wasn't working, but I was.
18    Q.    Did you know how many children Jeff
19 had?
20    A.    I believe he had five.
21    Q.    Were you aware that he had sole
22 custody of his children?
23    A.    I don't know that I was aware of
24 that.
25    Q.    Were you aware he had sole custody of

80

1 his autistic son?
2    A.    I don't know.  I don't think so.
3    Q.    Did you have any discussions with
4 Paul Pulver concerning the termination of
5 Jeff Bowie's employment?
6    A.    Yes.
7    Q.    What type of conversations did you
8 have?
9    A.    About the termination or about the
10 investigation, I'm sorry?
11    Q.    Both.
12    A.    We spoke about the investigation.
13 When I sent him the information, he did not like
14 Jeff's original statement, asked me to have Jeff
15 write another statement explaining some things,
16 which Jeff did.
17         We discussed other things that I
18 don't remember.  When it came back that I was to
19 terminate him, I discussed the fact I had mistakenly
20 told Jeff that I thought he was going to be demoted
21 and moved to another building.
22    Q.    What did Paul say to that?
23    A.    He said, it's not your decision, and
24 you know, it's okay that I said it.
25    Q.    Did you mention to Paul that Jeff had

**STATE SHORTHAND REPORTING SERVICE, INC.**

81

1  left early when you were on vacation?
2       A.    I don't think so.
3       Q.    Well, do you know either way?
4       A.    I don't know.
5       Q.    Who else, if anyone, did you discuss
6  Jeff's investigation with?
7            We know you talked to Paul, and now
8  we know you worked with Mike. Anyone else?
9       A.    I don't remember.
10           MR. DENOIA: It's 12:30. I'm going
11 to take a short break.
12           (Whereupon, a brief recess was
13 taken.)
14           MR. DENOIA: Back on the record.
15 BY MR. DENOIA:
16      Q.    Now that we've gone through this
17 stuff for awhile, has any of this refreshed your
18 recollection as to when you first met Jeff?
19      A.    I met him around 2003 when I got
20 promoted to assistant. I forget who left, and he
21 came in. Possibly, he came in right before I got
22 promoted. I know it was around that time.
23           You give me a two-year timeframe,
24 it's between 2002 and 2004 probably.
25      Q.    And did you work with him for -- at

82

1  any time?
2            You know, you worked together for
3  quite sometime; is that fair to say?
4       A.    About three years, I guess.
5       Q.    And then you saw him again when you
6  came back to the Brick store; is that correct?
7       A.    Yes.
8       Q.    Then he was your assistant manager?
9       A.    Yes.
10      Q.    Did you work well with him?
11      A.    Fine working relationship.
12      Q.    Now, did you ever do a performance
13 evaluation of Jeff?
14      A.    Yes.
15      Q.    And how did you rate him?
16      A.    Average.
17      Q.    Did you have any negative rating?
18      A.    I'm sure I put things in there for
19 him to work on.
20           MR. GALLIGAN: What did you say;
21 could you repeat your answer? I didn't get it.
22           THE WITNESS: I'm sorry, he asked if
23 there were any negative things in the review. I
24 said I am sure I put things in there for him to work
25 on.

83

1            MR. GALLIGAN: Okay. Thank you.
2            MR. DENOIA: Okay. I'm going to have
3  this document starting at Bates stamp 744 through
4  Bates stamp 784 marked for identification.
5            (Whereupon, P-4 was received and
6  marked for identification.)
7  BY MR. DENOIA:
8       Q.    I am going to show you what's marked
9  P-4 for identification and ask if any of these are
10 the evaluations you did of Jeff.
11      A.    If I did them?
12      Q.    It's on both sides of the paper.
13      A.    No, I did not do any of them.
14      Q.    Would it be on a similar form to the
15 forms you just reviewed?
16      A.    A similar form to the top one, yes.
17           MR. DENOIA: Off the record for a
18 second.
19           (Whereupon, a brief recess was
20 taken.)
21           MR. DENOIA: Back on the record.
22           If counsel would be kind enough to
23 see if he can supply Mr. Bowie's evaluations for
24 2013 and 2014.
25 BY MR. DENOIA:

84

1       Q.    How many evaluations of Jeff did you
2  do; do you recall?
3       A.    I don't remember. I'm thinking now
4  with the timeframe I might not have done one.
5       Q.    Okay. Other than these last
6  incidents, did you have any problems with him as an
7  employee?
8       A.    In the last year I was or --
9       Q.    Last year.
10      A.    -- as a general manager?
11      Q.    As a general manager.
12      A.    I had to speak to him about leaving
13 through the tire center earlier that year.
14      Q.    Anything else?
15      A.    No.
16      Q.    He was your assistant manager. So
17 did you have any issues with him as an assistant
18 manager, in his performance?
19      A.    Not that I remember.
20      Q.    When you were an assistant manager,
21 did you have any problems with Jeff?
22      A.    Not that I remember.
23      Q.    All right. Have you ever done an
24 investigation on anyone else for going out the wrong
25 entrance?

**STATE SHORTHAND REPORTING SERVICE, INC.**

85

1    A.    No.
2    Q.    Now, let's talk about the tea kettle
3  for a second.  Now, when he took that tea kettle off
4  the floor for use in the office, that is a permitted
5  action; is that correct?
6    A.    If it were put on a supply card.
7    Q.    All right.  So what's the purpose of
8  putting it on a supply card?
9    A.    Inventory control.  Inventory control
10  really.  It let's us know where it went.  It's now
11  an asset to the company.
12    Q.    Right.  So he is permitted to take a
13  product off the floor to use in the office as long
14  as he puts it on the supply -- who reviews the
15  supply cards?
16    A.    It would be reviewed by my sales
17  auditor.
18    Q.    Is there anything that he would not
19  be permitted to put on a supply card?
20    A.    Anything for personal use,
21  anything -- personal food, something for his own
22  personal use.
23    Q.    How many people work in the office?
24    A.    Eight, ten.
25    Q.    Okay.  Now, this morning I bought a

86

1  dozen donuts for my staff and put them in the
2  office.  If a manager were to get a dozen donuts off
3  the floor for the staff, would that be permitted if
4  they put it on a supply card?
5    A.    It actually wouldn't go on a supply
6  card.  It would be purchased on a P card, a purchase
7  card, but yes, that would be fine.
8    Q.    So that would be permitted.  So if
9  someone bought a dozen donuts for the staff to eat
10  in the office, that would be okay if it was on a
11  P card?
12    A.    Yes, on a purchase card.
13    Q.    Is there any limitations to that?
14    A.    Within reason, you can't spend $1,000
15  on donuts, but you know, and again, it's run by the
16  general manager, what I'm doing for the staff.
17    Q.    Obviously, it would be inappropriate
18  to, you know, cook ten pounds of filet mignon for
19  the staff?
20    A.    Mm-hmm.
21    Q.    Is that correct?
22    A.    Yes.
23    Q.    Now, if you bought oatmeal for the
24  staff, would that be acceptable?
25    A.    I can't think of a situation where it

87

1  would be because I don't buy meals for people.  We
2  buy our new items.  We buy something to put out just
3  for the day.
4         I'm not feeding my employees
5  breakfast every day.  That would not be part of the
6  way we do things.
7    Q.    It might not be the way you do
8  something, but if someone were to put out a box of
9  cereal and a quart of skim milk for the staff, with
10  plastic spoons, would that be acceptable?
11    A.    Yes, in certain circumstances.
12         MR. DENOIA:  All right.  I have
13  nothing further.  Thank you.
14         (Whereupon proceeding adjourned.
15  Time noted: 12:43  p.m.)
16
17
18
19
20
21
22
23
24
25

88

1                CERTIFICATE
2       I, GERALDINE ADINOLFI, a Certified Court
3  Reporter of the State of New Jersey, do hereby
4  certify that the witness was duly sworn by me.
5       I FURTHER CERTIFY that the foregoing is a
6  true and accurate transcript of the testimony as
7  taken stenographically by and before me at the time,
8  place and on the date hereinbefore set forth.
9       I FURTHER CERTIFY that I am neither a
10  relative nor employee nor attorney nor counsel of
11  any of the parties in this action and that I am
12  neither a relative nor employee of such attorney or
13  counsel, and that I am not financially interested in
14  the action.
15
16
17
18
19
20
21
22
23  GERALDINE ADINOLFI, C.C.R.
   License No. 30XI00228000
24
25
   DATED:  July 23, 2018

# Exhibit 3

**Jeffrey Bowie v. Costco Wholesale Corporation**
**July 13, 2018**

1

 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF NEW JERSEY

 3             CIVIL ACTION 3:16-CV-05808-BRM-LHG

 4  - - - - - - - - - - - - - - - - - - - - - - - -

 5  JEFFREY BOWIE,

 6              Plaintiff,

 7       vs.

 8  COSTCO WHOLESALE CORPORATION,

 9  BRUCE DZENEORF; and JOHN AND JANE DOES 1-10

10  (fictitious names),

11              Defendants.

12  - - - - - - - - - - - - - - - - - - - - - - - -

13

14              TRANSCRIPT of the stenographic notes of

15  the deposition of WILLIAM BOWIE in the above-entitled

16  matter, as taken by and before LORRAINE B. ABATE, a

17  Certified Court Reporter and Notary Public of the

18  State of New Jersey and Registered Professional

19  Reporter, held at the offices of DeNoia Tambasco &

20  Germann, 501 Main Street, Toms River, New Jersey, on

21  July 13, 2018, commencing at 10:00 a.m., pursuant to

22  Subpoena.

23

24

25

**Jeffrey Bowie v. Costco Wholesale Corporation**
**July 13, 2018**

2

1   A P P E A R A N C E S:

2

3            DeNOIA TAMBASCO & GERMANN, LLC

4            Attorneys for the Plaintiff

5               501 Main Street

6               Toms River, New Jersey 08753

7            BY: JAMES N. CITTA, ESQ.

8               (732)341-1030

9               citta@denoiatambasco.com

10

11           SEYFARTH SHAW, LLP

12           Attorneys for the Defendants

13              620 Eighth Avenue

14              New York, New York  10018

15           BY: EPHRAIM J. PIERRE, ESQ.

16              (212) 218-5500

17           epierre@seyfarth.com

18

19

20

21

22

23

24

25

**Jeffrey Bowie v. Costco Wholesale Corporation**
**July 13, 2018**

15

1   months.

2        Q.    Did there come a time where you bought a

3   Sony television from Costco?

4        A.    My wife purchased it.

5        Q.    Do you recall what warehouse you

6   purchased that television from?

7        A.    Either Ocean or Edison.  I'm sure you

8   can look up exactly where it came from.

9              MR. PIERRE:  Off the record.

10             (Discussion off the record.)

11             MR. PIERRE:  Let's mark this as an

12   exhibit.

13             (W. Bowie Exhibit 2, Three-Page Purchase

14   Detail, marked for identification, as of this date.)

15       Q.    Mr. Bowie, what I have put in front of

16   you is an exhibit marked W. Bowie No. 2.  If you

17   could, please turn your attention to the page marked

18   Costco 885.  The numerals are indicated at the bottom

19   right hand portion of the page.

20             Do you notice at the top of the page

21   there, it says member number.  It lists a series of

22   digits and then says William Bowie.

23       A.    Okay.  Now I recollect what happened.

24   It was a gift from my wife.  She bought the smaller

25   one because it only fit in my in-law's car.  So I

**Jeffrey Bowie v. Costco Wholesale Corporation**
**July 13, 2018**

16

1   immediately returned it and got the bigger one

2   because I owned a truck.  So that's how it got to my

3   name.  Sorry.

4        Q.    So with the smaller one -- do you recall

5   what the size of the original television your wife

6   bought you?

7        A.    I think it was 55.  And we returned it

8   and bought a 60.

9        Q.    And this transaction occurred in July of

10  2016 -- I mean, July of 2006?  I'm sorry.

11       A.    That's what the paper says.

12       Q.    Do you remember it happening around that

13  time span, the summer of 2006?

14       A.    I do.  Because it was a birthday gift.

15       Q.    And your birthday is?

16       A.    June 21st, '66.

17       Q.    Do you recall how much the television

18  cost?

19       A.    I see on here that it was $2,799, which

20  is roughly what I remember.

21       Q.    Do you recall buying a warranty with

22  this television?

23       A.    I do not.

24       Q.    Before purchasing the 60-inch

25  television, do you recall when your wife bought the

**Jeffrey Bowie v. Costco Wholesale Corporation**
**July 13, 2018**

19

1   and I see that there was an adjustment there for

2   $428.

3            Is that the adjustment you received with

4   the sale on the 60-inch television?

5        A.    I believe so.

6        Q.    And the location you went to for that

7   adjustment was the Edison location; is that correct?

8        A.    I don't know.  That's what it says.

9        Q.    Was the Edison location closer to you?

10       A.    It's closer to my work.  I see the time

11  is 12:05.  I was probably on lunch.

12       Q.    Prior to seeking this price adjustment,

13  did you speak with Jeffrey Bowie?

14       A.    In relation to the TV or speak to him at

15  all?

16       Q.    In relation to the television.

17       A.    Probably not.  No idea, though.

18       Q.    After getting the price adjustment, were

19  you satisfied with the television and your purchase?

20       A.    Yes.

21       Q.    Did there come a time when this Sony

22  television did not work?

23       A.    Yes.

24       Q.    What was the issue with the television?

25       A.    Just dead.

Jeffrey Bowie v. Costco Wholesale Corporation
July 13, 2018

20

1      Q.      When you say dead, was there an issue

2   with the picture?

3      A.      I believe it's no picture, no sound.

4      Q.      When did this no picture, no sound issue

5   first appear in the Sony television?

6      A.      A day or two before I returned it.

7      Q.      Do you remember the time frame when that

8   happened specifically?

9      A.      I believe I returned it in the morning

10  and it didn't come on.

11     Q.      Did it occur in the summer of 2014?

12     A.      I assume it aligns with whenever I

13  returned it, which I'm sure you have here.

14     Q.      After the Sony television went dead as

15  you testified, did you attempt to get it fixed?

16     A.      I did not.

17     Q.      Did you contact Costco after the

18  television stopped operating?

19     A.      I don't believe so.

20     Q.      Did you speak with Jeffrey Bowie after

21  the television stopped operating?

22     A.      Probably.

23     Q.      Did you speak with him via text?

24     A.      Don't know.

25     Q.      Did you speak with him via telephone?

**Jeffrey Bowie v. Costco Wholesale Corporation**
**July 13, 2018**

22

1     Q.     So during the time that your television

2   broke, you were aware of this policy and you

3   individually intended to return the television?

4     A.     Yes.

5     Q.     In returning the television, what did

6   you hope to get?

7     A.     Another television.

8     Q.     So you wanted a full refund on the

9   purchase?

10     A.     I wanted what the rules allowed.

11     Q.     In your conversation with Jeffrey Bowie

12   prior to returning the television, did he explain to

13   you Costco's refund policies?

14     A.     I already knew the refund policies.  I

15   knew it when I bought it.  That factored into my

16   decision to purchase at Costco.

17     Q.     You stated earlier that your wife bought

18   it as a gift.

19            Did you instruct her that if she were to

20   give you a television, it should come from Costco?

21     A.     We had talked about buying one.  She is

22   also aware of the policies.

23     Q.     With the return policy in mind, did you

24   intend to get a new television based on the refund

25   policy?

**Jeffrey Bowie v. Costco Wholesale Corporation**
**July 13, 2018**

23

1      A.      Yes.

2      Q.      Did you intend to get a bigger

3  television based on the refund policy?

4      A.      I intended to spend all of the money I

5  got back.  I actually did not intend to buy bigger,

6  but the same size TVs were cheaper.  So I bought a

7  bigger one.

8      Q.      Do you recall the date on which you

9  returned your Sony television?

10      A.      I do not, but it's probably on here.

11      Q.      If you can refer back to W. Bowie

12  Exhibit 2 and to page Costco 883.  It says

13  September 20, '14.

14           Does that refresh your memory as to when

15  you returned your Sony television?

16      A.      I assume that is accurate.

17      Q.      But you don't specifically remember the

18  date?

19      A.      I do not.

20      Q.      Do you recall it occurring in the summer

21  of 2014?

22      A.      I have no recollection.

23      Q.      September 2014 was a Saturday.  Do you

24  ordinarily work on Saturdays?

25      A.      Not normally, no.

**Jeffrey Bowie v. Costco Wholesale Corporation**
**July 13, 2018**

25

1   warehouse that perhaps --

2       A.      No.

3       Q.      And for clarification, at the time that

4   you did return this television, Jeffrey Bowie worked

5   at the Brick warehouse; is that correct?

6       A.      Yes.

7       Q.      And the reason why you went to the Brick

8   warehouse is because he worked there.

9               Did you believe you would get

10  preferential treatment because Bowie worked there?

11      A.      No.

12      Q.      Did you think that your refund would go

13  smoother because Jeffrey Bowie worked there?

14      A.      No.

15      Q.      So besides Jeffrey Bowie working there,

16  were there any other reasons for you to go to the

17  Brick warehouse to return this television?

18      A.      No.

19      Q.      So the primary reason that you returned,

20  it was because Jeffrey Bowie worked there?

21      A.      Yes.

22      Q.      Did anyone accompany you when you

23  returned the television?

24      A.      My wife.

25      Q.      What is her name?

Jeffrey Bowie v. Costco Wholesale Corporation
July 13, 2018

29

1    Q.    Was Jeffrey Bowie at the counter during

2    the entire transaction where you received the refund?

3    A.    I believe so.

4    Q.    Do you recall the amount of money you

5    were refunded?

6    A.    It was whatever the purchase price here

7    was minus the adjustment.

8    Q.    I'll refer you back to W. Bowie Exhibit

9    No. 2 and page 883.  You see there is an amount there

10   in the refund transaction detail.

11         Does that refresh your memory as to how

12   much was returned to you?

13   A.    That does not show the correction for

14   the price adjustment.  I believe they refunded the

15   full thing and then corrected the price adjustment

16   again.

17   Q.    When was the refund corrected for the

18   price adjustment again?

19   A.    At that time.

20   Q.    So based upon --

21   A.    I don't see that transaction here.

22   Q.    So based upon the price adjustment done

23   at the Edison location at Costco 884, do you believe

24   you were refunded the amount of $2399.99?

25   A.    Yes, I believe I was refunded what I

**Jeffrey Bowie v. Costco Wholesale Corporation**
**July 13, 2018**

30

1    paid, not more.

2         Q.    And how did you receive this refund?

3         A.    It was all credit card corrections.

4         Q.    Did you receive a cash card or a Costco

5    gift card?

6         A.    I don't remember.  Possibly, because I

7    had told them I was purchasing a TV today, so I did

8    not need -- so that may be what was done.  I do not

9    know.  I'm sure you have a record of it.

10        Q.    So prior to coming to the warehouse for

11   the refund, did Jeffrey Bowie look up any transaction

12   details related to that Sony television?

13        A.    I believe he did.

14        Q.    What did he tell you about the

15   transaction details on the television?

16        A.    I think he just verified the purchase

17   date and that stuff.  I don't know what else he did

18   with it.

19        Q.    Did you ask him to verify the purchase

20   date for you?

21        A.    I did not.

22        Q.    He did it on his own?

23        A.    He knew that I was going to return, so

24   probably did.

25        Q.    Do you know when Bowie told you the

Jeffrey Bowie v. Costco Wholesale Corporation
July 13, 2018

31

1  purchase date of your television?

2       A.    I do not.

3       Q.    Do you know when Bowie looked up that

4  information for you?

5       A.    I do not.

6       Q.    So after processing the television, what

7  happened next?

8       A.    He introduced me to the guy who was

9  their television expert and me and my wife and that

10  person went through and talked about which TV was the

11  best one.

12       Q.    Do you recall the name of this

13  television quote, unquote, expert?

14       A.    I do not.  It was a man.

15       Q.    What TV did you ultimately select?

16       A.    Samsung.

17       Q.    Do you recall how big it was?

18       A.    75.

19       Q.    Was it an HD television?

20       A.    Yes.

21       Q.    Was it internet or wifi  capable?

22       A.    Yes.

23       Q.    Was it a smart television?

24       A.    Yes.  They did not sell anything but

25  that at that point.

Jeffrey Bowie v. Costco Wholesale Corporation
July 13, 2018

32

1      Q.    Do you recall any other features that

2  this Samsung television had?

3      A.    No.

4      Q.    Do you believe that Samsung television

5  was better than your Sony television that you

6  previously purchased?

7      A.    Yes.

8      Q.    Did Jeffrey Bowie in any way assist you

9  in picking out a television?

10     A.    No.

11     Q.    Did you purchase anything else with the

12  Samsung television?

13     A.    I don't know.  I may have bought the

14  warranty.  I believe I did.

15     Q.    And you're referring to an extended

16  warranty?

17     A.    Yes.

18     Q.    After the purchase, did you have any

19  other money remaining on the cash card or refund that

20  was provided to you?

21     A.    I don't believe so.  I believe I paid

22  additional.

23     Q.    You think you contributed a little more

24  towards the purchase?

25     A.    Yes.

Jeffrey Bowie v. Costco Wholesale Corporation
July 13, 2018

39

1

2                        ERRATA SHEET

3           I, WILLIAM BOWIE, wish to make the
     following changes to the foregoing transcript
4    of my testimony taken on the 13th day of July,
     2018, for the reasons cited below:
5    PG-LN        CHANGE FRM/TO            REASON

6    20-9  (FRM) I Retuned IT      ReFlect whAt I SAid

7    _____  (TO) I TurNed it ON     _____

8    _____  _____        _____

9    _____  _____        _____

10   _____  _____        _____

11   _____  _____        _____

12   _____  _____        _____

13   _____  _____        _____

14   _____  _____        _____

15   _____  _____        _____

16   _____  _____        _____

17   _____  _____        _____

18   _____  _____        _____

19                              _____
20                                 WILLIAM BOWIE

21   Subscribed and sworn to before me
     this 29th day of   August      , 20 18 .
22

23   _____
        NOTARY PUBLIC
24
                                     9th
     My Commission expires the  27th  day
25   of   August September 20 18 .2021

INNES M MCEVOY
Notary Public, State of New Jersey
My Commission Expires
September 09, 2021

# Exhibit 4

1             UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW JERSEY
2             CIVIL NO. 3:16-cv-05808-BRM-LHG

3
  X-----------------------------X
4   JEFFREY BOWIE,
             Plaintiff,
5                      DEPOSITION OF:
       -v-             PETER DEMOLEAS
6
   COSTCO WHOLESALE CORPORATION,
7   BRUCE DZENEORF; and JOHN and
   JANE OES 1-10 (fictitious names),
8             Defendants.
  X-----------------------------X
9

10        A Computerized Transcript of the

11  Stenographic notes of the proceedings in the

12  Above-entitled matter as taken by and before

13  PATRICIA A. FORNAROTTO, a Certified Shorthand

14  Reporter and Notary Public of the State of New

15  Jersey, certify the foregoing deposition was taken

16  At the offices of DeNoia, Tambasco & Germann,

17  Esqs., 501 Main Street, Toms River, New Jersey,

18  08753, on Wednesday, July 25, 2018, commencing at

19  1:45 p.m.

20

21

22

23

24

25

1                    A P P E A R A N C E S

2

3   DENOIA, TAMBASCO & GERMANN, ESQS.
    BY:   THOMAS DENOIA, ESQ., and
4           JAMES N. CITTA, ESQ.,
            501 Main Street
            Toms River, New Jersey  08753
5   Attorney for the Plaintiff.

6   SEYFARTH SHAW, LLP
    BY:   EPHRAIM J. PIERRE, ESQ.,
7           620 Eighth Avenue
            New York, New York  10018-1405
8   Attorney for the Defendants.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Demoleas - direct**                                               **6**

1    to ask anything further on that subject, but thank

2    you.  Where do you reside?

3    A      I live in New Jersey in Matawan.

4           Q      What's your address?

5    A      12 Carrie Drive, C-a-r-r-i-e, in Matawan New

6    Jersey, 07747.

7           Q      Are you married?

8    A      Yes.

9           Q      And do you have any children?

10   A      Yes.

11          Q      How many?

12   A      Two.

13          Q      And what are their ages?

14   A      My son is three and my daughter is one and a

15   half.

16          Q      Now, how long have you known Jeff

17   Bowie?

18   A      Only from work when he came to the Brick

19   Costco.

20          Q      Okay.  So when would that be?

21   A      I started Brick I believe in 2014, and he

22   replaced John Dougherty, I think a year after that.

23   I'm not a hundred percent sure with the time frame.

24          Q      So you started in 2014?

25   A      I believe so.

**STATE SHORTHAND REPORTING SERVICE, INC.**

**Demoleas - direct**                                                     8

1    A       No.

2            Q       So how do you know he didn't like

3    that?

4    A       His demeanor when he saw me the next day,

5    really didn't talk much.

6            Q       Did Mr. Bowie ever tell you that he

7    had an autistic son?

8    A       Yes.

9            Q       How did that come about?

10   A       I was actually having an issue with an

11   employee that works with us who I believe is

12   autistic, and I had a hard time and I showed

13   frustration dealing with him.  Jeff told me he had

14   an autistic son and he was able to handle the

15   situation better and I actually learned from him

16   how to deal with the employee.

17           Q       Did he ever tell you that he had

18   custody of his children?

19   A       I believe so.  I'm not sure.

20           Q       Did he ever tell you that he needed

21   to leave early or come in late on occasions to take

22   care of his son?

23   A       No.

24           Q       Did he ever leave early?

25   A       Yes.

**STATE SHORTHAND REPORTING SERVICE, INC.**

**Demoleas - direct**                                          12

1   Jeff or was he higher?

2   A     He's below.

3         Q     Were managers permitted to take

4   equipment from the floor for use in the office?

5   A     As long as it's rung up, yes.

6         Q     That would be put on the supply card?

7   A     Correct.

8         Q     And did you need prior approval to

9   take something off the floor to put on the supply

10  card?

11  A     It depends what the item would be.

12        Q     Tea kettle?

13  A     For use in the office, yes.

14        Q     Yes, you would need prior approval?

15  A     I would think so, yes.

16        Q     And who would you get approval from?

17  A     The general manager.

18        Q     And at the time, who was that in

19  2014?

20  A     I believe Bruce would be there by then.

21        Q     And is there any written policy

22  concerning taking an item off the floor for use in

23  the office?

24  A     I would guess the only thing would be

25  grazing, taking stuff off of the floor.  There's

**Demoleas - direct**                                    15

1    A      Yeah.  Anything you look up would say okay

2    or expired in it currently.

3           Q      What does okay mean?

4    A      Okay means it would be, it's okay to return

5    it, it's not expired.  The 90 days isn't expired.

6           Q      Now, what part if any did you take in

7    Jeff Bowie's termination?

8    A      I only witnessed his final consultation that

9    termed him.

10          Q      How did that come about?

11   A      I was sitting in the office doing my work.

12   Bruce asked me to sit in and he went over the

13   paperwork with him and I just signed as witness.

14          Q      If you would, give me your best

15   recollection of what happened when you witnessed

16   this meeting.

17   A      The most I remember was Bruce went over all

18   the paperwork with him.  At the end of it, he said,

19   okay.  Jeff Bowie said, no, it's not okay.  And

20   then he signed and exited the building.

21          Q      Did Jeff say anything else?

22   A      Not that I can recall.

23          Q      Did Mr. Dezendorf say anything else?

24   A      I think he talked about RSU issues, anything

25   that was already granted, already reached its

**Demoleas - direct**                                              **16**

1   value.  He had a couple of days to cash it out or

2   he would forfeit it.

3           Q       What's an RSU?

4   A       As assistant general managers, you get stock

5   bonuses and stocks and you get, every year 20

6   percent of it gets vested.  And you're able to cash

7   that out if you'd like.

8           Q       And what was discussed if anything?

9   I think you were describing -- I'll stop and

10  rephrase the question.  What were the discussions

11  about RSU's in that meeting?

12  A       I think he told him anything that is vested

13  that you have in your account, you should cash it

14  out and everything else would be forfeited that

15  wasn't vested.

16          Q       Was anybody else at that meeting

17  other than you, Jeff and Mr. Dezendorf?

18  A       Not that I recall.

19          Q       Other than attending that meeting,

20  did you have any other participation in the

21  decision to terminate Jeff?

22  A       No.

23          Q       Did you ever request an accommodation

24  to take care of, concerning the need to take care

25  of child care issues?

**Demoleas - direct**                                    17

1    A       Yes.

2            Q       Would you explain?

3    A       Sure.  When my son was first born, I had a

4    hard time finding child care on Fridays.  So I

5    requested to have Fridays off which is a busy day

6    and they granted it until I was able to find child

7    care.

8            Q       And who was the manager at that time?

9    A       Bruce Dezendorf.

10           Q       And when did that happen?

11   A       My son was born on June 2.  I had five weeks

12   off.  So starting in July, I believe.

13           Q       What year?

14   A       2015.

15           Q       2015.  So that's after Jeff was

16   fired?

17   A       I believe so.

18           Q       And I apologize.  This is the third

19   deposition so if I asked this question already, I'm

20   confusing my depositions.  Did Jeff ever tell you

21   his son had autism?

22   A       Yes, you asked that already.

23               MR. DENOIA:  I hear you.  Off the

24   record.

25               (Whereupon a discussion is held off

# Exhibit 5

1

```
1                UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
2                CIVIL NO. 3:16-cv-05808-BRM-LHG

3

4
    X-------------------------------X
5     JEFFREY BOWIE,
                        Plaintiff,
6                                        DEPOSITION OF:
             -v-                          JAMES MACK
7
      COSTCO WHOLESALE CORPORATION,
8     BRUCE DZENEORF; and JOHN and
      JANE OES 1-10 (fictitious names),
9                        Defendants.
    X-------------------------------X
10

11

12
                A Computerized Transcript of the
13
    Stenographic notes of the proceedings in the
14
    Above-entitled matter as taken by and before
15
    PATRICIA A. FORNAROTTO, a Certified Shorthand
16
    Reporter and Notary Public of the State of New
17
    Jersey, certify the foregoing deposition was taken
18
    At the offices of DeNoia, Tambasco & Germann,
19
    Esqs., 501 Main Street, Toms River, New Jersey,
20
    08753, on Wednesday, July 25, 2018, commencing at
21
    10:20 a.m.
22

23

24

25
```

2

1                     A P P E A R A N C E S

2     DENOIA, TAMBASCO & GERMANN, ESQS.
      BY:   THOMAS DENOIA, ESQ., and
3           JAMES N. CITTA, ESQ.,
            501 Main Street
4           Toms River, New Jersey  08753
      Attorney for the Plaintiff.

5

      SEYFARTH SHAW, LLP
6     BY:   EPHRAIM J. PIERRE, ESQ.,
            620 Eighth Avenue
7           New York, New York  10018-1405
      Attorney for the Defendants.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Mack - direct**                                                    7

1    it to the office.  Were you aware of that

2    allegation?

3    A       No.

4            Q       Have you ever become aware of that

5    allegation?

6    A       Yes.

7            Q       And how did you become aware of the

8    allegation?

9    A       Through hearsay.  I didn't even know if it

10   was true.

11           Q       And when did you get this hearsay?

12   A       After the fact.

13           Q       Well, after the fact, after Jeff was

14   fired?

15   A       Yes.

16           Q       And who told you that?

17   A       It was, like I said, gossip.  Didn't even

18   know if it was true.

19           Q       Have you ever used any merchandise in

20   the office on the house account?

21   A       Yes.

22           Q       And what's the procedure when you do

23   that?

24   A       It's to be purchased.  It would be purchased

25   first for the office on a warehouse supply card and

**Mack - direct**                                                                8

1   the item that I'm speaking of is a refrigerator to

2   put my lunch in.

3                   MR. DENOIA:  Off the record.

4                   (Whereupon a discussion is held off

5   the record.)

6                   MR. DENOIA:  Would you be kind enough

7   to tell me what my last question was?

8                   (Whereupon the last question and

9   answer are read back by the court reporter.)

10          Q       And do you consider that a purchase

11   of supplies for the office whether it be a

12   refrigerator in your case or a tea kettle to be

13   something that's not permitted?

14   A       Well, it would have --

15                   MR. PIERRE:  Objection.  I was going

16   to say objection as to facts established there.

17                   MR. DENOIA:  I'm sorry.

18                   (Whereupon a short recess is taken.)

19                   MR. DENOIA:  You were objecting to my

20   question.

21                   MR. PIERRE:  And to clarify the

22   objection it would be to the characterization of

23   the tea kettle.  I don't think we established

24   whether or not if it was for office use or not.

25   The prior question is to refer to whether Mr. Bowie

**STATE SHORTHAND REPORTING SERVICE, INC.**

**Mack - direct**                                                9

1   had a take kettle in the office or not.

2            MR. DENOIA:  Well, actually it wasn't

3   related Mr. Bowie.  It was related to policy.  But

4   I'll rephrase the question.

5       Q      Is it permitted to purchase something

6   like a tea kettle for the office?

7   A       You had to have approval from the warehouse

8   manager.

9       Q      And who was the warehouse manager at

10  the time?

11  A       Bruce Dezendorf.

12      Q      And what do you base that answer on?

13           MR. PIERRE:  Perhaps you can clarify

14  what that refers to.  You asked two consecutive

15  questions there.

16      Q      On what do you base your answer?

17  A       If you're going to purchase anything for the

18  office or for whatever the case may be, it would be

19  on the warehouse supply card so it would be able to

20  be tracked through Rose in the office, and you

21  would have to have approval from Bruce that you're

22  making a purchase on the warehouse supply card.

23      Q      So you would have to obtain approval

24  in advance?

25  A       Yes.

**STATE SHORTHAND REPORTING SERVICE, INC.**

**Mack - direct**                                                10

1           Q       And is there any written policy that

2     you're aware of that sets that procedure forth?

3     A       I'm not sure.

4           Q       So where did you get the information

5     to support the answer you've just given me?

6     A       It's just how -- I mean, that's just --

7     there's nothing written that I know but that's the

8     process in which we do it.

9           Q       Did somebody tell you that was the

10    process?

11    A       I don't remember if anybody ever told me

12    that but coming up through the years, that's just

13    how it's been done.

14          Q       By you or by everyone?

15    A       It should be by everyone.

16          Q       Okay.  So I just want to understand

17    how you know that.  So did any -- so this is

18    question number one.  Did anybody in management

19    ever tell you that was the procedure?

20    A       Not that I remember.

21          Q       Just go down and check, just clarify,

22    and you're not aware of any written procedure that

23    sets that forth; correct?

24    A       Yes.

25          Q       Have you ever gone out of the tire

**Mack - direct**                                                          13

1   A       Well, I'm just doing for instance.  I mean,

2   to take care of an emergency at home or -- I mean,

3   I don't recall a specific one but I know --

4           Q       Well, were you aware of whether or

5   not Jeff's child had a disability?

6   A       I was not aware.

7           Q       So he never asked you to cover for

8   him when he had to, because he had to take care of

9   his son?

10  A       No.

11          Q       Are you aware of the policy and

12  procedures for Costco concerning TV returns?

13  A       Yes.

14          Q       There was a time when the policy

15  changed; is that correct?

16  A       Correct.

17          Q       And what is the policy for a TV that

18  was purchased before the policy changed?

19  A       Prior to the policy changing, you could

20  basically take any TV back at any, at any amount of

21  time basically.

22          Q       And were you aware of whether or not

23  these TV's were grandfathered when the new policy

24  came into effect?

25  A       Yes, there was -- yes.  There was a, if -- I

**STATE SHORTHAND REPORTING SERVICE, INC.**

# Exhibit 6

1

```
                UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
                CIVIL NO. 3:16-cv-05808-BRM-LHG

X------------------------------X
   JEFFREY BOWIE,
                     Plaintiff,
                                   DEPOSITION OF:
             -v-                   LEONARD WOHLGEMUTH

   COSTCO WHOLESALE CORPORATION,
   BRUCE DZENEORF; and JOHN and
   JANE OES 1-10 (fictitious names),
                     Defendants.
X------------------------------X
```

A Computerized Transcript of the

Stenographic notes of the proceedings in the

Above-entitled matter as taken by and before

PATRICIA A. FORNAROTTO, a Certified Shorthand

Reporter and Notary Public of the State of New

Jersey, certify the foregoing deposition was taken

At the offices of DeNoia, Tambasco & Germann,

Esqs., 501 Main Street, Toms River, New Jersey,

08753, on Wednesday, July 25, 2018, commencing at

12:30 p.m.

1                    A P P E A R A N C E S

2

3       DENOIA, TAMBASCO & GERMANN, ESQS.
        BY:   THOMAS DENOIA, ESQ., and
4             JAMES N. CITTA, ESQ.,
              501 Main Street
5             Toms River, New Jersey  08753
        Attorney for the Plaintiff.

6       SEYFARTH SHAW, LLP
        BY:   EPHRAIM J. PIERRE, ESQ.,
7             620 Eighth Avenue
              New York, New York  10018-1405
8       Attorney for the Defendants.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Wohlgemuth - direct**                                                8

1   reserved; correct?

2              MR. DENOIA:  Yeah, go ahead.  Back on

3   the record?

4        Q       Mr. Leonard, do you know why Mr.

5   Bowie was fired?

6   A        Yes.

7        Q       What's your, what do you, why do you

8   believe he was fired?

9   A        Violated company policy.

10       Q       And how did you become aware of that?

11  A        Through discussion with my attorney.

12       Q       Other than discussions with your

13  attorney, did you have, do you have any other basis

14  of knowledge as to why he was terminated?

15  A        No.

16       Q       Did you discuss his termination with

17  any other employee of Costco outside the presence

18  of your attorney?

19  A        No.

20       Q       How long have you known Jeff Bowie?

21  A        He began working with me in 2006.

22       Q       And what was your position at the

23  time?

24  A        I was warehouse manager.

25       Q       And what was his position?

**Wohlgemuth - direct**                                          9

1   A       Assistant warehouse manager.

2           Q       How would you rate him as an employee

3   while he worked for you?

4   A       Satisfactory.

5           Q       Were you aware that he had a child

6   with autism?

7   A       He shared that information.

8           Q       Did he ever request an accommodation

9   that he leave early or come in late due to this,

10  due to his care for his son?

11  A       He did not request an accommodation.

12          Q       Did he ever request family leave to

13  care for his son?

14  A       Not that I can recall.

15          Q       In 2014, were you contacted by Bruce

16  Dezendorf concerning Mr. Bowie?

17  A       I don't recall.

18          Q       There was some type of issue that

19  arised concerning Mr. Bowie's employment while he

20  worked for you; is that correct?

21  A       Repeat the question.

22                  (Whereupon the last question is read

23  back by the court reporter.)

24  A       No disciplinary action that I can recall.

25          Q       Well, was there some sort of an

**STATE SHORTHAND REPORTING SERVICE, INC.**

**Wohlgemuth - direct**                                            **10**

1   anonymous letter written concerning Mr. Bowie?

2   A      I don't recall.

3          Q      So you don't recall any investigation

4   into any issues concerning Mr. Bowie?

5   A      In my position as the general manager in

6   Brick?

7          Q      In your position as the general

8   manager with Mr. Bowie at any time.

9   A      I don't recall.

10         Q      Were you aware that Mr. Bowie had

11  gotten divorced?

12  A      Yes.

13         Q      How did you become aware of that?

14  A      He shared that information.

15         Q      Did his ex-wife, then wife work in

16  your store?

17  A      No.

18         Q      Did she work for Costco?

19  A      Not that I was aware of.

20         Q      So you were in the Brick store when

21  Jeff began to work there as an assistant manager;

22  is that correct?

23  A      Yes.

24         Q      And while you were in the Brick

25  store, did he tell you about his son with autism?

**Wohlgemuth - direct**                                            11

1   A       He shared that information.

2           Q       Did he explain that he was, at that

3   time that he was recently divorced?

4   A       I don't recall a specific conversation where

5   he shared his divorce but it was known.

6           Q       Did he share with you in a

7   conversation that he was a single father with

8   custody of his children?

9   A       He shared that he was separated from his

10  wife.

11          Q       Did he share that he had custody of

12  his children?

13  A       I don't know the specific custody

14  arrangements.

15          Q       So he did not share that with you?

16  A       I don't know who had specific legal custody

17  of his children.

18          Q       I didn't ask you that question.  I

19  asked you if he shared with you and represented to

20  you that he had custody of his children.

21  A       He shared with me that he had children.

22          Q       Did he share with you that his son

23  with autism was having a difficult time because of

24  the divorce?

25  A       He may have shared that information.

**Wohlgemuth - direct** 12

1        Q       Did he share with you that his

2   autistic son was having behavioral issues and

3   difficulty with his medication as a result of the

4   divorce?

5   A       I don't recall any specific conversations

6   regarding medication.

7        Q       Do you recall any conversations

8   regarding behavioral issues?

9   A       He mentioned that he had an autistic son.

10          MR. DENOIA:  Okay.  Could you read

11  back my question?

12          (Whereupon the last question is read

13  back by the court reporter.)

14  A       I don't recall any specific conversations

15  regarding behavioral issues.

16       Q       Did he ever ask to leave early or

17  come in late to care for his son?

18  A       He may have.

19       Q       And what did you tell him when he

20  asked that?

21  A       I don't recall any specific conversation to

22  any specific incident.

23       Q       Well, did you permit him to do that?

24  A       I may have.

25       Q       Did you tell him that it was

**Wohlgemuth - direct**                                    **13**

1   acceptable as long as his building had coverage?

2   A       I don't recall making that statement.

3           Q       Do you recall making any similar

4   statement?

5   A       If he had asked to leave early, I may have

6   granted that as an opportunity on a specific day.

7           Q       Do you recall him ever asking to

8   leave early because he had to take care of his

9   autistic son?

10  A       I'll say yes, that may have happened.

11          Q       Did that happen more than once?

12  A       I don't recall a frequency.

13          Q       Did it happen one time?

14  A       Yes.

15          Q       Do you know if it happened any other

16  time?

17  A       It may have.

18          Q       Is there any document or record that

19  would refresh your recollection as to whether or

20  not it may have happened again?

21  A       Not that I'm aware of.

22          Q       Have you reviewed any documents to

23  prior for this deposition?

24  A       Some with my attorney.

25          Q       What documents did you review?  I

**Wohlgemuth - direct**                                      **14**

1    don't want to know what your attorney said to you.

2    I just want to know what documents.

3    A       Documents that I had signed.

4            Q       Which documents that you signed?

5    A       A letter issued to Jeff for an area of

6    concerns for his performance.

7            Q       And what was the concern of

8    performance?

9    A       The letter relating to an investigation at

10   his warehouse at that time.

11           Q       Which warehouse was that?

12   A       Manahawkin.

13           Q       And tell me about this investigation;

14   what was it about?

15   A       I didn't conduct the investigation.  I

16   administered the letter.

17           Q       Okay.  Who conducted the

18   investigation?

19   A       I would assume the warehouse manager in

20   Manahawkin at that time.

21           Q       And who was that?

22   A       I believe it was Zoya is her first name.

23           Q       And what were the facts surrounding

24   that investigation?

25                   MR. CITTA:  Off the record.

**STATE SHORTHAND REPORTING SERVICE, INC.**

**Wohlgemuth - direct**                                         **19**

1            MR. DENOIA:   Can we have this marked

2    as Leonard-2?

3            (Whereupon a memo dated 10/8/12 is

4    received and marked as Leonard-2 for

5    identification.)

6       Q       So I'm going to show you what's shall

7    mashed as Leonard-2 for identification.  It's a

8    document that says confidential on the top and it's

9    dated October 8, 2012.  I'm going to show it to

10   counsel.  It's got a bate stamp of 000892.  Is

11   Leonard-2 the letter you're referring to?

12   A       Yes.

13       Q       And it's actually an E-mail; is it

14   not or is it a memo?  Do you know?

15   A       I don't recall if it was an E-mail or sent

16   to me.

17       Q       Okay.  But it's from you?

18   A       It's signed by me.

19       Q       Well, it says --

20   A       Administered; right.

21       Q       On the top it says to who?

22   A       Jeff Bowie, assistant general manager.

23       Q       From?

24   A       Leonard Wohlgemuth.

25       Q       And what does it read?

**STATE SHORTHAND REPORTING SERVICE, INC.**

# Exhibit 7

**1**

1         UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF NEW JERSEY
        CIVIL NO. 3:16-cv-05808-BRM-LHG
3 X---------------------------- X
4 JEFFREY BOWIE,
        Plaintiff,     CIVIL
5                 ACTION
      v.         VIDEO
6                CONFERENCE
  COSTCO WHOLESALE     DEPOSITION
7 CORPORATION, BRUCE DZENDORF   OF:
  and JOHN and JANE DOES 1-10   DARYL
8 (fictitious names),       GEISE
       Defendants,
9 X---------------------------- X
10
11 T R A N S C R I P T   of the stenographic notes
12
  of the proceedings in the above-entitled matter as
13
14 taken by and before DEBRA A. BAPTIST, a Certified
15
16 Shorthand Reporter and Notary Public of New Jersey,
17 at offices of STATE SHORTHAND REPORTING SERVICE,
18
19 212 Monmouth Road Oakhurst, 07753, on Wednesday,
20 August 15, 2018 commencing at eight minutes after
21
22 ten in the forenoon.
23
24
25

**2**

1         A P P E A R A N C E S
2
3 DENOIA, TAMBASCO & GERMANN, ESQS.,
  BY:   THOMAS DENOIA, ESQ.,
4       502 Main Street
      Toms River, New Jersey 08753
5   Attorneys for the Plaintiff.
6 SEYFARTH SHAW, LLP
  BY:   EPHRAIM J. PIERRE, ESQ.,
7       620 Eighth Avenue
      New York, New York 10018
8   Attorneys for the Defendant.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1          I N D E X
2        EXAMINATIONS
3 Witness     Direct   Cross   Redirect   Recross
4 DARYL GEISE
  By Mr. DeNoia     4
5
6         EXHIBITS
7 No.   Description            Page
8 DG-1   Statement of Daryl Geise............. 8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1 DARYL GEISE, 4696 Gardens Park Boulevard,
2 Orlando, Florida 32839 having been sworn by the court
3 reporter, testified as follows:
4
5 DIRECT EXAMINATION BY MR. DeNOIA:
6     Q   Good morning.
7 A   How you doing?
8     Q   How are you doing? My name is Tom
9 DeNoia. I represent Jeff Bowie in an action we've
10 brought against Costco.
11 A   Sure.
12     Q   And this proceeding is known as a
13 deposition. I thank you for attending.
14 A   Sure.
15     Q   We're attending by video. Some
16 instructions. The first instruction is probably
17 the most important when you're doing a video
18 deposition is there may be some delay --
19 A   Yeah.
20     Q   -- from me to you so, therefore, let
21 me finish my question before you answer so that we
22 have a clear record. The Court Reporter seated to
23 my right you just spoke to who is taking down
24 everything we say, she can't take down a nod of the
25 head or a shake of the hands so your responses will

9

1  you ever asked to do returns while you were a
2  manager there?
3  A   I was only a supervisor.  I was never a
4  manager in that building.
5  Q   I mean while a supervisor, while you
6  were a supervisor were you ever asked to do
7  returns?
8  A   Can you clarify that.  What do you mean by
9  was I asked to do returns?
10  Q   At all?
11  A   Well, basically --
12  Q   Go ahead.
13  A   Okay. So let me sort of - cause it's -
14  sometimes people that don't work within the
15  industry it kind of - there is verbage (sic) we use
16  or verbiage we use that's not correct  or doesn't
17  make sense outside.  A supervisor wouldn't do a
18  return.  Somebody would authorize the return but
19  the supervisor would have to key it.  But it's not
20  an approval or a disapproval, it's just literally
21  somebody says we're going to take care of the
22  member, you know, somebody higher would say we're
23  going to take care of the member, we need you to go
24  ahead and key it.  So you may physically flip the
25  key but something of this magnitude you would not

10

1  make that decision.  That's much above a
2  supervisor's pay grade.
3  Q   Okay. Now what do you mean by key it?
4  A   So basically what that means is you put a
5  key in the register and you turn it and then you
6  have to physically put a code in to override it,
7  right. So let's say that a GM, for instance, or
8  AGM or whatever says okay, we're going to go ahead
9  and take care of this member, we're going to do the
10  return so that AGM that GM as far as I'm aware
11  doesn't have a key. I can't think of a time when I
12  have ever seen somebody of that level override a
13  return.  All right.  So what would happen is they
14  would call a supervisor or lower manager over to
15  actually process -0 like physically process. Just
16  like the refund cashier would type the info in.
17  The supervisor or the lower tier manager would put
18  the override key in and override it but they're
19  just physically carrying out the action.  They're
20  not making the decision.
21  Q   Now you're saying with respect to
22  this specific transaction other than the statement
23  in front of you is it fair to say you don't have an
24  independent recollection?
25  A   Not really.  It's been a lot of years.

11

1  Q   Okay. So I did a double negative
2  there so let's clarify.
3  A   Sure.
4  Q   Do you have an independent
5  recollection?
6  A   No.  Like if I didn't have this statement
7  and you say hey, do you remember a TV that was
8  returned in October? Honestly if you asked me this
9  back then I would say yeah, I could probably tell
10  you all about it but it's just been a long time and
11  I don't really remember much, if anything.  Reading
12  it I can sort of remember the 75-inch Samsung that
13  we sold at that time so I can tell you I have a
14  vague memory of what the TV the person would have
15  gotten, would have looked like. But if you said
16  what kind of TV did they return I don't have a
17  clue.  I couldn't tell you.  I thought it was older
18  but by reading this statement it's been so long.
19  MR. PIERRE: Off the record.
20  (Whereupon a discussion is held off
21  the record.)
22  MR. PIERRE: Back on.
23  Q   And the transaction that we're
24  talking about is a return of a television which
25  took place on October 11th, 2014 and it was

12

1  requested by Jeff.  Is that what you're talking
2  about also?
3  A   Was the trans - was the transaction the 11th
4  or was that the date of my statement?
5  Q   That might have been the date of your
6  statement.  I don't know the date of the
7  transaction.
8  A   Yeah.  That would be - that transaction in
9  question would be the one - would be the one I
10  think we're all referring to.
11  Q   Now we clarified that.  Did you know
12  that the person returning the television was Jeff
13  Bowie's brother?
14  A   I honestly can't recall.  I don't - I don't
15  remember if that was brought to anybody's
16  attention.  But the one thing that I would say is,
17  you know, anyone that would have done the return
18  whether it was - whoever the refund cashier was or
19  any supervisor involved there's - none of that
20  would register because honestly it would have just
21  been if a manager says we're going to take care of
22  a member you're going to do a return, you go down
23  and do the return.  The decision is already made
24  before they would ever drag - not drag, before they
25  would ever get anybody to physically do the return

Exhibit 8

**1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL NO.  3:16-cv-05808-BRM-LHG

X---------------------------   X

JEFFREY BOWIE,
       Plaintiff,      CIVIL
                    ACTION
    v.            DEPOSITION
                    OF:
COSTCO WHOLESALE        MICHAEL
CORPORATION, BRUCE DZENDORF  STATILE
and JOHN and JANE DOES 1-10
(fictitious names),
       Defendants,

X---------------------------   X

T R A N S C R I P T   of the stenographic notes

of the proceedings in the above-entitled matter as

taken by and before DEBRA A. BAPTIST, a Certified

Shorthand Reporter and Notary Public of New Jersey,

at offices of STATE SHORTHAND REPORTING SERVICE,

212 Monmouth Road Oakhurst, 07753, on Wednesday,

August 15, 2018 commencing at twenty-three minutes

after eleven in the forenoon.

---

**2**

A P P E A R A N C E S

DENOIA, TAMBASCO & GERMANN, ESQS.,
BY:  THOMAS DENOIA, ESQ.,
    502 Main Street
    Toms River, New Jersey 08753
Attorneys for the Plaintiff.

SEYFARTH SHAW, LLP
BY:  EPHRAIM J. PIERRE, ESQ.,
    620 Eighth Avenue
    New York, New York 10018
Attorneys for the Defendant.

---

**3**

I N D E X

EXAMINATIONS

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|

MICHAEL STATILE
By Mr. DeNoia    4
By Mr. Pierre        29

EXHIBITS

| No. | Description | Page |
|-----|-------------|------|
| MS-1 | Notes of Michael Statile............... | 10 |

---

**4**

MICHAEL STATILE, 465 Route 70, Brick, New

Jersey 08723 having been sworn by the court reporter,

testified as follows:

DIRECT EXAMINATION BY MR. DeNOIA:

   Q    Still morning so I'll say good

morning.

   A    Morning.

   Q    We just informally met.  My name is

Tom DeNoia.  I represent Jeff Bowie in an action

against Costco dealing with his employment there.

You've just been sworn in.  And that's the same

oath you would take in a courtroom and it has the

same affect. There is a court reporter seated

across from you and to my right who is going to

take down everything you say. She can't take down a

nod of the head or a shake of the hand so your

response will have to be verbal.

   A    Okay.

   Q    If you don't understand a question

stop and ask me to rephrase it.

   A    Okay.

   Q    Why do I say that?  Because when we

get to the trial in this case there may come a time

where you say something that may be different than

---

**STATE SHORTHAND REPORTING SERVICE, INC.**

**5**

1  you say today.  And I may come up to you at the
2  trial and say to you do you remember being in Ocean
3  Township on August 15th, 2018 and I asked you X and
4  you answered Y? I don't want you to look at me and
5  look at the jury and say well, I didn't understand
6  the question.  So you understand that instruction?
7  A    I get it, yes, sir.
8        Q    Okay. The Court Reporter can only
9  take down one of us at a time.  So although it's
10  very common for people to anticipate a question and
11  answer before it's complete, I'm going to ask you
12  to let me complete the question.
13  A    Okay.
14        Q    There may come a time during the
15  deposition I may say to you was that a yes or let
16  me finish the question.  I'm not being rude.  I'm
17  just trying to make a clear record.  Do you
18  understand that?
19  A    Yes, sir.
20        Q    All right.  Are you under the
21  influence of any medications or substances that
22  would prevent you from testifying clearly today?
23  A    No.
24        Q    Okay. Have you ever had your
25  deposition taken before?

**6**

1  A    Yes.
2        Q    How often?
3  A    Not very often.  I honestly can't remember
4  the last time I did a depo.
5        Q    Do you know Jeff Bowie?
6  A    Yes.
7        Q    And how long have you known Jeff?
8  A    Approximately 12 years.
9        Q    And how would you describe your
10  relationship with Jeff?
11  A    Normal.
12        Q    Prior to October of 2014 had you had
13  any issues with Jeff as a manager?
14  A    Me personally?
15        Q    Yes?
16  A    No.
17        Q    Now you said me personally.  Are you
18  aware of any issues with Jeff prior to October of
19  2014?
20  A    I'm not sure I understand what you're
21  saying.  Do you mean with me or do you mean in the
22  warehouse?
23        Q    In the warehouse?
24  A    Yes. I'm aware of an issue in September.
25        Q    Of?

**7**

1  A    2014.
2        Q    Okay. And what issue is that?
3  A    When I entered the building, I don't
4  remember the exact date, it was approximately the
5  15th of September of 2014, I walked into the Admin
6  office and was approached by Jessica and Rose, two
7  office employees, who stated that they saw Jeff
8  enter the Admin office with product off the selling
9  floor.
10        Q    And what did you do when you were
11  advised of this?
12  A    I kept the information to myself until my
13  boss arrived at the warehouse who was Bruce
14  Dzendorf and I reported the incident to Bruce.
15        Q    And who is Jessica?
16  A    Jessica is the payroll clerk for the Brick
17  building.
18        Q    And who is Rose?
19  A    Rose is the sales audit person for the Brick
20  location.
21        Q    And do they still both work at Brick?
22  A    They do.
23        Q    So what happened next?
24  A    I reported the interest didn't to Bruce, sat
25  down with Bruce for a little bit.  He asked me to

**8**

1  look into it, investigate it, which I did.
2        Q    Did he give you any specific
3  directions concerning the investigation?
4  A    Told me to reserve his shopping history. See
5  if the items were purchased that were brought into
6  the office.  Which I did.
7        Q    Anything else?
8  A    At that point in time, no.
9        Q    Okay. Did there come a time in
10  October of '14 that you were asked to do a further
11  investigation?
12  A    I do not remember if it was October.
13        Q    Okay.
14  A    With our conversation Bruce mentioned to me
15  that some of his managers have brought some issue
16  to his attention.
17        Q    And what issue was that?
18  A    An issue of Jeff entering and leaving the
19  building early and late.
20        Q    Do you know what managers brought
21  that to his attention?
22  A    I do not.
23        Q    Did you ask him that?
24  A    I did not.
25        Q    And what happened then he did ask you

**STATE SHORTHAND REPORTING SERVICE, INC.**

**9**

1  to do something about that?
2  A    He asked me to keep an eye on that.
3  Q    And did you do that?
4  A    Yes, I did.
5  Q    And what did you discover?
6  A    I discovered that that in fact was true.
7  Q    That he left the building early and
8  came in late?
9  A    Yes.
10  Q    And how often?
11  A    I don't remember how often.
12  Q    And how did you determine that?
13  A    CCTV.
14  Q    And would you define CCTV for me?
15  A    Our video surveillance system within the
16  warehouse.
17  Q    So did you review the CCTV to
18  determine whether or not he left early and came in
19  late?
20  A    Yes.
21  Q    And did you prepare a report
22  concerning that?
23  A    I did not prepare a report. I made some
24  notes.
25  Q    Okay. And did you share those notes

**10**

1  with management?
2  A    With Bruce.
3  Q    And did your notes indicate what days
4  he left early and what days he came in late?
5  A    It -- I believe it had a couple of dates on
6  there.
7  Q    Do you remember those dates?
8  A    I do not.
9  Q    Do you know what happened to those
10  notes?
11  A    My notes I believe Counsel has a copy of.
12  MR. DeNOIA: Can we go off the record
13  for a second.
14  (Whereupon a discussion is held off
15  the record.)
16  MR. DeNOIA: Can we mark this as MS-1
17  (Whereupon Plaintiff's Exhibit MS-1,
18  Notes of Michael Statile, was received and marked
19  for Identification.)
20  MR. DeNOIA: We can go back on the
21  record. Counsel was kind enough to turn over
22  Costco 1256 through Costco 1259. Counsel, you
23  represented this is Mr. Statile's file; is that
24  correct (indicating)?
25  MR. PIERRE: That is correct.

**11**

1  MR. DeNOIA: Thanks. And we've just
2  had it marked MS-1 for Identification.
3  Q    Okay. If you would look at MS-1, Mr.
4  Statile, would you tell us what it is?
5  A    It's my notes.
6  Q    And when did you take these notes?
7  A    Probably on the dates that are jotted on the
8  - on the paper.
9  Q    Okay. So help me understand the first
10  page, 1256 is the notation on the bottom. That's
11  what we call the Bates stamp?
12  A    Uh-hum.
13  Q    There is a number 316343571000. What
14  does that depict?
15  A    I believe that's Jeff's membership number,
16  Costco membership number.
17  Q    And then there is a number under that
18  starting with 111. What is that?
19  A    Don't know exactly. It probably his whoever
20  else is on his account.
21  Q    Okay. And then we go down to the next
22  line it says there is a number sign 845 et cetera.
23  What is that?
24  A    That 845070 is the item number for that
25  water kettle, tea kettle.

**12**

1  Q    And that's the one he brought to the
2  office, correct?
3  A    Yes.
4  Q    And the next one is 168, starts with
5  168. What is that?
6  A    Item number for a bag of M&M's.
7  Q    Okay. Was the M&M's paid for?
8  A    Did not find a purchase for the M&M's on
9  Jeff's account.
10  Q    And who - who took the M&M's?
11  A    The M&M's were sitting on Jeff Bowie's desk.
12  Q    And the next item 828?
13  A    828285 and the 828097 were lance crackers.
14  Two slightly different sell units found under
15  Jeff's desk.
16  Q    And the next line?
17  A    535170 is the oatmeal, the other item
18  brought to the office along with the kettle.
19  Q    And there is a date there says 9/6/14
20  Carol Murray. What does this mean?
21  A    I believe Carol Murray was Jeff's girlfriend
22  at the time. And there was a box of oatmeal found
23  on her account.
24  Q    That she paid for?
25  A    In another location, yes. And that 1025 is

13

1  the Manahawkin location that you see jotted there.
2      Q    Okay. And then under that it says
3  1/2/14 to present. What does that mean?
4      A    I went back to January 2nd of '14 --
5      Q    Uh-hum?
6      A    -- trying - looking for a purchase for those
7  items. And none were found.
8      Q    Well, okay, let's go back up where it
9  says Shirley Bowie. What is that there for?
10     A    I believe that's Stacy.
11     Q    Oh, Stacy. Go ahead. Does that mean
12 she --
13     A    There must have been a bag of M&M's
14 purchased from Stacy in another location, 1093,
15 which I believe is Marlboro New Jersey on 8/15 of
16 2014.
17     Q    Okay. Then you have 915 and you got a
18 bunch of numbers. What are they, on the bottom
19 right of your notes?
20     A    The -- That's the date that the kettle and
21 the oatmeal were brought into the office by Jeff.
22     Q    And then you have a little 9/17/14
23 23. What is that?
24     A    I don't remember what that date is.
25     Q    And what does R 51 mean, do you know?

14

1      A    Yeah. Register 51.
2      Q    All right. Let's go to the next
3  page, 1257.
4      A    (Complies).
5      Q    And it's a list of things in and the
6  Quaker Instant Oatmeal is circled. Is that
7  correct?
8      A    Yes.
9      Q    Okay. And this is paid for by Carol
10 Murray --
11     A    Yes.
12     Q    -- is that what that shows in?
13     A    In Manahawkin, not in Brick.
14     Q    Okay.
15     A    On 9/6. The date is up there as well.
16     Q    Okay. Then on the next page 1258
17 would you tell us what those notations represent?
18     A    Different dates and camera numbers and times
19 for Jeff.
20     Q    Okay. You have 9/17 it says 13:55C25
21 (W/Vase). Is that what that says?
22     A    It says with vase I believe that first line.
23     Q    And what does that mean?
24     A    I believe we were looking at where the --
25 there was another issue had come up where - besides

15

1  the in and out late and leaving early an issue came
2  up where we were told - I wasn't told, Bruce was
3  told by another manager that Jeff was exiting the
4  building without product not through the main exit.
5  This is related to that.
6      Q    And did you determine that he entered
7  - he left the building with product that he didn't
8  pay for?
9      A    Not in this case here, no.
10     Q    Did you ever find him leaving the
11 building with product he didn't pay for?
12     A    No.
13     Q    Okay. And those dates with the -
14 starting, for example, so we can refer back to it
15 the first line to the right it says star 6/30 in at
16 4:00 a.m. What is that?
17     A    On June 30th that I guess is his arrive
18 time.
19     Q    Okay. Was he late?
20     A    I don't remember. It doesn't note here what
21 time he was scheduled.
22     Q    Where do you see that?
23     A    It does not I said.
24     Q    Oh, okay. So the rest of the dates
25 are arrive times except for the one that says exit?

16

1      A    Yeah. 7/7, been there 5:05, exits at
2  6:54 a.m. Out and exits through the tire shop.
3      Q    All right. And is that the last
4  page? Oh, then we have 1259. And what's 1259
5  depict?
6      A    Different dates with different reasonings.
7      Q    Okay. Let's start with 9/25. What is
8  - what do you notate about 9/25?
9      A    9/25 is his time in and out. And then below
10 that Jeff purchased a Caesar salad at the court
11 food and then removed some dressing from the deli
12 for I'm assuming for his salad. The dressing from
13 the deli is - is not for sale at the deli. It's for
14 the deli to use in product that we sell, in salads
15 that they sell. That's why that is noted there.
16     Q    So did he buy the salad at the deli?
17     A    Bought the salad at the deli, did not buy
18 the dressing.
19     Q    So he had to buy the dressing
20 separately at the deli?
21     MR. PIERRE: If I could just clarify
22 he stated he bought it at the food court.
23     A    He bought the Caesar salad at the food
24 court.
25     MR. PIERRE: Correct.

**STATE SHORTHAND REPORTING SERVICE, INC.**

**21**

1   hours doing this?
2   A    Total time most likely.  Although I do not
3   know for sure.
4       Q    Okay. And do you know how many videos
5   - how many dates of videos you reviewed?
6   A    I don't offhand.
7       Q    Did you keep any record of that?
8   A    Whatever video I burnt Counsel has.
9       Q    Okay. Now the last video you burnt
10  was a video depicting the - Jeff at the counter and
11  someone with a TV?
12  A    Yes.
13      Q    Do you recall that?
14  A    Yes.
15      Q    And there is a - probably a good five
16  or six minutes of blank, blackness before that.  Do
17  you know why that is?
18  A    I have absolutely no idea.
19      Q    When you burnt it was the entire -
20  the entire tape visible, viewable?
21  A    I don't remember.
22      Q    Do the original tapes still exist?
23  A    The original tapes would have been off on
24  the DVR.
25      Q    Yes.

**22**

1   A    That DVR is long gone.
2       Q    Have you ever been asked to review
3   videos concerning any other employee?
4   A    Yes.
5       Q    How often?
6   A    Quit often actually.
7       Q    And who initiated those
8   investigations?
9   A    Everything that I do is initiated by my boss
10  who for the past five years has been Bruce.
11      Q    Now were you aware that Jeff's son
12  had autism?
13  A    I believe I knew that.
14      Q    And how did you know that?
15  A    Well, Jeff used to' talk about it.
16      Q    And were you aware that Jeff had sole
17  custody of his son?
18  A    No.
19      Q    Were you aware that Jeff needed to
20  care for his son?
21  A    Nope.
22      Q    Did anybody ever tell you that Jeff
23  at times had to leave to take care of his son?
24  A    No.
25      Q    Did Mr. Dzendorf ask you to review

**23**

1   videos?
2   A    Yes.
3       Q    Did he tell you what time periods to
4   review?
5   A    No.
6       Q    Did he ask you to see if he was
7   leaving early and coming in late?
8   A    Yes.
9       Q    Now have you discussed this case with
10  Mr. Dzendorf recently?
11  A    No.
12      Q    Have you ever discussed this case
13  with Mr. Dzendorf?
14  A    No.
15      Q    Do you know that Jeff was terminated?
16  A    Yes.
17      Q    And how did you become aware of that?
18  A    Bruce did tell me that.
19      Q    When did he tell you that?
20  A    After he was terminated.  I don't remember
21  the date.
22      Q    Did you ask him why he was
23  terminated?
24  A    No.
25      Q    Did he tell you why he was

**24**

1   terminated?
2   A    No.
3       Q    Other than your notes did you prepare
4   any type of formal report of your investigation?
5   A    No.
6       Q    Did anybody interview you, other than
7   Counsel, concerning this investigation?
8   A    No.
9       Q    Are you aware of anybody else in the
10  store ever being fired for leaving through the
11  wrong door?
12  A    I am not aware.
13      Q    Are you aware of anybody ever being
14  fired for taking a tea kettle to the office or any
15  item to the office?
16  A    I am not.  But I will say this, every
17  employee in that building knows there's no product
18  that goes - comes off the selling floor unless it's
19  paid for.
20      Q    But there is an office account for
21  product used in the office, correct?
22  A    Can you repeat that?
23      Q    Is there an office account for
24  product used in the office?
25  A    There is a supply card which as far as I

**STATE SHORTHAND REPORTING SERVICE, INC.**

# Exhibit 9

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL NO. 3:16-cv-05808-BRM-LHG

X-------------------------------X
JEFFREY BOWIE,
                    Plaintiff,

                                    DEPOSITION OF:
        -v-                         JESSICA VAUGHN

COSTCO WHOLESALE CORPORATION,
BRUCE DZENDORF; and JOHN and
JANE OES 1-10 (fictitious names),
                    Defendants.
X-------------------------------X

A Computerized Transcript of the

Stenographic notes of the proceedings in the

Above-entitled matter as taken by and before

PATRICIA A. FORNAROTTO, a Certified Shorthand

Reporter and Notary Public of the State of New

Jersey, certify the foregoing deposition was taken

At the offices of DeNoia, Tambasco & Germann,

Esqs., 501 Main Street, Toms River, New Jersey,

08753, on Monday, August 28, 2018, commencing at

10:05 a.m.

1                      A P P E A R A N C E S

2

3

4     DENOIA, TAMBASCO & GERMANN, ESQS.

5     BY:   THOMAS DENOIA, ESQ., and

6           JAMES N. CITTA, ESQ.,

7           501 Main Street

8           Toms River, New Jersey   08753

9     Attorney for the Plaintiff.

10

11

12

13

14

15     SEYFARTH SHAW, LLP

16     BY:   EPHRAIM J. PIERRE, ESQ.,

17           620 Eighth Avenue

18           New York, New York   10018-1405

19     Attorney for the Defendants.

20

21

22

23

24

25

**Vaughn - direct**                                      6

1   leave?

2   A        The end of September, like the last week.

3            Q        At any time during the month of

4   September 2014, did you report Jeff Bowie to Loss

5   Prevention about any issue?

6   A        Yes.

7            Q        Okay.  And what was that?

8   A        There was items being brought in the office.

9            Q        Do you know what items?

10  A        There was a box of oatmeal and a container

11  of M&M's.

12           Q        And what did they say when you

13  reported it?

14  A        I told him and he said he would look into it

15  and talk to Bruce.

16           Q        And do you know when that was?

17  A        Before I went out.

18           Q        So was that in September?

19  A        Yes.

20           Q        Have you ever reported anyone else to

21  Loss Prevention?

22  A        Yes.

23           Q        How often?

24  A        If I see something, members, employees,

25  anything like that.  Like if I see something,

**STATE SHORTHAND REPORTING SERVICE, INC.**

**Vaughn - direct**                                              9

1          Q          What did you do at Chuckie Cheese?

2    A       I hosted parties.

3          Q          And what's your highest educational

4    degree?

5    A       I did a year of college.

6          Q          And where was that?

7    A       Ocean County College.

8          Q          What did you study there?

9    A       Just generic classes.

10          Q          And where did you go to high school?

11    A       Brick Memorial.

12          Q          And where is that?

13    A       Bricktown.

14          Q          Oh, Brick Memorial?

15    A       Yeah.

16          Q          I thought you said Brook.  And what

17    year did you graduate?

18    A       2005.

19          Q          Are you familiar with Costco's policy

20    concerning discrimination?

21    A       Yes.

22          Q          How, how are you familiar with that?

23    A       I talk about it in orientations, it's in my

24    orientation manuals.

25          Q          Is that one of your job duties?

**STATE SHORTHAND REPORTING SERVICE, INC.**

**Vaughn - direct**                                                 **10**

1    A        Yes.

2            Q        Are you familiar with their family

3    leave policy?

4    A        Yes.

5            Q        Do they have an intermittent family

6    leave policy?

7    A        Yes.

8            Q        And how does that work?

9    A        You submit paperwork to the doctors, doctor

10   fills it out, turn it back into Costco.  They tell

11   you how long you need leave for, how many days,

12   anything like that.  It gets turned into our third

13   party and they go through, cross all the, you know,

14   make sure everything is in line and then it gets

15   approved.

16           Q        Have you processed any family leave

17   for any employees?

18   A        Yes.

19           Q        Have you ever processed an interim

20   family leave?

21   A        Yes.

22           Q        And how would you define interim

23   family leave?

24   A        I don't understand that.

25           Q        What is interim family leave in your

**STATE SHORTHAND REPORTING SERVICE, INC.**

# EXHIBIT 10



**COSTCO WHOLESALE**

*Employee Agreement* | *United States*

**MARCH 2013**

PRINTED WITH SOY INK

EXHIBIT

Defs-3 for ID
6/18/18 R.L.

COSTCO 000001

CONFIDENTIAL



## Employee Agreement

**COSTCO** WHOLESALE



### A message from CRAIG JELINEK

Dear Fellow Employees,

As our Company continues to grow and succeed, our future looks very bright. It's my hope that each of you feels secure and confident in your job and Costco.

Costco prides itself on being a leader in our industry because we are excellent merchants, efficient operators, and we treat our members and each other fairly. This Employee Agreement reflects our latest effort to provide you with the highest level of care.

Along with our operating policies and personnel procedures, within these pages you will find our Mission Statement, Code of Ethics and Standards for Conduct. I invite you to read those sections, as they are the cornerstones of our company philosophy.

Costco management pledges to abide by the terms of this Agreement so employees covered by it can rest assured that consistency and fairness are built into our employment practices. But we don't stop there. We have an Open Door Policy available to every employee at Costco. It's a great policy that ensures that the lines of communication truly stay open. I urge you to talk with your management team anytime you have questions, concerns, suggestions, or comments.

We have over 600 locations and more than 161,000 employees worldwide. Over the next few years, our business is on track to expand into new markets, develop in existing areas, and explore new opportunities around the world. We plan to open hundreds of locations in the years ahead. With expansion comes opportunity for each of you. We need talented leaders to grow the business and adventurous employees to help drive our future. We need to stay open-minded and creative as we strive for new heights. Let us know how we can help you reach your career goals.

Each of you represents our Company in the communities where we do business. You consistently deliver the highest level in member service; setting the standard that makes Costco a destination for loyal shoppers and a place your co-workers want to be. Your job at Costco should be challenging, but also fun and rewarding.

Thank you for being part of the Costco family.

Cordially,

*Craig*

Craig Jelinek, President/CEO

*Employee Agreement—United States—March 2013*

COSTCO 000002

CONFIDENTIAL



Employee Agreement

Employee Agreement



# TABLE OF CONTENTS

**WHAT DO WE STAND FOR?**
1.0   INTRODUCTION ........................................................... 5

**WHAT POLICIES DO I NEED TO KNOW?**
2.0   PERSONNEL PROCEDURES AND POLICIES
   2.1   Open Door Policy/Resolution of Disagreements ............................. 11
   2.2   Equal Opportunity ........................................................ 12
   2.3   Americans with Disabilities Act (ADA) ..................................... 13
   2.4   Anti-Harassment Policy ................................................... 13
   2.5   Reporting Harassment, Discrimination, or Retaliation...................... 15
   2.6   Anonymous Reporting of Accounting Issues or Illegal Conduct ............. 16
   2.7   Drug and Alcohol-Free Workplace Policy ................................. 17
   2.8   Drug and Alcohol Testing ................................................. 18
   2.9   Voluntary Requests for Assistance ........................................ 19
   2.10  Fitness for Duty .......................................................... 19

**WHAT'S MY JOB AND HOW COULD IT CHANGE?**
3.0   EMPLOYEE CLASSIFICATIONS – See tab in back for specific classifications
   3.1   Employee Status .......................................................... 20
   3.2   Forklift/Cashier Training .................................................. 22
   3.3   Job Postings .............................................................. 23

4.0   EMPLOYMENT STATUS CHANGE
   4.1   Automatic Changes to Status ............................................. 24
   4.2   Change to Classification ................................................... 24
   4.3   Demotions to Lower Classifications ........................................ 25
   4.4   Transfers ................................................................. 26
   4.5   Length of Continuous Employment ......................................... 26
   4.6   Reduction in Workforce/Layoffs ........................................... 26
   4.7   Layoff Notice Pay ........................................................ 27
   4.8   Termination .............................................................. 28
   4.9   Resignation ............................................................... 28

**HOW DO I GET PAID?**
5.0   COMPENSATION AND PAYROLL – See tab in back for specific wages
   5.1   Scheduling (Hourly Non-Exempt Employees) ............................... 29
   5.2   Travel .................................................................... 31
   5.3   Supplemental Pay (Non-Exempt Employees) ............................... 32
   5.4   Breaks and Meal Periods (Non-Exempt Employees) ........................ 33
   5.5   Supervisor Pay ........................................................... 33
   5.6   Limited Part-time Pharmacists ............................................ 34
   5.7   Accumulation of Goal Hours ............................................... 34
   5.8   Interchange of Duties ..................................................... 34

**WHAT ELSE DOES THE COMPANY OFFER ME?**
6.0   BENEFITS
   6.1   Benefit Options ........................................................... 35
   6.2   Holidays ................................................................. 35
   6.3   Vacations ................................................................. 38
   6.4   Paid Sick/Personal Days (Hourly Non-Exempt Employees) ................. 39
   6.5   Membership .............................................................. 41
   6.6   Sunshine Brooks Scholarship Program ..................................... 42
   6.7   Care Network ............................................................. 42

**WHAT IF I NEED TIME OFF?**
7.0   FAMILY AND MEDICAL LEAVES OF ABSENCE (LOA) ........................... 43
   7.1   Rules Governing All Family/Medical Leaves ................................. 46
      A.   Requesting Family/Medical Leave of Absence ......................... 46
      B.   Leave Certifications and Reporting While on Leave .................... 47
      C.   Accepting Employment While on Leave ............................... 48
      D.   Hours Accumulation ................................................ 48
      E.   Holiday Pay ........................................................ 48
      F.   Return from Medical Leave .......................................... 48
      G.   Transitional Return to Work ......................................... 48
      H.   Benefit Coverage While on LOA ...................................... 49
      I.   Pay While on Leave ................................................. 50

8.0   NON-MEDICAL LEAVES
   8.1   Personal Leave ........................................................... 52
   8.2   Winter Leave (Hourly Non-Exempt Employees) ............................ 52
   8.3   Bereavement Leave ....................................................... 52
   8.4   Military Leave ............................................................ 53
   8.5   Jury Duty Leave .......................................................... 54

**WHAT ARE THE CAREER OPPORTUNITIES?**
9.0   HOURLY NON-EXEMPT CLASSIFICATIONS
   9.1   Home Office and Regional Offices ......................................... 55
   9.2   Warehouses and Business Centers ......................................... 56
      A.   Licensed Positions .................................................. 57
   9.3   Depots ................................................................... 60
   9.4   Meat Plant ............................................................... 60
   9.5   Optical Lab ............................................................... 60
   9.6   Packaging Plants .......................................................... 61
   9.7   Costco Trading ........................................................... 61
   9.8   Costco Travel ............................................................ 62
   9.9   Auburn Business Facilities ................................................ 62

**HOW MUCH AM I PAID?**
10.0  WAGES – Hourly Non-Exempt Wages
   10.1  Service Assistants ........................................................ 63
      A.   Employees Hired Between 3/5/07 and 3/3/13 ........................ 63
      B.   Employees Hired On or After 3/4/13 ................................. 63
   10.2  Service Clerks ............................................................ 64
      A.   Employees Hired Between 3/5/07 and 3/3/13 ........................ 64
      B.   Employees Hired On or After 3/4/13 ................................. 64
   10.3  Meat Cutters ............................................................. 65
      A.   Employees Hired Between 3/5/07 and 3/3/13 ........................ 65
      B.   Employees Hired On or After 3/4/13 ................................. 65
   10.4  Truck Drivers-Depot ...................................................... 66
   10.5  Extra Check Payments .................................................... 66
   10.6  Your True Rate of Pay .................................................... 68

COSTCO 000003

CONFIDENTIAL

**COSTCO** WHOLESALE                    **Employee Agreement**

**WHAT ARE THE RULES?**
**11.0 STANDARDS OF CONDUCT AND DISCIPLINE**
11.1  Standards of Conduct and Discipline............................................69
11.2  Unpaid Suspension.................................................................69
11.3  Causes for Termination............................................................70
11.4  Causes for Disciplinary Action ...................................................74
11.5  Gratuity Policy....................................................................76
11.6  Employment and Relationships......................................................76
11.7  Standard of Ethics - Managers/Supervisors ........................................77
11.8  Privacy Policy....................................................................78
11.9  Intellectual Property Provision ..................................................80
11.10 Electronic Communications and Technology Policy...................................80
11.11 Timecards (Non-Exempt Employees) .................................................82

**WHAT DOES MEMBER SERVICE LOOK LIKE?**
**12.0  MEMBER SERVICE**
12.1  Member Service Standards..........................................................83
12.2  Personal Appearance Policy........................................................84

**HOW DO I PROTECT MYSELF AND OTHERS?**
**13.0  SAFETY POLICIES**
13.1  General Safety Rules..............................................................85
13.2  Food Handlers.....................................................................86
13.3  Emergency Procedures .............................................................87
13.4  Forklift/Electric Pallet Jacks (EPJ)..............................................87
13.5  Hand Trucks.......................................................................87
13.6  Pallets...........................................................................88
13.7  Dock Safety.......................................................................88
13.8  Chemical Safety...................................................................89
13.9  Lift/Carry Materials Safely ......................................................89

**INDEX OF KEY WORDS** ...................................................................90
**ACKNOWLEDGMENT OF RECEIPT OF THE 2013 EMPLOYEE AGREEMENT**........95

This Agreement is a general statement of Company policies. Costco may, from time to time, revise its policies, practices, or procedures. This Agreement supersedes any previous Employee Agreement, and any document addressing Company policies that is inconsistent with this Agreement. To the extent any law differs from the policies included in this Agreement, the Company will comply with the law.

*March 4, 2013*

---

**Employee Agreement**                    **COSTCO** WHOLESALE



# "WHAT DO WE STAND FOR?"
# 1.0—INTRODUCTION

## Our Mission
To continually provide our members with quality goods and services at the lowest possible prices.

In order to achieve our mission we will conduct our business with the following Code of Ethics in mind:

## Our Code of Ethics
1. Obey the law.
2. Take care of our members.
3. Take care of our employees.
4. Respect our suppliers.

If we do these four things throughout our organization, then we will achieve our ultimate goal, which is to:

5. Reward our shareholders.

## Costco's Code of Ethics[1]

### 1. Obey the law
*The law is irrefutable! Absent a moral imperative to challenge a law, we must conduct our business in total compliance with the laws of every community where we do business. We pledge to:*



- Comply with all laws and other legal requirements.
- Respect all public officials and their positions.
- Comply with safety and security standards for all products sold.
- Alert management if we observe illegal workplace misconduct by other employees.
- Exceed ecological standards required in every community where we do business.
- Comply with all applicable wage and hour laws.
- Comply with all applicable antitrust laws.
- Conduct business in and with foreign countries in a manner that is legal and proper under United States and foreign laws.
- Not offer or give any form of bribe or kickback or other thing of value to any person or pay to obtain or expedite government action or otherwise act in violation of the Foreign Corrupt Practices Act or the laws of other countries. Not request or receive any bribe or kickback.
- Promote fair, accurate, timely, and understandable disclosure in reports filed with the Securities and Exchange Commission and in other public communications by the Company.

[1] *Adapted from Jim Sinegal's presentation of Costco's Code of Ethics*

COSTCO 000004    CONFIDENTIAL    1.0

**COSTCO** WHOLESALE

**Employee Agreement**

**Employee Agreement**

**COSTCO** WHOLESALE



COSTCO 000005

CONFIDENTIAL

## 2. Take care of our members



*Costco membership is open to business owners, as well as individuals. Our members are our reason for being – the key to our success. If we don't keep our members happy, little else that we do will make a difference. There are plenty of shopping alternatives for our members and if they fail to show up, we cannot survive. Our members have extended a trust to Costco by virtue of paying a fee to shop with us. We will succeed only if we do not violate the trust they have extended to us, and that trust extends to every area of our business. To continue to earn their trust, we pledge to:*

- Provide top-quality products at the best prices in the market.
- Provide high quality, safe and wholesome food products by requiring that both suppliers and employees be in compliance with the highest food safety standards in the industry.
- Provide our members with a 100% satisfaction guarantee on every product and service we sell, including their membership fee.
- Assure our members that every product we sell is authentic in make and in representation of performance.
- Make our shopping environment a pleasant experience by making our members feel welcome as our guests.
- Provide products to our members that will be ecologically sensitive.
- Provide our members with the best customer service in the retail industry.
- Give back to our communities through employee volunteerism and employee and corporate contributions to United Way and Children's Hospitals.

## 3. Take care of our employees

*Our employees are our most important asset. We believe we have the very best*



*employees in the warehouse club industry, and we are committed to providing them with rewarding challenges and ample opportunities for personal and career growth. We pledge to provide our employees with:*

- Competitive wages
- Great benefits
- A safe and healthy work environment
- Challenging and fun work
- Career opportunities
- An atmosphere free from harassment or discrimination
- An Open Door Policy that allows access to ascending levels of management to resolve issues
- Opportunities to give back to their communities through volunteerism and fund-raising

Career Opportunities at Costco:

- Costco is committed to promoting from within the Company. The majority of our current management team members (including Warehouse, Merchandise, Administrative, Membership, Front End and Receiving Managers) are "home grown."
- Our growth plans remain very aggressive and our need for qualified, experienced employees to fill supervisory and management positions remains great.
- Today we have Location Managers and Vice Presidents who were once Stockers and Callers or who started in clerical positions for Costco. We believe that Costco's future executive officers are currently working in our warehouses, depots and buying offices, as well as in our Home Office.

## 4. Respect our suppliers



*Our suppliers are our partners in business and for us to prosper as a company, they must prosper with us. To that end, we strive to:*

- Treat all suppliers and their representatives as we would expect to be treated if visiting their places of business.
- Honor all commitments.
- Protect all suppliers' property assigned to Costco as though it were our own.
- Not accept gratuities of any kind from a supplier.

These guidelines are exactly that—guidelines—some common sense rules for the conduct of our business. At the core of our philosophy as a company is the implicit understanding that all of us, employees and management alike, must conduct ourselves in an honest and ethical manner every day. Dishonest conduct will not be tolerated. To do any less would be unfair to the overwhelming majority of our employees who support and respect Costco's commitment to ethical business conduct. Our employees must avoid actual or apparent conflicts of interest, including creating a business in competition with the Company or working for or on behalf of another employer in competition with the Company.[2] If you are ever in doubt as to what course of action to take on a business matter that is open to varying ethical interpretations, TAKE THE HIGH ROAD AND DO WHAT IS RIGHT.

*If we follow the four principles of our Code of Ethics throughout our organization, then we will achieve our fifth principle and ultimate goal, which is to:*

---

[2] *Except where otherwise provided by law.*



**COSTCO** WHOLESALE

**Employee Agreement**

**Employee Agreement**

**COSTCO** WHOLESALE

COSTCO 000006

## 5. Reward our shareholders



- As a company with stock that is traded publicly on the NASDAQ Stock Market, our shareholders are our business partners.
- We can only be successful so long as we are providing them with a good return on the money they invest in our Company.
- This, too, involves the element of trust. They trust us to use their investment wisely and to operate our business in such a way that it is profitable.
- Over the years Costco has been in business, we have consistently followed an upward trend in the value of our stock. Yes, we have had our ups and our downs, but the overall trend has been consistently up.
- We believe Costco stock is a good investment, and we pledge to operate our Company in such a way that our present and future stockholders, as well as our employees, will be rewarded for our efforts.

---

### Reporting of Violations and Enforcement

1. The Code of Ethics applies to all directors, officers, and employees of the Company. Conduct that violates the Code of Ethics will constitute grounds for disciplinary action, ranging from reprimand to termination and possible criminal prosecution.

2. All employees are expected to promptly report actual or suspected violations of law or the Code of Ethics. See Section 2 for where and how to report violations. Federal law, other laws and Costco policy protect employees from retaliation if complaints are made in good faith.

---



## What do Costco's Mission Statement and Code of Ethics have to do with you?
# EVERYTHING!

The continued success of our Company depends on how well each of Costco's employees adheres to the high standards mandated by our Code of Ethics. And a successful company means increased opportunities for success and advancement for each of you.

No matter what your current job, you can put Costco's Code of Ethics to work every day. It's reflected in the energy and enthusiasm you bring to work, in the relationships you build with your management, your co-workers, our suppliers and our members.

By always choosing to do the right thing, you will build your own self-esteem, increase your chances for success and make Costco more successful, too. It is the synergy of ideas and talents, each of us working together and contributing our best, which makes Costco the great company it is today and lays the groundwork for what we will be tomorrow.

## How we do business

**Our Warehouses:**
- We operate large, no-frill, low-cost facilities designed for simplicity, economy and efficient use of shopping space.

**Our Merchandise:**
- We offer a wide range of product categories with a narrow selection of the most popular items and styles within each category.
- Goods are displayed in original cartons on pallets, allowing for efficient storing and moving of products into display/sell positions.
- We carry nationally branded products as well as our own top-quality private label goods (Kirkland Signature products), which must meet or exceed national brand quality and provide a substantial savings to our members.
- While name-brand recognition is very important, buyers purchase only high-quality products based on which items they can obtain at the best price. This is why at different times our members may find products of the same high quality but in different brands.

CONFIDENTIAL



**COSTCO** WHOLESALE                    **Employee Agreement**

**Our Depots:**

- To reduce the cost of receiving goods and improve productivity, our depots receive goods by truck or container in a cross-dock manner. Products come in from our manufacturers at one dock and leave later that day or the next from another dock in a truck bound for our warehouses.

**Our Other Businesses:**

To ensure our members the highest quality and best prices in certain categories, Costco owns and operates ancillary businesses which source, manufacture, and provide products and services. These are:

- Costco Auburn Business Facilities
- Costco Business Centers
- Costco Travel
- Costco Wholesale Industries (CWI)
  - \* Costco Trading
  - \* Meat plants
  - \* Optical laboratories
  - \* Packaging plants

**Employee Agreement**                    **COSTCO** WHOLESALE



## "WHAT POLICIES DO I NEED TO KNOW?"
## 2.0—PERSONNEL PROCEDURES AND POLICIES

### 2.1  OPEN DOOR POLICY/ RESOLUTION OF DISAGREEMENTS

When a work-related disagreement occurs, every effort should be made to resolve the issue right away at the workplace level, starting with your Supervisor. However, Costco's Open Door Policy means that you have the option of contacting any Supervisor or Manager to help you resolve problems. Since Costco fosters an atmosphere of openness and mutual support, you may contact ascending levels of management either verbally or in writing, preferably in the following order:

1. **Supervisor/Manager**
   You are encouraged to first speak with your immediate Supervisor/Manager, who will provide a response in a timely manner.

2. **Location Manager**
   If you do not feel comfortable approaching your Supervisor/Manager, if your Supervisor/Manager has not resolved the issue, or if you do not agree with your Supervisor/Manager's response, then please inform your Location Manager of the problem, either verbally or in writing. Again, you will receive a prompt response.

3. **Regional/Senior/Executive Vice President**
   If you do not agree with the response provided by your Location Manager, or if you are not comfortable approaching your Location Manager, please inform your Regional, Senior, or Executive Vice President of the problem, either verbally or in writing. Again, you will receive a prompt response.

4. **Home Office Human Resources Department**
   If you do not agree with the response provided by your Regional, Senior, or Executive Vice President, or if you are not comfortable approaching them, please inform the Home Office Human Resources Department of the problem, either verbally or in writing. Again, you will receive a prompt response.

5. **Ombud's Office**                                    1-800-284-4882
   The purpose of the Ombud is to assist Costco employees by listening, discussing issues, answering questions, reviewing policies, providing information and referrals, facilitating meetings with management and helping develop options for problem resolution. The Ombud serves as an additional advocate for fairness. Before contacting the Ombud's Office, you are urged to use the Open Door Policy as described above. Please be prepared to present the Ombud with all steps taken to resolve the issue, as well as the Supervisors, Managers, Vice Presidents, and members of Human Resources with whom you worked regarding the matter.

COSTCO 000007

CONFIDENTIAL

COSTCO 000008



### 6. Improper Deductions from Salary

It is our policy to comply with the salary basis requirements of the Fair Labor Standards Act (FLSA) and state law. The Company does not allow deductions that violate these requirements.

*What To Do If An Improper Deduction Occurs*

If you believe that an improper deduction has been made to your salary, you should immediately report this information to your Location Manager or Human Resources.

Reports of improper deductions will be promptly investigated. If it is determined that an improper deduction has occurred, you will be promptly reimbursed for any improper deduction made. The Company does not tolerate any retaliation against those who make such reports.

Please see the Intranet for detailed information on the types of salary deductions that may constitute improper deductions under this policy.

## 2.2   EQUAL OPPORTUNITY

It always has been and continues to be Costco's policy that employees should be able to enjoy a work environment free from all forms of unlawful employment discrimination. All decisions regarding recruiting, hiring, promotion, assignment, training, termination, and other terms and conditions of employment will be made without unlawful discrimination on the basis of race, color, national origin, ancestry, sex, sexual orientation, gender identity or expression, religion, age, pregnancy, disability, work-related injury, covered veteran status, political ideology, genetic information, marital status, or any other factor that the law protects from employment discrimination. Individuals will be selected for promotion based on skill and ability. Where skill and ability are equal, then length of continuous employment will be the determining factor.

Additionally, Costco prohibits unlawful harassment of its employees, applicants, or independent contractors in any form. Complaints of unlawful employment discrimination or harassment should be reported as discussed below in Section 2.5. In cases where investigation confirms the allegations, appropriate corrective action will be taken, regardless of whether the inappropriate conduct rises to the level of any violation of law. No employee will suffer retaliation for reporting, in good faith, any violation of Company policy or unlawful discrimination, harassment, or retaliation.

## 2.3   AMERICANS WITH DISABILITIES ACT (ADA)

It is Costco's intent to fully comply with our duty to provide reasonable accommodations to allow people with disabilities to apply for and perform their jobs. If you have a disability that affects your job performance, let us know as soon as possible.

We will then discuss with you the reasonable accommodations we may be able to provide to enable you to perform the essential functions of your job. If you become unable to perform your essential job functions, even with reasonable accommodation, we will try to assist you in identifying other jobs that may become available and for which you may be otherwise qualified.

If you are assigned to a new position on a non-temporary basis due to permanent or long-term work restrictions, you will be paid at the rate of pay for the new position.

If you feel the above policy is in any way violated, you are required to use the Open Door Policy (Section 2.1) and report the violation to management.

## 2.4   ANTI-HARASSMENT POLICY

It is Costco's intent to provide a working and shopping environment free from all verbal, physical and visual forms of harassment for employees, applicants, independent contractors, members, and suppliers. All employees are expected to be sensitive to and respectful of their co-workers and others with whom they come into contact while representing Costco. We prohibit all forms of harassment based upon any protected status, including race, color, national origin, ancestry, sex, sexual orientation, gender identity or expression, religion, age, pregnancy, disability, work-related injury, covered veteran status, political ideology, genetic information, marital status, or any other protected status.

**Examples of the conduct we prohibit include:**

- Epithets, slurs, negative stereotyping or threatening, intimidating or hostile acts that relate to any of the above-mentioned protected groups.
- Written or graphic material displayed or circulated in our workplace that denigrates or shows hostility or aversion toward any of the above-mentioned protected groups.

CONFIDENTIAL

**COSTCO** WHOLESALE                    Employee Agreement

With respect to sexual harassment, examples of the conduct we prohibit include:

- Vulgar or sexual comments, jokes, stories, and innuendo.
- Graphic or suggestive comments.
- Gossip or questions about someone's sexual conduct or orientation.
- Vulgarity, inappropriate or unwelcome touching or staring, and obscene or suggestive gestures.
- Display in the workplace of sexually suggestive images, cartoons, graffiti, and the like.
- Unwelcome and repeated flirtations, requests for dates, and the like.
- Subtle pressure for sexual activity, including unwelcome sexual advances by a Supervisor to a subordinate.
- Solicitation or coercion of sexual activity, dates, or the like with the implied or express promise of rewards or preferential treatment.
- Solicitation or coercion of sexual activity, dates, or the like by the implied or express threat of punishment.
- Sexual assault.
- Intimidating, hostile, derogatory, contemptuous, or otherwise offensive remarks directed at a person because of that person's sex, whether or not the remarks themselves are sexual in nature, where the remarks cause discomfort or humiliation.
- Retaliation against an employee for refusing sexual or social overtures, for complaining about sexual harassment, for assisting another employee to complain, or for cooperating with the investigation of a complaint.

Harassment can be difficult to define. Misconceptions abound. For this reason, we require you to use our harassment reporting policy without worrying about whether the conduct involved would be considered harassment in a legal sense.

If you consider the conduct to be harassment, report it. This policy is intended to assist Costco in addressing not only illegal harassment, but also any conduct that is offensive or otherwise inappropriate in our work environment.

Employee Agreement

**COSTCO** WHOLESALE

## 2.5  REPORTING HARASSMENT, DISCRIMINATION, OR RETALIATION

If at any time you believe you are being subjected to harassment, discrimination, or retaliation, if you become aware of such conduct being directed at someone else or if you believe another employee has received more favorable treatment because of discrimination or sexual favoritism, you are required to report the matter to a Manager or above as outlined in the Open Door Policy in Section 2.1. Sexual favoritism occurs whenever an employment decision is based upon an employee's receptiveness to sexual advances. This duty to report applies to harassment, discrimination, or retaliation caused by anyone with whom an employee comes into contact as part of the employee's job: Managers, Supervisors, co-workers, members, independent contractors, suppliers, or others. All reported incidents will be investigated under the following guidelines:

- All complaints will be kept confidential to the fullest extent possible, and will only be disclosed as necessary to allow us to investigate and respond to the complaint. No one will be involved in the investigation or response except those with a need to know. All employees who participate in investigations are held to the same standards of confidentiality.
- We will not permit retaliation against anyone who, in good faith, makes a complaint, assists another to complain, or cooperates in an investigation. If you feel you are being subjected to retaliation, report the matter to a Manager.
- Anyone who is found to have violated our policies against harassment, discrimination, or retaliation is subject to corrective action up to and including immediate termination of employment, regardless of whether the violation amounts to a violation of law. Corrective action will depend on the severity of the offense. We will take whatever action we deem necessary to ensure the inappropriate behavior stops.

**Again, you are required to report all incidents of harassment, discrimination, retaliation, or other inappropriate behavior as soon as possible. We want to provide you with a pleasant and productive working environment, but we can't do that if these issues are not brought to our attention. Please join us in our efforts to maintain Costco as an enjoyable place to work for everyone.**

COSTCO 000009

CONFIDENTIAL

**COSTCO** WHOLESALE

**Employee Agreement**

**Employee Agreement**

**COSTCO** WHOLESALE



COSTCO 000010

## 2.6 ANONYMOUS REPORTING OF ACCOUNTING ISSUES OR ILLEGAL CONDUCT

Costco has established a confidential reporting tool relating to concerns with or complaints about: Costco's accounting, auditing and internal controls; or anyone at or connected with Costco who has committed, is committing, or is about to engage in conduct that may be illegal. The tool can be accessed through www.costco.ethicspoint.com, which is available on the internet, the Intranet, and the eNet. You are encouraged to use the Open Door Policy before you utilize the Ethicspoint system.

Reports can be made anonymously if you prefer. Please include as much detail as possible to permit an investigation of the subject matter of your report. All reports will be reviewed by Costco's General Counsel and Chief Compliance Officer, who will either investigate the matter themselves or forward it to the appropriate person(s) for review/investigation. In addition, you can make a report in writing and/or provide documentation for your concern/complaint by addressing it to "Confidential Submission" and mailing to the General Counsel, Costco Wholesale Corporation, 999 Lake Drive, Issaquah, WA 98027.

Federal law and Costco policy protect you from retaliation or reprisal if you, in good faith, make a complaint of this type. If you believe that you have been the subject of retaliation for making a complaint, you may report that through the procedures discussed above. As you know, it is part of our Code of Ethics that we obey the law, including the securities laws and accounting standards. The Company encourages the good faith reporting of unlawful or inappropriate activity.

## 2.7 DRUG AND ALCOHOL-FREE WORKPLACE POLICY

Costco is dedicated to ensuring a safe, efficient, drug and alcohol-free working and shopping environment. It is Costco's policy that all employees, including management, are to be free of the presence and adverse effects of unauthorized substances at all times so they are capable of exercising good judgment and safe work behavior. For more detailed information, see Costco's policy handout on this subject, available from your Manager or on the Intranet.

**Costco specifically prohibits employees from engaging in the following conduct while working, while on Company premises, while conducting Company business at any location, or while utilizing Company vehicles, machinery, or equipment including, but not limited to:**

1. The use, possession, purchase, sale, solicitation, manufacture, distribution, dispensation, or transfer of illegal drugs or drug paraphernalia.
2. The unauthorized possession of open containers of alcohol or use of alcohol at any point during the workday, including meal periods.
3. Being under the influence of unauthorized substances.
4. The use of inhalants.

**In addition, Costco specifically prohibits:**

5. Refusal to cooperate in a drug or alcohol test required by this policy.
6. Reporting for duty or remaining on duty with the presence or adverse effects of any unauthorized substance in an employee's system.

This policy does not prohibit employees from the lawful possession and use of over-the-counter and prescribed medications. Employees have the responsibility to consult with their doctors or other licensed medical practitioners about the effect of over-the-counter and prescribed medications on their ability to perform their specific job duties in a safe manner, and to promptly disclose any work restrictions to their Managers or the Human Resources Department. Employees should not, however, disclose underlying medical conditions, impairments or disabilities to their Managers or the Human Resources Department unless specifically directed to do so by their doctors or other licensed medical practitioners.

The use of marijuana, even if permitted by state law, will not be considered a legitimate medical explanation by Costco, and its Medical Review Officer (MRO), for a positive drug test result for marijuana.

CONFIDENTIAL



**Employee Agreement**

**Employee Agreement**



COSTCO 000011

## 2.8   DRUG AND ALCOHOL TESTING

To ensure compliance with this policy, Costco will conduct drug and alcohol testing for unauthorized substances in the situations described below, and in accordance with applicable state law. Failure to successfully pass a drug and/or alcohol test will cause the individual to be ineligible for employment and may subject an employee to termination of employment. Refusal to report for, submit to, or cooperate in a required drug and/or alcohol test will be considered a violation of the Drug and Alcohol-Free Workplace Policy, insubordination, and grounds for termination of employment.

1. <u>Pre-Employment Testing</u> All final applicants being considered for a position must pass a drug test before they receive an unconditional offer of employment and/or begin working for the Company. This includes all rehires for full-time, part-time or Seasonal employment.[3]

2. <u>Reasonable Suspicion Testing</u> If a Manager, based on reasonable conclusions drawn from specific facts, reasonably suspects an employee is using or is under the influence of an unauthorized substance while the employee is working, on Company premises, utilizing a Company vehicle, machinery, or equipment, or conducting Company business at any location, then the Company may require the employee to undergo a drug and/or alcohol test.

3. <u>Post-Accident Testing</u> When the Company reasonably believes an employee caused or contributed to a work-related accident that results in damage to Costco vehicles, machinery, equipment or property, or results in an injury to a person who requires off-site medical treatment, the employee will be required to submit to a drug and alcohol test as soon as practical following the accident. An employee who is required to submit to a post-accident drug and alcohol test will be removed from the performance of safety-sensitive functions pending the final result(s) of the test. Employees must notify their Manager as soon as possible after any accident, even if it does not result in serious damage to Company vehicles, machinery, equipment or property, or an injury to a person.

4. <u>Return to Duty and Follow-Up Testing</u> An employee who has signed a **Contract for Continued Employment (CCE)** and has undergone a substance abuse evaluation, whether or not through the Care Network, will not be permitted to return to duty without passing any appropriate drug and/or alcohol tests and is subject to follow-up drug and/or alcohol testing at times and frequencies determined by Costco for up to two (2) years.
Note:
1. "Unauthorized substances" are defined as alcohol, illegal drugs, inhalants and any legally prescribed drugs being used in a manner for which they were not intended or prescribed, including, but not limited to, the use of prescription drugs prescribed for another individual.
2. The application of this Policy may vary based on legal requirements in some states.

## 2.9   VOLUNTARY REQUESTS FOR ASSISTANCE

Costco encourages employees with drug and alcohol problems to seek help from the Care Network before they become subject to discipline for violating Costco's Drug and Alcohol-Free Workplace Policy or any other Costco policies. Costco will support, assist, and accommodate those employees to the extent required by applicable law. Employees will not be disciplined by Costco because they request assistance, but may not avoid discipline by requesting assistance after they violate Costco's policies or are notified of their selection for drug or alcohol testing. In addition, employees who request assistance will not be excused from complying with Costco's policies, including its standards for employee performance and conduct.

## 2.10   FITNESS FOR DUTY

When a Manager has a reasonable belief based on objective evidence that an employee's medical condition will impair his or her ability to perform essential job functions, or cause the employee to pose a direct threat to the safety or health of the employee or others, then the Company may require the employee to undergo a medical fitness for duty evaluation. This evaluation is performed by a licensed physician selected by the Company and may include drug, alcohol and/or psychiatric testing. Refusal to report for a fitness for duty examination as scheduled, or refusal to submit to any test requested by the physician, will be considered insubordination and grounds for termination of employment.

---

[3] *Except regular layoffs rehired within 180 days and Seasonal terminations rehired within 60 days.*

CONFIDENTIAL

**COSTCO** WHOLESALE | Employee Agreement

## "WHAT'S MY JOB AND HOW COULD IT CHANGE?"
## 3.0—EMPLOYEE CLASSIFICATIONS*
*See tab in back for specific classifications*

### 3.1  EMPLOYEE STATUS

**A.   Full-Time Employees**

Are guaranteed and regularly scheduled 40 hours per week or regularly scheduled for four 8-hour days, plus at least six hours on Sunday.

**B.   Part-Time Employees**

Are regularly scheduled less than 40 hours per week, but are guaranteed to be scheduled no less than 24 hours per week (this does not apply to Seasonal Employees, as stated below in Section G).

In the warehouse, we will focus on hiring part-time people willing to work Saturdays, Sundays, and evenings.



**C.   Limited Part-Time Employees**
- Are regularly scheduled less than 24 hours per week by mutual agreement between you and the Location Manager. If you are scheduled limited part-time and, by mutual agreement between you and the Location Manager, choose to move to a regular part-time schedule, then you will immediately be reclassified to part-time status and begin accruing hours to become eligible for benefits.
- Are not eligible for medical, dental, and vision benefits, but are eligible for Voluntary Short-Term Disability, the Care Network, the Employee Stock Purchase Plan, and the 401(k) Plan.
- There may be up to 20 employees at each location working limited part-time schedules.

**D.   Salaried Non-Exempt Managers**
- Are entitled to overtime pay and are provided with meal periods and rest breaks by this Agreement and applicable laws.
- Are not entitled to Sunday premium pay.

**E.   Exempt Employees**
- Are not entitled to premium pay or to overtime pay under this Agreement and applicable laws.

---

**COSTCO** WHOLESALE | Employee Agreement

**F.   Probationary Employees**
- Are classified as Probationary during their first 90 days of employment.
- You will be evaluated during your 90-day Probationary period. Continued employment depends upon a satisfactory evaluation. During the 90-day Probationary period, Costco reserves the right to terminate employment with or without cause or notice. If you are off work during the 90-day Probationary period for any authorized leave of absence, including illness, accident or workers' compensation injury, then your 90-day Probationary period is extended upon your return to work by the amount of time you were absent, up to a maximum of 90 days.

**G.   Seasonal Employees**

Costco will periodically hire Seasonal employees.

The following Seasonal periods apply:

**Costco warehouses:** October 7 – Sunday of Period 5 inventory

**Depots:** September 15 – January 15

**Costco Travel:** January – March

**Optical Labs/Optical Depot:** May – September 30

**CWI:**   **Meat Plant:** April – August
   **Costco Trading:** October – December
   **Costco Packaging Plants:** August – December

If you remain employed after the Seasonal period, you will be reclassified. If you do not complete your 90-day Probationary period during the Seasonal period, you will be reclassified as Probationary until your length of continuous employment, including the time classified as Seasonal, totals 90 days. If you complete your 90-day Probationary period during the Seasonal period, you remain classified as Seasonal until the end of the Seasonal period.

As a Seasonal employee:
- You are not eligible for holiday pay.
- You are not guaranteed a minimum number of hours per week.
- You are not eligible for paid vacation or sick/personal days.
- Hours worked during the Seasonal period <u>are not included</u> for purposes of determining full-time status or promotion to a higher classification.
- Your employment may be terminated at any time during the Seasonal period.
- If your employment is terminated during the Seasonal period and you are rehired within 60 days, you will have your original hire date reinstated and you are not required to take a pre-employment drug test or complete another background check. In addition, time worked during the Seasonal period will be applied toward completion of your 90-day Probationary period.

COSTCO 000012

CONFIDENTIAL

 
**H. Transitional Duty**

Transitional duty is a temporary assignment of duties, which may not encompass all the duties of a position. If you have a temporary medical restriction that prevents you from performing the essential functions of your position with or without reasonable accommodation, you may be eligible for transitional duty, if available, for a maximum of six weeks. After six weeks, your status will be re-evaluated.

If you are assigned to transitional duty in a position in a lower pay classification, you continue to receive your normal rate of pay while on transitional duty for a maximum of six weeks. If you are assigned to temporary transitional duty for longer than six weeks, you will be paid at the rate of pay for the position you are performing. Your benefits may be affected by your transitional duty assignment. Please see your Health Care Summary Plan Description for more detailed information.

## 3.2 FORKLIFT/CASHIER TRAINING



Opportunities will be posted for those interested in being trained on the forklift or on the cash register. Selections for training will be made according to length of continuous employment, so that when openings occur you may be qualified to apply. All forklift drivers must successfully complete and pass the forklift certification program. If while training on the forklift or cash register you work in a higher classification, you will be paid at the next highest rate in that classification for training time totaling 15 or more consecutive minutes. Training hours worked in the higher classification will not count toward automatic changes to status or classification.

## 3.3 JOB POSTINGS

**A. Regular Job Postings**

- All Job Openings, up to and including Staff Managers in the locations and Assistant Buyers and Salaried Managers at the Home and Regional offices, are posted.
- Postings for Home Office and Regional Job Openings are posted on the Intranet.
- Personnel rotations, such as Supervisor/Manager moves between locations or within a location, do not need a posting, as there is no Job Opening.
- For open Supervisor or Manager positions, rotations may be completed first, and then the remaining Job Opening posted.
- If a position reopens within 60 days of the close of the posting, it does not need to be re-posted and will be awarded to the next most-qualified candidate.

When a Job Posting is needed, the position is filled by a person whose skills and abilities best match those outlined in the Posting. Where skill and ability are equal, length of continuous employment is the determining factor except where necessary to comply with the Americans with Disabilities Act (ADA) and/or state law.[4] Specific Job Posting guidelines can be found in the Rothman Workplan. Although Costco's philosophy is to promote from within, we may hire outside the Company when appropriate.

**B. Temporary Job Openings**

Temporary Job Openings expected to last longer than six weeks are posted. For those lasting less than six weeks, our business needs can be addressed through an interchange of duties. Opportunities to temporarily work full-time, though an opening does not exist, may be posted within the department needing to add hours. Prior to accepting a Temporary Job, employees should meet with their Manager to discuss their status once the Temporary Job ends.

Temporary Job Postings will:

- Follow the guidelines listed in Section 3.3 A. Regular Job Postings.
- State that the position is temporary.
- Give an estimated length of time that the position will be needed.
- Not count toward automatic change to full-time status or an automatic move to a higher classification.
- Not guarantee that the employee returns to their previous position.

For any temporary salaried exempt job, non-exempt employees will be paid at an hourly off-scale rate equal to the salary for the Temporary Job.

---

[4] *As part of the accommodation process.*

COSTCO 000013



CONFIDENTIAL

**COSTCO** WHOLESALE                    **Employee Agreement**

## 4.0—EMPLOYMENT STATUS CHANGE

### 4.1   AUTOMATIC CHANGES TO STATUS

**A.   Part-time to Full-time**

Part-time employees who are scheduled to work an average of 40 hours per week for eight consecutive weeks in their own department will be promoted to full-time.

This does not apply during Seasonal periods in any Costco business, during your 90-day Probationary period, or while working in a posted Temporary Job.

**B.   Full-time to Part-time**

If you are a full-time employee and average less than 36 hours paid per week during the first 13 pay periods or during the second 13 pay periods of the fiscal year, you will be reclassified as part-time.[5]

### 4.2   CHANGE TO CLASSIFICATION



If you work an average of more than 50% of your hours in a higher classification for eight consecutive weeks, you will be promoted to that classification.

This does not apply during Seasonal periods in any Costco business, during your 90-day Probationary period, or while working in a posted Temporary Job.

**A.   Pay**

When promoted to a higher classification, you are moved to the pay scale associated with that classification. On the new pay scale, you receive the next highest wage that will grant you an increase.

**B.   Retention of Hours Upon Promotion**

When you transfer between classifications, you retain your accumulated hours for the next goal raise.

**C.   Within 30 Days of Promotion and/or Transfer**

The first 30 days of a transfer or promotion is used to evaluate your performance in the new position. If the evaluation is not satisfactory, or if you decide within 30 days that you wish to return to your previous location/pay classification, you will:

- Return to your prior classification at your prior rate of pay.
- Not be guaranteed the same position.
- Wait 90 days before requesting a schedule preference.

---

**Employee Agreement**                    **COSTCO** WHOLESALE

### 4.3   DEMOTIONS TO LOWER CLASSIFICATIONS

**A.   Demotions**

**1. Disciplinary Demotions**

Disciplinary demotions may occur after at least two prior documented counseling notices for poor job performance within the three-month period preceding the demotion. Demotions may also occur in lieu of termination of employment.

**2. Voluntary Demotions**

Voluntary demotions will occur when you voluntarily remove yourself from a position. In the event of a voluntary demotion, you should post into an open position.

**B.   Pay and Classification Following a Demotion**

**1. Hourly Employees**

- You move to the pay scale associated with your new position.
- Your pay is reduced to the next-lowest rate of pay in the lower classification.
- If you were not at the top of the pay scale prior to demotion, you retain hours earned toward your next goal raise.
- If you received an Extra Check payment prior to demotion, you remain Extra Check payment eligible.

**2. Supervisors/Salaried Employees**

- You return to the pay scale you were on before your promotion.
- On that original pay scale, you retain the number of hours worked before the promotion and you are credited the number of hours worked in the higher classification. Based on the combination of hours, your pay rate is moved up to the corresponding step on the pay scale.
- Now that your rate of pay has been determined, you will be moved to the scale associated with your new position.
  For example, you were a Service Clerk prior to your Supervisor promotion, but the demotion is going to be to a Service Assistant job. We determine what the rate of pay is on the Clerk scale before moving you to the Service Assistant scale.
- If you received an Extra Check payment prior to demotion, you remain Extra Check payment eligible.

---

[5] *Effective 9/2/13. Except where otherwise provided by law.*



COSTCO 000014

CONFIDENTIAL

**COSTCO** WHOLESALE          Employee Agreement

### 4.4   TRANSFERS

The Company is under no obligation to transfer employees from one location to another.

Employees wishing to transfer should post to an open position. To request a transfer to a different location, you must:

- Complete a Request for Transfer form.
- Submit the completed form to the desired location(s) along with a copy of your last performance review, attendance record, and a letter of reference from your current Location Manager.
- A transfer request is not considered approved until the new Location Manager signs your Request for Transfer form. Keep a copy of the approved form until your transfer process is complete.

If you wish to work at the Home or Regional offices, you must have spent at least one year at a Costco location prior to posting to an open position.

### 4.5   LENGTH OF CONTINUOUS EMPLOYMENT

Length of continuous employment is defined by your hire date. Former employees who are rehired will receive a new hire date.[6]

### 4.6   REDUCTION IN WORKFORCE/LAYOFFS

Costco tries to avoid Non-Seasonal layoffs by giving you the opportunity to perform other work where possible, provided you have the skill, knowledge, and ability to perform the work.

#### A.   Reduction In Workforce

Should it become necessary to reduce the number of employees in any classification or department, the reduction will take place as follows:

- Reductions are conducted according to length of continuous employment.
- Every effort will be made to keep employees at their original rate of pay in the same classification.
- Full-time employees take precedence over part-time employees; therefore, part-time employees with the shortest length of continuous employment may be moved to available positions first. If you are moved to a new position or classification as part of a reduction in workforce, then you may not use your seniority to request a schedule preference for six months.
- Full-time employees' status may be changed to part-time in lieu of layoffs.

If the location is able to return a displaced employee to their original position within 180 days, no posting is necessary and there is no waiting period to request a schedule preference. Employees should be returned to their original position prior to the location hiring new employees.

[6]  *Except in the case of layoffs, Seasonal terminations or return from military service. See the Intranet for detailed rehire information.*

Employee Agreement          **COSTCO** WHOLESALE

#### B.   Layoffs

If layoffs are unavoidable, they will take place as follows:

- Layoffs are conducted according to length of continuous employment.
- Full-time employees take precedence over part-time employees; therefore, part-time employees with the least years of service would be laid off first.

In the event you are laid off, and you are recalled within 180 days, the following applies:

- You are recalled according to length of continuous employment (most senior first).
- You are reinstated at your last rate of pay and you retain any hours previously accumulated toward your next increase.
- Your original hire date is reinstated.
- You are not required to take a pre-employment drug test.
- You are not required to complete another background check.
- If you previously completed your 90-day Probationary period, you are not required to complete another one.
- If you did not previously complete your Probationary period, you are required to complete the full 90-day Probationary period and will be reviewed during this period.

If you previously qualified for medical benefits, you are eligible to continue medical benefits on the day that you are rehired, provided you meet all eligibility requirements.

### 4.7   LAYOFF NOTICE PAY (REGULAR EMPLOYEES ONLY, NOT SEASONAL OR TEMPORARY)

- If continuously employed for one year or more, you receive either one-week's notice of discontinuance of employment, or one week's pay in lieu thereof.
- For two years of continuous service, you receive two weeks' notice or two weeks' pay.
- For five years of continuous service, you receive three weeks' notice or three weeks' pay.
- For ten or more years of continuous service, you receive four weeks' notice or four weeks' pay.



COSTCO 000015

CONFIDENTIAL

**COSTCO** WHOLESALE

**Employee Agreement**

COSTCO 00016

### 4.8 TERMINATION

We reserve the right to terminate your employment for good and sufficient cause as defined by Costco. This includes, but is not limited to, the "Causes for Termination" listed in Section 11.3. No prior Counseling Notice is required. In addition, we reserve the right to terminate employment at any time during the 90-day Probationary period without cause and without notice. No Counseling Notice is required.

Employment may also be terminated for repeated violations of policies listed under Standards of Conduct and Discipline in Section 11.0. Prior to terminating the employment of an individual who has been employed two or more years, the circumstances must be reviewed with a Senior Vice President or above. Prior to terminating the employment of an individual who has been employed five or more years, the circumstances must be reviewed with an Executive Vice President or above.



### 4.9 RESIGNATION

We reserve the right to accept your resignation effective immediately and separate employment, even if notice is provided.

**Employee Agreement**

**COSTCO** WHOLESALE

### 5.0—COMPENSATION AND PAYROLL*

*See tab in back for specific wages*

**Work Week and Work Day Definitions**

For payroll and accounting purposes, the work week is Monday through Sunday and the work day is midnight to midnight. Paychecks are issued every other Friday.

### 5.1 SCHEDULING (Hourly Non-Exempt Employees)

You will not be required to work more than six consecutive days in any work week. You may volunteer to work additional days if you so desire. Unless mutually agreed to by both employee and Manager, we will attempt to schedule as many full-time employees as possible for five consecutive days. Employees who have the most years of continuous employment are offered first options for an available schedule when all other aspects (i.e., full-time, part-time, classification, department) are equal.

When you transfer to a new location, promote or demote to a new position, or move to a different department including as part of a Reduction in Workforce, you agree to meet all requirements of that position, which include availability. In these situations, you may not use your seniority to request a schedule preference for the first six months.



A.  **Ratio of Full-time and Part-time Employees**
To conduct our business, our standard is to maintain at least a minimum of 50% full-time employees.

B.  **Minimum Hours Work Week**
All employees, with the exception of Seasonal employees, are scheduled to work a minimum of 24 hours per week. There may be exceptions made for up to 20 limited part-time employees at each location who choose to work fewer hours on a regular basis.

C.  **Minimum Work Day**
You are guaranteed to work or be paid for at least four hours per work day, whether you are scheduled or called to come in. This four-hour minimum does not apply to mandatory employee meetings.[7]

---

[7] *Except where otherwise provided by law.*

CONFIDENTIAL

**COSTCO** WHOLESALE                    **Employee Agreement**

**D.    Work Schedule**

We post a work schedule in each location no later than noon on the Monday before each work week. This schedule includes your name, work shift start and end times, and days off. Once the schedule has been posted, the Company will not change your schedule without providing you personal notification from a Supervisor or Manager at least 24 hours in advance. This advance notice does not apply to a request that you work overtime at the end of your regular shift.

**E.    Physical Inventory**

You may be required to work Physical Inventory. Whenever possible, notice of Physical Inventory will be given at least one week in advance.

**F.    Employee Meetings**

Mandatory employee meetings may be scheduled on a quarterly basis. Voluntary meetings may be scheduled from time to time. You are paid only for actual time spent attending such meetings.[8]

Overtime pay for working multiple shifts in a day does not apply when one shift is for the purpose of attending an employee meeting. However, if the combined time spent working and attending a meeting exceeds eight hours, you will be paid overtime for all hours over eight in a day or all hours over 40 in a work week.

> Example:
> You attend an employee meeting from 8am to 10am and then work from 2pm to 10:30pm on the same day. You will receive overtime for the last two hours of your shift.

**G.    Closure of Business**

Should the workplace be forced to close due to circumstances such as power outage, earthquake, snow, natural disasters, etc., hourly non-exempt employees are paid only for time worked.[9] Every effort is made to reschedule you so that you can work your normally scheduled number of hours. No 24-hour notice of schedule change and no four-hour minimum work shift guarantee is required in the event of an emergency.

**Employee Agreement**                    **COSTCO** WHOLESALE

**5.2    TRAVEL**

While traveling on Company business, employees must conduct themselves in a manner that reflects well on Costco. Misconduct while traveling on business can be a basis for discipline.

**A.    Expenses**

If you drive your own vehicle, you may be entitled to a reimbursement. You also may be entitled to reimbursement of other expenses, including hotel and meal costs, as outlined in the Travel and Entertainment Policy. (A copy of this policy is posted on the Intranet.)

**B.    Work Time (Non-Exempt Employees)**

Employees are paid for all hours worked. Travel time may count as hours worked, as described below. (For detailed information, see the Travel Policy posted on the the Intranet.)

**C.    Travel Time (Non-Exempt Employees)**

*Overnight travel* [10]

You are paid for all travel that occurs during your normal working hours, regardless of whether you are scheduled off that day.

*One-day travel* [11]

For travel to an alternate work site, you are paid for all travel time over and above your normal commute to your home location. If you are required to report to your home location first, all time spent traveling to the alternate work site is paid as hours worked.



---

[8]  *Except where otherwise provided by law. For example, in California, employees who return to the warehouse during the same work day for such a meeting are entitled to a minimum of two hours of pay.  For example, in New York, employees may be entitled to additional pay.*

[9]  *Except where otherwise provided by law.*

[10]  *In some states, such as California, Colorado, Connecticut, and Wisconsin, all overnight travel time is treated as hours worked, without regard to whether it falls within or outside the employee's normal working hours.*

[11]  *Except where otherwise provided by law. See the Intranet for additional information.*

COSTCO 000017

CONFIDENTIAL

**COSTCO** WHOLESALE

**Employee Agreement**

## 5.3   SUPPLEMENTAL PAY (Non-Exempt Employees)

There is no duplication of overtime. Overtime is paid at a rate of time-and-one-half or double time. The work day is midnight to midnight.

### A.   Sunday Premium Pay (Hourly Non-Exempt Employees)

All hours worked on Sunday are paid at the rate of time-and-one-half (Sunday premium pay).[12]

### B.   Overtime is paid at a rate of time-and-one-half:

1. For all hours worked in excess of eight hours per day, including employee meetings.
2. For all hours worked in excess of eight hours per shift.
3. For all hours worked during a later shift when there are multiple shifts in a day, regardless of the length of each shift, when there is less than eight hours between shifts (except in the event of an employee meeting). See also Section 5.1.F, Employee Meetings.
4. For all hours worked in excess of 40 hours per week.

Paid vacation, sick/personal days, Martin Luther King, Jr.'s Birthday, and floating holidays do not count for purposes of computing overtime pay.[13] All overtime requires Supervisor approval PRIOR to working overtime. All overtime will be paid; employees working unapproved overtime or failing to record hours worked may be subject to discipline.

### C.   Double Time is paid:

1. For all consecutive hours worked in excess of 12 in any work day.[14]
2. If you work Monday through Sunday and work more than eight hours on Sunday, regardless of the number of hours worked Monday through Saturday, double time starts after eight hours on Sunday and continues until you have a day off.

---

**Employee Agreement**

**COSTCO** WHOLESALE

### D.   Other Non-Exempt Employees

**1. Salaried Non-Exempt Managers**
- Overtime is paid for all hours worked in excess of eight hours per day or 40 hours per week.[15]
- Are not eligible for Sunday premium pay.

**2. Pharmacists (Non-Exempt)**
- Overtime is paid for all hours worked in excess of 40 hours per week.[16]
- Are not eligible for Sunday premium pay.[17]

## 5.4   BREAKS AND MEAL PERIODS (Non-Exempt Employees)

A separate area is provided for employee break and meal periods. You receive a paid 15-minute break for each four-hour period you work. Breaks are to be taken as close to the middle of each four-hour work period as possible.

Costco will provide you with an unpaid, uninterrupted meal period of at least 30 minutes if you are working more than five hours in a work day. You MUST begin any such meal period provided, no later than the end of the fifth hour of work. Because certain state laws may differ somewhat from our policy, please see your Manager or the Intranet for detailed information regarding your own location.

### A.   Home and Regional Offices

In the Home and Regional Offices, meal periods of 30 minutes or one hour may be assigned.

### B.   Employee Use of Breaks/Meal Periods

Employees are not allowed to combine their break(s) or meal periods for any reason, including to leave work early. Each break or meal period that is due must be taken individually and at the appropriate time.

## 5.5   SUPERVISOR PAY

### A.   Supervisor:
- Is classified as Service Clerk.
- Is paid at the top step on the Service Clerk scale, plus $1.00 premium.

---

[12] *Senior Hearing Aid Specialists are not eligible for Sunday premium pay, except where otherwise provided by law.*

[13] *Paid bereavement leave and jury duty leave may count for purposes of computing overtime.*

[14] *Except where additional payment is required by law. For example, in California, double time will be paid for all hours worked in excess of 12 hours in a work day and the hours need not be consecutive.*

[15] *Except where otherwise provided by law. For example, in California, all non-exempt employees will be paid overtime for all hours worked on the seventh consecutive day of work in a work week.*

[16] *Except where otherwise provided by law. For example, in California, non-exempt Pharmacists will be paid overtime for all hours worked in excess of eight hours in a work day, unless an alternative work week schedule has been adopted, and for all hours worked on the seventh consecutive day worked in a work week. Non-exempt Pharmacists in Alaska and Colorado will be paid daily overtime as provided by law.*

[17] *Except where otherwise provided by law. For example, in Massachusetts, non-exempt Pharmacists will be paid Sunday premium pay.*



COSTCO 000018

CONFIDENTIAL

**COSTCO** WHOLESALE                    **Employee Agreement**

COSTCO 000019

### 5.6 LIMITED PART-TIME PHARMACISTS
- Are non-exempt Pharmacists who work infrequently or on call.
- Do not qualify for benefits.
- Earn pro-rated vacation, sick/personal days, holiday, and jury duty pay based on number of hours worked in relation to full-time (40 hours per week).
- Are not eligible for Sunday premium pay.[18]
- Are eligible for overtime pay only if they work in excess of 40 hours per week.[19]

### 5.7 ACCUMULATION OF GOAL HOURS
For purposes of accumulating hours towards raises, jury duty pay, bereavement leave pay, sick/personal days, vacation pay, and overtime hours are included. Full-time employees who work on Sunday will not receive an accelerated rate towards their goal hours. Hours worked on Sunday are counted as regular hours worked.[20]

Example:
A. You work 78 regular hours and 8 overtime hours. You accumulate 86 hours for the 2-week pay period.
B. You work 60 regular hours and 6 hours on Sunday. You accumulate 66 hours for the 2-week pay period.

### 5.8 INTERCHANGE OF DUTIES
We reserve the right to schedule you in different classifications as business needs dictate. If you are assigned to duties in a higher classification for more than 15 consecutive minutes, you are paid at the higher rate. Your rate of pay in the higher classification is the next highest rate of pay that would grant you an increase.

If required to work in a lower classification, you are paid at your normal rate of pay.

[18] *Except where otherwise provided by law. For example, in Massachusetts, non-exempt Pharmacists will be paid Sunday premium pay.*
[19] *Except where otherwise provided by law.*
[20] *Except where otherwise provided by law.*

---

**Employee Agreement**                    **COSTCO** WHOLESALE

# "WHAT ELSE DOES THE COMPANY OFFER ME?"
# 6.0—BENEFITS

## 6.1 BENEFIT OPTIONS
You and your family's health and welfare are a primary concern to Costco, and we offer one of the most competitive benefit packages in the industry and provide our employees with flexibility to choose from an array of programs to suit their individual and family needs. Spouses, children, and domestic partners are also eligible for coverage. (See the separate Health Care Summary Plan Description for more detailed information.) Programs include:

- Health Care
- Pharmacy Program
- Dental Care
- Vision Program
- Health Care Reimbursement Account
- Dependent Care Reimbursement Account
- Voluntary Short-Term Disability
- Long-Term Disability
- Long-Term Care Insurance
- Life Insurance and AD&D Insurance
- Care Network
- Employee Stock Purchase Plan
- 401(k) Plan

## 6.2 HOLIDAYS
1. New Year's Day
2. Martin Luther King, Jr.'s Birthday
3. Easter
4. Memorial Day
5. Independence Day
6. Labor Day
7. Thanksgiving Day
8. Christmas Day

CONFIDENTIAL



**COSTCO** WHOLESALE

**Employee Agreement**

**Employee Agreement**    **COSTCO** WHOLESALE

COSTCO 000020

CONFIDENTIAL

**A.  Holiday Eligibility (Hourly Non-Exempt Employees)**
   1. Probationary Employees – not eligible for holiday pay.
   2. Seasonal Employees and Temporary Employees – not eligible for holiday pay, vacation pay or paid sick/personal days.
   3. Leave of Absence – employees on a leave of absence are not eligible for holiday pay unless the holiday falls during a time when using vacation or paid sick/personal days.

**B.  Holiday Pay (Hourly Non-Exempt Employees)[21]**
All eligible employees are paid straight time for holiday pay. When the holiday falls on a Sunday, holiday pay is paid at your normal rate of pay. You will be paid for the holiday on the actual holiday.

   1. **Eligibility**
   To be eligible for pay on closed-building holidays, you must report to work and work 50% or more of your last scheduled work day preceding the holiday and your first scheduled work day following the holiday. If you obtain prior permission for the day off, if you are on vacation, or if you are absent due to illness/injury and provide certification from a health care provider stating the specific date(s) that you needed to be absent before and after the holiday, then you will remain eligible for holiday pay.

   2. **When You Work On a Holiday**
   You are paid time-and-one-half for each hour worked. This does not apply to Martin Luther King, Jr.'s Birthday.

   3. **Holiday Work Week**
   For full-time employees the holiday work week consists of the holiday itself and four regularly scheduled eight hour days or three regularly scheduled eight hour days and six hours on Sunday. Anything over 40 hours during the holiday work week is paid at the rate of time-and-one-half your rate of pay. If the combination of holiday pay and any hours worked during the holiday work week exceed 40 hours, any additional time is paid at the rate of time-and-one-half your rate of pay.

   4. **Calculating Hours for Paid Holidays**
   Holiday pay is pro-rated based on a four week average of all hours paid (up to a maximum of 40 hours per work week). This proration is calculated one week before the posting of the holiday schedule. If you were on or returned from an approved leave of absence, your pay is pro-rated based on all hours paid (up to a maximum of 40 hours per work week) during the four weeks prior to your leave of absence.

**C.  Floating Holidays and Martin Luther King, Jr.'s Birthday**

   1. **Floating Holidays (Salaried Employees)**
   After one year of continuous employment, salaried employees earn three floating holidays each year. You may take your floating holidays any time during the anniversary year that is agreeable to you and your Manager. Floating holidays must be used within the anniversary year they are earned and will not be carried over to the next anniversary year.[22] Upon termination of employment, all available floating holidays will be paid.[23]

   2. **Martin Luther King, Jr.'s Birthday**
   You will be scheduled on a day mutually agreed upon by you and your Supervisor any time from two weeks before to four weeks after the actual date of the holiday. Pay is pro-rated based on a four week average of all hours paid (up to a maximum of 40 hours per work week). This proration is calculated one week before the posting of the schedule that includes the first available day the holiday could be scheduled. If you were on or returned from an approved leave of absence, your pay is pro-rated based on all hours paid (up to a maximum of 40 hours per work week) during the four weeks prior to your leave of absence.

   3. **Scheduling**
   If you wish, we will try to schedule floating holidays and Martin Luther King, Jr.'s Birthday so as to give you a long weekend or longer vacation, provided you request the holiday at least two weeks in advance, in writing, on the form we provide. Where more than one employee requests the same time off, consideration will be given to the employee whose request was received first. If received at the same time, then the employee with the longest length of continuous employment will be given first consideration.

   We will respond promptly to all such requests, and we will try to honor them whenever practical. If we have to deny your first choice, we will try to honor your second choice.



---

[21] *Massachusetts employees who work on Columbus Day or Veterans Day are paid at the rate of time-and-one-half for all hours worked.*

[22] *Except where otherwise provided by law.*
[23] *Except where otherwise provided by law.*



**Employee Agreement**

**Employee Agreement** 

COSTCO 000021

## 6.3  VACATIONS

If you are continuously employed for 12 months preceding your anniversary, and you have been paid for 2,000 hours* or more, you will receive an annual vacation as follows:

| Continuously Employed | Vacation | Weeks of Vacation |
|---|---|---|
| One Year | *up to* 40 hours | 1 week |
| Two years but less than five | *up to* 80 hours | 2 weeks |
| Five years but less than ten | *up to* 120 hours | 3 weeks |
| Ten years but less than fifteen | *up to* 160 hours | 4 weeks |
| Fifteen years or more | *up to* 200 hours | 5 weeks |

*Full-time employees will receive an accelerated accrual for all hours worked on Sunday.

If you were paid for less than 2,000 hours, your annual vacation is pro-rated accordingly. Your maximum number of days off is only reduced when you have been on a leave of absence. (As explained in Section 7.1, you will not accrue vacation during any leave of absence other than during leave periods when you are using vacation, paid sick/personal days, or floating holidays.)

### A.    Scheduling of Vacation

A time-off request form is available in January to request the vacation time that you would like to take in week-long increments for the remainder of the calendar year.

You may request your vacation time in smaller increments during the year, but the decision to grant your request will be based on scheduling requirements. Please remember that, in the warehouses, no vacations will be scheduled between the week of Thanksgiving through December 24.[24]

Requests that are received in the month of January will be responded to by the end of February. These requests will be granted based on length of continuous employment.

Requests received after January will be responded to within one week. When more than one employee requests the same time off, consideration will be given to the employee whose request was received first. If more than one request is received at the same time, the employee with the longest length of continuous employment is given first consideration.

Every effort will be made to accommodate last-minute requests for, or changes to, vacation time.

Because your well-being is important to us, we want you to use your vacation. To ensure a balance between work and personal time, management may schedule your vacation for you if a time-off request has not been received within 90 days of your next anniversary.

[24] *Generally, no vacations are scheduled during the Seasonal periods for any of the ancillary businesses as listed in Section 3.1 G. The seasonal vacation black-out period for the Home and Regional Offices will be distributed annually.*

### B.    Vacation Payment Upon Termination of Employment

If eligible for vacation pay, you will receive available and accrued vacation pay upon termination of employment. No vacation will be paid out for any employee who has not completed one year of continuous employment.[25]

### C.    Vacation Eligibility

You are eligible for and may request vacation after completion of one year of employment.[26] No vacation is earned during the first year of employment.[27] Thereafter, paid vacation is earned annually and credited to your paid vacation account each subsequent anniversary.

### D.    Vacation Roll-Over

Because we want you to take your vacation time, we will give no pay in lieu of vacation. You may roll over up to 40 hours of unused vacation to the following year. Rolled-over vacation time cannot be carried over from year to year. It is Costco's policy that you must take your vacation during the 12 months following the anniversary year in which the vacation was earned.[28]

### E.    Employees Not Eligible For Vacation

Seasonal and Temporary employees are not eligible for vacation pay.

## 6.4   PAID SICK/PERSONAL DAYS
## (Hourly Non-Exempt Employees)

If you have been continuously employed for a period of at least one year and have been paid the minimum number of hours listed below, you will be entitled to paid sick/personal days as indicated.

| Minimum Hours Paid in Anniversary Year | Paid Sick/Personal Days |
|---|---|
| 2,000 hours* | *up to* 72 hours (9 days) |

*Full-time employees will receive an accelerated accrual for all hours worked on Sunday.

If you do not reach the minimum of paid hours listed above, your paid sick/personal time will be pro-rated accordingly.

### A.    Employees Who Do Not Earn Paid Sick/Personal Days

Seasonal and Temporary employees do not earn paid sick/personal days.

[25] *Except where otherwise provided by law.*

[26] *Except where otherwise provided by law.*

[27] *During the first year of employment, California employees begin to earn vacation after the first six months.*

[28] *Except where otherwise provided by law.*



CONFIDENTIAL



**Employee Agreement**

**B.  Use of Paid Sick/Personal Days**

Paid sick/personal days may be used for personal illness or injury, family illness, or time lost due to a workers' compensation injury. Paid sick/personal days may also be scheduled as needed for time away from work. Scheduled sick/personal days may be taken at any time that is mutually agreeable between you and your Supervisor. You should request sick/personal days two (2) weeks in advance, in writing on a form provided by the Company. If you fail to report to work on a scheduled work day, it will be counted as an instance of absence, even if you are using sick/personal days.[29]

Paid sick/personal days also may be used in the event of time missed due to closure of business as noted in Section 5.1 G.

**C.  Payoff**

No paid sick/personal days will be earned until completion of one year of continuous employment. Paid sick/personal days are earned annually and credited to your account on each subsequent anniversary.

On your anniversary date, you will be paid your total unused paid sick/personal days account balance.[30] Those paid hours are not included for purposes of accumulating or accruing hours towards goal hours, vacation, holidays, sick/personal days, or Extra Check payments.

**D.  Paid Sick/Personal Days Upon Promotion**

Hourly non-exempt employees promoted to a salaried position will receive a payoff for all available and accrued paid sick/personal days.

**E.  Paid Sick/Personal Days Upon Demotion**

Salaried employees who go to an hourly non-exempt position, who have been continuously employed with the Company for one year, and who have been in a salaried position for one year or more, will immediately become eligible for pro-rated paid sick/personal days at a rate of one hour per month for the period between the demotion and their next anniversary date. All available floating holidays will be immediately available as paid sick/personal days.

**F.  Paid Sick/Personal Days Upon Termination**

Any available and accrued paid sick/personal days will be paid upon termination of employment. Paid sick/personal days are not earned until the employee has been continuously employed for one year.[31] No paid sick/personal days will be paid to any employee who has not completed one continuous year of employment.[32]



[29] *Except where otherwise provided by law.*
[30] *Except where otherwise provided by law.*
[31] *Except where otherwise provided by law.*
[32] *Except where otherwise provided by law.*

**40**

**Employee Agreement**

**G.  Notification of Absence**

If you are unable to report for work, you must call in and speak directly with management at your location one hour before the start of the work shift (unless you are working the first shift of the day, in which case you must notify management at the start of the shift).

If you become ill while at work and need to leave early, you must notify your Supervisor or Manager before leaving. If you have worked less than 50% of your shift, it will count as an absence. If you have worked 50% of your shift or more, it will count as 1/2 of an absence. Consecutive absences are considered continuous unless broken by any period of work. You will be paid regular time for hours worked and, if available, paid sick/personal time for hours missed. Legally protected absences will not be used as a basis for discipline; however, if you provide false or misleading information in connection with such an absence, including the reason for the absence, you will be subject to discipline, up to and including termination.

**H.  Release to Return to Work**

If your absence from work was due to injury, serious illness, or illness of five or more days duration, you must present a release from your health care provider before returning to work. In the event your health care provider places limitations on your ability to perform your job duties, we will make a reasonable effort to accommodate those restrictions.

**6.5   MEMBERSHIP**

You are entitled to a Business Membership at no charge, which includes a spouse or domestic partner card. Once you pass your 90-day Probationary period, you and your spouse or domestic partner are upgraded to an Executive Membership and also are allowed two additional non-Executive membership cards for which you are responsible. These may be issued to individuals of your choice, provided they are at least 18 years of age. This free membership entitles you and the individuals of your choice to shop at Costco and purchase at posted prices.

Employee Executive Memberships are limited to the employee and the employee's spouse or domestic partner. Add-on cardholders wanting an Executive Membership must convert to their own membership and pay the Executive fee.

**A.  Lifetime Executive Membership**

You receive a lifetime Executive Membership card if, when you leave the Company, you are at least 55 years of age and have a minimum of 15 years of service with Costco or have at least 25 years of service with Costco. Employees who are terminated for cause are ineligible for the lifetime Executive Membership.



COSTCO 000022

CONFIDENTIAL

**41**



### 6.6   SUNSHINE BROOKS SCHOLARSHIP PROGRAM

Sunshine Brooks founded the Sunshine Brooks Foundation in 1985 to award scholarships to employees of her favorite company. The Foundation offers college scholarships for tuition and fees, up to $1,500 per year. There is no automatic renewal, and an applicant may only receive a total of two awards.

Applicants must be enrolled in an academic program leading to an undergraduate or graduate degree in an accredited college or university. Scholarships are awarded to Costco employees residing in the USA or their children. Spouses of employees are not eligible unless they also work for Costco.

Please see your Location Manager for application information or log onto www.sunshinebrooks.com.

### 6.7   THE CARE NETWORK

You and your immediate family members may contact the Care (Confidential Assistance and Resources for Everyone) Network at no cost to speak with a trained counselor who can provide guidance, information and/or referrals to local service providers. Care counselors can direct you to community resources for elder and child care needs, provide educational materials, and offer follow-up to you and your loved ones. The Care Network can help you address difficulties related to emotional concerns, relationships, substance abuse, and legal and financial concerns, while helping you to develop an action plan. You can call the Care Network, a confidential service, 24 hours a day, seven days a week. See the poster in your breakroom for contact information.



---



## "WHAT IF I NEED TIME OFF?"
## 7.0—FAMILY AND MEDICAL
## LEAVES OF ABSENCE (LOA)

Costco provides two types of family and medical leaves of absence (Family/Medical Leave) for employees:

- Costco's Personal Medical Leave
- FMLA Leave (Family and Medical Leave Act)

You will be required to submit appropriate paperwork to have your leave approved.  LOA paperwork is available at your work location or on the Intranet.

All applicable leaves, including FMLA Leaves, state law leaves, and Costco Personal Medical Leaves, including leave for pregnancy or a work-related injury or illness, will run concurrently to the extent permitted by applicable law. If you are paid available vacation, sick/personal days, or floating holidays, the time will also be counted against your available leave under the FMLA, state leave laws, or Company policy.

Subject to applicable law, your employment may be terminated if you fail to return to work on or before the expiration of your leave. **If you provide false or misleading information in connection with your leave of absence, including the reason for an absence, then you will be subject to discipline, up to and including termination.**

### A.   Costco's Personal Medical Leave

All employees are eligible for Costco's Personal Medical Leave beginning the first day of employment. If you miss five or more consecutive days of work due to your own medical condition, including pregnancy or a work-related injury or illness, then you should complete and have approved a Request for Leave of Absence, as detailed in Section 7.1.A. The maximum time allowed for an approved medical LOA for your own medical condition is twelve months, except as required by law. A health care provider must certify the length of your Personal Medical Leave of Absence. Under certain circumstances, the number of Costco Personal Medical Leaves that are approved within a twelve-month period may be limited (other than leaves protected by law).

1. Medical, Pregnancy, or Workers' Compensation Leave
   - You are eligible at any time to apply for a leave of absence.
   - A leave will be granted when you are unable to perform the essential functions of your position due to a personal medical condition, including pregnancy or a work-related injury or illness, as certified by a health care provider.



COSTCO 000023

CONFIDENTIAL



**COSTCO** WHOLESALE                    **Employee Agreement**

- In some situations, it may be appropriate to provide you with work in lieu of granting a leave.
- If you are taking a leave for the birth of a child and you are no longer certified disabled by a health care provider, you will be eligible to take any additional FMLA/state leave to which you are entitled. Once the FMLA/state leave has been exhausted, you must return to work.

**B.    FMLA Leave  (Family and Medical Leave Act)[33]**

To be eligible for up to 12 work weeks of FMLA Leave during a 12-month period, you must have been employed by Costco for at least 12 months, and you must have worked at least 1,250 hours (approximately 25 hours per week) during the 12 months immediately prior to the date the leave is to begin. For FMLA Leaves (other than to care for an Injured Servicemember) the 12-month period is measured backward from the date you take any FMLA Leave.

For Injured Servicemember Care FMLA Leave, if you meet the eligibility requirements, you are eligible for up to 26 weeks of leave, as described below.

Some states have enacted their own leave laws. If your state law is more generous than the FMLA, you will receive the benefits of the state law. If you want to request an FMLA Leave of any duration, you should complete and have approved a Request for Leave of Absence, as detailed in Section 7.1.A.

If eligible, you will be granted FMLA Leave for one or more of the following reasons:

- **Birth/Placement.** For the birth of your child and to care for the child in the first 12 months after birth or for a child's placement with you for adoption or foster care, within the first 12 months of placement,
- **Family Care.** To care for your spouse, child, or parent who has a serious health condition,
- **Employee Serious Health Condition.** Because of your own serious health condition, when you are unable to perform one or more of the essential job functions of your position,
- **Qualifying Exigency.** Because of a qualifying exigency as defined in the FMLA final regulations, arising out of the fact that your parent, child, or spouse is on covered active military duty or has been notified of an impending call or order to covered active duty in the Armed Forces in a foreign country. Qualifying exigencies may include attending certain military events, arranging for alternative childcare, addressing certain financial and legal arrangements, attending certain counseling sessions, attending post-deployment reintegration briefings, and other activities associated with the family member's call or order to service.

[33] *Some state family and medical leave laws provide additional or different benefits from the FMLA as described in this section. Please see the Intranet for detailed information. Additionally, for some states, an Addendum will be provided to you.*

---

**Employee Agreement**                    **COSTCO** WHOLESALE

- **Injured Servicemember Care.** To care for your parent, child, spouse, or individual for whom you are the next of kin, who is either (1) a current member of the Armed Forces (including the National Guard or Reserves) and who is undergoing medical treatment, recuperation, or therapy, is in outpatient status, or is otherwise on the temporary disability retired list, for a serious illness or injury incurred in the line of active duty (or aggravated by service in the line of active duty) that may render the military member medically unfit to perform the duties of the member's office, grade, rank or rating; or (2) a veteran who was a member of the Armed Forces (including the National Guard or Reserves) at any time during the five years preceding the date the veteran undergoes treatment, recuperation, or therapy, and who is undergoing medical treatment, recuperation, or therapy for a serious illness or injury incurred in the line of active duty (or aggravated by service in the line of active duty). To be considered "next of kin," you must be the nearest blood relative of the Injured Servicemember (other than the individual's parent, spouse or child). Such leave may be taken for up to 26 weeks in a single 12-month period. This single 12-month period begins on the first day you take leave for this purpose and ends 12 months after that date.

FMLA Leave for an Employee Serious Health Condition, Family Care, Qualifying Exigency, and Injured Servicemember Care may be taken intermittently or on a reduced schedule basis (e.g., by working fewer days in a week or by working fewer hours in a day) only if medically necessary.

FMLA Leaves for Birth/Placement may not be taken intermittently or on a reduced schedule basis. If you are certified to take FMLA Leave on an intermittent or reduced leave schedule basis, you must advise management at the time of the absence if the absence is for your certified FMLA Leave reason.

If your spouse is also employed by Costco, the two of you will be entitled to a combined total of 12 weeks of FMLA Leave for Birth/Placement. Spouses both employed by Costco also may be required to share FMLA Leave for Injured Servicemember Care.




COSTCO 000024

CONFIDENTIAL

**COSTCO** WHOLESALE                    **Employee Agreement**

Under the FMLA, a "serious health condition" is an illness, injury, impairment, or health condition that involves any one or more of the following:

- Inpatient care (i.e., an overnight stay) in a hospital, hospice or residential care facility, including any period of incapacity or any treatment in connection with inpatient care;
- Any period of incapacity of more than three consecutive full calendar days that also involves:
  - Treatment twice by a health care provider within 30 days of the first day of incapacity (unless extenuating circumstances exist); or
    - Treatment once by a health care provider, which results in a regimen of continuing treatment under the supervision of a health care provider.
    - The first (or only) treatment described above must be within 7 days of the first day of incapacity;
- Any period of incapacity or treatment due to a chronic health condition requiring periodic treatment;
- Any period of incapacity, which is permanent or long-term for a condition for which treatment may not be effective, and the employee or family member is under continuing supervision of a health care provider;
- Any period of absence to receive multiple treatments for restorative surgery following an accident or injury, or for a condition that likely would result in incapacity of more than three consecutive full calendar days if left untreated; or
- Incapacity due to pregnancy or for prenatal care.

**C.    Maximum Allowed Length for FMLA Leave**
The maximum length of FMLA Leave is 12 weeks in a 12-month period (or 26 weeks in a single 12-month period if FMLA Leave for Injured Servicemember Care is taken). If you take FMLA Leave for Injured Servicemember Care, you may not take more than a combined total of 26 weeks of FMLA Leave in a single 12-month period, including any leave taken for other FMLA-covered reasons. Under such circumstances, no more than 12 weeks of FMLA Leave in a 12-month period may be taken for reasons other than to care for an Injured Servicemember.

**D.    Additional Information**
Please see the Department of Labor publication in the FMLA Addendum for additional information regarding the FMLA.

## 7.1   RULES GOVERNING ALL FAMILY/MEDICAL LEAVES

**A.    Requesting Family/Medical Leave of Absence**
If you miss five or more consecutive days of work or you want to request Family/Medical Leave of any duration, you should complete and have approved a Request for Leave of Absence. You will be required to submit appropriate paperwork to have your leave approved. A health care provider must certify your need for leave, including the duration of your leave, if it is for your own medical condition or is an FMLA Leave for Family Care or Injured Servicemember Care. Request for LOA forms, certification forms, and other related forms are available at your work location or on the Intranet.

---

If you know in advance that you are going to need to go out on a leave (maternity, scheduled operation, etc.), you must give your Manager at least 30 days' notice, or as much notice as practicable. For unforeseeable leaves and FMLA Leaves for Qualifying Exigency, you need to notify your Manager as soon as practicable after learning of your need for leave. Failure to provide such notice may be grounds for delaying or denying the leave and may result in adverse consequences. In either case, your leave date will commence on your first scheduled day of work missed. If your leave is for planned medical treatment, you must attempt to schedule the treatments so as to create minimum disruption at work. In addition, absent unusual circumstances, you must comply with Costco's usual call-in procedures.

**B.    Leave Certifications and Reporting While on Leave**
You must provide medical certification to support your request for a Costco Personal Medical Leave, or FMLA Leave for an Employee Serious Health Condition or Family Care, including certification that you are needed to care for the family member and an estimate of the time needed.

If your leave request is for a Costco Personal Medical Leave or FMLA Leave for an Employee Serious Health Condition, your certification must include certain information about your condition, including, but not limited to:

- The probable duration of your serious health condition,
- The probable duration of your need for leave, and
- That you are unable to work at all due to your condition, or you are unable to perform one or more of the essential functions of your job due to your condition.

If you are requesting FMLA Leave for Qualifying Exigency or Injured Servicemember Care, you must provide certification of your need for leave. Certification forms are available from your location or on the Intranet.

In certain situations, you may be required to provide your Manager with periodic reports every 30 days of your status and your intent to return to work. If circumstances of your leave change enabling you to return to work earlier than the date originally indicated, you must notify your Manager at least two business days prior to the date you intend to return, if possible.

Subject to applicable law, Costco may require you to provide periodic medical information to support your leave request and may ask for clarification and authentication of any medical certification submitted. Costco may, at its own expense, require a second or third medical opinion. Costco also may require a medical examination by a health care provider of its choice when appropriate. This information may result in a change to your leave status.

Failure to provide Costco with the requested Certification within the appropriate time frame may result in delay or denial of leave and is cause for termination of employment if the leave has commenced, as described in Section 11.3, #7.



COSTCO 000025

CONFIDENTIAL

 **Employee Agreement**

**Employee Agreement** 

**C.  Accepting Employment While on Leave**

If you accept employment elsewhere while on LOA, your employment may be terminated, where consistent with applicable law.

**D.  Hours Accumulation**

Other than during leave periods when you are using vacation, paid sick/personal days, or floating holidays, you will not accumulate hours during any leave of absence (subject to USERRA; see Section 8.4 and the Intranet) for the purpose of:

- Goal Raises
- Extra Check Payment
- Vacation
- Sick/Personal Days
- Holiday Pay
- Floating Holidays

**E.  Holiday Pay**

You do not qualify for holiday pay if you are on any LOA unless the holiday falls during a time you are using vacation, paid sick/personal days or floating holidays.

**F.  Return from Medical Leave**

You must provide a release from a health care provider prior to returning to work from medical leave. The release must state that you are able to perform the essential functions of the position to which you are returning, or describe any work restrictions, including their expected duration. If your health care provider certifies that you have work restrictions, Costco will attempt to reasonably accommodate such restrictions.

Subject to applicable law and Costco's business needs, you will generally return to the same, equivalent, or other suitable vacant position. For any LOA, you have no greater right of reinstatement or to other terms, benefits and conditions of employment than you would have if you had not taken a leave.

Subject to applicable law, if you return from LOA and subsequently go back out on a LOA within 90 calendar days or less for any illness or injury, your original LOA date will apply for purposes of determining your available leave and benefits.

**G.  Transitional Return to Work**

If you return to work in a transitional duty status and are temporarily assigned to a position with a lower pay classification, you will continue to receive your normal rate of pay while on transitional duty for a maximum of six weeks, at which time your status will be re-evaluated. If you are reclassified on a temporary basis for longer than six weeks, you will be paid at the rate of pay for the position you are performing. Your benefits may be affected upon your transitional return to work. Please see your Health Care Summary Plan Description for details.

**H.  Benefit Coverage While on LOA**

If you were eligible at the commencement of your leave or became eligible during your leave, your Group Benefit health and welfare coverage will remain in effect through the term of your approved leave according to the following schedule and subject to premium payments and applicable laws. The maximum period of time will be counted from the day your LOA commences. In addition, if you are on an approved Costco Personal Medical Leave that extends past the maximum period of benefits and you elect to continue your COBRA health care coverage at your own expense, Costco will assist you with your monthly COBRA payments to continue your benefits according to the following schedule for a maximum of six months:

| Length of Continuous Employment | Maximum Period Benefits Continue | Company COBRA Premium Subsidy |
|---|---|---|
| Less than 90 days | 30 days | No premium subsidy |
| Less than 12 months | 90 days | No premium subsidy |
| 12 months, but less than 5 years | 180 days | 25% premium subsidy |
| 5 years or more | 180 days | 50% premium subsidy |

You are responsible for your regular benefit-related paycheck deductions while you are out on a LOA (as described in the Health Care Summary Plan Description). If you do not pay your share of the premiums in a timely manner during your leave, your coverage may be canceled. If your coverage is canceled because of non-payment of these deductions, you may continue medical/dental benefits under the provisions of COBRA and, if eligible, you may re-enroll in your group benefit plans when you return to work. (If your benefits are canceled due to non-payment, you will not be eligible for the Company COBRA subsidy.) If you do not return to work at the expiration of your FMLA Leave, you may be charged retroactively for the full premium cost of the health benefits coverage provided by the Company during your unpaid FMLA Leave, unless you cannot return to work because of a serious health condition (or serious illness or injury of a covered servicemember) or other circumstances beyond your control.





CONFIDENTIAL

COSTCO 000026

**COSTCO** WHOLESALE

**Employee Agreement**

## I.   Pay While on Leave

In general, LOA is unpaid, except as described below:

- *Family Leave* – Depending on your state, you may qualify for paid family leave benefits if your leave is related to a family member's medical condition or to bond with a new child following birth, adoption, or foster care placement.[34]

- *Workers' Compensation* – If you leave work and receive medical treatment on the date of your workers' compensation injury, you will receive your normal pay for the remainder of your scheduled shift. This time will not be counted against your paid sick/personal days.

- **Hourly Non-Exempt Employees:**
  - *Costco's Personal Medical Leave* – You may qualify for disability benefits if your leave is related to your own medical condition. For non-work related medical conditions, you must be enrolled in and apply for benefits under Costco's voluntary short-term disability program. If you work in California, Hawaii, New York, or New Jersey, you should apply for state disability benefits.

- **Salaried Employees:**
  - *Costco's Personal Medical Leave* – You may qualify for salary continuation benefits if your leave is related to your own medical condition. Costco will pay the first week of your salary continuation.[35] If you are going to be out longer than one week or are working a reduced work schedule, then, to receive salary continuation benefits you must apply under Costco's salary continuation program. In no event will the benefits paid under this program exceed a total of 26 weeks (13 weeks at 100% pre-disability earnings and the next 13 weeks at 60% of pre-disability earnings) of your pay or 1,040 hours (520 hours at 100% and the next 520 hours at 60%). For non-work related medical leaves, if you work in California, Hawaii, New York, or New Jersey you should apply for state disability benefits or paid leave programs. Your salary continuation benefits will be reduced by the amount of income continuation benefits you would be eligible to receive under any state disability, workers' compensation, or paid leave programs.

---

**Employee Agreement**

**COSTCO** WHOLESALE

- *Bonding Leave* – You will be eligible for up to five weeks of pay during a leave of absence for the birth or adoption of a child.[36] To receive the full five weeks of paid bonding leave, the leave must begin within one week of the birth or adoption and must be taken in one increment. Salaried birth mothers are eligible to receive up to 13 weeks of salary continuation in connection with a leave for pregnancy-related disability and bonding with a new baby. If you reside in a state with a paid family leave program, you will need to apply for the paid leave benefits. Your bonding benefits will be reduced by the amount of income continuation benefits you would be eligible to receive under any paid family leave programs.

- All benefit-eligible employees are entitled to apply for benefits under the Company sponsored long-term disability insurance plan. Long-term disability may provide additional monthly income commencing after the 180th day of leave.

At your option, you may use any available vacation, paid sick/personal days, or floating holidays during an otherwise unpaid Costco Personal Medical Leave, FMLA Leave, or other state leave. Any paid time used will be counted against your available leave under the FMLA, state leave laws and Company policy.

---

[34] *Salaried employees who are eligible for paid sick leave must use available sick leave, floating holidays, or vacation to be paid during the first week of leave.*

[35] *Except for salaried employees who are eligible for paid sick leave.*

---

[36] *Salaried employees who are eligible for paid sick leave must use available sick leave, floating holidays, or vacation to be paid during the first week of leave.*

COSTCO 000027

CONFIDENTIAL

 **Employee Agreement**

## 8.0—NON-MEDICAL LEAVES

Some states provide additional protected leaves of absence. See your Manager or the Intranet for detailed information. **If you provide false or misleading information in connection with a leave of absence, including the reason for an absence, then you will be subject to discipline, up to and including termination.**

### 8.1  PERSONAL LEAVE

As a general rule, we do not authorize unpaid personal time off from work. However, in extraordinary circumstances, with prior approval of the Location Manager, up to two weeks may be approved. If additional time is needed for any reason, prior approval from a Senior Vice President is required.

You will be required to exhaust your available vacation and paid sick/personal days prior to requesting a Personal Leave. You are responsible for paying your portion of benefit premiums during any Personal Leave. If your Personal Leave exceeds 30 days, your benefits will cease.

### 8.2  WINTER LEAVE (Hourly Non-Exempt Employees)

Costco may grant hourly non-exempt employees an unpaid leave of absence in the months of January, February and March for up to four weeks. Employees must have a minimum of one year of service to be eligible to apply for this leave, and requests will be granted depending on the needs of the business. In order to ensure that all employees have equal opportunity to use this leave, the leave may be granted on a rotating basis from year to year. The following guidelines apply:

- Applications for a Winter Leave should be submitted in writing no later than four weeks in advance.
- Vacation scheduling will take precedence over Winter Leaves.
- Winter Leaves may be taken as single full days or in week-long increments.
- All Company benefits will be maintained during your approved leave.

### 8.3  BEREAVEMENT LEAVE

#### A.   Eligibility

After completing your 90-day Probationary period, you are eligible for paid bereavement leave unless you are a Temporary or Seasonal employee.



#### B.   Paid Bereavement Leave

If there is a death in your immediate family, you receive up to three days paid time off for the bereavement. Immediate family is generally defined as spouse, domestic partner, mother, father, sister, brother, child, grandparents, grandchildren, step-parent, stepchild, mother-in-law, father-in-law, sister-in-law, brother-in-law, and grandparents of spouse.  You will be provided the same time off for your domestic partner's immediate family. See your Location Manager regarding relationships other than those defined above.

You are paid at your normal rate for the hours scheduled for each work day lost due to bereavement leave. In addition to the above, an employee may be allowed extended time off, without pay, in extenuating circumstances.

### 8.4  MILITARY LEAVE

#### A.   Eligibility

Whether you leave Costco to voluntarily join a uniformed service, are drafted, or are a reservist or national guard member who is called to active duty or training, you are protected by the Uniformed Services Employment and Reemployment Rights Act (1994), as amended – also called USERRA. Please see your Manager or the Intranet for detailed information regarding military service.

Costco's intent is to comply in full with USERRA and any applicable state or local laws regarding military leave. To the extent any applicable law conflicts with the provisions of our policy, that law will control.

#### B.   Short Term Reserve/National Guard Leave

As a member of the National Guard or a Military Reserve Unit, you may request leave for weekend drills, summer camp, special schools, or other short-term assignments, such as military fitness examinations or funeral honors duty.

In addition to the policies outlined on the Intranet, the following also applies to reserve leaves.  If salaried, you are eligible to receive salary continuation benefits for a maximum of two weeks reserve leave in any 12-month period (or as otherwise required by law). Upon receipt of documentation of military pay for reserve leave, Costco will pay the difference between your military pay and regular salary (not to exceed 100% of your salary). For hourly non-exempt employees, such leave is unpaid.

COSTCO 000028

CONFIDENTIAL

**8.0**

**8.0**

**COSTCO** WHOLESALE                     Employee Agreement

## 8.5  JURY DUTY LEAVE

**A.  Eligibility**

All employees are eligible for leave when required to serve on a jury. The leave is unpaid for hourly non-exempt Probationary, Temporary or Seasonal employees, unless otherwise required by state law.

**B.  Jury Pay**

Employees eligible for paid jury duty leave will be paid their normal rate, as noted below:

1. **Full-time Employees**
   Are paid for actual hours served in jury duty service to a maximum of 40 hours per week.
2. **Part-time Employees**
   Are paid for actual hours served in jury duty service to a maximum of 30 hours per week.
3. **Salaried Employees**
   Receive salary continuation benefits for the length of time in jury duty service.
4. **Limited Part-time Employees**
   **(including Limited Part-time Pharmacists)**
   Are paid an average of the number of hours worked in the previous two pay periods (four weeks).

**C.  Overtime (Non-Exempt Employees)**

You may be asked to work additional hours during the week(s) you are in jury duty service. All hours paid for jury duty service count toward hours worked. If your hours served on jury duty, plus actual hours worked, total over eight hours in any work day or over 40 hours in any work week, then you are entitled to overtime pay.

**D.  Return to Work Requirement**

If you are excused from jury duty service on a scheduled work day, you must immediately, upon release, report for work to complete the remaining hours of your scheduled work shift, unless there are less than two hours left in your scheduled work day.[37] Salaried employees are paid for the entire day, regardless of the number of hours served in jury duty.

**E.  Certification and Falsification**

We require you to have a jury duty form completed by an officer of the court, indicating the report time and time released from jury duty service.

You will present a copy of this form to your Supervisor. Falsification of jury duty claims is cause for disciplinary action, up to and including termination of employment.

[37] *Except where otherwise provided by law. For example, in Virginia, employees who serve on a jury are not required to work on the day of service.*



54

---

Employee Agreement                     **COSTCO** WHOLESALE

## "WHAT ARE THE CAREER OPPORTUNITIES?"
## 9.0—HOURLY NON-EXEMPT CLASSIFICATIONS

### 9.1  HOURLY NON-EXEMPT CLASSIFICATIONS HOME OFFICE AND REGIONAL OFFICES

| Service Assistants | Service Clerks |
|---|---|
| 2% Rebate Agent | 7780 Processor |
| Mail Opener | Accounting Clerk |
| Maintenance/Janitorial Assistant | Accounts Receivable Clerk |
| Member Service Agent | A/P Expense Clerk |
| Membership Maintenance | A/P Freight Clerk |
| Merchandise Accounting Mail Associate | A/P Merchandise Clerk |
| Optical Imaging Scanning Associate | A/P Support Clerk |
| | Business Delivery Agent |
| | Call Center Email Agent |
| | Card Room Processor |
| | Computer Operator |
| | Credit Card Clerk |
| | Credit Card Service Agent |
| | Dollar Bay Clerk |
| | E-commerce Agent |
| | Executive Service Agent |
| | Inventory Control Specialist |
| | Mail Room Clerk |
| | Merchandise Accounting Control Clerk |
| | Payroll Clerk |
| | Receptionist |
| | Sales Audit Clerk |
| | Supervisor |
| | Traffic Clerk |

55

9.0—HOURLY NON-EXEMPT CLASSIFICATIONS

COSTCO 000029

CONFIDENTIAL

 **Employee Agreement**

## 9.2 HOURLY NON-EXEMPT CLASSIFICATIONS FOR COSTCO WAREHOUSES AND BUSINESS CENTERS

**Service Assistants**
Bakery Wrapper
Car Wash Assistant
Cashier Assistant
Cigarette Stocker
Data Entry
Food Service Assistant
Gas Station Attendant
HAC Non-Licensed
    Hearing Aid Attendant
Liquor Store Sales Assistant
Maintenance
Marker
Meat Wrapper
Member Service
Membership
Non-Licensed Optician
Order Picker/Order Taker
Pharmacy Assistant[1]
Photo Lab Assistant
Pre-opening Canvasser
Print Shop Assistant
Product Demonstrator
Sales Assistant[2]
Sanitation Assistant
Service Deli Assistant
Stocker

**Service Clerks**
Accounts Receivable (Bus. Ctr.)
Account Representative (Bus. Ctr.)
Admin/Payroll
Baker
Business Delivery Truck Driver[3]
Cake Decorator
Cashier[4]
Cigarette Stocker[5]
Electric Pallet Jack Operator
Forklift Operator
Graphic Artist/Designer
HAC Licensed Hearing
    Aid Dispenser-Audiologist
Hearing Aid Dispenser Apprentice
Inventory Auditor
Inventory Scan Auditor
Licensed Optician
Loss Prevention Clerk
Membership Refund Cashier
Nationally Certified Pharmacy Technician
Outside Marketer
Receiving Appointment Clerk
Receiving Clerk
Router
RTV Clerk
Sales Audit Clerk
Skilled Maintenance[6]
Supervisor[7]
Tire Installers
Vault Clerk

[1] *Non-licensed and non-Nationally Certified Pharmacy staff*

[2] *Includes Majors, Optical, and Print Shop*

[3] *Business Delivery Truck Drivers located at Costco Business Centers and at designated warehouses receive a $1.00/hr premium in addition to their normal rate of pay. See the Intranet for designated warehouses and detailed information.*

[4] *Does not include Pharmacy, Optical, Hot Dog Stand, Photo Shop, Food Service Cashiers, Membership and Liquor Store*

[5] *Stockers who stamp cigarettes*

[6] *Doing skilled electrical, plumbing or carpentry in excess of 50% of their time*

[7] *Based on business needs, a supervisor may be designated in the following positions: Bakery, Car Wash, Food Service (Food Court), Front End, Gas Station, Majors, Meat, Membership, Merchandise, Pharmacy Technician, Photo Lab, Print Shop, RTV, Service Deli, Tire Shop*

**Note:** Because management positions are typically salaried, they are not individually identified in this section - see your Location Manager for more information.

---

**Employee Agreement** 

A.  **Licensed Positions**
   1. **Hearing Aid**
      - Once the HAC Attendant becomes a fully licensed Hearing Aid Dispenser, they are promoted to Service Clerk and paid at the top of the Service Clerk scale.
      - Once the HAC Apprentice becomes a fully licensed Hearing Aid Dispenser, they are paid at the top of the Service Clerk scale.
      - All newly hired, fully licensed Hearing Aid Dispensers are paid at the top of the Service Clerk scale.
      - The pay increase will take place effective the day proof of accreditation is given to the warehouse.
      - **Licensing Premiums**
        Non-exempt fully licensed Hearing Aid Dispensers and Audiologists are entitled to a licensing premium in the following states:

| STATE | LICENSING PREMIUM |
|---|---|
| AK, AL, AZ, GA, IA, KS, ND, NE, OR, SC, TX, WI | $2.00/hr in addition to regular scale |
| CA, CO, CT, DE, FL, HI, ID, IL, IN, KY, MD, MI, MN, MO, MT, NC, NJ, NM, NY, OH, PA, TN, VA, VT | $3.00/hr in addition to regular scale |
| UT, WA | $4.00/hr in addition to regular scale |
| NV | $6.00/hr in addition to regular scale |

   2. **Pharmacy**
      - All Pharmacists are required to obtain and maintain their state licenses for the states in which they work.
      - All Pharmacy Technicians are required to obtain and maintain their state licenses and National Certification.
      - Effective April 1, 2014, all current Pharmacy Technicians must obtain and maintain National Certification within six months, or sooner, from the date of hire, transfer, or status change.[38] In addition, all Pharmacy Technicians must obtain and maintain all licenses required in the states in which they work. Failure to obtain and maintain National Certification and/or state licenses is cause for removal from the department.

   3. **Photo Lab**
      - Photo Lab Supervisors and Managers are required to certify in Costco 1-Hour Photo Advanced Training and Costco 1-Hour Photo Digital Training within 90 days of hire or promotion to the position. Failure to certify within 90 days may result in disciplinary action, up to and including demotion.

[38] *Except where otherwise provided by law.*

9.0—HOURLY NON-EXEMPT CLASSIFICATIONS

9.0—HOURLY NON-EXEMPT CLASSIFICATIONS

COSTCO 000030

CONFIDENTIAL



**Employee Agreement**

**Employee Agreement**



### 4. Optical

- **Minimum Licensing Requirements**
  - All optical employees have three years from the first day worked in the Optical department to complete their state specific requirements as detailed below. Failure to obtain and maintain ABO and NCLE certifications (non-licensed states) or state requirements (registration and licensed states) is cause for removal from the department. Employees will not be eligible to return unless they have met all licensing requirements.
  - Any applicable pay increases are effective the date the warehouse is provided proof of the employee's accreditation(s).
  - Optical Managers who relocate to another state on or after 3/4/13 must meet all state specific requirements for the state they are seeking employment in prior to the transfer unless transferring as an hourly employee.

A. *Non-Licensed States*

*(AL, CO, DC, DE, IA, ID, IL, IN, KS, MD, MI, MN, MO, MT, ND, NE, NM, OR, PA, TX, UT)*

All optical employees who work in non-licensed states are required to obtain and maintain their ABO and NCLE certifications.

B. *Licensed States*

*(AK, AZ, CT, FL, GA, HI, KY, MA, NC, NJ, NV, NY, OH, SC, TN, VA, VT, WA)*

- All optical employees who work in licensed states are required to obtain and maintain their state license to dispense eyeglasses and contact lenses.
- Apprentices in licensed states must obtain their ABO to receive Service Clerk pay.
- Apprentices hired on or after 3/4/13 are required to obtain and maintain their ABO and NCLE certifications within three years, at which time they will receive a $1.00 premium. Employees enrolled in an apprenticeship in CT, AZ, and FL prior to 3/4/13 will have until the completion of their apprenticeship (not to exceed five years) to complete state and/or Costco requirements.

C. *Registration States (CA, NH)*

All optical employees who work in registration states are required to obtain and maintain their state specific registrations in addition to their ABO and NCLE certifications.

- **Licensing Premiums**

| STATE | LICENSING PREMIUM |
|---|---|
| All states not listed below, TX* | $1.00/hr. in addition to regular scale |
| AZ, MD, NH, TX** | $2.00/hr. in addition to regular scale |
| AK, DC, DE, KY, PA, TN, Southern VA, VT, WA | $3.00/hr. in addition to regular scale |
| MA | $4.00/hr. in addition to regular scale |
| GA, NC, SC, Northern VA | $5.00/hr. in addition to regular scale |
| FL | $6.00/hr. in addition to regular scale |
| CT, NJ, NV*, NY | $9.00/hr. in addition to regular scale |
| NV** | $11.50/hr. in addition to regular scale |

*Employees hired on or after 3/4/13*
**Employees hired prior to 3/4/13*

**THESE GUIDELINES AFFECT WAREHOUSES ONLY.**



**Employee Agreement**



**Employee Agreement**

### 9.3 HOURLY NON-EXEMPT CLASSIFICATIONS DEPOTS

| Service Assistants | Service Clerks |
|---|---|
| Maintenance | Fleet/Receiving/Shipping Clerk |
| Receiving Assistant | Guard Booth |
| | Inventory Auditor |
| | Payroll/Personnel Clerk |
| | Power Equipment Operator |
| | Supervisor |

### 9.4 HOURLY NON-EXEMPT CLASSIFICATIONS COSTCO MEAT PLANT

| Service Assistants | Service Clerks |
|---|---|
| Box Making | Administrative |
| Data Entry | Forklift Operator |
| Janitorial | Machine Operator |
| Machine Operator Assistant | QA Technician |
| Maintenance Assistant | Shipping/Receiving |
| Microwave Worker | Skilled Maintenance Technician |
| Pack Off Worker | Supervisor |
| Sanitation Worker | |

### 9.5 HOURLY NON-EXEMPT CLASSIFICATIONS OPTICAL LAB

| Service Assistants | Service Clerks |
|---|---|
| Bench Personnel | Admin/Payroll Clerk |
| Facility Assistant | Financial Analyst |
| Facility Maintenance | Inventory Audit Clerk |
| Member Service Assistant | QA Technician |
| Production Worker | Reject Specialist |
| QA Blocking Assistant | Reorder Specialist |
| Stockroom Assistant | Supervisor |
| Surface Assistant | System Coordinator |
| Warehouse Assistant | Technical Maintenance Clerk |

### 9.6 HOURLY NON-EXEMPT CLASSIFICATIONS PACKAGING PLANTS

| Service Assistants | Service Clerks |
|---|---|
| Data Entry/IS Assistant | AP/AR Clerk |
| Janitorial/Clean-up Crew | Forklift Operator |
| Machine Operator Assistant | Inventory Audit Clerk |
| Maintenance Assistant | Inventory Control Specialist |
| Packaging Crew | IS Clerk |
| QA Packaging Assistant | Payroll/HR Clerk |
| | Machine Operator |
| | QA Technician |
| | Shipping/Receiving Clerk |
| | Skilled Maintenance Technician |
| | Supervisor |

### 9.7 HOURLY NON-EXEMPT CLASSIFICATIONS COSTCO TRADING

| Service Assistants | Service Clerks |
|---|---|
| Facilities Assistant | Admin/Payroll Clerk |
| Production Assistant | Production Clerk |
| | Receiving Clerk |
| | Repairs Clerk |
| | Returns Clerk |
| | Security |
| | Supervisor |
| | Vault Clerk |

**COSTCO** WHOLESALE                    **Employee Agreement**

## 9.8   HOURLY NON-EXEMPT CLASSIFICATIONS
## COSTCO TRAVEL

**Service Assistants**
Documentation/Mail Room
Receptionist

**Service Clerks**
Accounting Clerk
Air Ticketing Specialist
Corporate Travel Agent
Customer Service
Database Specialist
Inventory Control Specialist
Marketing Coordinator
Product Development Coordinator
Reservations Sales Agent
Reservations Trainer
Supervisor*

\*   *Includes Supervisors of Reservations Sales Agents, Database Specialist, Air Ticketing Specialist and Accounting Clerk*

## 9.9   HOURLY NON-EXEMPT CLASSIFICATIONS
## AUBURN BUSINESS FACILITIES

**Service Assistants**
Order Picker
Packaging Assistant
Production Assistant
Receiving Assistant
Receptionist
Shipping Assistant
Stocker

**Service Clerks**
Bindery Operator
Customer Service Representative
Data Entry Clerk
Discrepancy Clerk
Expense and Payables Clerk
Facilities Clerk
Forklift Operator
Inventory Audit Clerk
Machine Operator
Payroll Clerk
Pre-Press/Press Operator
Production Clerk
Purchasing Clerk
Receiving/Shipping Clerk
Sales Audit Clerk
Sales Clerk
Sign Production
Skilled Technician

**Employee Agreement**                    **COSTCO** WHOLESALE

## "HOW MUCH AM I PAID?"
## 10.0—WAGES
### COSTCO HOURLY NON-EXEMPT WAGES

### 10.1   SERVICE ASSISTANTS
- *On 3/4/13, current employees at $11.00 and $11.25 move to $11.50 and their goal hours are set to zero.*
- *New employees will receive a pro-rated Extra Check at 12,400 hours.*

**A.   HOURLY NON-EXEMPT RATES** – Hired Between 3/5/07 and 3/3/13

|  | 03/13 | 03/14 | 03/15 |
|---|---|---|---|
| First 800 Hours | $11.50 | $11.50 | $11.50 |
| next 1040 Hours | $12.00 | $12.00 | $12.00 |
| next 1040 Hours | $12.50 | $12.50 | $12.50 |
| next 1040 Hours | $13.00 | $13.00 | $13.00 |
| next 1040 Hours | $13.75 | $13.75 | $13.75 |
| next 1040 Hours | $14.50 | $14.50 | $14.50 |
| next 1040 Hours | $15.25 | $15.25 | $15.25 |
| next 1040 Hours | $16.00 | $16.00 | $16.00 |
| next 1040 Hours | $17.00 | $17.00 | $17.00 |
| Top Step | $20.30 | $20.80 | $21.35 |

Effective the first full pay period in March of the respective year listed above.

**B.   HOURLY NON-EXEMPT RATES** – Hired On or After 3/4/13

|  | 03/13 | 03/14 | 03/15 |
|---|---|---|---|
| First 800 Hours | $11.50 | $11.50 | $11.50 |
| next 800 Hours | $11.75 | $11.75 | $11.75 |
| next 800 Hours | $12.00 | $12.00 | $12.00 |
| next 800 Hours | $12.50 | $12.50 | $12.50 |
| next 1040 Hours | $13.00 | $13.00 | $13.00 |
| next 1040 Hours | $13.50 | $13.50 | $13.50 |
| next 1040 Hours | $14.00 | $14.00 | $14.00 |
| next 1040 Hours | $15.00 | $15.00 | $15.00 |
| next 1040 Hours | $16.00 | $16.00 | $16.00 |
| next 1040 Hours | $17.00 | $17.00 | $17.00 |
| next 880 Hours | $19.00 | $19.00 | $19.00 |
| Top Step | $20.30 | $20.80 | $21.35 |

Effective the first full pay period in March of the respective year listed above.

COSTCO 000033

CONFIDENTIAL

9.0—HOURLY NON-EXEMPT CLASSIFICATIONS

10.0—WAGES

**COSTCO** WHOLESALE                                  **Employee Agreement**

## COSTCO HOURLY NON-EXEMPT WAGES

### 10.2   SERVICE CLERKS

- On 3/4/13, current employees at $11.50 and $11.75 move to $12.00 and their goal hours are set to zero.
- New employees will receive a pro-rated Extra Check at 12,400 hours.

**A.**   HOURLY NON-EXEMPT RATES – Hired Between 3/5/07 and 3/3/13

|  | 03/13 | 03/14 | 03/15 |
|---|---|---|---|
| First 800 Hours | $12.00 | $12.00 | $12.00 |
| next 1040 Hours | $12.50 | $12.50 | $12.50 |
| next 1040 Hours | $13.00 | $13.00 | $13.00 |
| next 1040 Hours | $14.00 | $14.00 | $14.00 |
| next 1040 Hours | $15.00 | $15.00 | $15.00 |
| next 1040 Hours | $16.00 | $16.00 | $16.00 |
| next 1040 Hours | $17.00 | $17.00 | $17.00 |
| next 1040 Hours | $18.00 | $18.00 | $18.00 |
| next 1040 Hours | $19.00 | $19.00 | $19.00 |
| Top Step | $22.00 | $22.50 | $23.05 |

Effective the first full pay period in March of the respective year listed above.

**B.**   HOURLY NON-EXEMPT RATES – Hired On or After 3/4/13

|  | 03/13 | 03/14 | 03/15 |
|---|---|---|---|
| First 800 Hours | $12.00 | $12.00 | $12.00 |
| next 800 Hours | $12.25 | $12.25 | $12.25 |
| next 800 Hours | $12.50 | $12.50 | $12.50 |
| next 800 Hours | $13.00 | $13.00 | $13.00 |
| next 1040 Hours | $13.50 | $13.50 | $13.50 |
| next 1040 Hours | $14.00 | $14.00 | $14.00 |
| next 1040 Hours | $15.00 | $15.00 | $15.00 |
| next 1040 Hours | $16.00 | $16.00 | $16.00 |
| next 1040 Hours | $17.00 | $17.00 | $17.00 |
| next 1040 Hours | $19.00 | $19.00 | $19.00 |
| next 880 Hours | $21.00 | $21.00 | $21.00 |
| Top Step | $22.00 | $22.50 | $23.05 |

Effective the first full pay period in March of the respective year listed above.

## COSTCO HOURLY NON-EXEMPT WAGES

### 10.3   MEAT CUTTERS

- On 3/4/13, current employees at $11.50 move to $12.00 and their goal hours are set to zero.
- New employees will receive a pro-rated Extra Check at 12,400 hours.

**A.**   HOURLY NON-EXEMPT RATES – Hired Between 3/5/07 and 3/3/13

|  | 03/13 | 03/14 | 03/15 |
|---|---|---|---|
| First 800 Hours | $12.00 | $12.00 | $12.00 |
| next 800 Hours | $12.50 | $12.50 | $12.50 |
| next 800 Hours | $13.00 | $13.00 | $13.00 |
| next 800 Hours | $14.00 | $14.00 | $14.00 |
| next 1040 Hours | $15.00 | $15.00 | $15.00 |
| next 1040 Hours | $16.00 | $16.00 | $16.00 |
| next 1040 Hours | $17.00 | $17.00 | $17.00 |
| next 1040 Hours | $18.00 | $18.00 | $18.00 |
| next 1040 Hours | $19.00 | $19.00 | $19.00 |
| Top Step | $23.50 | $24.00 | $24.55 |

Effective the first full pay period in March of the respective year listed above.

**B.**   HOURLY NON-EXEMPT RATES – Hired On or After 3/4/13

|  | 03/13 | 03/14 | 03/15 |
|---|---|---|---|
| First 800 Hours | $12.00 | $12.00 | $12.00 |
| next 800 Hours | $12.50 | $12.50 | $12.50 |
| next 800 Hours | $13.00 | $13.00 | $13.00 |
| next 800 Hours | $14.00 | $14.00 | $14.00 |
| next 1040 Hours | $15.00 | $15.00 | $15.00 |
| next 1040 Hours | $16.00 | $16.00 | $16.00 |
| next 1040 Hours | $17.00 | $17.00 | $17.00 |
| next 1240 Hours | $18.00 | $18.00 | $18.00 |
| next 1240 Hours | $19.00 | $19.00 | $19.00 |
| Top Step | $23.50 | $24.00 | $24.55 |

Effective the first full pay period in March of the respective year listed above.

10.0—WAGES

COSTCO 000034

CONFIDENTIAL



**COSTCO** WHOLESALE

**Employee Agreement**

## 10.4   TRUCK DRIVERS – DEPOT*

- *All employees will receive an Extra Check at 9,200 hours. Extra Check payments for employees hired on or after 3/4/13 will be pro-rated.*

### A.   HOURLY NON-EXEMPT RATES

|  | 03/13 | 03/14 | 03/15 |
|---|---|---|---|
| First 1040 Hours | $18.00 | $18.00 | $18.00 |
| next 1040 Hours | $18.50 | $18.50 | $18.50 |
| next 1040 Hours | $19.00 | $19.00 | $19.00 |
| Top Step | $23.50 | $24.00 | $24.55 |

Effective the first full pay period in March of the respective year listed above.

- *\* Fleet Dispatchers are paid on the Truck Driver pay scale.*

## 10.5   EXTRA CHECK PAYMENTS

Even though Costco pays a very competitive hourly rate, our long-term employees qualify for two Extra Check payments each year in recognition of the value that their experience adds to our operation.

### A.   ELIGIBILITY

1. Salaried and off-scale non-exempt employees are not eligible for an Extra Check payment.
2. To receive the next Extra Check payment, hourly non-exempt employees must:
   a. Have been paid the designated number of hours through continuous employment by the relevant Measurement Period end date outlined in the table below:
      i. Hired before 3/4/13 - 9,200 hours
      ii. Hired on or after 3/4/13 - 12,400 hours

| Measurement Period End Date | Paycheck Date | Year |
|---|---|---|
| March 17 | April 5 | 2013 |
| September 15 | October 4 | 2013 |
| March 16 | April 4 | 2014 |
| September 14 | October 3 | 2014 |
| March 15 | April 3 | 2015 |
| September 13 | October 2 | 2015 |

   b. Be paid on the scales listed in this Employee Agreement.
   c. Be employed on the date of the Extra Check payment.

**Employee Agreement**

**COSTCO** WHOLESALE

3. Promotions and Demotions
   a. Hourly non-exempt employees who have already received an Extra Check payment and who move to a salaried position are paid a pro-rated Extra Check based on the number of hours paid as an hourly non-exempt employee in the eligibility period prior to the April or October payment.
   b. Supervisors and Salaried employees who received an Extra Check payment prior to demotion, remain Extra Check payment eligible.

### B.   FORMULA

- Years of continuous service are determined as of April 1 for the April Extra Check payment and as of October 1 for the October Extra Check payment.
- To qualify for the entire Extra Check payment, you must have been paid a minimum of 1,000 hours during the Extra Check Measurement Period.  An accelerated accrual for hours worked on Sunday by full-time employees will be applied toward the 1,000 paid hours.
- If you were paid for less than the minimum of 1,000 hours, your Extra Check payment is pro-rated based on hours paid.
- If you were hired on or after 3/4/13 and reach the required hours for Extra Check eligibility (12,400 hours) during the Extra Check Measurement Period, your first Extra Check will be pro-rated based on the number of hours paid after reaching 12,400 hours.

For eligible employees who were paid less than 1,000 hours during the Extra Check Measurement Period, the formula for a pro-rated Extra Check is:

**Employees hired before 3/4/13:** Accumulated hours paid ÷ 1,000 x entire Extra Check Amount = Amount Due.

**Employee hired on or after 3/4/13:** Accumulated hours paid in excess of 12,400 hours ÷ 1,000 x entire Extra Check Amount = Amount Due.

The Extra Check calculation also includes any additional overtime pay due under applicable law.

- The Extra Check payment is included in the paycheck as listed in Section A.
- The amount of the entire Extra Check payment for which you are eligible is based on your length of continuous employment, as follows:

| Years of continuous service: | April | October |
|---|---|---|
| Less than 10 years | $2,500 | $2,500 |
| 10 to 14 years | $3,000 | $3,000 |
| 15 to 19 years | $3,500 | $3,500 |
| 20 or more years | $4,000 | $4,000 |

**10.0—WAGES**

**10.0—WAGES**

COSTCO 000035

CONFIDENTIAL

**COSTCO** WHOLESALE            Employee Agreement

Employee Agreement            **COSTCO** WHOLESALE

COSTCO 000036

**10.0—WAGES**

### 10.6   YOUR TRUE RATE OF PAY
(Hourly Non-Exempt Employees)

When the Extra Check payment is expressed in hourly rate terms, the actual rate earned by our long-term employees is considerably higher. True rate of pay is our way of emphasizing that actual compensation for long-term hourly non-exempt employees significantly exceeds the stated base hourly rate. This common-sense term should not be confused with legal terms, such as the "regular rate" used to compute overtime premium pay.

For example, full-time employees with nine years of continuous service who work 1,000 hours every six months, at an hourly rate of $22.00, will earn a $2,500 Extra Check twice a year. Their hourly Extra Check rate would be $2,500 divided by 1,000 hours, or $2.50 per hour, making their true pay rate $24.50 per hour.

| YEARS OF EMPLOYMENT | HOURLY NON-EXEMPT RATE | | EXTRA CHECK | | TRUE RATE OF PAY |
|---|---|---|---|---|---|
| **SERVICE ASSISTANT** | | | | | |
| < 10 Years | $20.30 | + | $2.50 | = | $22.80 |
| 10 to 14 Years | $20.30 | + | $3.00 | = | $23.30 |
| 15 to 19 Years | $20.30 | + | $3.50 | = | $23.80 |
| 20+ Years | $20.30 | + | $4.00 | = | $24.30 |
| | | | | | |
| **SERVICE CLERK** | | | | | |
| < 10 Years | $22.00 | + | $2.50 | = | $24.50 |
| 10 to 14 Years | $22.00 | + | $3.00 | = | $25.00 |
| 15 to 19 Years | $22.00 | + | $3.50 | = | $25.50 |
| 20+ Years | $22.00 | + | $4.00 | = | $26.00 |

**Note:** If you have more than one year of service with the Company, remember to also add your 401(k) lump-sum contribution when you compute your true rate of pay. Additionally, the Extra Check payment amount also includes any additional overtime pay in accordance with applicable law.

---

## "WHAT ARE THE RULES?"
## 11.0—STANDARDS OF CONDUCT AND DISCIPLINE

### 11.1   STANDARDS OF CONDUCT AND DISCIPLINE

The following basic Company guidelines are not intended to encompass all Company policies and procedures. If you have questions, please ask your Supervisor/Manager for clarification. We may, from time to time, modify these guidelines at our discretion.

Counseling Notices will be issued within three scheduled working days of Management's knowledge of violation (excluding Saturdays, Sundays, and holidays). In some instances, such as an ongoing investigation, issuance may exceed three scheduled working days. You will be asked to sign the Counseling Notice to verify that you received it.

- Employee Counseling Notices for Causes for Disciplinary Action will remain in the employee's personnel file for six months.
- Employee Counseling Notices for absenteeism will remain in the employee's personnel file for one year.
- Employee Counseling Notices for Causes for Termination will remain in the employee's personnel file permanently.

**Note:** The amount of time an Employee Counseling Notice remains in an employee's personnel file will be extended by the amount of time an employee is out on a leave of absence.[39]

### 11.2   UNPAID SUSPENSION

We have the option to give you an immediate unpaid suspension for the purpose of an investigation for a violation of any of the major offenses listed under the "Causes for Termination" in Section 11.3. The length of suspension is as follows:

| | |
|---|---|
| Hourly Non-Exempt | 3 days |
| Salaried Employees | Full, 5-day work weeks must be used for unpaid suspensions. If the employee performs work of any kind for the Company during a work week, the employee MUST be suspended with pay. The employee may be suspended without pay for five days the following week if necessary. |

- While on suspension, you may not perform any work for the Company.
- If the investigation finds you violated Company policy and your employment is not terminated, the Employee Counseling Notice is retained permanently in your personnel file.
- If the investigation finds you did not violate Company policy, your suspension is paid.
- If the investigation continues past the number of unpaid days listed above, your suspension may be extended but you are paid for any additional days.

[39] *Except where otherwise provided by law.*

**11.0—CONDUCT & DISCIPLINE**

CONFIDENTIAL



**COSTCO** WHOLESALE                    **Employee Agreement**

## 11.3   CAUSES FOR TERMINATION

Our commitment requires us to operate within the law. You must adhere to Company policies and directives in all aspects of the operation. The following is a list of actions that can result in immediate termination of employment. These causes of termination (including, especially, subsections 11.3.3, 11.3.4, 11.3.8, 11.3.22, and 11.3.27) do not in any way prohibit the sharing of information for purposes of communicating about their wages, hours, and working conditions. No previous Counseling Notices are necessary. If termination does not occur, an Employee Counseling Notice will be issued and is permanently retained in the employee's personnel file.

1. Falsification of Company records or timecards, including omitting facts or willfully giving wrong or misleading information. This includes, but is not limited to:
   a. The employment application
   b. Internal investigations
   c. Benefit enrollment forms
   d. Workers' compensation or LOA forms
   e. Inventory, vault or sales audit forms
   f. Food labels, temperature or fat test logs
   g. Completing someone else's timecard or swiping someone else's name badge
   h. Having your timecard completed or your name badge swiped by someone else

2. Violation of Company policy prohibiting harassment or discrimination including, but not limited to:
   a. Sexual harassment
   b. Retaliation
   c. Interfering with an investigation

3. Violation of Company policy not of the nature to constitute a violation of Company policy prohibiting discrimination or harassment including, but not limited to:
   a. Malicious gossip
   b. Derogatory attacks
   c. Retaliation
   d. Interfering with an investigation
   e. Breach of confidentiality

4. Unauthorized collection, disclosure or misuse of confidential information relating to Costco, its members, employees, suppliers or agents including, but not limited to:
   a. Unauthorized removal of such confidential information from Company premises
   b. Recording a conversation without permission from all parties

5. Violation of Manager's Standard of Ethics.

6. Job Abandonment – failure to report to work for three consecutive days without notifying management or unauthorized absence for three consecutive days.

7. Violation of Costco's policies involving Leave of Absence (LOA) or other time off, including, but not limited to:
   a. Unauthorized leave of absence
   b. Failure to return from a leave of absence
   c. Failure to provide required documentation for a leave of absence
   d. Providing false or misleading information in connection with a leave of absence or other time off

8. Any act that jeopardizes the order of business or safety of the Company, the employee, other employees, customers, suppliers, or Company property, including, but not limited to:
   a. Unbecoming conduct or horseplay
   b. Statements made orally or in writing (including over the Internet) that maliciously disparages the Company, defames any individual, or violates the law or policies outlined in the Costco Employee Agreement[40]
   c. Possession of firearms, weapons, or explosives on Company time or premises[41]

9. Any conflict of interest which includes, but is not limited to:
   a. Creating a business in competition with Costco
   b. Working for another employer in competition with the Company[42]
   c. Performing unauthorized work for a customer as a representative of Costco.

10. Serious misconduct of any kind as defined by the Company, including, but not limited to, failure to provide fair, courteous, or respectful member service.

11. Excessive Policy Violations including, but not limited to:
    a. Three unpaid suspensions in a 12-month period
    b. Third violation of Causes for Disciplinary Action of the same or similar nature within a six-month period*
    c. Four counseling notices within a six-month period, even if unrelated*
    * Counseling Notices for Excessive Absenteeism cannot be counted.

12. Any conduct or relationship that jeopardizes your ability to perform your job responsibilities safely, competently, and/or honestly.

[40] Except where otherwise provided by law.
[41] Except where otherwise provided by law.
[42] Except where otherwise provided by law.

**COSTCO** WHOLESALE                                    Employee Agreement

13. Creating or contributing to unsanitary or immoral conditions.

14. Any violation of the Drug and Alcohol-Free Workplace Policy.[43]

15. Dishonesty including, but not limited to:
    a. Grazing[44]
    b. Theft of any kind

16. Borrowing, using, lending, removal of, or giving away Company funds, merchandise, or equipment without written authorization of a Manager, including, but not limited to:
    a. Taking non-purchased merchandise beyond the point of sale (registers)
    b. Concealing merchandise in such a manner that it cannot be accessed for purchase

17. Fighting, striking, or attempting to strike another person, or any act of violence or threat of violence occurring on Company premises or on Company time.

18. Willful damage or destruction of Company property, equipment, merchandise, or property of others on Company premises.

19. Insubordinate conduct including, but not limited to:
    a. Refusal to comply with the direct instructions or directions of your Supervisor
    b. Any violation of, or non-compliance with, a Contract for Continued Employment

20. Conviction or record of conviction of a job-related crime, including, but not limited to, adjudication or where sentence is imposed.[45]

21. Extending or receiving unauthorized discounts, refunds, or credits, including, but not limited to:
    a. Failure to record sales
    b. Ringing up one's own sales or a family member's sales
    c. Misuse of the Executive Membership benefit
    d. Processing one's own Optical order or a family member's Optical order
    e. Working with an open register
    f. Misuse of coupons, cash cards, p-cards, or other Company-related funds

[43] *Except where otherwise provided by law.*

[44] *Grazing includes, but is not limited to: making personal use of shelf stock, RTV merchandise (including merchandise being destroyed for credit), merchandise returned by members, and any packages that either become opened or damaged during the course of business (e.g., blade cut, defective seams, etc.). Also included are Food Court and fresh food products and any ingredients used in their preparation. "If you didn't buy it, don't eat it!"*

[45] *Except where otherwise provided by law.*

---

Employee Agreement                                    **COSTCO** WHOLESALE

22. Unauthorized posting, distribution, removal, or alteration of any material in work areas.

23. Unauthorized entry or exit from Company premises at points other than those designated for employees. Entering restricted areas without authorization.

24. Leaving Company premises during working shift without permission of management.

25. Exceeding maximum time granted for leaves of absence or exceeding a vacation period.

26. Accepting employment with another employer while on leave of absence.[46]

27. Disobedience of Company rules, including, but not limited to:
    a. Electronic Communications and Technology policy
    b. Safety policies and procedures
    c. Fire procedures
    d. Sanitary rules and regulations, SSOP's and food handling regulations

28. Giving or accepting gratuities, gifts, presents, money, or tips from members/customers, or suppliers.

29. Failure to produce or maintain required licenses or proper work authorization, including, but not limited to:
    a. Licensed or certified Pharmacy, Optical, and Hearing Aid personnel must maintain their own license or certificate as a condition of employment.
    b. Employees working in the tire shop must maintain current driver's license.
    c. Non-citizens must maintain current government-issued work authorizations.

30. Failure to report to your Supervisor/Manager any injury, accident, or damage to Company property.

[46] *Except where otherwise provided by law.*

COSTCO 000038

11.0—CONDUCT & DISCIPLINE

CONFIDENTIAL

**COSTCO** WHOLESALE                    **Employee Agreement**

## 11.4   CAUSES FOR DISCIPLINARY ACTION

1. Excessive absenteeism is defined as exceeding seven instances in any 12-month period, extended by any leave of absence. (Consecutive absences count as one instance.) Unscheduled paid sick/personal days are included for purposes of calculating instances of absence.[47]
   - The eighth and ninth instances in any 12-month period will each result in a documented Employee Counseling Notice.
   - The tenth instance in any 12-month period will result in an unpaid three-day suspension.
   - The eleventh instance in any 12-month period will result in termination of employment.

   **What does not count as an instance of absence:[48]**
   - When you received your Manager's approval by requesting a day off in advance or when your absence is due to an approved LOA.

2. Excessive Tardiness – Tardies include reporting to work late for a scheduled shift or returning late from a meal period. Tardies can only be counted once. Four or more minutes late is considered tardy.

   In any 30-day period, excessive tardiness is:
   a. Three separate occasions of 4 minutes or more, or
   b. Two separate occasions of 30 minutes or more, or
   c. One occasion of 120 minutes or more.

3. Failure to follow the posted schedule, including, but not limited to:
   a. Trading, switching, or not following the posted work schedule without prior approval of management.
   b. Beginning work prior to the start of your shift or leaving before your work shift is completed without the express approval of management to change your schedule. Working "off the clock."
   c. Failure to notify management of your absence at least one hour before the start of your shift unless you are working the first shift of the day, in which case you must notify management at the start of your shift.
   d. No show - Failure to report to work for your entire scheduled shift without notifying management.
   e. Working overtime without prior approval from management.

4. Failure to perform work as required. Not meeting Company requirements for quality, accuracy or quantity of work; inefficiency or the inability to perform assigned tasks or responsibilities (job incompetence); violations of cash handling policies (excluding theft of any kind or other acts of dishonesty).

---
[47] Except where otherwise provided by law.

[48] In accordance with applicable law, there may be other instances of absence that do not count as absenteeism.

5. Use of rude, derogatory, or obscene language or gestures, not of the nature to constitute a violation of the anti-harassment policy.
6. Discourtesy, insolence, or rudeness to a member or supplier.
7. Improper use of Company property.
8. Unnecessary loitering, wasting of time, engaging in personal conversations, detracting from your work or the work of others, including any behavior or conduct that causes a disruption in the workplace.
9. Use of the following except in emergency situations and then only with express management approval:
   a. Company telephones, fax machines, computers, and property for personal business.
   b. Technological advances continue to enhance our ability to communicate, but we need to be mindful that the new devices can be disruptive and are not appropriate in the workplace. Accordingly, use of cell phones and other personal electronic devices while working is prohibited.
10. Taking an extended break, loafing, or other abuse of Company time.
11. Parking cars in areas not assigned as employee parking areas or "on premises" traffic violations.
12. Violations of established policies and procedures, including, but not limited to:
    a. Excessive failure to consistently or accurately swipe in or out at beginning and at end of shift, at beginning and at end of meal period, including swiping in early from your meal period. (Three separate failures to swipe consistently or accurately in a 30-day period is considered excessive.)
    b. Excessive failure to begin your meal period (if required) no later than the end of the fifth hour of work (three separate failures in a 30-day period is considered excessive).
    c. Excessive failure to sign and verify the accuracy of your time records (three separate failures to sign in a 90-day period is considered excessive).
13. Chewing gum, chewing tobacco, or smoking, except in designated areas, and never on the sales floor or at the registers.
14. Failure to follow any safety rules or regulations, including, but not limited to, improper lifting or box cutting techniques.
15. Presenting the Company with a personal check for insufficient funds/ closed account, or defaulting on a Company-sponsored credit card.

**11.0—CONDUCT & DISCIPLINE**

CONFIDENTIAL

**COSTCO** WHOLESALE                          **Employee Agreement**

16. Soliciting or collecting funds for any purpose during work time without permission of a Supervisor or Manager.
17. Failure to follow rules and regulations from the security department concerning identification/name badges and/or other procedures.
18. Violation of Costco's Personal Appearance policy.

## 11.5   GRATUITY POLICY

All of us as Costco employees are prohibited from accepting gratuities from suppliers, members/customers, or service agencies with whom Costco presently does business, has done business with in the past, or any firm that may be considered for future business. Gratuities are interpreted to include gifts, moneys, trips, meals, lodging or special favors. In the event gifts arrive at the workplace or home, these gifts must be immediately reported to your Manager.

Failure to comply will be considered a very serious matter and grounds for termination of employment.

## 11.6   EMPLOYMENT AND RELATIONSHIPS

If you have a relative, friend, or domestic partner who is interested in employment with Costco, we will be happy to discuss opportunities. However, having a relative, friend, or domestic partner reporting to you or having a relationship with a co-worker that violates the Standard of Ethics for Managers/Supervisors can give the appearance of favoritism and affect your performance. This is a serious violation of Company policy that could result in termination of your employment, as described in Section 11.3, #5, #12. We will therefore avoid reporting relationships between friends and family members.

In addition, your relationship with a co-worker can jeopardize your ability to perform your job responsibilities safely, honestly, and/or competently if you work in the same department or if such co-worker audits your work. In the event that such relationships exist, appropriate transfers will occur.

If you feel that you are in a situation where the appearance of bias or favoritism might arise, it is your responsibility to make your Manager aware of the situation.

**Employee Agreement**                          **COSTCO** WHOLESALE

## 11.7   STANDARD OF ETHICS – MANAGERS/SUPERVISORS

The Costco Mission Statement sets forth our commitment to obey the law, take care of our members and employees, respect our suppliers, and reward our shareholders. We cannot accomplish these goals unless we adhere to a set of moral principles that project our Mission's objectives to our fellow employees, members, suppliers and community. In accepting a position of management, you must be committed to and demonstrate a role of honesty and forthrightness. Any time there is the slightest doubt about an activity that could be questioned regarding honesty, integrity or intent, you must discuss it with your Manager or Regional Vice President to remove any doubt. Managers above all else lead by example:

- You must treat employees, members and suppliers with respect and dignity.
- Inappropriate fraternization with employees creates an atmosphere of conflict of interest and favoritism and is not acceptable.
- You must always strive to keep the workplace free of any form of harassment, discrimination, or retaliation. All members of management must review, be versed in, and administer the policy prohibiting harassment, discrimination, and retaliation as outlined by the Costco Employee Agreement. All forms of harassment are prohibited.
- You must deal with suppliers in the same honest and forthright manner that we expect from them.
- Personal relationships with any person providing a business service to Costco are generally prohibited. Do not give, seek or accept from any person or company doing business with Costco any gift, service, loan, entertainment or trip of any value. Your position at Costco must never be used to influence a supplier or any person doing business with us to provide benefit to you or your family.
- Without proper authorization, you may not release confidential information to outside sources.
- Never manipulate records (payroll, personnel, inventory, etc.) to enhance performance or results.
- Do not exploit Costco merchandise, equipment, supplies, or employees for personal gain.
- Our management commitment requires us to operate within the law. You must adhere to Company policies and directives in all aspects of the operation.
- All Managers are to be aware of and administer our Drug and Alcohol-Free Workplace Policy.

Following and administering the standards of conduct and discipline as stated in the Costco Employee Agreement is one way to foster our goal of maintaining a safe and efficient working and shopping environment.

The above common sense guidelines can never answer every question or solve all problems. At the core of our philosophy as a Company must be the implicit understanding that not one of us is required to lie or cheat on behalf of Costco or to enhance our Company or personal performance. Managers must never engage in any activity which could raise a question concerning their integrity.

**11.0–CONDUCT & DISCIPLINE**

**11.0–CONDUCT & DISCIPLINE**

COSTCO 000040

CONFIDENTIAL

**COSTCO** WHOLESALE                    **Employee Agreement**

**Employee Agreement**                    **COSTCO** WHOLESALE

COSTCO 000041

### 11.8   PRIVACY POLICY

Costco respects our members' and employees' right to privacy, and it is up to each employee to take every precaution to make sure we respect this right. In the course of our business, we collect from our members and employees a substantial amount of personal information (such as name, address, phone number, e-mail address, social security number, membership numbers, and credit card numbers). *All of this information must be held strictly confidential and cannot be disclosed to any third party for any reason, unless (1) we have the person's prior consent, (2) a special exception is allowed that has been approved by the legal department, or (3) employees are exercising their right to communicate about wages, hours, and working conditions by sharing fellow employee contact information including name, address, phone number, and e-mail addresses, so long as such information was not obtained by an employee who improperly accessed Costco's database.*

**Social Security Number/Personal Information**

It is Costco's policy to protect the confidentiality of social security numbers and personal information obtained in the ordinary course of business from employees, suppliers, contractors, members, or others in either electronic or paper form. "Personal information" is any information that can be connected with an individual and includes, at a minimum, first name or initial and last name plus: (a) social security number (SSN); or (b) driver's license number; or (c) a financial account number, with or without a required security code.

Costco restricts access to information or documents containing SSNs or personal information to employees who have a legitimate business reason to access such information or documents. No employee shall knowingly obtain, store, transfer, use, disclose, or dispose of an SSN or personal information that Costco obtains or possesses except in accordance with Company policy.

- No part of an SSN should be used as a primary account or identification number for any individual.
- All documents containing SSNs or personal information should be stored in a physically secure manner. SSNs and personal information should not be stored on computers or other electronic devices that are not secured against unauthorized access.
- Do not put SSNs on documents that are designed for public display or may be widely seen, such as name badges, time cards, schedules, and bulletin board postings.
- Documents, materials, or computer screens that display all or part of an SSN should be kept out of public view at all times.
- Documents containing all or part of an SSN, that are sent through the mail, should not reveal the number through the envelope window or otherwise be visible from outside the envelope or package.
- Neither an SSN or part of an SSN should be used or transmitted on the Internet or on a computer system unless you know the transmission is encrypted.

- Documents containing SSNs and personal information will be retained in accordance with Costco's record retention policy and the requirements of state and federal laws. Documents containing confidential, personal, and/or protected information that are authorized for disposal will be shredded.
  - Electronic documents containing SSNs, personal information or confidential information should be destroyed in a manner consistent with guidance from the I.S. Department.
- As part of employment, employees agree that Costco may use their image, voice, or likeness in videos, photographs, or recordings with or without their name and for any lawful purpose, including, for example, such purposes as internal publications, illustration, advertising, training, and Web content.
- If you at any time become aware of a possible violation of this Privacy Policy, you are required to report the matter to a Manager.
- Costco shall take reasonable measures to enforce this Privacy Policy and to correct and prevent any known violations. Any employee who knowingly obtains, uses, or discloses SSNs or personal information contrary to the requirements of this Policy shall be subject to disciplinary action, up to and including termination of employment, in accordance with Company policy.

Additional rules apply to personal health information collected in our pharmacies or in our optical and hearing aid centers, as well as personal health information related to our employees, such as benefits and leaves of absence for medical reasons. All employees who handle personal health information are required to complete additional training. Please contact your Supervisor if you have not received this training.

- Documents containing confidential or otherwise protected information that are authorized for disposal will be shredded.
- Costco employees shall refrain from discussing private matters of members and private matters of employees, such as employee sick calls, leaves of absence, FMLA call outs, ADA accommodations, workers' comp injuries, personal health information, etc.

Although Costco may provide Company property for employees to use, it remains Costco property. These items, as well as any articles found within them, can be inspected by Costco at any time, without prior notice. Costco reserves the right to inspect the following:

1. All Company furniture and property, including, but not limited to, lockers, desks, filing cabinets, and drawers;
2. All articles, packages, or other containers brought into or taken from Costco, including backpacks, lunch boxes, and purses; and
3. All vehicles located on Company premises when management has reason to suspect a violation of Company policy.

**11.0—CONDUCT & DISCIPLINE**

**11.0—CONDUCT & DISCIPLINE**

CONFIDENTIAL

**COSTCO** WHOLESALE                    **Employee Agreement**

Because an inspection might result in a discovery of an employee's personal possessions, all employees are encouraged to avoid bringing into the workplace any personal property that they do not wish to reveal at Costco.

This Privacy Policy is not intended to restrict the rights of employees, which Costco respects, to share information for the purpose of engaging in protected concerted activity.

## 11.9   INTELLECTUAL PROPERTY PROVISION

Please remember that as an employee of Costco, all creative work, business ideas, and products that you design and develop as a Costco employee, or that otherwise relate directly to our business, are the sole property of Costco. This does not apply to creative work, business ideas or inventions developed entirely on an employee's own time and without the use of Company equipment, supplies, facilities, or trade secrets.

## 11.10   ELECTRONIC COMMUNICATIONS AND TECHNOLOGY POLICY

Costco recognizes the benefits associated with electronic communications for business use. All employees are responsible for communicating with appropriate business decorum by means of e-mail, the Internet, hard-copy, in conversation, or using other technology or electronic means. Information stored in or transferred through Costco's electronic systems is not private personal information but is the property of Costco and can be accessed by Costco in accordance with law. Misuse or excessive personal use of Costco technology or electronic communications is a violation of Company policy for which you may be disciplined, up to and including termination of employment. Your use of Costco technology and electronic communication systems represents your agreement with the following policies:

- Every employee is responsible for ensuring that all information relating to Costco, its members, suppliers, and operations is secure, kept in confidence, and not disseminated or misused.
- Any communication transmitted, stored, or displayed electronically must comply with policies outlined in the Costco Employee Agreement, whether or not it occurs during working hours or using Costco's systems. Employees should be respectful and be aware that material published electronically such as web sites, social networking sites, online message boards, or discussion groups (e.g., Facebook, Google+, Twitter, YouTube, etc.) may be cause for discipline, up to and including termination of employment, if the material could reasonably be viewed as malicious, obscene, threatening or intimidating. Examples of such material include offensive posts meant to intentionally harm someone's reputation or posts that could contribute to a hostile work environment on the basis of race, sex, disability, religion, or any other status protected by law or Company policy. Employees, however, are not prohibited from sharing information for purposes of communicating about their wages, hours, and working conditions.

- Employees should be aware that Costco owns and maintains records of all data collected, created, or stored on Costco information systems. Costco, consistent with applicable law, may monitor and log all computer activities and employee use of Company-provided technology and devices without notification.
- Electronic communications, data transfers, remote access, and Internet access are for the purpose of facilitating the business of Costco. Personal use must be kept to a minimum and may be monitored for any reason, including excessive personal or inappropriate use.
- Only software or computer equipment authorized by Costco Information Systems may be installed. Installation of personal and/or unauthorized software or computer equipment is prohibited, including, but not limited to, items such as video games, personal photos, CD/DVD players, music files, wireless devices, modems, and storage devices (such as iPods, MP3 players, etc.).
- Copying and distribution of copyrighted material is prohibited. Costco respects the intellectual property rights of those who create this material.
- Confidential or sensitive materials (electronic or hard-copy) must be secured at all times.
- Sensitive and/or confidential information such as membership, company financial information, credit card numbers, social security numbers, or employee personal health information protected by privacy laws, such as but not limited to HIPAA, may not be shared, transmitted, or stored for personal or public use without prior management approval. Additionally, unauthorized or insecure removal or transmittal of confidential material from Company premises is prohibited.
- All Costco system access passwords are the responsibility of the employee and should be kept confidential. Employees are prohibited from the unauthorized use of other employees' passwords.
- All computer users should log off at the end of their work day. Locking your workstation is expected for shorter absences.

The Electronic Communications and Technology Policy is not intended to restrict the right of employees, which Costco respects, to share information for the purpose of engaging in protected concerted activity.

Please contact the Costco Information Security group by email at InformationSecurity@costco.com for additional information.

11.0—CONDUCT & DISCIPLINE

CONFIDENTIAL

 **Employee Agreement**

**Employee Agreement** 

COSTCO 000043

## 11.11  TIMECARDS (Non-Exempt Employees)

Electronic timecard systems are used to record your time. Failure to accurately record your time is a violation of Company policy.

Please record the exact time of the following:

1. When you begin your shift.
2. When you leave for your meal period.
3. When you return from your meal period.
4. When you end your shift.

It is your responsibility to be at your position when your shift begins. Personal activities before you do work (hanging up your coat, etc.) should be completed before you sign in.

Other important points are as follows:

1. Never fill in a timecard ahead of time.
2. Always sign your timecard at the end of your last shift.
3. Never fill in another person's timecard.
4. All overtime requires management approval PRIOR to working overtime. If you work overtime without prior approval, you must still accurately record all of your time worked.
5. Review, approve, and sign your timecard each pay period. Excessive failure to sign time records may result in disciplinary action.
6. Each pay period, review your pay stubs for accuracy. Any discrepancies or inaccuracies should be immediately reported to management.

**11.0—CONDUCT & DISCIPLINE**

# "WHAT DOES MEMBER SERVICE LOOK LIKE?" 12.0—MEMBER SERVICE

## 12.1  MEMBER SERVICE STANDARDS

Member service can be simply defined as the treatment of our members in a fair, courteous, respectful and expeditious manner.

Costco's service is its most critical commodity. We can stock the perfect mix of products and merchandise them beautifully, but if we don't provide our members with the respect and assistance that they deserve and have come to expect from us, all other efforts will be fruitless.

The following standards are required of everyone at all times:

*Eye contact:* First impressions make a difference and include complying with Costco's dress code and keeping a clean, safe workplace.

*Smile:* It's one of the easiest and most tangible ways your body language shows good member service.

*Greet and acknowledge each member sincerely:* Give the member your full attention. Make every effort to assist and approach members in all areas of the operation. Don't engage in idle chatter with co-workers.

*Appreciate and thank every member:* Give each member your sincere gratitude.

*Be accountable and take responsibility:* If you see something outside your area that needs attention, take action or immediately contact your supervisor or manager.

### Know Your Role

Our primary duty is to provide an exceptional level of member service, and every position at Costco has a direct impact on member service.

*As a Stocker:* Keep your aisle clean, straight, and safe. Merchandise should be well presented, in stock, and on the floor. Make sure all pertinent information about the merchandise is clearly displayed.

*On the Front End:* Greet every member with a smile and present yourself in a professional, friendly manner. Ring up orders accurately and make sure there are boxes available for members' purchases. Keep your register area clean and clear of personal items.

*At the Door:* Offer a clean cart to any member without one. Thank each member for coming in and answer basic questions about the warehouse that members may need to know.

**12.0—MEMBER SERVICE**

**CONFIDENTIAL**

**Employee Agreement**

*At the Membership Counter:* Greet each member or potential member with a smile and thank them when they leave. Follow our 100 percent satisfaction policy. Process all transactions in an efficient, professional manner. Keep the return area neat and safe and ensure the membership counter is clean and clear of personal items.

*At the Food Court:* Make sure all tables are clean and that the area is sanitary and clear of trash and wrappers. Trash containers should be monitored and emptied regularly.

Our pledge in the Code of Ethics is to provide our members with the best customer service in the retail industry. Our members are our reason for being; if we don't keep them happy, little else that we do will matter.

### 12.2 PERSONAL APPEARANCE POLICY

It is Costco's belief that our employees are responsible individuals who are capable of ensuring that their appearance is neat, clean, and professional. Employees are expected to practice good grooming and personal hygiene habits.



In order to allow Costco to be relaxed in its dress code, we ask your assistance by arriving to work dressed in a neat, clean, and professional manner. In addition, for safety reasons we prohibit open-toed shoes or sandals being worn in the warehouses and depots. Some departments require safety shoes, as noted below.

The employee name badge is an important part of how we all present ourselves to Costco members. It is necessary that the name badge be clean, accurate, and easy to read, with only Company approved attachments.

**Note:** If you have specific questions regarding appropriate attire, ask your Location Manager in advance. Inappropriately dressed employees are considered unsuitable to commence work and will be sent home. Employees may be asked to return to work later the same day in attire conforming to Company standards. Employees required to leave due to inappropriate attire will not be compensated for any lost time. Employees may also be disciplined if they arrive for work inappropriately dressed, as described in Section 11.4, #18.

---

**Employee Agreement** 

## "HOW DO I PROTECT MYSELF AND OTHERS?" 13.0—SAFETY POLICIES

### 13.1 GENERAL SAFETY RULES

**Note:** In addition to those listed here and in the Risk Management manual, other safety rules, and procedures are integrally intertwined in all Costco policies, procedures, rules, and employee training programs.

1. Comply with all Costco safety rules and actively participate and cooperate in the safety program.
2. Never start work on a job for which you have not been trained, or when you don't know the hazards and how to protect yourself from them.
3. Report immediately any unsafe condition, work practice, accident, or injury to a Supervisor or Manager.
4. Climbing on merchandise or storage racks is not permitted.
5. Provided equipment guards must be used. Only authorized and trained employees performing operationally required adjustments should remove, bypass or modify equipment guards, covers or interlocks.
6. Horseplay is not permitted.
7. Jewelry and/or loose clothing are not to be worn in bakery, meat, deli, and food service departments, nor when working with any moving machinery/equipment.
8. Box cutters or other cutters using changeable blades must not be used in bakery, meat, food court, service deli, and any department involved in the manufacturing and/or preparing of food products.
9. Damaged equipment or storage fixtures must be reported to the Location Manager promptly.
10. Avoid distracting others.
11. Lift with your legs and not your back – get help with heavy, bulky or awkward loads.
12. Use the right tools and equipment for the job. Use and properly care for all personal protective equipment (PPE) provided.
13. Never enter a compactor chute unless the compactor has been locked out and a Manager is present.
14. With minor exceptions, electrical work must be performed by an outside contractor.
15. No more than ten (10) shopping carts are to be pushed at one time. Push, don't pull carts/flats. Cart pushers are to use a cart rope and wear a bright safety vest. The vest must be reflective and should be worn whenever work is performed in the parking lot or gas station, regardless of whether the warehouse is open or not.
16. Clean as you go and maintain a clean workplace.

**12.0—MEMBER SERVICE** · **13.0—SAFETY**

COSTCO 000044 · CONFIDENTIAL

**COSTCO** WHOLESALE                                    **Employee Agreement**

17. In general, all equipment/machinery must be unplugged (with plug kept in sight) or tagged and locked out while it is being cleaned, worked on, serviced, repaired, or when an authorized and trained employee is by-passing a machine interlock or guard while performing operationally required adjustments. For example: Changing plastic on the wrapping machine or placing fingers near the muffin depositor throat or ports.

18. Only trained and authorized employees who have completed the respective Costco equipment training or certification program shall operate powered equipment.

19. Never ride on any powered equipment where riding is not intended.

20. Do not work under suspended loads.

21. Wear all personal protective equipment required for work performed, including safety glasses, splash goggles, gloves, hearing protection, etc.

22. Use the proper tool for the job and use only tools that are in good condition.

23. Use ladders or proper platforms when working off the ground.

24. Before entering confined or concealed spaces, review the job with Home Office Risk Management/Safety and follow designated safety procedures.

25. Store materials only in designated areas.

26. Sweep all floors regularly and clean up spills promptly.

27. Keep all traffic areas free of clutter.

28. Maintain good housekeeping.

29. Report leaking containers to a Supervisor.

## 13.2   FOOD HANDLERS

These policies ensure a safe and sanitary work environment and comply with applicable Food Service Health and Safety Regulations:

**Head and Facial Hair Covering** - A hat and white hair net must be worn at all times. Beard nets must also be worn if you have facial hair.

**Jewelry** - No jewelry of any kind may be worn, including rings, wedding rings, facial or tongue jewelry, watches, necklaces, bracelets, earrings, etc.

**Hands** - Fingernails must be kept trimmed short. No nail polish or false nails may be worn.

**Clothing** - No loose-fitting clothing may be worn as it could get caught in equipment or contaminate food. No shorts may be worn. Bakery and Food Service employees must wear shirts with short sleeves (above the elbow).

**Safety Shoes** - You must wear shoes that are sold as being slip resistant in oil or water and have hard rubber or leather soles. Tennis shoes, heels or open-toed shoes are not permitted.

---

**Employee Agreement**                                    **COSTCO** WHOLESALE 

## 13.3   EMERGENCY PROCEDURES

1. Know the personnel who are trained in first aid and CPR. Their names and pictures should be posted on the Employee Bulletin Board and/or on all first-aid kits.

2. Know emergency fire, evacuation, and other immediate emergency procedures. Report any emergency to a Supervisor immediately.

3. If a spill occurs:
   • Secure the area or mark the spill.
   • Notify a Supervisor/Manager.
   • Determine action to be taken to clean up spill (i.e., hazardous material, etc.).
   • Clean up spill (if directed by a Supervisor/Manager).

## 13.4   FORKLIFT/ELECTRIC PALLET JACKS (EPJ)

1. Only trained and authorized employees who have completed the Costco forklift/EPJ certification program shall operate a forklift or electric pallet jack.

2. Forklifts and EPJ's may not be used to push/pull other forklifts, carts, or EPJ's.

3. Please refer to the Costco Forklift/EPJ Manual and the Risk Management Manual for entire certification program.

4. Following any forklift/EPJ-related incident, documented retraining will occur.

5. Sturdy leather shoes are recommended for all forklift drivers as they tend to be more slip resistant than tennis shoes and generally provide better foot support and protection.

## 13.5   HAND TRUCKS

1. Stack the heavier containers toward the bottom to keep the center of gravity as low as possible.

2. Balance the load over the axle as you walk. Do not rely on the handles to carry the burden of weight.

3. Never walk backwards except when necessary to maneuver in tight places.

13.0—SAFETY

COSTCO 000045

CONFIDENTIAL



**COSTCO** WHOLESALE                    **Employee Agreement**

**13.6   PALLETS**
1. Inspect pallets daily.
2. Broken pallets (i.e., missing chunks of wood, broken boards) are not to be used.
3. Watch for loose nails or sharp edges.
4. Be sure top deck boards and bottom stringers are sound and securely fastened to the runners.
5. Pallets should be stored flat on the floor, never turned on side.
6. Empty pallets should not be left on the selling floor. Do not store empty pallets in the steel. Do not walk over an empty pallet on the floor, walk around it. Drivers should promptly remove empty pallets to the receiving area.
7. Merchandise should be stacked on a pallet with a maximum 3-inch overhang, front and back. This will help ensure a minimum 6-inch flue space is maintained between the double row steel.
8. Partial pallets of merchandise must be combined and restocked promptly to conserve pallets. In other words, pallets on the floor, which have been depleted of their merchandise by shoppers, should be consolidated and empty pallets removed to Receiving.

**13.7   DOCK SAFETY**
A. Wheel Chocking
   1. Receiving personnel are responsible for setting and removing wheel chocks.
   2. Tractors must set air brakes prior to loading or unloading of trailer.
   3. Use wheel chocks designed for the purpose. Lumber, concrete blocks, and chunks of asphalt are not acceptable.

B. Permanent Mechanical Dock Plates
   1. Lock dock plates in place until loading or unloading of trailers is finished.
   2. Receiving personnel and assigned forklift driver are to be in complete control of the trailer under all loading and unloading conditions.

C. Portable Dock Plates
   1. Use only dock plates designed for the purpose.
   2. Use lift trucks to install and remove plates.
   3. Make sure the plate overlaps both the truck bed and the dock floor by at least eight inches.
   4. Secure the plate with anchor stops to reduce slipping.

**Employee Agreement**                    **COSTCO** WHOLESALE

**13.8   CHEMICAL SAFETY**
1. Know the chemicals you work with. Read the label or refer to the applicable Material Safety Data Sheet(s) available through the Costco Intranet MSDS link.
2. Store chemicals in designated areas and in accordance with manufacturer's instructions.
3. Keep containers closed when not in use. Appropriately label all temporary storage containers.
4. Be familiar with first aid procedures for chemicals used (see Label or Material Safety Data Sheet).
5. Notify a Supervisor of any chemical spill for clean up and disposal procedure direction.

**13.9   LIFT/CARRY MATERIALS SAFELY**
1. If load is heavy, big or awkward, get help or find a way to split the load before attempting to lift and carry it.
2. If you cannot see over or around the load, it is too big to carry.
3. Check a load for rough edges, protruding nails or pinch points.
4. Check for open or weak bottoms on containers.
5. Know where you are going before you start. Plan a direct, obstacle-free route.
6. Use mechanical help when possible.

13.0—SAFETY

13.0—SAFETY

COSTCO 000046

CONFIDENTIAL



**COSTCO** WHOLESALE    Employee Agreement    Employee Agreement    **COSTCO** WHOLESALE

## INDEX

401(k) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Absences . . . . . . . . . . . . . . . . . . . . 41, 69, 71, 74
Accommodation . . . . . . . . . . . . . . . . . . 13, 22, 79
Accounting Issues or Illegal Conduct,
   Anonymous Reporting . . . . . . . . . . . . . . . . . 16
Accumulation of Goal Hours . . . . 24, 25, 34, 48
ADA (Americans with Disabilities Act) . . 13, 23
Adoption . . . . . . . . . . . . . . . . . . . . . . . 44, 50–51
   See also Leaves of Absence
Alcohol and Drugs . . . . . . . . . . . . . 17–19, 72, 77
Anti-Discrimination . . . . . . . . . 6, 12–15, 70, 77
Anti-Harassment Policy . . . . . . 6, 12–15, 70, 77
Auburn Business Facilities . . . . . . . . . . . . 10, 62
Benefits
   Descriptions of . . . . . . . . . . . . . . . . . . . . 35–42
   Employee Status and . . . . . . . . . . . . . . . 20, 22
   Layoff Recalls and . . . . . . . . . . . . . . . . . . . 27
   Leaves of Absence and . . . . . . . . . . . . . 48–51
Bereavement Leave . . . . . . . . . . 32, 34, 52–53
Bonding . . . . . . . . . . . . . . . . . . . . . . . . . 50–51
   See also Leaves of Absence
Breaks . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 75
Business Center . . . . . . . . . . . 10, 56, 63–65
Business Practices . . . . . . . . . . . . . . . . . . . 9–10
Cameras . . . . . . . . . . . . . . . . . . . . . . 75, 80–81
Career Opportunities . . . . . . . . . . . . . . 7, 55–62
Care Network . . . . . . . . . . . . . . . 19–20, 35, 42
Cell Phones . . . . . . . . . . . . . . . . . . . . . . . . . . 75
Chemical Safety . . . . . . . . . . . . . . . . . . . . . . . 89
Chewing Gum/Tobacco . . . . . . . . . . . . . . . . . 75
Classification and Status
   Business Needs and . . . . . . . . . . . . . . . . . . 34
   Changes in . . . . . . . . . . . . . . . 24–28, 40
   Compensation and . . . . . . . . . . . . . . . . . . . 33
   Described . . . . . . . . . . . . . . 20–22, 48, 55–62
Closures . . . . . . . . . . . . . . . . . . . . . . . . . 30, 40
COBRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
Code of Ethics . . . . . . . . . 5–9, 16, 71, 72–73, 77
Company Property . . . . . . . . 17–18, 71–73, 75, 79
Compensation . . . . See Wages and Compensation
Complaints . . . . . . . . . . . . . . . . . . . . . . 8, 12–16
Conduct and Discipline . . . . . . . . . . . . . . 69–82
Confidential Complaints . . . . . . . . . . . . . 15–16

Confidentiality . . . . . . . . . . . . 15–16, 70, 77–81
Conflicts of Interest . . . . . . . . . . . . . . 7, 48, 71, 77
Contracts for Continued Employment . . 19, 72
Costco Trading . . . . . . . . . . . . . . . . 10, 21, 61
Costco Travel . . . . . . . . . . . . . . . 10, 21, 62–64
Counseling Notices . . . . . . . . 25, 28, 69–71, 74
Counseling Services . . . . . . . . . . . . . . . . . . . 42
Crime Convictions . . . . . . . . . . . . . . . . . . . . . 72
CWI (Costco Wholesale Industries)
   . . . . . . . . . . . . . . . . . . 10, 21, 60–61, 63–65
Demotions . . . . . . . . . . . . . . . . . . 25, 29, 40, 67
Depots
   Classifications in . . . . . . . . . . . . . . . . . . . . 60
   Described . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   Hourly Pay Rates in . . . . . . . . . . . . . . 63–66
   Seasonal Periods in . . . . . . . . . . . . . . . . . . 21
Disagreements . . . . . . . . . . . . . . . . . . . . 11–12
Disciplinary Actions . . . . . . . . . . . . . . 25, 74–76
Discipline Standards . . . . . . . . . . . . . . . . 69–82
Discounts, Unauthorized . . . . . . . . . . . . . . . . 72
Discourtesy . . . . . . . . . . . . . . . . . . . . . . . 71, 75
Discrimination . . . . . . . See Anti-Discrimination
Dishonesty . . . . . . . . . . . . . . . . . . . . . . . . 7, 72
Dock Plates/Safety . . . . . . . . . . . . . . . . . . . . 88
Double Time . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Dress Code . . . . . . . . . . . . . . . . . . . 76, 83–84
Drugs and Alcohol . . . . . . . . . . . . 17–19, 72, 77
Electronic Communications . . . . . . . . 75, 80–81
Emergency Procedures . . . . . . . . . . . . . . . . . 87
Employee Meetings . . . . . . . . . . . . . . 29–30, 32
Employee Parking . . . . . . . . . . . . . . . . . . . . . 75
Equal Opportunity . . . . . . . . . . . . . . . . . . . . . 12
Ethics . . . . . . . . . . . . . . . . . . 5–9, 12, 71, 77
Excessive Absenteeism . . . . . . . . . . . . . . 69, 74
Excessive Tardiness . . . . . . . . . . . . . . . . . . . . 74
Extra Check Measurement Period . . . . . . 66–67
Falsification of Records . . . . . . . . . . . 54, 70, 77
Family and Medical Leave Act . . . 43–51, 79
   See also Leaves of Absence
Favoritism . . . . . . . . . . . . . . . . . . . . 15, 76–77
Fitness for Duty . . . . . . . . . . . . . . . . . . . . . . . 19
Floating Holidays . . . . . . . . 32, 37, 40, 48, 50–51

Food Handlers . . . . . . . . . . . . . . . . . . . . . . . . 86
Forklift/Cashier Training . . . . . . . . . . . . . . . . . 22
Forklift Operators . . . . . . . . . . . . . . . 22, 87–88
Full-time Employees
   Classification of . . . . . . . . . . . . . . . . . . . . . 20
   Jury Pay for . . . . . . . . . . . . . . . . . . . . . . . . 54
   Ratio to Part-time . . . . . . . . . . . . . . . . . . . 29
   Sick/Personal Days for . . . . . . . . . . . . . . . 39
   Status Changes in . . . . . . . . . . . . . . . . . . . 24
   Vacation . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
Gratuities . . . . . . . . . . . . . . . . . . . . . . . 7, 73, 76
Grazing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
Hand Trucks . . . . . . . . . . . . . . . . . . . . . . . . . . 87
Harassment . . . . . . . . . . . . . . 6, 12–15, 70, 77
   See also Anti-Harassment
Hearing Aid Center Employees . 56–57, 73, 79
Holidays . . . . . . . . . . . . . . . . . . . . 35–38, 48
Home Office . . . 7, 23, 26, 33, 38, 55, 63–64
Hourly Non-Exempt Employees
   Classifications of . . . . . . . . . . . 19–22, 55–62
   Extra Check Payments for . . . . . . . . . 66–67
   Opportunities for . . . . . . . . . . . . . . . . . 22–23
   Pay Rates for . . . . . . . . . . . . . . . . . . . 63–66
   Schedules/Compensation for . 29–33, 50–51
   Status Changes in . . . . . . . . . . . . 24–25, 40
   Suspension of . . . . . . . . . . . . . . . . . . . . . . 69
Insubordination . . . . . . . . . . . . . . . . . 18–19, 72
Insurance . . . . . . . . . . . . . . . . . . . . . . . . . 35, 51
Intellectual Property . . . . . . . . . . . . . . . . . 80–81
Interchange of Duties . . . . . . . . . . . . . . . 23, 34
Internet . . . . . . . . . . . . . . . . . . . 71, 78, 80–81
Inventory . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Jewelry . . . . . . . . . . . . . . . . . . . . . . . . . . 85, 86
Job Posting . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Jury Duty Leave . . . . . . . . . . . . . . . . . . . 32, 54
Layoffs . . . . . . . . . . . . . . . . . . . . . . . . . . 26–27
Leaves of Absence
   Benefits and . . . . . . . . . . . . . . . 36–37, 49
   Family and Medical . . . . . . . . . . . . . . . 43–51
   Non-Medical . . . . . . . . . . . . . . . . . . . . 52–54
   Pay during . . . . . . . . . . . . . . . . . . . . . . 50–51
   Policy Violations of . . . . . . . . . . . . . . . 71, 73
Length of Employment, Continuous . . . . . . . . 28
Licensed Employees . . . . . . . . . . . . . 57–58, 73
Lifetime Executive Membership . . . . . . . . . . 41
Lifting Procedures . . . . . . . . . . . . . . . . . 75, 89

Limited Part-time Employees . . . . . . . 20, 29, 54
Limited Part-time Pharmacists . . 34, 54, 57
Loitering . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
Managers . . . . . . . . . . . . . . 20, 23, 33, 37, 71, 77
Martin Luther King, Jr.'s Birthday . . . 32, 35–37
Meal Periods . . . . . . . . . . . 17, 20, 33, 74–75, 82
Meat Cutters . . . . . . . . . . . . . . . . . . . . . . . . . . 65
Meat Plants . . . . . . . . . . . . . . . . . . . . 10, 21, 60
Medical Leaves of Absence . . . . . . . . . . . 43–51
Member Service Standards . . . . . . . . . . . 83–84
Members, in Code of Ethics . . . . . . . . . . . . 5–6
Membership, for Employees . . . . . . . . . . . . . 41
Merchandise, in Code of Ethics . . . . . . . . . . . 9
Military Leave . . . . . . . . . . . . . . 26, 44–45, 53
Minimum Hours . . . . . . . . . . . . . . . . . . . . . . . 29
Minimum Work Day . . . . . . . . . . . . . . . . . . . . 29
Misconduct . . . . . . . . . . . . . . . . . . . 31, 70–76
   See also Conduct and Discipline
Mission Statement . . . . . . . . . . . . . . . . . 5, 9, 77
Natural Disasters . . . . . . . . . . . . . . . . . . . . . . 30
No Show . . . . . . . . . . . . . . . . . . . . . . . . . 71, 74
Non-Competition . . . . . . . . . . . . . . . . . 7, 48, 71
Obscenity . . . . . . . . . . . . . . . . . . . . . . . . 75, 80
Ombud's Office . . . . . . . . . . . . . . . . . . . . . . . 11
Open Door Policy . . . . . . . . . . 11–12, 13, 15, 16
Optical Labs . . . . . . . . . . . . . . 10, 21, 58–59, 60
Outside Employment . . . . . . . . . . . . . 7, 48, 73
Overtime Pay . . . . . . 20, 30, 32–34, 54, 74, 82
Packaging Plants . . . . . . . . . . . . . . . . 10, 21, 61
Paid Time Off . . . . . . . . . . . . . . . . . 35–40, 73
Pallet Jacks (EPJ's) . . . . . . . . . . . . . . . . . . . . 87
Pallets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
Part-time Employees
   Classification of . . . . . . . . . . . . . . . . . . . . . 20
   Jury Pay for . . . . . . . . . . . . . . . . . . . . . . . . 54
   Ratio to Part-time . . . . . . . . . . . . . . . . . . . 24
   Sick/Personal Days for . . . . . . . . . . . . . . . 39
   Status Changes in . . . . . . . . . . . . . . . . . . . 24
   Vacation . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
Performance Evaluation/Review . . . 21, 24, 26
Performance Failure . . . . . . . . . . . . . . . . 25, 74
Personal Appearance Policy . . . . . . . . . 76, 84
Personal Checks . . . . . . . . . . . . . . . . . . . . . . 75

COSTCO 000047

CONFIDENTIAL

Personal Days . . 21, 32, 34, 36, 39–40, 48, 50, 51

Personal Medical Leave . . . . . . . . . . . . . .43–51
  *See also Leaves of Absence*

Personal Property . . . . . . . . . . . . . . . . . . .79–80

Pharmacists
  License Requirements for. . . . . . . . . . . . . 57
  Overtime for . . . . . . . . . . . . . . . . . . . . . . . 33
  Limited Part-time . . . . . . . . . . . . . . . . 34, 54

Photo Lab Employees. . . . . . . . . . . . . . . .56, 57

Physical Inventory. . . . . . . . . . . . . . . . . . . . . 30

Policy Violations . . . . . . . . . . . . . . . . . . . .70–76

Privacy Policy. . . . . . . . . . . . . . . . . . . . . .78–80

Probationary Period . . . . . . . . . . .21, 24, 27, 28,
  . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 40, 52, 54

Promotions . . . . . . . . . . .7, 12, 23, 24, 40, 57, 67

Property Damage. . . . . . . . . . . . . . . . . . . . . . 72

Reduction in Workforce. . . . . . . . . . . . . . .26–27

Regional Offices. . . . . . . . . . . 23, 26, 33, 38, 55

Relationships, in Workplace . . . . . . . . .71, 76, 77

Reporting Harassment, Discrimination, or
  Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Resignation . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Resolution of Disagreements . . . . . . . . . . .11–12

Retaliation. . . . . . . . . . . . .8, 12, 14–16, 70, 77

Rudeness . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Safety Policies . . . . . . . . . . . . . . .71, 73, 75, 85–89

Safety Shoes. . . . . . . . . . . . . . . . . . . . . . . 84, 86

Salaried Employees
  Classification of . . . . . . . . . . . . . . . . . . . . . 20
  Demotion of . . . . . . . . . . . . . . . . . . . . .25, 40
  Pay and Compensation for . . . 20, 33, 37, 40,
  . . . . . . . . . . . . . . . . . . . 50–51, 53–54, 56, 66–67
  Suspension of . . . . . . . . . . . . . . . . . . . . . . . 69

Salary . . . . . . . . . *See Wages and Compensation*

Schedules. . . . . . . . . . . . . . . . 20, 24, 29–30, 74

Seasonal Employees
  Benefit Eligibility of . . . . . . . . . . . . . . . .36, 39
  Classification of . . . . . . . . . . . . . . . . . . . . . 21
  Leaves of Absence for . . . . . . . . . . . . . . 52, 54
  Seasonal Period . . . . . . . . . . . . . . .21, 24, 38

Security Violations . . . . . . . . . . . . . . . . . . . . . 76

Service Assistant . . . . . . . . . . . . . 25, 55–63, 68

Service Clerk. . . . . . . . . . . . 25, 33, 55–62, 64, 68

Sexual Favoritism . . . . . . . . . . . . . . . . . . . . . 15

Sexual Harassment . . . . . . . . . . . . . . 13–15, 70

Shareholders . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

Sick/Personal Days . . . . . . . . . 21, 34, 39–41, 51

Smoking. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Soliciting . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Status . . . . . . . . . . . *See Classification and Status*

Stock Purchase Plan . . . . . . . . . . . . . . . . .20, 35

Substance Abuse . . . . . . . . . . . . 17–19, 42, 72, 77

Sunday Premium Pay . . . . . . . . . . 20, 32, 33, 34

Sunshine Brooks Scholarship Program . . . . . 42

Supervisors . . . . . . . . . . . . . .23, 25, 33, 55–62, 77

Supplemental Pay . . . . . . . . . . . . . . . . . . .32–33

Suppliers . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 77

Suspension, Unpaid . . . . . . . . . . . . . . .69, 71, 74

Tardiness . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Technology Policy . . . . . . . . . . . . . . . . . . .80–81

Temporary Employees
  Benefit Eligibility of. . . . . . . . . . . . . . . . .36, 39
  Leaves of Absence for . . . . . . . . . . . . . . 52, 54

Temporary Job Openings . . . . . . . . . . . . . . . 23

Termination
  Causes for. . . . . . . . . . 8, 15, 18, 19, 25, 41, 43,
  . . . . . . . . . . . . . . . 47, 52, 54, 70–74, 76, 79, 80
  Costco's Right to . . . . . . . . . . . . . . . . . . . . . 28
  Sick/Personal Days and . . . . . . . . . . . . . . 40
  Vacation Pay/Floating Holidays and . . 37, 39

Theft . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Timecards . . . . . . . . . . . . . . . . . . . . . .70, 75, 82

Tobacco Use . . . . . . . . . . . . . . . . . . . . . . . . . 75

Transfers . . . . . . . . . . . . . . . . 24, 26, 29, 57–58

Transitional Duty. . . . . . . . . . . . . . . . . . . . . . 22

Transitional Return to Work. . . . . . . . . . . . . . 48

Travel Expenses . . . . . . . . . . . . . . . . . . . . . . . 31

Truck Drivers . . . . . . . . . . . . . . . . . . . . . . .56, 66

USERRA . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 53

Vacations . . . . . . . . . 21, 34, 38–39, 48, 50–51, 73

Violence, Act or Threat of . . . . . . . . . . . . . . . 72

Voluntary Requests for Assistance. . . . . . . . . 19


Wages and Compensation
  *See also Holidays; Sick/Personal Days; Vacations*
  Extra Check Payments . . . . . . . . . . . . .66–67
  Hourly Non-Exempt Rates . . . . . . . . . .63–66
  Improper Deductions from. . . . . . . . . . . . 12
  Leaves of Absence and . . . . . . . . . . . . .48–51
  Supplemental Pay. . . . . . . . . . . . . . . . .32–33
  For Travel. . . . . . . . . . . . . . . . . . . . . . . . . . 31
  True Rate of Pay . . . . . . . . . . . . . . . . . . . . 68

Warehouses. . . . . . . . . . . . . . . 9, 21, 56, 63–65

Wheel Chocks . . . . . . . . . . . . . . . . . . . . . . . . 88

Winter Leave. . . . . . . . . . . . . . . . . . . . . . . . . 52

Worker's Compensation Leave. . . 43–44, 50
  *See also Leaves of Absence*

Work Day, defined. . . . . . . . . . . . . . . . . . . . . 29

Work Week, defined . . . . . . . . . . . . . . . . . . . 29

COSTCO 000048

CONFIDENTIAL

**COSTCO** WHOLESALE

**Employee Agreement**

## NOTES:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

---

**Employee Agreement**

**COSTCO** WHOLESALE

COSTCO 000049

# ACKNOWLEDGMENT OF RECEIPT OF THE 2013 COSTCO EMPLOYEE AGREEMENT

I hereby acknowledge that I have received a copy of the 2013 Costco Employee Agreement. I understand that I am responsible for reading this Agreement and complying with the policies contained in the Agreement. I understand that Costco has strict policies against unlawful discrimination, harassment and retaliation. I agree to abide by these policies.

I understand that Costco policy prohibits an employee from working while under the influence of an unauthorized substance, and that, where consistent with applicable law, Costco may require testing of an employee upon a reasonable suspicion that the employee is under the influence of an unauthorized substance, or has contributed to an accident involving injury or harm to individuals, property, or equipment.

I understand that I will be classified as a Probationary Employee during the first 90 days of my employment, and that my employment may be terminated at any time, for any reason, during this Probationary period.

I understand that this Agreement summarizes various Costco policies. It is not intended to replace the actual language in various policies and procedures, but merely to act as a condensed summary.

Costco may, from time to time, revise its policies, practices, or procedures. This Agreement supersedes any previous Employee Agreement and any document addressing Company policies that is inconsistent with this Agreement. I understand that whenever Company policy conflicts with applicable law, Costco will comply with the law.

_____

Print Your Name

_____

Your Signature

_____

Employee Number

_____

Date

CONFIDENTIAL

# EXHIBIT 11

 

## Acknowledgment of Management Training

### HR Month

*Discrimination and Harassment
Prevention Policies and Procedures*

I acknowledge that on _____ __/__ _____ 2006 , I attended Costco's
                        Month / Day        Year

Discrimination and Harassment Prevention Training and that I understand: 1) every
employee has the right to work in an environment free from harassment, discrimination
and retaliation; 2) I have a responsibility not to engage in behaviors that constitute
harassment, discrimination or retaliation; 3) if I feel I am being harassed, discriminated
against or retaliated against, I have the right and responsibility to either communicate
this directly to the harasser or to a non-involved Supervisor; and 4) as a Supervisor or
Manager, I am responsible for preventing harassment, discrimination and retaliation in
the workplace and for taking prompt effective action if I know or have reason to know of
these behaviors in the workplace.

229
Location #

Jeffery M Bowie
Print Name

183559
Employee #

Signature

Chris Binas
Trainer (Print Name)

*Place signed document in employee's personnel file and key training into the HRIS
system (the code is HR05).*

ED0128.DOC                    REVISED 1/10/06



CONFIDENTIAL

COSTCO 000648



Acknowledgment of
Management Training

HR Month

*Discrimination and Harassment
Prevention Policies and Procedures*

I acknowledge that on ___5/3___ ___200 7___ , I attended Costco's
                        Month / Day      Year

Discrimination and Harassment Prevention Training and that I understand: 1) every
employee has the right to work in an environment free from harassment, discrimination
and retaliation; 2) I have a responsibility not to engage in behaviors that constitute
harassment, discrimination or retaliation; 3) if I feel I am being harassed, discriminated
against or retaliated against, I have the right and responsibility to either communicate
this directly to the harasser or to a non-involved Supervisor; and 4) as a Supervisor or
Manager, I am responsible for preventing harassment, discrimination and retaliation in
the workplace and for taking prompt effective action if I know or have reason to know of
these behaviors in the workplace.

___229___
Location #

___Jeffery m Bowie___
Print Name

___183559___
Employee #

___[signature]___
Signature

_____
Trainer (Print Name)

*Place signed document in employee's personnel file and key training into the HRIS
system (the code is HR05).*

ED0128.DOC                    REVISED 1/10/06

**EXHIBIT**
Defs-6 for ID
6/18/18 R.L.

## MANAGING TO COSTCO'S STANDARD OF ETHICS


Seyfarth Shaw at Work

## Participation and Policy Acknowledgment Form

Directions:

Please read and fill out this page, then give it to the Leader(s) before the end of the training program.

I, _Jeffery M Bowie_, participated in Costco's  Managing to Costco's
    (Print Name)

Standard of Ethics program on __2/15/11__.
             (date)

I acknowledge that I have been given a copy, have read and understand

__Costco__'s harassment prevention policy.

    (Company Name)

I understand that I am to follow the terms and procedures of our policy.

X _(signature)_
Signature of Participant

X _Jeffery M Bowie_
(Print Name: First, Middle Initial, Last)

_183557_
Employee No. (if applicable)

_Assist GM_
Employee Title (if applicable)

EXHIBIT
Defs-8 for ID
6/18/18 R.L.
PENGAD 800-631-6989

CONFIDENTIAL

COSTCO 000628

# EXHIBIT 12



**Request For Leave of Absence and Notification of Family and Medical Leave Entitlements (FMLA) and Other Similar State Leave Acts**

EMPLOYEE NAME: *Jeffery M Bowie*   LOC: *229 Brick*
EMPLOYEE ADDRESS: *1003 Larchmont Place*   SS#: ███ Redacted
*Mount Laurel NJ 08054*   ID#: *183659*

Check One
☑ Salary
☐ Hourly

I hereby request the following type of FMLA Leave of Absence:

☑ Birth or Placement of a Child; or
☐ Serious Health Condition affecting my
  ☐ Spouse   ☐ Child   ☐ Parent
  For whom I am needed to provide care

Please indicate reason for request:

*Birth of child*

Requested Time Off:   *Starting: 9/22/05*   *Ending: 10/27/05*

I understand that if the Leave is due to my family member's medical condition that the Certification of Health Care Provider (WH-380) form must be completed in its' entirety and returned prior to the start of my Leave or within 15 days. If I am already on a Leave this Certificate must be completed and returned within 15 days. Failure to furnish an appropriate Certification will result in denial or delay of my Leave. For a Leave due to a medical condition, the Company may, at its expense, may require me to obtain a second or third opinion from a health care provider of its choice regarding information contained in the original Certification.

If I am unable to return to work on or before the day my Leave expires, I must apply, in advance and in writing, to my manager for an extension not to exceed 12 weeks in a 12 month period.

If eligible for group health benefits prior to commencement of my Leave, I will continue to be eligible for such benefits. Costco has the right to charge me for my regular benefit related payroll deduction while I am out on a Leave of Absence. If my coverage is cancelled because of non-payment of these deductions, I may continue medical/dental benefits under the provisions of COBRA. Group benefits may be maintained, through payments, for a maximum time period of 12 weeks or as required by state law.

I understand that while on Leave, I will be required to furnish my manager with periodic reports every 30 days of my status and intent to return to work. If circumstances of my Leave change and I am able to return to work earlier than the date indicated above, I must notify my manager at least two work days prior to the date I intend to return.

I understand that additional information regarding continuing my group health benefits will be sent to me if I exceed the time listed in the previous schedule. If I do not return at the expiration of my FMLA Leave, under certain circumstances, I may be charged retroactively for the full premium cost of the medical benefits coverage paid by the Company during any unpaid leave.

I also understand that my employment will terminate the date I engage in any other gainful employment (unless approved by the Company) while on Leave or if I do not return to my job on or before this Leave expires.

All time taken under any Leave of Absence will count as time taken under FMLA, if applicable (please see next page for more information regarding FMLA Leave). I further understand that the maximum length of time for Family / Medical Leave of Absence is 12 weeks in any 12-month period.

*9-30-05*
Date

*9/30/05*
Date

Employee's Signature

Manager's Approval

The requested leave will be counted against your available ☑ FMLA ☐ state family and/or medical leave entitlement. Note: All FMLA or state family leave approvals are contingent upon the employee meeting the required eligibility qualifications in accordance with applicable law.

*request notification fmla act_all_family.doc*   Issued: January 28, 2002   *1*

*faxed 10/3/05*

EXHIBIT
Defs-10 *for ID*
6/18/18  R.L.
PENGAD 800-631-6989

CONFIDENTIAL   COSTCO 000824

## Salaried Bonding Certification

Employee Name: _Jeffery M Bowie_

Employee Number: _183559_

Address: _1003 Larchmont Place_

Phone Number (_856_) _866 - 1852_

Please Check One:          Birth ☑          Adoption ☐

Date of Birth/Adoption (placement): **Redacted**

Last Day Worked: _9/19/05_

Expected Return Date: _10/27/05_

Has this employee received Salary Continuation in the last 6 Mos? _NO_

Annual Salary: _$69,779.00_

Weekly Salary: _$1342.00_

Tax Purposes:

Married or Single _Married_          Number of Dependents: _9_

Person filling out this form: _Jeffery Bowie_

Date Faxed: _____

**FAX THIS FORM ALONG WITH  PROOF OF ADOPTION OR BIRTH:**

**Proof of adoption (adoption paperwork w/employees name and placement date.**

**Proof of Birth (release from hospital)**

**Attention:  LaVerne McGee**
**FAX # (425) 427-7865**

*For Internal UNUM Use Only*
*SI STD Client # = 554393*
*Division 004-004*



# LOURDES MEDICAL CENTER OF
# BURLINGTON COUNTY

## 218 A SUNSET ROAD, WILLINGBORO, NEW JERSEY

## Certificate of Birth

*This Certifies* that GAGE MICHAEL BOWIE

*was born to* JEFFERY & KIMBERLY BOWIE

*in this Hospital at* 7:15 *o'clock,* P *m on* THURSDAY

*the* Redacted *day of* Redacted Redacted

*In Witness Whereof the said Hospital has caused this Certificate,
be signed by its duly authorized officer, and its Official Seal to be he
unto affixed*

ATTENDING PHYSICIAN

JOHN NESPOLI, CHIEF ADMINISTRATIVE OFFICE

**THIS IS NOT AN OFFICIAL DOCUMEN**

CONFIDENTIAL



## FAMILY HISTORY

Father's full name _JEFFREY MICHAEL BOWIE_

Birthplace _NEW BRUNSWICK, NEW JERSEY_ _____ Date _____

Mother's maiden name _KIMBERLY CAMILLE CAVANAUGH_

Birthplace _BATON ROUGE, LOUISIANA_ _____ Date _____

Residence at time child was born _MOUNT LAUREL, NEW JERSEY_

Sex of child _MALE_ Weight at birth _7_ pounds _6_ ounces. Length _20_ inches

Baby's left footprint ⟶

Baby's right footprint

Mother's left thumbprint

Mother's right thumbprint

This Document should be carefully preserved. It is your family's heirloom record of the facts pertaining to your child's birth. The law requires that the original certificate (not this document) be filed with the Vital Statistics Office at _____ from which an official copy may be obtained.

CONFIDENTIAL

COSTCO 000827



**Request For Leave of Absence and Notification of Family and Medical Leave Entitlements (FMLA) and Other Similar State Leave Acts**

EMPLOYEE NAME: _Jeffery m Bowie_   LOC: _Brick NJ 229_   Check One
EMPLOYEE ADDRESS: _23 Highland Dr_   SS#: ██Redacted██   ☑ Salary
_Barnegat NJ 08005_   ID#: _183559_   ☐ Hourly

I hereby request the following type of FMLA Leave of Absence:

☑ Birth or Placement of a Child; or
☐ Serious Health Condition affecting my
  ☐ Spouse   ☐ Child   ☐ Parent
  For whom I am needed to provide care

Please indicate reason for request:

Requested Time Off:   Starting: _12 /28/06_   Ending: _2 /1 /07_

I understand that if the Leave is due to my family member's medical condition that the Certification of Health Care Provider (WH-380) form must be completed in its' entirety and returned prior to the start of my Leave or within 15 days. If I am already on a Leave this Certificate must be completed and returned within 15 days. Failure to furnish an appropriate Certification will result in denial or delay of my Leave. For a Leave due to a medical condition, the Company may, at its expense, may require me to obtain a second or third opinion from a health care provider of its choice regarding information contained in the original Certification.

If I am unable to return to work on or before the day my Leave expires, I must apply, in advance and in writing, to my manager for an extension not to exceed 12 weeks in a 12 month period.

If eligible for group health benefits prior to commencement of my Leave, I will continue to be eligible for such benefits. Costco has the right to charge me for my regular benefit related payroll deduction while I am out on a Leave of Absence. If my coverage is cancelled because of non-payment of these deductions, I may continue medical/dental benefits under the provisions of COBRA. Group benefits may be maintained, through payments, for a maximum time period of 12 weeks or as required by state law.

I understand that while on Leave, I will be required to furnish my manager with periodic reports every 30 days of my status and intent to return to work. If circumstances of my Leave change and I am able to return to work earlier than the date indicated above, I must notify my manager at least two work days prior to the date I intend to return.

I understand that additional information regarding continuing my group health benefits will be sent to me if I exceed the time listed in the previous schedule. If I do not return at the expiration of my FMLA Leave, under certain circumstances, I may be charged retroactively for the full premium cost of the medical benefits coverage paid by the Company during any unpaid leave.

I also understand that my employment will terminate the date I engage in any other gainful employment (unless approved by the Company) while on Leave or if I do not return to my job on or before this Leave expires.

All time taken under any Leave of Absence will count as time taken under FMLA, if applicable (please see next page for more information regarding FMLA Leave). I further understand that the maximum length of time for Family / Medical Leave of Absence is 12 weeks in any 12-month period.

_12/26/06_
Date                              Employee's Signature

_12/26/06_
Date                              Manager's Approval

The requested leave will be counted against your available ☑ FMLA ☑ state family and/or medical leave entitlement. Note: All FMLA or state family leave approvals are contingent upon the employee meeting the required eligibility qualifications in accordance with applicable law.

EXHIBIT
_Defs-11-fo1 ID_
_6/18/18 R.L._

CONFIDENTIAL                                    COSTCO 000818

Salaried Bonding Certification

Employee Name: _Jeffery m Bowie_

Employee Number: _183559_

Address: _23 Highland Dr Barnegat NJ 08005_

Phone Number _(609) 489-6276_

Please Check One:          Birth  ☑          Adoption ☐

Date of Birth/Adoption (placement): **Redacted**

Last Day Worked: _Tuesday December 26, 2006_

Expected Return Date: _February 1, 2007_

Has this employee received Salary Continuation in the last 6 Mos? _NO_

Annual Salary: _$ 72,350.00_

Weekly Salary: _$ 1391.35_

Tax Purposes:

**Married or Single** _Married_          **Number of Dependents:** _9_

Person filling out this form: _Kimberly Clemente_

Date Faxed: _____

FAX THIS FORM ALONG WITH LEAVE OF ABSENCE REQUEST FOR AND <u>PROOF OF ADOPTION OR BIRTH</u>:

**Proof of adoption** (adoption paperwork w/employees name and placement date.)
**Proof of Birth** (release from hospital w/employees name and child's birth date.)

**Attention: Leave Administration**

**FAX # (425) 427-7865**

CONFIDENTIAL

# Costco Wholesale #229
# 1722 Rt. 88
# Brick, N.J. 08724
(732) 458-2114

To: _Jennifer Stoner_       From : _Kim_

Fax#: _485/727·7865_       Re: _____

Ph#: _____       CC: _____

☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺

Paternity leave

CONFIDENTIAL

HP Officejet 5600 series 5615          Personal Printer/Fax/Copier/Scanner

Log for
Costco 229
7328403838
Jan 07 2007 9:10a

Last Transaction

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Jan 07 | 09:06a | Fax Sent | 14254277865 | 3:52 | 5 | OK |

CONFIDENTIAL

**COSTCO WHOLESALE**

## 2007 FMLA Leave Tracking Sheet

Leave entitlement equals _____ Hours *   Name: Jeff Bowie   Start Date: 12/08

### January 2007

| Mon | Tues | Wed | Thurs | Fri | Sat | Sun |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

Total Hours Used   Total Days Used

### July 2007

| Mon | Tues | Wed | Thurs | Fri | Sat | Sun |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

Total Hours Used   Total Days Used

### February 2007

| Mon | Tues | Wed | Thurs | Fri | Sat | Sun |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | | | | |

Total Hours Used   Total Days Used

### August 2007

| Mon | Tues | Wed | Thurs | Fri | Sat | Sun |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

Total Hours Used   Total Days Used

### March 2007

| Mon | Tues | Wed | Thurs | Fri | Sat | Sun |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

Total Hours Used   Total Days Used

### September 2007

| Mon | Tues | Wed | Thurs | Fri | Sat | Sun |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

Total Hours Used   Total Days Used

### April 2007

| Mon | Tues | Wed | Thurs | Fri | Sat | Sun |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | | | | | | |

Total Hours Used   Total Days Used

### October 2007

| Mon | Tues | Wed | Thurs | Fri | Sat | Sun |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

Total Hours Used   Total Days Used

### May 2007

| Mon | Tues | Wed | Thurs | Fri | Sat | Sun |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

Total Hours Used   Total Days Used

### November 2007

| Mon | Tues | Wed | Thurs | Fri | Sat | Sun |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

Total Hours Used   Total Days Used

### June 2007

| Mon | Tues | Wed | Thurs | Fri | Sat | Sun |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

Total Hours Used   Total Days Used

### December 2007

| Mon | Tues | Wed | Thurs | Fri | Sat | Sun |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 / 31 | 25 | 26 | 27 | 28 | 29 | 30 |

Total Hours Used   Total Days Used

**Total Used**

**TO DETERMINE ENTITLEMENT HOURS:**
Full Time = 480 Hours
Part Time = Total number of hours paid in the 12 weeks preceding the beginning of FMLA leave
Salaried Employee = Location manager and salaried employee must agree upon the hours worked per week and multiply by 12
Please record hours missed, not time worked

CONFIDENTIAL

COSTCO 000822



**FMLA Leave Tracking Sheet**

Leave entitlement equals _____ Hours *   Name: Jeff Bowie   Start Date: 10/28



**Request For Leave of Absence and Notification of Family and Medical Leave Entitlements (FMLA) and Other Similar State Leave Acts**

EMPLOYEE NAME: _Jeffery M Bowie_  LOC: _1025_    
EMPLOYEE ADDRESS: _23 Highland Dr_  SS#: **Redacted**    
_Barnegat NJ 08005_  ID#: _183559_

**Check One**
☑ Salary
☐ Hourly

I hereby request the following type of FMLA Leave of Absence:

☑ Birth or Placement of a Child; or
☐ Serious Health Condition affecting my
    ☐ Spouse    ☐ Child    ☐ Parent
    For whom I am needed to provide care

Please indicate reason for request:

Requested Time Off:    Starting: _5/29/08_    Ending: _7/3/08_

I understand that if the Leave is due to my family member's medical condition that the Certification of Health Care Provider (WH-380) form must be completed in its' entirety and returned prior to the start of my Leave or within 15 days. If I am already on a Leave this Certificate must be completed and returned within 15 days. Failure to furnish an appropriate Certification will result in denial or delay of my Leave. For a Leave due to a medical condition, the Company may, at its expense, may require me to obtain a second or third opinion from a health care provider of its choice regarding information contained in the original Certification.

If I am unable to return to work on or before the day my Leave expires, I must apply, in advance and in writing, to my manager for an extension not to exceed 12 weeks in a 12 month period.

If eligible for group health benefits prior to commencement of my Leave, I will continue to be eligible for such benefits. Costco has the right to charge me for my regular benefit related payroll deduction while I am out on a Leave of Absence. If my coverage is cancelled because of non-payment of these deductions, I may continue medical/dental benefits under the provisions of COBRA. Group benefits may be maintained, through payments, for a maximum time period of 12 weeks or as required by state law.

I understand that while on Leave, I will be required to furnish my manager with periodic reports every 30 days of my status and intent to return to work. If circumstances of my Leave change and I am able to return to work earlier than the date indicated above, I must notify my manager at least two work days prior to the date I intend to return.

I understand that additional information regarding continuing my group health benefits will be sent to me if I exceed the time listed in the previous schedule. If I do not return at the expiration of my FMLA Leave, under certain circumstances, I may be charged retroactively for the full premium cost of the medical benefits coverage paid by the Company during any unpaid leave.

I also understand that my employment will terminate the date I engage in any other gainful employment (unless approved by the Company) while on Leave or if I do not return to my job on or before this Leave expires.

All time taken under any Leave of Absence will count as time taken under FMLA, if applicable (please see next page for more information regarding FMLA Leave). I further understand that the maximum length of time for Family / Medical Leave of Absence is 12 weeks in any 12-month period.

_6/4/08_    
Date

_6/6/08_    
Date

Employee's Signature

Manager's Approval

**The requested leave will be counted against your available ☑ FMLA ☑ state family and/or medical leave entitlement. Note: All FMLA or state family leave approvals are contingent upon the employee meeting the required eligibility qualifications in accordance with applicable law.**

EXHIBIT
_Defs-12/01 ID_
_6/18/18 R.L._
PENGAD 800-631-6989

CONFIDENTIAL

## Family Medical Leave Act

Pursuant to the Family & Medical Leave Act of 1993 (FMLA), eligible employees may be entitled to 12 weeks of Family & Medical Leave in a 12-month period. To be eligible for FMLA Leave, an employee must have worked for the Company for at least 12 months and must have worked at least 1250 hours during the last 12 months prior to the date the Leave is to begin. The 12-month period is measured backward from the date an FMLA Leave begins. State law's which are more generous than FMLA will control to the extent required.

FMLA Leaves will be granted in any 12-month period for one or more of the following reasons:

- Because of childbirth and to care for a child in the first 12 months after childbirth.

- Because of a child's placement with the employee for adoption or foster care, within the first 12 months of the placement.

- To care for a spouse, child, or parent who has a serious health condition.

- Because of the employee's own serious health condition, where the employee is unable to perform his/her job.

**For leaves covered by the FMLA,** State Family and Medical Leave and/or Pregnancy Disability Leave laws, where applicable, including the California Family Rights Act (CFRA), generally employees will be reinstated to the same or equivalent job if they return on or before their Leave expires. Where permitted, FMLA will run concurrently with all other required state leave laws, including CFRA and pregnancy disability leaves.

**For pregnancy disability leaves in California,** an employee is entitled for 4 months of pregnancy disability Leave and, if eligible, for an additional 12 weeks of CFRA Leave.

**For a non-FMLA Medical Leave,** employees generally will be reinstated to the same, equivalent or other suitable vacant position subject to the Company's business needs and applicable law.

**At your option,** you may use any available earned vacation during any unpaid Leave and any available sick leave during an otherwise unpaid FMLA Leave taken for the serious health condition of you or your family member, Pregnancy Disability Leave, or Personal Medical Leave. Any paid time used will be counted against your available Leave under FMLA, State Leave laws, and/or Company policy.

**If you do not return to work** following FMLA Leave for a reason other than: (1) the continuation, recurrence or onset of a serious health condition which would entitle you to FMLA Leave; or (2) other circumstances beyond your control, you may be required to reimburse the Company for YOUR share of health insurance premiums paid on your behalf during your FMLA Leave.

**For any Leave of Absence,** employees have no greater right of reinstatement or other benefits and conditions of employment than if they had not taken a Leave.

**For further details** please refer to the "Family and Medical Leave Legislation" poster displayed in the Employee Break Room.

CONFIDENTIAL

# Salaried Bonding Benefit Certification

Employee Name: _Jeff. M. Bowie_

Employee Number: _183559_

Address: _23 Highland Dr. Barnegat_

_NJ_ , _08005_

Phone Number: _(609) 489 - 6276_

**Please Check One:**     Birth ☑     Adoption ☐

**Redacted**

Date of Birth/Adoption (placement): _____

Last Day Worked: _5\28\08_
(Must be within one week <u>after</u> the date of birth)

Expected Return Date: _7\3\08_

Has this employee received Salary Continuation in the last 6 Mos? _no_
(If yes, contact Leave Administration at 425.313.2537 prior to proceeding)

Annual Salary: _75,000-_          Weekly Salary: _1442.31_

**Tax Purposes:**  Married or Single: _Married_  # of Dependents: _____  _Claims Exempt_

**Please Initial:**

___  I understand that I must begin my leave within one week after the date of birth or placement to be eligible for this benefit.

___  I understand that I cannot split up my time while using the Salaried Bonding Benefit.

_____  **CA ONLY:**  I understand that my benefit will be offset by the California PFL benefits whether I apply for the PFL benefits or not.

_____  **WA ONLY:**  I understand the first week will be unpaid unless I choose to use my salaried sick leave, vacation or floating holidays.  The remaining 4 weeks are paid through Unum.

**FAX THIS FORM TO (425) 427-7865 (ATTENTION:  LEAVE ADMINISTRATION) ALONG WITH THE <u>LEAVE OF ABSENCE REQUEST FORM</u> AND <u>PROOF OF BIRTH OR ADOPTION</u>:**

**Proof of Adoption:**  adoption paperwork w/employees name and placement date.
**Proof of Birth:**  release from hospital w/employees name and child's birth date.



# EXHIBIT 13



**STANDARD OF ETHICS**
**(MANAGERS/SUPERVISORS)**

The Costco Mission Statement sets forth our commitment to obey the law, take care of our members and employees, respect our suppliers, and reward our shareholders. We cannot accomplish this unless we adhere to a set of moral principles that project our Mission's objectives to our fellow employees, members, suppliers and community. In accepting a position of management, you must be committed to and demonstrate a role of honesty and forthrightness. Any time there is the slightest doubt about an activity that could be questioned regarding honesty, integrity or intent, you must discuss it with your Manager or Regional Vice President to remove any doubt. Managers above all else lead by example.

- You must treat employees, members and suppliers with respect and dignity.
- Inappropriate fraternization with employees creates an atmosphere of conflict of interest and favoritism and is not acceptable.
- Managers must always strive to keep the workplace free of any form of harassment or discrimination. All members of management must review, be versed in, and administer the policy prohibiting harassment and discrimination as outlined by the Costco Employee Agreement. All forms of harassment, whether due to race, color, national origin, ancestry, sex, sexual orientation, gender identity or expression, religion, age, pregnancy, disability, work related injury, covered veteran status, political ideology or any other reason is prohibited.
- Suppliers are dealt with in the same honest and forthright manner that we expect from them.
- Personal relationships with any person providing a business service to Costco are generally prohibited. Do not give, seek or accept from any person or company doing business with Costco any gift, service, loan, entertainment or trip of any value. Your position at Costco must never be used to influence a supplier or any person doing business with us to provide a benefit to you or your family.
- Without proper authorization, you may not release confidential information to outside sources.
- Never manipulate records (payroll, personnel, inventory, etc.) to enhance performance or results.
- Do not exploit Costco merchandise, equipment supplies and/or employees for personal gain.
- Our management commitment requires us to operate within the law. You must adhere to Company policies and directives in all aspects of the operation.
- All Managers are to be aware of and administer our Drug and Alcohol-Free Workplace Policy as defined in the Costco Employee Agreement.

Following and administering the standards of conduct and discipline as stated in the Costco Employee Agreement is one way to foster our goal of maintaining a safe and efficient working and shopping environment.

The above common sense guidelines can never answer every question or solve all problems. At the core of our philosophy as a Company must be the implicit understanding that not one of us is required to lie or cheat on behalf of Costco or to enhance our company or personal performance. Managers must never engage in any activity which could raise a question concerning their integrity.

EMPLOYEE NAME: _Jeffery M Bowie_
(please print)

SIGNATURE: _Jeffery M Bowie_

DATE: _5/6/07_

**Costco**
UNIVERSITY
001981-2

HR Month

© 2007 All Rights Reserved

Leader Notes – Ver. 3

EXHIBIT
Defs-7 for JD
6/18/18 A.L.
PENGAD 800-631-6989

CONFIDENTIAL

COSTCO 000643



## MANAGING TO COSTCO'S STANDARD OF ETHICS

Seyfarth Shaw at Work

## <u>Participation and Policy Acknowledgment Form</u>

Directions:

Please read and fill out this page, then give it to the Leader(s) before the end of the training program.

I, _____Jeffery  M  Bowie_____, participated in Costco's  Managing to Costco's
      (Print Name)

Standard of Ethics program on ___2/15/11___.
                   (date)

I acknowledge that I have been given a copy, have read and understand

___Costco_____'s harassment prevention policy.

      (Company Name)

I understand that I am to follow the terms and procedures of our policy.

X _____
Signature of Participant

X _Jeffery  M  Bowie_____
(Print Name: First, Middle Initial, Last)

_183559_____
Employee No. (if applicable)

_Assist GM_____
Employee Title (if applicable)

CONFIDENTIAL

EXHIBIT
Defs-8 for ID
6/18/18 R.L.

COSTCO 000628