**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____
                                              :
JEFFREY BOWIE,                                :
                                              :    Case No. 3:16-cv-5808(BRM)(LHG)
                    Plaintiff,                :
                                              :
        v.                                    :
                                              :         **OPINION**
COSTCO WHOLESALE                              :
CORPORATION,                                  :
BRUCE DZENEORF, and                           :
JOHN AND JANE DOES 1-10,                      :
                                              :
                    Defendants.               :
_____:

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Defendants Costco Wholesale Corporation ("Costco") and Bruce Dezendorf's ("Dezendorf") (collectively, "Defendants") Motion for Summary Judgment. (ECF No. 32.) Plaintiff Jeffrey Bowie ("Bowie") opposes the Motion. Having reviewed the submissions filed in connection with the Motion and having held oral argument on July 9, 2019, pursuant to Federal Rule of Civil Procedure 78(a), for the reasons set forth below and for good cause shown, Defendants' Motion for Summary Judgment is **GRANTED**.

## I.    BACKGROUND

This case involves Bowie's termination from Costco. The main question before the Court is whether Bowie was discriminated by being terminated because he exercised his scheduling accommodation by leaving work early and coming in late to take care of his autistic son or for committing four Costco policy violations in a week.

### A. Costco's Corporate Structure

Costco, a Washington corporation, operates warehouses to "provide non-food items, food items, and other merchandise and ancillary products to its 'members.'" (ECF No. 32-2 ¶ 1 and ECF No. 35-2 ¶ 1.) One of those warehouses is located in Brick, New Jersey ("Brick Warehouse"). (ECF No. 32-2 ¶ 2 and ECF No. 35-2 ¶ 2.) Every Costco warehouse is operated by a general manager, who oversees all operations at his warehouse and who is supported by two to four assistant general managers, as well as a team of senior or staff level managers. (ECF No. 32-2 ¶¶ 3, 5 and ECF No. 35-2 ¶¶ 3, 5.) The general managers report to a regional vice president, who in turn reports to a Costco's senior vice president. (ECF No. 32-2 ¶ 4 and ECF No. 35-2 ¶ 4.) The senior vice president then reports to an executive vice president and chief operating officer for the Eastern United States and Canada. (ECF No. 32-2 ¶ 4 and ECF No. 35-2 ¶ 4.)

Bruce Dezendorf ("Dezendorf") was the General Manager of the Brick Warehouse from August 2013 to present. (ECF No. 32-2 ¶ 3 and ECF No. 35-2 ¶ 3.)[1] At all relevant times, Paul Pulver ("Pulver") was the Regional Vice President of the Brick Warehouse, Jeff Long ("Long") was the Senior Vice President, and Joe Portera ("Portera") was the Executive Vice President and Chief Operating Officer of the United State and Canada. (ECF No. 32-2 ¶ 4 and ECF No. 35-2 ¶ 4.) Pulver, Long, and Portera work out of Costco's regional corporate offices in Virginia. (ECF No. 32-2 ¶ 4 and ECF No. 35-2 ¶ 4.) In addition, during the relevant time period, Jim Mack ("Mack"), Peter Demoleas ("Demoleas"), and Bowie were Assistant General Managers at the Brick Warehouse. (ECF No. 32-2 ¶¶ 7-8 and ECF No. 35-2 ¶¶ 7-8.)

Bowie has sole custody of his five children, one whom is autistic and disabled. (ECF No. 32-2 ¶ 10; ECF No. 35-2 ¶ 10; ECF No. 35-1 ¶ 1.) He began his employment with Costco in 1994

---

[1] Dezendorf is legally blind. (ECF No. 32-2 ¶ 3 and ECF No. 35-2 ¶ 3.)

as a forklift operator in the Edison, New Jersey warehouse. (ECF No. 32-2 ¶ 38; ECF No. 35-2 ¶ 38; ECF No. 35-1 ¶ 2.) Through a series of promotions and relocations, Bowie eventually became an Assistant General Manager at the Brick Warehouse. (ECF No. 32-2 ¶¶ 38-40; ECF No. 35-2 ¶¶ 38-40; ECF No. 35-1 ¶¶ 3-5.)

**B. Costco's Employee Agreement**

In March 2013, Costco issued an Employee Agreement, which articulated Costco's Equal Opportunity policy that

> employees should be able to enjoy a work environment free from all forms of unlawful employment discrimination. All decisions regarding recruiting, hiring, promotion, assignment, training, termination, and other terms and conditions of employment will be make without unlawful discrimination on the basis of race, color, national origin, ancestry, sex, sexual orientation, gender identity or expression, religion, age, pregnancy, disability, work-related injury, covered veteran status, political ideology, genetic information, marital status, or any other fact that the law protects from employment discrimination.

(Ex. 10 to ECF No. 32-4 at 13.) Costco's Employee Agreement also intends to comply with its duty to provide reasonable accommodations to people with disabilities. (*Id.*) Costco maintains a policy governing reports of harassment, discrimination, or retaliation. (*Id.* at 14.) Any such claims should be reported to a manager or higher and will be investigated. (*Id.*) "In cases where investigation confirms the allegations, appropriate corrective action will be taken, regardless of whether the inappropriate conduct rise to the level of any violation of law." (*Id.*) In addition, employees will not suffer retaliation for reporting any violation of Costco's policy or unlawful discrimination, harassment, or retaliation. (*Id.* at 13.) Costco also maintains an Open-Door Policy, meaning that an employee has "the option of contacting any Supervisor or Manager to help you resolve problems." (*Id.* at 11.) Bowie received a copy of the Costco's Employee Agreement, and as Assistant Manager, employees approached Bowie on a regular basis through the Open-Door

Policy. (ECF No. 32-2 ¶¶ 16, 19 and ECF No. 35-2 ¶¶ 16, 19.)

Section 7.0 of the Employee Agreement also sets forth Costco's policies regarding the use of the Family Medical Leave Act ("FMLA"). (Ex. 10 to ECF No. 32-4.) A Costco employee is eligible for up to twelve work weeks of FMLA leave during a 12-month period if they have been employed by Costco for at least twelve months and worked at least 1,250 hours during that twelve-month period. (*Id.* at 44.) FMLA leave is available for the birth of a child; family care for a spouse, child, or parent; a serious health condition, qualifying exigencies, and injured servicemember care. (*Id.* at 44-45.) FMLA leave "may be taken intermittently or on a reduced schedule basis (e.g., by working fewer days in a week or by working fewer hours in a day) only if medically necessary." (*Id.* at 45.)

To receive FMLA leave, an employee is required to submit appropriate paperwork to have the leave approved. (*Id.* at 46.) A health care provider is required to certify the need for leave and the duration for leave. (*Id.*) Costco's paperwork is accessible to employees in the administrative office and the employee intranet. (*Id.*) The Payroll Clerk is responsible for distributing Costco's FMLA forms to inquiring employees, collecting completed forms, calculating employees' work hours, and submitting the forms to headquarters for review and approval. (ECF No. 32-2 ¶ 24 and ECF No. 35-2 ¶ 24.) Bowie was trained to direct employees inquiring about FMLA leave to the payroll department. (ECF No. 35-2 ¶¶ 25-26.) Bowie applied for FMLA leave three times while working at the Brick Warehouse when his children were born. (ECF No. 32-2 ¶ 27 and ECF No. 35-2 ¶ 27.)

Section 11.7 of the Employment Agreement sets forth Costco's Standard of Ethics— Managers/Supervisors. (Ex. 10 to ECF No. 32-4 at 77.) When accepting a management position, an employee "must be committed to and demonstrate a role of honesty and forthrightness. Any

time there is the slightest doubt about an activity that could be questioned regarding honesty, integrity or intent, you must discuss it without your Manager or Regional Vice President to remove any doubt." (*Id.*) "Managers must never engage in any activity which could raise a question concerning their integrity." (*Id.*) Bowie was aware of and understood this section of the Employment Agreement. (ECF No. 32-2 ¶ 31 and ECF No. 35 ¶ 31.)

The Employment Agreement also set forth causes for termination in Section 11.3. (Ex. 10 to ECF No. 32-3 at 70-73.) In relevant part, causes for termination include: (1) violating company policies prohibiting harassment or discrimination; (2) violating the manager's standard of ethics; (3) dishonest including, theft of any kind; (4) unauthorized entry or exit from the Costco premises; and (5) "[e]xtending or receiving unauthorized discounts, refunds, or credits, including but not limited to . . . [r]inging up one's own sales or a family member's sales." (*Id.*) Prior to termination, however,

> the employment of an individual who has been employed two or more years, the circumstances must be reviewed with a Senior Vice President or above. Prior to terminating the employment of an individual who has been employees five or more years, the circumstances must be reviewed with an Executive Vice President or above.

(*Id.* at 28.)

### C. Bowie's Accommodation

In 2012, Bowie utilized the Open-Door policy to speak with the former General Manager of the Brick Warehouse, Leonard Wohlgemuth ("Wohlegemuth"), to request an accommodation to care for his disabled son. (ECF No. 32-2 ¶ 51 and ECF No. 35-2 ¶ 51.) Specifically, he requested to leave early or come in late to work to care for his son. (ECF No. 32-2 ¶ 52 and ECF No. 35-2 ¶ 52.) Wohlgemuth approved such accommodation at least twice. (*Id.*) The parties dispute whether Wohlgemuth's approval allowed Bowie to leave early or arrive late, without requesting prior

permission from senior management. (ECF No. 32-2 ¶¶ 52-54; ECF No. 35-2 ¶¶ 52-54; ECF No. 35-1 ¶ 16; and ECF No. 36 ¶ 16.) They further dispute whether Bowie was required to file for formal FMLA leave following their conversation. (ECF No. 32-2 ¶ 55; ECF No. 35-2 ¶ 55; ECF No. 35-1 ¶ 17; and ECF No. 36 ¶ 17.)

In August 2013, Dezendorf became the new General Manager of the Brick Warehouse. (ECF No. 32-2 ¶ 56 and ECF No. 35-2 ¶ 56.) Bowie informed Dezendorf of his accommodation, that he would need to either come in late or leave early to care for his disabled son. (ECF No. 32-2 ¶ 59 and ECF No. 35-2 ¶ 59.) Dezendorf agreed with the previous arrangement. (ECF No. 32-2 ¶ 60 and ECF No. 35-2 ¶ 60.) However, Dezendorf recalls asking Bowie to notify him when he was coming in late or leaving early, which Bowie argues was never a part of the accommodation. (*Id.*) Again, after advising Dezendorf of his accommodation, he did not file for formal FMLA leave because he was allegedly told it was unnecessary. (ECF No. 32-2 ¶ 61 and ECF No. 35-2 ¶ 61.) Bowie utilized his informal accommodation with no issue until Dezendorf went on vacation. (ECF No. 32-2 ¶ 62 and ECF No. 35-2 ¶ 62.)

### D. Bowie Violates Costco Employee Agreement

From September 25, 2014 to October 3, 2014, Dezendorf took a vacation. When he returned from vacation, an unidentified Costco employee notified him that Bowie had been leaving early or arriving late while he was away. (ECF No. 32-2 ¶ 75 and ECF No. 35-2 ¶ 75.) As a result of the complaint, Dezendorf initiated an investigation on October 7, 2014, "aimed at discovering when Bowie was getting to and leaving work" and to investigate issues brought by another employee Jessica Vaughn regarding Bowie's taking of a teakettle and oatmeal without prior purchase. (ECF No. 35-1 ¶¶ 24-25; *see* ECF No. 32-2 ¶ 75; ECF No. 35-2 ¶ 75.) The investigation revealed Bowie violated Costco's Employee Agreement.

### 1. Teakettle and Oatmeal Pack

On September 15, 2014, Bowie removed a teakettle and an oatmeal pack from the Brick Warehouse sales floor without first paying for such items. (ECF No. 32-2 ¶ 64 and ECF No. 35-2 ¶ 64.) At oral argument, Bowie admits both actions occurred, however, he claims it was appropriate to take the oatmeal pack because his girlfriend had already purchased another oatmeal pack at the Manahawkin Warehouse that she forgot to take. Therefore, he was replacing the one she forgot. (ECF No. 32-2 ¶ 64 and ECF No. 35-2 ¶ 64.)

With respect to the teakettle, Bowie alleges "he removed the teakettle from the sale floor for general use in the office and further explained that he had asked the Administration Manager, Ronn Neil, to purchase the teakettle on the warehouse 'supply card,' and that he would verify the purchase was completed." (ECF No. 32-2 ¶ 66 and ECF No. 35-2 ¶ 66.) The "supply card" is a credit card that Costco employees use to purchase merchandise that is intended for common use within the warehouse. (ECF No. 32-2 ¶ 67 and ECF No. 35-2 ¶ 67.) However, items for use in the warehouse must be purchased before use at a register with the supply card and with the prior approval of a senior manager, such as a general or assistant general manager, which did not occur in this circumstance. (ECF No. 32-2 ¶ 68 and ECF No. 35-2 ¶ 68.) Instead, Bowie stored the teakettle between his desk and a co-worker's desk for use by all employees prior to purchasing it on the supply card. (ECF No. 35-1 ¶ 36; ECF No. 32-2 ¶ 93; and ECF No. 35-2 ¶ 93.) "While he did not place the teakettle on the supply car personally, he gave the bar code to Ronn Neil, the administration manager, and instructed him to do so." (ECF No. 35-1 ¶ 37 and ECF No. 32-2 ¶ 93.) At oral argument, the parties conceded Bowie eventually placed the teakettle on the supply card after several reminders and three weeks after removing it from the sales floor.

### 2. Exit Through an Unauthorized Exit

The investigation, during the review of video surveillance footage from the time Dezendorf was on vacation, revealed Bowie had exited the Brick Warehouse through the tire shop garage doors, an unauthorized exit, with vase flowers he had purchased. (ECF No. 32-2 ¶ 76 and ECF No. 35-2 ¶ 76.) Costco members and employees are required to exit through the appropriate authorized exit to have their receipts checked. (ECF No. 32-2 ¶ 77 and ECF No. 35-2 ¶ 77.) Bowie became aware that was an unauthorized exit because, on July 4, 2014, Dezendorf explained to him that exiting the Brick Warehouse through the tire shop was inappropriate. (ECF No. 32-2 ¶ 80 and ECF No. 35-2 ¶ 80.)

### 3. Unauthorized Refund to Family Member

Review of the video surveillance also exposed that Bowie refunded an eight-year-old television belonging to his brother. (ECF No. 32-2 ¶ 81 and ECF No. 35-2 ¶ 81.) On July 2, 2006, Bowie's wife purchased a 55-inch television, which was later returned by Bowie's brother on August 1, 2006 for a 60-inch television. (ECF No. 32-2 ¶ 82 and ECF No. 35-2 ¶ 82.) In September 2014, the television broke and Bowie's brother sought a refund under the Costco "Satisfaction Guaranteed" policy. (ECF No. 32-2 ¶ 83 and ECF No. 35-2 ¶ 83.) Therefore, Bowie's brother contacted Bowie, who "verified that the 'Satisfaction Guarantee' policy applied to the television because it was purchased before the new 90-Day Policy was implemented." (*Id.*) As such, on September 20, 2014, Bowie arranged to return the television. (ECF No. 32-2 ¶ 84 and ECF No. 35-2 ¶ 84.) Bowie asked Daryl Geise, a Front-End supervisor to refund the television. (ECF No. 32-2 ¶ 89 and ECF No. 35-2 ¶ 89.) Geise then helped Bowie's brother select and purchase a new television and extended warranty. (ECF No. 32-2 ¶ 91 and ECF No. 35-2 ¶ 91.)

Bowie contends he did nothing wrong in approving the refund because the computer

verified that the television could be refunded. (ECF No. 35-2 ¶ 90.) Bowie "believed that he did nothing wrong by issuing a $2,539.99 refund to a family member without first consulting with Dezendorf because the refund fell under the 'Satisfaction Guaranteed' return policy." (ECF No. 32-2 ¶ 97 and ECF No. 35-2 ¶ 97.) However, he understood he could not make the return, as he was a family member and therefore, had a supervisor make the return. (ECF No. 32-2 ¶ 98 and ECF No. 35-2 ¶ 98.) Nevertheless, Geise, as a supervisor, did not have the independent authority to approve the refund, and it was ultimately authorized by Bowie. (ECF No. 32-2 ¶ 90 and ECF No. 35-2 ¶ 90.)

### 4. Bowies Early Departures and/or Late Arrivals

The investigation confirmed the anonymous employee report that Bowie was leaving the Brick Warehouse early and/or coming in late without informing senior management while Dezendorf was away.[2] (ECF No. 32-2 ¶ 100 and ECF No. 35-2 ¶ 100.) On October 9, 2014, after reviewing the video footage, Dezendorf asked to speak with Bowie regarding his early departures and late arrivals. (*Id.*) Bowie alleges Dezendorf accused him of "stealing company time." (ECF No. 35-1 ¶ 30.)[3] Bowie responded by explaining that he needed to care for his son and Dezendorf dropped the subject and moved on to another topic. (ECF No. 32-2 ¶¶ 101-106; ECF No. 35-2 ¶¶ 101-106; and ECF No. 35-1 ¶ 31.)

---

[2] Bowie maintains his prior agreement with Wohlgemuth, regarding his accommodation, did not require him to inform senior management. (ECF No. 35-2 ¶ 101.)

[3] Defendants deny ever stating that and instead contend Dezendorf merely "informed Bowie that he received reports from other employees that Bowie left the warehouse early and/or came in late without informing management, and requested that [Bowie] explain." (ECF No. 36-1 ¶ 30.)

### E. Bowie's Termination

On October 9, 2014, Dezendorf sent an investigation memorandum outlining Bowie's policy violations to Pulver for review. (ECF No. 32-2 ¶ 109 and ECF No. 35-2 ¶ 109.) After reviewing the investigation memorandum, Pulver asked Dezendorf to obtain a more detailed statement from Bowie concerning his policy violations. (ECF No. 32-2 ¶ 110 and ECF No. 35-2 ¶ 110.) As such, on October 10, 2014, Dezendorf provided Bowie with four handwritten questions to answer, which Bowie did. (ECF No. 32-2 ¶ 111 and ECF No. 35-2 ¶ 111.) The questions provided did not address Bowie's late arrivals and early departures, as those were not included in Dezendorf's investigation memorandum. (ECF No. 32-2 ¶¶ 111-12 and ECF No. 35-2 ¶¶ 111-12.) Ultimately, Pulver reviewed Bowie's statement, an updated investigation memorandum written by Dezendorf, investigation notes related to the anonymous complaint against Bowie, and investigation files maintained by Costco concerning Bowie's behavior at the Manahawkin Warehouse. (ECF No. 32-2 ¶ 114 and ECF No. 35-2 ¶ 114.) Pulver made the decision to suspend Bowie pending further review of the circumstances. (ECF No. 32-2 ¶ 116 and ECF No. 35-2 ¶ 116.)

On October 12, 2014, Dezendorf issued Bowie an Employee Counseling Notice ("ECN") "for violating Costco's Standard of Ethics, serious misconduct, dishonest including grazing, extending or receiving unauthorized discounts, refunds, or credits, and unauthorized exit from the warehouse." (ECF No. 32-2 ¶ 117 and ECF No. 35-2 ¶ 117.) Ultimately, Pulver recommended that Costco terminate Bowie's employment and presented his recommendation to Long, who agreed to terminate him based on his review of the circumstances. (ECF No. 32-2 ¶¶ 121, 123 and ECF No. 35-2 ¶¶ 121, 123.) In turn, Long presented the termination recommendation to Portera, who made the ultimate decision to terminate Bowie pursuant to Section 4.8 of the Employee Agreement.

(ECF No. 32-2 ¶¶ 124-25 and ECF No. 35-2 ¶¶ 124-25.) When Pulver made the recommendation to terminate Bowie, he had no knowledge that Bowie had a son who suffered from autism, was unaware that Bowie had an accommodation at work to provide care for his son, and did not know Bowie was leaving early or coming in late without advising senior management. (ECF No. 32-2 ¶ 127.)

On October 21, 2014, Bowie was issued a Termination/Resignation Form, specifying his "employment was terminated for violating the Costco's Manager's Standard of Ethics (Section 11.3(5)); serious misconduct of any kind as defined by the Company (Section 11.3(10)); dishonesty (Section 11.3(21)); and unauthorized entry or exit from Company premises at points other than those designated for employees (Section 11.3(23))." (ECF No. 32-2 ¶ 130 and ECF No. 35-2 ¶ 130.) However, rumors in the Brick Warehouse indicated Bowie was terminated for "leaving the building when he was supposed to have been at work." (ECF No. 35-13 at 10:15-25.)

### F. Bowie Files This Lawsuit

On September 22, 2016, Plaintiff filed a seven-count complaint, alleging: (1) a violation of the Americans with Disabilities Act of 1990 ("ADA") (Count One); (2) a violation of the ADA based on associational discrimination (Count Two); (3) a violation of the New Jersey Law Against Discrimination ("NJLAD") (Count Three); (4) that Dezendorf aided and abetted unlawful discrimination under the NJLAD (Count Four); (5) claims for both intentional and negligent infliction of emotional distress (Count Five); (6) a claim for intentional interference with Plaintiff's employment relationship (Count Six); and (7) violations of the Family Medical Leave Act ("FMLA") and the New Jersey Family Leave Act ("NJFLA") (Count Seven). (ECF No. 1.) On December 20, 2016, Defendants filed a Motion to Dismiss Counts Three through Seven of Bowie's

Complaint (ECF No. 7)[4] and filed a partial answer to the Complaint (ECF No. 9). On April 11, 2017, the Court heard oral argument. (ECF No. 16.) On July 26, 2017, the Court granted in part and denied in part Defendants' Motion to Dismiss. (ECF Nos. 19-20.) Specifically,

> Defendants' Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART** as follows: (1) Defendants' Motion to Dismiss Counts One and Two as to Dezendorf is **GRANTED WITH PREJUDICE**; (2) Defendants' Motion to Dismiss Count Three is **GRANTED WITHOUT PREJUDICE** as to Dezendorf and **DENIED** as to Costco; (3) Defendants' Motion to Dismiss Count Four is **GRANTED WITHOUT PREJUDICE**; (4) Defendants' Motion to Dismiss Count Five is **GRANTED WITHOUT PREJUDICE** as to Plaintiff's claim for intentional infliction of emotional distress and **WITH PREJUDICE** as to Plaintiff's claim for negligent infliction of emotional distress; (5) Defendant's Motion to Dismiss Count Six is **GRANTED WITHOUT PREJUDICE**; (6) Defendants' Motion to Dismiss Count Seven is **GRANTED WITH PREJUDICE** as to the NJFLA claim against Dezendorf, **WITHOUT PREJUDICE** as to the FMLA claim against Dezendorf, and **WITHOUT PREJUDICE** as to the claims against the remaining Defendants.

(ECF No. 19 at 21-22.)[5]

On August 24, 2016, Bowie filed an Amended Complaint, alleging: (1) unlawful termination based on associational disability pursuant to the ADA and NJLAD; (2) retaliation under the ADA; (3) unlawful interference and/or retaliation under the Family Medical Leave Act

---

[4] Although Defendants' brief stated they were seeking partial dismissal of Bowie's Complaint, specifically as to Counts Three through Seven (ECF No. 7-1 at 1), they later argued "[t]here is no alternative basis to attach individual liability to Dezendorf under Plaintiff's remaining claims under the ADA, FMA, or NJFLA" (*Id.* at 20). All ADA claims against Defendants were asserted in Counts One and Two, not Three through Seven. Therefore, Defendants also sought to partially dismiss Counts One and Two as to Dezendorf.

[5] At the Motion to Dismiss stage, the Court found an associational disability discrimination claim is cognizable under the NJLAD and the parties conceded to this at the summary judgment oral argument. Since the Court's July 26, 2017 Opinion, other courts have also found an association claim to be valid under the NJLAD. *See Calabotta v. Phibro Animal Health Corp.*, No. A-1576-17T3, 2019 WL 2619890, at *8 (N.J. Super. Ct. App. Div. June 27, 2019).

and the New Jersey Leave Act; and (4) aiding and abetting liability against Dezendorf under NJLAD. (*See* ECF No. 22.) Defendants filed an Answer on September 14, 2017. ECF No. 23.) On December 14, 2018, Defendants filed a Motion for Summary Judgment. (ECF No. 32.) Bowie opposes the Motion. (ECF No. 35.)

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3rd Cir. 1991) (citing *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.), *cert. denied*, 474 U.S. 1010 (1985)); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party bears the burden of persuasion at trial, summary judgment is appropriate only if the evidence is not susceptible to different interpretations or inferences by the trier of fact. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex*, 477 U.S. at 330 (Brennan, J., dissenting). Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders

all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III. DECISION

### A. Unlawful Termination Based on Associational Disability Under the ADA and NJLAD

Defendants argue Bowie's associational disability claims pursuant to the ADA and NJLAD fail as a matter of law because he has not established his employment was terminated because he was associated with his disabled son. (ECF no. 32-1 at 4.) Bowie contends there are genuine issues of material fact as to his associational disability claim. (ECF No. 35 at 4-11.) Specifically, he argues he performed his job to Costco's legitimate expectations until the time of discharge and that he was terminated for utilizing his accommodation. (*Id.* at 7-10.)

Under 42 U.S.C. § 12112(b)(4) of the ADA, an employer is prohibited from discriminating against an employee as a result of "the known disability of an individual with whom [the employee] is known to have a relationship or association." Unlike the ADA, the NJLAD does not explicitly recognize a claim for associational disability discrimination. N.J.S.A. § 10:5-4.1. The NJLAD, however, has "been construed in accordance with the ADA." *Tish v. Magee-Women's Hosp. of Univ. of Pittsburgh Med. Ctr.*, No. 06-820, 2008 WL 4790733, at *15 n.15 (W.D. Pa. Oct. 27, 2008) (citing *Armstrong v. Burdette Tornlin Mem'l Hosp.*, 438 F.3d 240, 246 n.12 (3d Cir. 2006) ("The requirements for failure to accommodate claims under [NJLAD] have been interpreted in accordance with the [ADA].")); *Maher v. Abbott Labs.*, No. 11-5161, 2013 WL 6326488, at *9 (D.N.J. Dec. 4, 2013) (stating "a plaintiff may prove discrimination under the ADA and NJLAD through the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [] (1973)"); *Moussavian v. China Ocean Shipping Co. Ams. Inc.*, No. 06-4818, 2009 WL 3074636, at *5 (D.N.J. Sept. 22, 2009) (applying the same standard for a

failure to accommodate claim under the ADA and NJLAD).

Moreover, courts within the Third Circuit, including this Court, have concluded that an associational disability claim is similarly cognizable pursuant to the NJLAD. *See, e.g.*, *Pascucci v. Twp. of Irvington, Irvington Police Dep't*, 46 F. App'x 114, 117 (3d Cir. 2002) (inferring an associational cause of action exists by affirming the district court's dismissal of that claim where "there was no evidence that [plaintiff, who was not a member of a protected class], was subject to a hostile work environment because of his friendship with [members of a protected class]); *Bowie v. Costco Wholesale Corp.*, No. 16-5808, 2017 WL 3168985, at *4 (D.N.J. July 26, 2017); *Downs v. U.S. Pipe & Foundry Co.*, 441 F. Supp. 2d 661, 665 (D.N.J. 2006) (finding "the New Jersey Supreme court would hold that NJLAD bars employment discrimination based upon a person's association with a person with a disability"); *Valenti v. Maher Terminals LLC*, No. 14-7897, 2015 WL 3965645, at *5 (D.N.J. June 30, 2015) (finding the Third Circuit and this Court recognize "an associational right under the NJLAD"); *Pailleret v. Jersey Constr. Inc.*, No. 09–1325, 2011 WL 1485402, at *7 (D.N.J. Apr. 19, 2011) ("The NJLAD affords protection to both disabled persons as well as individuals associated with disabled persons."). In fact, the parties agree both the ADA and NJLAD recognize a claim for associational disability discrimination. (ECF No. 32-1 at 5 and ECF No. 35 at 4-5.)

Employment discrimination claims brought pursuant to the ADA and NJLAD apply the burden-shifting framework set forth in *McDonnell Douglas*. *See Huggard v. Crown Bank*, No. 11-6194, 2012 WL 529548, at *3 (D.N.J. Feb. 17, 2012); *Olson v. Gen. Elec. Astrospace*, 966 F. Supp. 312, 315 (D.N.J. 1997). Pursuant to this framework, "a plaintiff must first make out a prima facie case of discrimination. Upon establishing a prima facie case, the burden of production shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's

termination." *Huggard*, 2012 WL 529548, at *3.

To establish a prima facie case of associational discrimination under the ADA and the NJLAD, a plaintiff must show that:

> (1) he was in a protected class (i.e., an individual known to have an association or relationship with an individual who has a known disability); (2) he was discharged; (3) at the time of his discharge, he was performing his job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

*Id.* (citing *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011)).

Although an employer is prohibited from discriminating against an employee as a result of his association with a disabled relative, "the association provision does not obligate employers to accommodate the schedule of an employee with a disabled relative." *Id.* (quoting *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 510 (3d Cir. 2009)). While refusing to make reasonable accommodations might constitute illegal discrimination against a disabled employee, 42 U.S.C. § 12112(b)(5), "the plain language of the ADA indicates that the accommodation requirement does not extend to relatives of the disabled." *Erdman*, 582 F.3d at 510 (citing 29 C.F.R. § 1630.8, Appendix ("It should be noted [] that an employer need not provide the applicant or employee without a disability with a reasonable accommodation because that duty only applies to qualified applicants or employees with disabilities."); *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1084 (10th Cir. 1997) ("[T]he plain language of [§§ 12112(b)(5)(A) and (B)]—the only two provisions requiring 'reasonable accommodation' in Title I of the ADA—suggests that only job applicants or employees, but not their relatives or associates, need be reasonably accommodated."); *Larimer v. IBM*, 370 F.3d 698, 700 (7th Cir. 2004) ("[T]he right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate

of a disabled person.")).

"Under the association provision, there is a material distinction between firing an employee because of a relative's disability and firing an employee because of the need to take time off to care for the relative." *Id.* An unlawful termination must be "motivated by the known disability of an individual with whom an employee associates, as opposed to actions occasioned by the association." *Id.* (citation omitted). To be unlawful the termination must be motivated by the disability rather than a plaintiff's stated intention to miss work; "in other words, that [the plaintiff] would not have been fired if [he] had requested time off for a different reason." *Id.*

Alternatively, a defendant may also be liable under the ADA or NJLAD pursuant to a "cat's paw" theory of unlawful discrimination. *Mason v. Se. Pa. Trans. Auth.*, 134 F. Supp. 3d 868, 873 (E.D. Pa. 2015). "Under this theory, an employer may be liable for employment discrimination if the source of illegal animus was not the final employment decision-maker but rather another employee whose animus proximately caused the adverse employment action at issue in the case." *Id.* (citing *McKenna v. City of Phila.*, 649 F.3d 171, 178 (3d Cir. 2011)). To survive a summary judgment motion on a subordinate bias theory,

> the plaintiff must first establish a genuine issue of material fact concerning the bias of the subordinate. It must then establish genuine issues of material fact as to whether the proffered reason for the employment action is pretextual, which in a subordinate bias claim requires the plaintiff to demonstrate a causal relationship between the subordinate's actions and the employment decision.

*Id.* (citation omitted). Essentially,

> in a "cat's paw" case, if the evidence is viewed under a theory of direct discrimination, the plaintiff does not so much argue personal bias on the part of the ultimate decision-maker, but rather that one or more persons involved deliberately tainted the decision-making process to bring about a discriminatory result. If the evidence is analyzed under the *McDonnell Douglass* inferential standard, the argument is not quite that the decision makers invented a pretext for

termination, but rather that they acted on the basis of a false premise because the information on which they relied was tainted by racial animus.

*Id.* at 874.

Defendants contend Bowie has failed to establish an association claim under the ADA and NJLAD because he failed to satisfy the third and fourth prong necessary to make out a prima facie claim. (ECF No. 32-1 at 7-21.)[6] The Court agrees.

Bowie has failed to establish he was performing his job at a level that met his employer's legitimate expectations. In less than a week, while Dezendorf was away, Bowie admittedly committed four different Employee Agreement policy violations. First, on September 15, 2014, he removed a teakettle from the sales floor before the Brick Warehouse opened to the public for communal use in the office. (ECF No. 32-2 ¶ 66 and ECF No. 35-2 ¶ 66.) He did so without first placing the item on the warehouse supply card, in violation of known protocol. (ECF No. 32-2 ¶¶ 66-70 and ECF No. 35-2 ¶ 66-70.) Under Costco's Employee Agreement, dishonesty including grazing is a cause for termination. (Ex. 10 to ECF No. 32-4 at 72.)

Second, on September 15, 2014, Bowie also removed an oatmeal package from the sales floor without paying for it. Bowie's argument that he took the package to substitute the paid-for oatmeal pack his girlfriend left at the Manahawkin Warehouse is unpersuasive. Under Costco's Employee Agreement, this too is a cause for termination. (Ex. 10 to ECF No. 32-4 at 72.)

Third, on September 17, 2014, despite being told not to do so, Bowie exited the Brick Warehouse through the tire shop with purchased merchandise. (ECF No. 32-2 ¶¶ 76, 80 and ECF No. 35-2 ¶¶ 76, 80.) Costco members and employees are required to exit through specific authorized exit to have their receipts checked. (ECF No. 32-2 ¶ 77 and ECF No. 35-2 ¶ 77.) Under

---

[6] The first two prongs are not in dispute and will not be addressed by this Court.

Costco's Employment Agreement, unauthorized entry or exit from the premises at points other than those designated for employees is a cause for termination. (Ex. 10 to ECF No. 32-4 at 73.)

Fourth, on September 20, 2015, Bowie ultimately approved a refund of his brother's eight-year-old television. (ECF No. 32-2 ¶¶ 81-84 and ECF No. 35-2 ¶¶ 81-84.) While he asked Geise to refund the television, as a supervisor, she did not have the independent authority to approve the refund, and he ultimately approved it himself. (ECF No. 32-2 ¶¶ 90, 98 and ECF No. 35-2 ¶¶ 90, 98.) Under Costco's Employment Agreement, extending or receiving unauthorized discounts, refunds, or credits, including but not limited to, ringing up one's own sales or a family member's sales is a cause for termination. (Ex. 10 to ECF No. 32-4 at 72.)

Any of the above violations, in isolation or combination, prevent Bowie from establishing that he was performing his job at a level that met Costco's legitimate expectations. *Maietta v. United Parcel Serv., Inc.*, 749 F. Supp. 1344, 1371 (D.N.J. 1990), *aff'd*, 932 F.2d 960 (3d Cir. 1991) (finding the plaintiff failed to establish a prima facie case for discrimination because he had not established he was qualified for his job in light of his misconduct, falsifying reports). In fact, at oral argument, Bowie conceded that he did not comply with the letter of Costco's policies but instead argued he complied with them in spirit. Bowie's attempt to justify his actions is immaterial, as he admits he violated the Employee Agreement. Accordingly, Bowie has failed to establish a prima facie case.

Nevertheless, the Court finds Bowie has also failed to satisfy the fourth prong because he has failed to establish that his termination occurred under circumstances that raise a reasonable inference of unlawful discrimination. The record is devoid of any evidence indicating that Costco's decision to terminate Bowie was motivated by his son's disability. Bowie's only purported evidence of discrimination is his belief that his termination occurred because Dezendorf was

displeased with him leaving early and/or arrived late to work to care for his disabled son while he was on vacation. However, Dezendorf has been aware of Bowie's son's disability for at least a year prior to Bowie's termination and never had an issue accommodating Bowie's requests to come in late or leave early. (ECF No. 32-2 ¶¶ 56, 59-60 and ECF No. 35-2 ¶¶ 56, 59-60.) In fact, Bowie admits he utilized his informal accommodation with no issue until Dezendorf went on vacation. (ECF No. 32-2 ¶ 62 and ECF No. 35-2 ¶ 62.) Bowie has also failed to demonstrate that Dezendorf or any Costco employee made a single derogatory comment concerning his disabled son. In addition, when Pulver made the recommendation to terminate Bowie, he had no knowledge that Bowie had a son who suffered from autism, was unaware that Bowie had an accommodation at work to provide care for his son, and did not know Bowie was leaving early or coming in late without advising senior management. (ECF No. 32-2 ¶ 127.)

More importantly, because Costco was not required to accommodate Bowie, Bowie must establish the termination was "motivated by" his son's disability, "as opposed to actions occasioned by the association." *Id.* (citation omitted). *Erdman*, 582 F.3d at 510. Even assuming Costco's termination had something to do with Bowie's late arrivals and early departures, Bowie has failed to demonstrate his termination was motivated by his son's disability rather than him leaving work early or coming in late; in other words, he has failed to demonstrate he would not have been fired if he had left early or came in late for a different reason other than caring for his son. *See id.; Den Hartog*, 129 F.3d at 1085 (recognizing that dismissal for absence or tardiness is not actionable "even if the reason for the absence or tardiness is to care for [a disabled relative]"). As such, Bowie has also failed to establish the fourth prong. Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to Bowie's unlawful discrimination claim pursuant to the ADA and NJLAD.

## B. Retaliation Pursuant to the ADA

Defendants argue Bowie cannot establish a prima facie claim of retaliation under the ADA. (ECF No. 32-1 at 23.) Bowie argues he has established a prima facie claim for retaliation under the ADA because he engaged in a protected activity "by utilizing his reasonable accommodation." (ECF No. 35 at 20.)

Pursuant to the ADA's retaliation provision: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). To establish a prima facie case of retaliation pursuant to the ADA, a plaintiff must show: "(1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001).

An employee's request for an accommodation for his disability is a protected activity for the purposes of § 12203(a). *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir.2003); *Merit v. Se. Pa. Transit Auth.*, 315 F. Supp. 2d 689, 705 (E.D. Pa. 2004), *aff'd sub nom. Merit v. Se. Pa. Transit Auth.*, 122 F. App'x 598 (3d Cir. 2005). Although a request for an accommodation for one's own disability is a protected activity, "the plain language of the ADA indicates that the accommodation requirement does not extend to relatives of the disabled." *Erdman*, 582 F.3d at 510 (citing 29 C.F.R. § 1630.8, Appendix ("It should be noted [] that an employer need not provide the applicant or employee without a disability with a reasonable accommodation because that duty only applies to qualified applicants or employees with

disabilities."); 42 U.S.C. § 12112(b)(4).

Here, Bowie argues he was retaliated against for "utilizing his reasonable accommodation." (ECF No. 35 at 20.) Because the ADA does not require Costco to accommodate Bowie to care for his son, Bowie has no claim under retaliation since he did not engage in a protected activity in requesting such accommodation. *Erdman*, 582 F.3d at 510; *Kennedy v. Chubb Grp. of Ins. Co.*, 60 F. Supp. 2d 384, 396 (D.N.J. 1999) (finding "§ 12112(b)(4) does not mandate that an employer provide an employee without a disability with a reasonable accommodation to enable the employee to care for a disabled individual with whom the employees is associated" and "that the ADA does not require [an employer] to allow plaintiff to continue to work part time because her request in that regard is necessitated by her need to care for her disabled son"); 42 U.S.C. § 12203(a). Accordingly, Defendants Motion for Summary Judgment as to Bowie's retaliation claim is **GRANTED**.

### C.  Interference and Retaliation Pursuant to the FMLA and NJFLA

The FMLA provides that "an eligible employee shall be entitled to a total of 12 work weeks of leave during any 12-month period . . . [i]n order to care for the spouse, or a son, daughter, or parent of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). A plaintiff is an "eligible employee" for FMLA purposes if he was employed "for at least 12 months by the employer with respect to whom leave is requested" and "for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). It further provides that an

> employee who takes leave under section 2612 . . . shall be entitled, on return from such leave . . . to be restored by the employer to the position of employment held by the employee when the leave commenced; or . . . to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a)(1). It shall be unlawful for an employer to: (1) "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA and (2) "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615.

Under the NJFLA, an employee is, "entitled to a family leave of 12 weeks in any 24-month period upon advance notice to the employer . . . [i]n the case of a family member who has a serious health condition." N.J.S.A. § 34:11B-4. An "employee" "means a person who is employed for at least 12 months by an employer . . . for not less than 1,000 base hours during the immediately preceding 12-month period." N.J.S.A. § 34:11B-3(e). Similar to the FMLA, the NJFLA provides:

> An employee who exercises the right to family leave . . . shall . . . be entitled to be restored by the employer to the position held by the employee when the leave commenced or to an equivalent position of like seniority, status, employment benefits, pay, and other terms and conditions of employment.

N.J.S.A. § 34:11B-7. It shall also be unlawful for any employer to "interfere with, restrain or deny the exercise of, or the attempt to exercise, the right provided under [the NJFLA]." N.J.S.A. § 34:11B-9(a).

"Due to the similarity of the statutes, courts apply the same standards and framework to claims under the FMLA and the NJFLA." *Wolpert v. Abbott Labs.*, 817 F. Supp. 2d 424, 437 (D.N.J. 2011) (citing *Santosuosso v. NovaCare Rehab.*, 462 F. Supp. 2d 590, 596 (D.N.J. 2006)).

To prevail on an interference claim, a plaintiff must show: (1) he was entitled to take FMLA and NJFLA leave and (2) the employer denied his right to do so. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 312 (3d Cir. 2012); *Hall-Dingle v. Geodis Wilson USA, Inc.*, No. 15-1868, 2017 WL 899906, at *4 (D.N.J. Mar. 7, 2017) ("[A] plaintiff bringing an interference claim under the [NJFLA] must show that she was entitled to benefits and denied those benefits.").

"To establish a prima facie claim for retaliation under the FMLA and NJFLA, the plaintiff must demonstrate that: (1) [he] took a FMLA/NJFLA leave; (2) [he] suffered from an adverse employment decision; and (3) the adverse decision was casually related to [his] FMLA/NJFLA leave." *Valenti*, 2015 WL 3965645, at *3 (quoting *Truesdell v. Source One Personnel Inc.*, No. 07-1926, 2009 WL 1652269, at *4 (D.N.J. June 9, 2009) (citations omitted)). Once the plaintiff establishes a prima facie claim for retaliation under the FMLA and NJFLA, the claim must be analyzed under the burden-shifting framework articulated in *McDonnell Douglas. See Truesdell*, 2009 WL 1652269, at *4.

To invoke one's rights under the FMLA, one must provide adequate notice to their employer about their need to take leave. 29 U.S.C. § 2612(e)(2). An employee does not need to "expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.303(b). The employee only needs to "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." *Id.* (emphasis added). This is not a formalistic or rigorous standard. *See Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007) (stating a "liberal construction" should be given to FMLA's notice requirement). The FMLA provides that "where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee . . . to ascertain whether leave is potentially FMLA-qualifying." 29 C.F.R. § 825.303(a). Therefore, the test "is not whether the employee gave every necessary detail to determine if the FMLA applies, but how the information conveyed to the employer is reasonably interpreted." *Lichtenstein*, 691 F.3d at 303. "How the employee's notice is reasonably interpreted is generally a question of fact, not law." *Id.*

First, Defendants argue Bowie cannot invoke his rights under the FMLA or NJFLA

because he failed to put them on notice that he required FMLA/NJFLA leave. (ECF No. 32-1 at 29.) The Court finds there is a genuine issue of material fact as to whether Bowie put the Defendants on notice that he required leave. Bowie's deposition alleges that in 2012, he utilized the Open-Door policy to speak with Wohlgemuth to request an accommodation to care for his disabled son. (ECF No. 32-2 ¶ 51 and ECF No. 35-2 ¶ 51.) During their discussion, Bowie allegedly explained his son's disability, stated he may need accommodations, and asked whether he needed to fill out FMLA paperwork. (ECF No. 35-6 at 28:22-29:6.) Wohlgemuth explained that Bowie did not need to request formal FMLA leave "as long as the building had coverage." (*Id.* at 29:9-11.) As such, there is a genuine issue as to whether Bowie put Defendants on notice.

Next, Defendants contend Bowie's claim for interference should be dismissed on summary judgment as duplicative of his claim for retaliation, and because Bowie has failed to establish he was prejudiced by the alleged interference. (ECF No. 32-1 at 33 and ECF No. 36 at 12-13.) The Court finds Bowie's FMLA interference claim is duplicative of his retaliation claim. Indeed, Bowie's interference claim is identical to his retaliation claim, and premised on the same allegations. *Kumar v. Johnson & Johnson, Inc.*, No. 12-779, 2014 WL 5512549, at *11 (D.N.J. Oct. 31, 2014) (granting judgment in defendant's favor as to plaintiff's inference claim where her "only claim of 'interference' under the FMLA [was] the same as her claim for retaliation-'not being returned to the same job with the same opportunities for advancement"). In fact, Bowie's opposition brief fails to distinguish between claims and merely argues he "clearly establish a prima facie case of retaliatory termination, and interference under FMLA." (ECF No. 35 at 22.) Here, retaliation is clearly the better fit, since Bowie argues Defendants wrongfully terminated him when he returned from FMLA leave. *See Yamamoto v. Panasonic Corp. of N. Am.*, No. 12-2352, 2013 WL 3356214, at *11 (D.N.J. July 2, 2013); *Lovland v. Emplrs. Mut. Cos. Co.*, 674 F.3d 806, 811–

12 (8th Cir. 2012) (affirming the district court's conclusion that plaintiff "asserted only . . . retaliation claims because she alleged discrimination that occurred after she took FMLA leave, not denial of, or interference with, her leave"). Accordingly, Defendants' Motion for Summary Judgment as to Bowie's interference claim is **GRANTED**.

Lastly, Defendants argue Bowie cannot establish a retaliation claim because the decision to terminate him employment occurred years after his purported FMLA request. (ECF No. 32-1 at 34.) To establish a prima facie case of retaliation, Bowie must demonstrate he: (1) took FMLA leave; (2) suffered an adverse employment decision; and (3) the adverse decision was causally related to her leave. *Palen v. Alcan Packaging*, 511 F. Supp. 2d 445, 448 (D.N.J. 2007). The Court finds there is a material issue of fact as to whether Bowie took FMLA leave. In 2012, Bowie utilized the Open Door policy to speak with Wohlgemuth to request an accommodation to care for his disabled son. (ECF No. 32-2 ¶ 51 and ECF No. 35-2 ¶ 51.) During their discussion, Bowie allegedly explained his son's disability, stated he may need accommodations, and asked whether he needed to fill out FMLA paperwork. (ECF No. 35-6 at 28:22-29:6.) Wohlgemuth explained that Bowie did not need to request formal FMLA leave "as long as the building had coverage." (*Id.* at 29:9-11.) In August 2013, after Dezendorf became the new General Manager, Bowie informed Dezendorf of his accommodation, that he would need to either come in late or leave early to care for his disabled son. (ECF No. 32-2 ¶ 59 and ECF No. 35-2 ¶ 59.) Dezendorf agreed with the previous arrangement. (ECF No. 32-2 ¶ 60 and ECF No. 35-2 ¶ 60.) Bowie utilized his informal accommodation with no issue until Dezendorf returned from vacation. (ECF No. 32-2 ¶ 62 and ECF No. 35-2 ¶ 62.) As such, the Court finds Bowie has established a genuine issue of material fact as to whether he invoked his right to FMLA leave and as to whether he took FMLA leave.

The second element is not contested. Bowie was undoubtedly terminated. With respect to

the third element, Defendants argue the temporal proximity between Bowie's request purported request for FMLA leave and his termination are insufficient to create such an inference of causation. (ECF No. 32-1 at 36-37.) Bowie, however, maintains that his termination less than three weeks after Dezendorf's investigation into his early departures and later arrivals are unduly suggestive. (ECF No. 35 at 22-24.) The Court disagrees with Bowie.

"[E]stablishing a causal relationship between the decision to take FMLA leave and the adverse employment decision necessarily requires proof of retaliatory intent by the employer." *Incorvati v. Best Buy Co.*, No. 10-1939, 2013 WL 3283956, at *5 (D.N.J. June 27, 2013). "Retaliation need not be the sole reason motivating the adverse employment decision; rather, it will suffice for the plaintiff to show that the retaliatory animus was 'a determinative factor,' meaning in essence that 'the action would not have been taken but for [the] protected activity.'" *Id.* (quoting *Culler v. Shinseki*, 840 F.Supp.2d 838, 846 (D.N.J.2011)). Essentially, "the court's inquiry is whether the proffered evidence raises an inference that the plaintiff's request for FMLA leave was causally related to his termination." *Id.* There are two principal methods of raising such an inference. *Abramson*, 260 F.3d at 288. First, is temporal proximity, where "unusually suggestive" timing exists between the leave request and the adverse employment action, such circumstance may be enough to establish causation. *Lamarca v. Verizon Pa., Inc.*, No. 09–203, 2010 WL 2044627 at *9 (W.D. Pa. May 20, 2010) (citing citation omitted). Second, causation can be established based on a period of "intervening antagonism." *LeBoon*, 503 F.3d at 232. In addition to these two primary methods, inconsistencies or discrepancies in the employer's reasons for terminating the employee may be enough to support an inference of causation. *Id.*

Here, Bowie offers scant evidence of a casual connection between his taking leave and his termination. Although Dezendorf returned from vacation on October 3, investigated Bowie's

actions (early departures, late arrivals, and the unauthorized removal of a teakettle and oatmeal package) on October 7, and Bowie was terminated on October 21, 2014, Bowie acknowledges that on October 9, 2014, after Dezendorf reviewed the video footage and asked to speak with him regarding his early departures and late arrivals and after Bowie explained that he had left early and arrived late to care for his son, Dezendorf dropped the subject and moved on to another topic. (ECF No. 32-2 ¶¶ 101-106; ECF No. 35-2 ¶¶ 101-106; and ECF No. 35-1 ¶ 31.) Moreover, it is undisputed that neither of Dezendorf's investigation memorandums to senior management mentioned Bowie's early departures or late arrivals. (ECF No. 32-2 ¶¶ 111-12 and ECF No. 35-2 ¶¶ 111-12.) Instead, the temporal proximity between his termination and the investigation, which determined Bowie violated four Employee Agreement policies, remarkably suggests he was terminated for those violations.

Significantly, Dezendorf has been aware of Bowie's son's disability and FMLA leave request for at least a year prior to Bowie's termination and never had an issue accommodating Bowie's requests to come in late or leave early. (ECF No. 32-2 ¶¶ 56, 59-60 and EF No. 35-2 ¶¶ 56, 59-60.) In fact, Bowie admits he utilized his informal accommodation with no issue. (ECF No. 32-2 ¶ 62 and ECF No. 35-2 ¶ 62.) As such, the Court finds there exists no "unusually suggestive" timing between the FMLA leave and termination, considering the proximity between Bowie's original request for leave and termination.

Bowie has also failed to establish a pattern of ongoing antagonism. The record is devoid of any antagonism or remarks made about him taking leave to care for his son. In addition, Bowie points to no inconsistencies or discrepancies in Defendants' reasons for terminating him. Even viewing the evidence in the light most favorable to Bowie, the Court finds he has failed to establish a causal connection necessary to sustain his FMLA retaliation claim. As such, he has failed to state

a prima facie case for FMLA retaliation, and the Court need not analyze the claim under the burden-shifting framework articulated in *McDonnell Douglas*. Accordingly, Defendants Motion for Summary Judgment as to his FMLA retaliation claim is also **GRANTED**.

### D. Aiding and Abetting Claim Against Dezendorf

Bowie also seeks to impose individual liability on Dezendorf pursuant to the NJLAD. (ECF No. 35 at 24-26.) The NJLAD provides it is unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden [the act], or to attempt to do so." N.J. Stat. Ann. § 10:5-12(e). Such conduct may result in personal liability. Tarr v. Ciasulli, 853 A.2d 921, 928 (N.J. 2004); *see Fasano v. Fed. Reserve Bank of N.Y.*, 457 F.3d 274, 289 (3d Cir. 2006) ("The [NJ]LAD permits the imposition of individual liability on an employee who has aided or abetted barred acts.").

To sustain a claim for aiding and abetting, a plaintiff must establish that:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.

*Tarr*, 181 N.J. at 84 (quoting *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 129 (3d Cir. 1999)); *see O'Toole v. Tofutti Brands, Inc.*, 203 F. Supp. 3d 458, 467 (D.N.J. 2016). However, "for a defendant to be individually liable for aiding and abetting, the employer must also be liable under the [NJ]LAD." *Ivan v. Cty. of Middlesex*, 595 F. Supp. 2d 425, 463 (D.N.J. 2009) Because Bowie's underlying NJLAD claim for unlawful termination fails, there can be no claim for aiding and abetting against Dezendorf in violation of the NJLAD. Accordingly, Defendants Motion for Summary Judgment as to Bowie's aiding and abetting claim is **GRANTED**.

# IV.   CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is

**GRANTED**.


Date: July 22, 2019                                    */s/ Brian R. Martinotti*_____
                                                       **HON. BRIAN R. MARTINOTTI**
                                                       **UNITED STATES DISTRICT JUDGE**